## Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    HOUSTON DIVISION
 3 MARK FLORA,              )
       Plaintiff,           )
 4                          ) CIVIL ACTION NO.
   VS.                      ) 4:19-CV-2328
 5                          )
   TRANSOCEAN DRILLING (USA),)
 6 INC., et al.,            )
       Defendants.          )
 7
 8 *********************************************************
 9  ORAL AND VIDEOTAPED AND VIDEOCONFERENCED DEPOSITION OF
10          LLOG EXPLORATION OFFSHORE, LLC
11       BY AND THROUGH ITS CORPORATE REPRESENTATIVE
12                    JAMES BASSI
13                   APRIL 7, 2021
14               (Reported Remotely)
15 *********************************************************
16   ORAL AND VIDEOTAPED AND VIDEOCONFERENCED DEPOSITION
17 OF LLOG EXPLORATION OFFSHORE, LLC, BY AND THROUGH ITS
18 CORPORATE REPRESENTATIVE, JAMES BASSI, produced as a
19 witness at the instance of the Plaintiff, and duly
20 sworn, was taken in the above-styled and numbered cause
21 on the 7th day of April, 2021, from 10:09 a.m. to
22 2:30 p.m., before Trisha Myler, CSR in and for the State
23 of Texas, reported by machine shorthand, with the
24 witness located at the offices of LLOG Exploration
25 Offshore in Covington, Louisiana, pursuant to the
```

## Page 2

```
 1 Federal Rules of Civil Procedure, the Thirty-Sixth
 2 Emergency Order Regarding the COVID-19 State of
 3 Disaster, and the provisions stated on the record or
 4 attached hereto.
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1              A P P E A R A N C E S
 2
 3 FOR THE PLAINTIFF, MARK FLORA:
 4     Mr. Daniel E. Sheppard (By Zoom Videoconference)
       MORROW & SHEPPARD, LLP
 5     5151 San Felipe Street, Suite 100
       Houston, Texas 77056
 6     Phone: (713) 489-1206
       Email: dsheppard@morrowsheppard.com
 7
 8 FOR THE DEFENDANTS GULF LOGISTICS, LLC, AND GULF
   LOGISTICS OPERATING:
 9
       Mr. Alan J. Meche (By Zoom Videoconference)
10     ALLEN & GOOCH
       2000 Kaliste Saloom Road, Suite 400
11     Lafayette, Louisiana 70508
       Phone: (337) 291-1000
12     Email: alanmeche@allengooch.com
13
   FOR THE DEFENDANT GRAND ISLE SHIPYARD, LLC:
14
       Ms. Melanie G. Fordyce (By Zoom Videoconference)
15     BROWN SIMS
       1177 West Loop South, Tenth Floor
16     Houston, Texas 77027
       Phone: (713) 629-1580
17     Email: mfordyce@brownsims.com
18
   ALSO PRESENT:
19
       Mr. Mike Flores, Videographer (By Zoom
20     Videoconference)
21
22
23
24
25
```

## Page 4

```
 1                     INDEX
 2                                              PAGE
 3 Appearances ..........................................2
 4 JAMES BASSI
 5   Examination by Mr. Sheppard ......................6
 6   Examination by Ms. Fordyce ......................80
 7   Examination by Mr. Meche ........................86
 8   Further Examination by Mr. Sheppard ............101
 9   Further Examination by Ms. Fordyce .............108
10 Signature Page .....................................110
11 Court Reporter's Certificate .......................112
12                   EXHIBITS
13 NO.  DESCRIPTION                              PAGE
14 1    Plaintiff's First Amended Notice of Oral .........6
        and Videotaped Deposition of LLOG
15      Exploration Offshore, LLC's Corporate
        Representative
16 2    Mr. Sepulvado' LinkedIn page ....................30
   3    John Friesenhahn's Facebook page ................34
17 4    Manifest, Bates Nos. GLO-LLOG 442 - 443 .........35
   5    Quote from Mike Vercher in Buckskin .............42
18      magazine, found on PDF Page No. 37
        (Page 35 of the magazine), in the
19      link:
        https://ridgewoodenergy.com/news/2157.p
20      df
21
22
23
24
25
```



Exhibit C

Page 5

1       P R O C E E D I N G S :

2       THE VIDEOGRAPHER:  Today's date is
3 April 7th, 2021.  The time is approximately 10:09 a.m.
4 We're now on the record.  Beginning of Tape 1.

5       THE REPORTER:  This deposition of Mike
6 [sic] Bassi, the Corporate Representative of LLOG
7 Exploration Offshore, LLC, is being conducted remotely
8 via LegalView.

9       The witness is located at LLOG Exploration
10 Offshore in Covington, Louisiana.  My name is Trisha
11 Myler, Texas CSR No. 3465.  The videographer is Mike
12 Flores.

13      And will all counsel please state their
14 appearances and whom they represent for the record.

15      MR. SHEPPARD:  Daniel Sheppard for the
16 plaintiff.

17      MR. MECHE:  Alan Meche for LLOG
18 Exploration Offshore and the Gulf Logistics defendants.

19      MS. FORDYCE:  Melanie Fordyce for Grand
20 Isle Shipyard, LLC.

**21      THE WITNESS:  And my name is James Bassi,**
**22 not Mike Bassi.  You said "Mike."  I'm sorry.**

23      THE REPORTER:  I apologize.

24

25

Page 6

1       JAMES BASSI,

2 having been first duly sworn, testified as follows:

3       EXAMINATION

4 BY MR. SHEPPARD:

5   Q.  Could you state your name for the record, sir?

**6   A.  Yes.  My name is James Bassi.**

7   Q.  Okay.  And, Mr. Bassi, who do you work for?

**8   A.  I work for LLOG Exploration Company.**

9   Q.  And what's your job title?

**10   A.   My job title is the chief risk officer and**
**11 chief accounting officer for LLOG Exploration Company.**

12   Q.  Okay.  Do you understand that you are here to
13 give binding testimony on behalf of LLOG?

**14   A.  Yes.  I received a notice of deposition and the**
**15 20 items that you wish to discuss.**

16   Q.  Okay.  Are you here to offer testimony on all
17 those items?

**18   A.  Yes, I believe so.**

19      (Exhibit 1 introduced)

20   Q.  (BY MR. SHEPPARD)  Okay.  I'm going to mark as
21 Exhibit 1 to your deposition a copy of the deposition
22 notice.  Do you happen to have one in front of you?

**23   A.  I do.**

24   Q.  Okay.  I'm not going to ask you anything about
25 it right now.  I just -- once we get to it, I might -- I

Page 7

1 might touch on it.  I just didn't know if I needed to
2 put it up on the screen or if you had one with you.

3   Q.  Okay.  Have you ever given a deposition before,
4 sir?

**5   A.  Yes.**

6   Q.  Could you estimate how many times you've given
7 a deposition?

**8   A.  Probably five.**

9   Q.  Okay.  Have they been for personal injury
10 matters or something else?

**11   A.  Something else.**

12   Q.  Okay.  Are you generally familiar with the
13 rules?

**14   A.  Yes.**

15   Q.  Okay.  I'll just touch base on a few of them.
16 One is -- and you're doing a great job of it -- give
17 verbal answers, "yes" and "no," instead of nodding your
18 head, because the court reporter ain't going to be able
19 to pick that up.  So if you -- if you -- or also, don't
20 say "uh-huh" and "huh-uh," because those are hard to put
21 down in writing.  If you do that, I'll say, "Is that a
22 yes, or is that a no?"  It's not me fussing at you.
23 It's just so that I have a clear record.

24      If I ask you a question and you don't
25 understand it, let me know.  We'll work on it, fix it,

Page 8

1 so that you understand exactly what I'm asking.  Is that
2 a -- is that -- is that fair for us to do?

**3   A.  Yes.**

4   Q.  Okay.  And if you answer a question, is it fair
5 for me to assume that you understood what I asked?

**6   A.  Yes.**

7   Q.  Okay.  Also, you're doing a good job at it.
8 It'll help your lawyer.  Take a beat after I ask a
9 question, a second, a moment.  It'll let him make an
10 objection if he needs to.

11      If I use a word that you don't understand, let
12 me know, and we will work on it and fix it so that you
13 understand what I'm asking.  If we do all those things,
14 is that a fair way to get at your truth, or is there any
15 way that I can make this fair for you?

**16   A.  I'm okay with what you just said.**

17   Q.  Okay.  If you need a break at any time, let me
18 know, and we'll do it.

**19   A.  Thank you.**

20   Q.  Okay.  And there's going to be some questions
21 that I'm asking you, just so that we're clear.  I'm not
22 going to ask you about content that you -- of
23 discussions that you've had with your lawyers.  You
24 don't have to answer that.  So if I'm asking a question,
25 just assume with me that I'm not asking you to tell me



Page 9

1 what Mr. Meche was speaking to you about.

2     But in that vein, have you had the opportunity

3 to meet with Mr. Meche or any of your lawyers?

4   **A. Yes, I have.**

5   Q. Okay. Did you meet with them today?

6   **A. Yes.**

7   Q. About how long did you meet with your lawyers

8 today?

9   **A. Two hours.**

10   Q. Okay. So, starting about 8 o'clock?

11   **A. Yes.**

12   Q. Did you meet with your lawyers prior to today

13 to -- in preparation for this deposition?

14   **A. Yes.**

15   Q. When did you meet with them?

16   **A. I met with them in person yesterday for about**

17 **three or four hours, and then we had a couple of**

18 **telephone conversations, and they were deciding on who**

19 **to use as the -- as the witness for LLOG.**

20   Q. So did you draw the short straw or the black

21 ball?

22   **A. I -- both.**

23   Q. Okay. So there was a document that was turned

24 over today. Is that something that you found while you

25 were preparing for your deposition?

Page 10

1   **A. It was not something that -- that I had in my**

2 **possession, but I had discussed it with our attorney,**

3 **and he happened to have it. We could not locate our**

4 **copy of the insurance.**

5   Q. Okay. Did you -- the results of a -- a letter

6 from GIS, did you happen to see that?

7   **A. I'm not sure I understand the question.**

8   Q. Sure. I'll just show it to you, and you let me

9 know if you've seen this before. Do you see this

10 document on the screen?

11   **A. Apologies. Let me put my glasses on. There we**

12 **go.**

13     **I may have looked at this document. I've**

14 **looked at so many things. I think it looks like a**

15 **contract or a -- or a purchase order.**

16   Q. Okay. This is something that we got -- we got

17 today. I was just wondering if you had -- I was going

18 to get into, is this something that you looked at to

19 prepare for your depo?

20   **A. Not that I can remember.**

21   Q. Okay. What did you review to prepare for your

22 deposition?

23   **A. The documents I looked at were -- were, of**

24 **course, your request for the deposition. I looked at --**

25 **at our answers to -- to, I guess, the claim, us as the**

Page 11

1 **defendant. And I also reviewed the -- the acts of the**

2 **incident reports, primarily from -- from Seadrill, who**

3 **was the drilling contractor. And they listed, like,**

4 **four or five documents on their incident report that --**

5 **that I felt like would have -- that you would want me to**

6 **look at before we had this -- this deposition.**

7     **One was -- I think three of them were for**

8 **individual statements from -- from individuals that were**

9 **directly involved in the incident. One was a report**

10 **that I looked at that our -- our contractor -- our**

11 **safety person that we contracted that was on the rig --**

12 **the report that he prepared for LLOG. And then I**

13 **believe there was a Gulf Logistics report on the**

14 **incident.**

15     **That's -- I did review that certificate of**

16 **insurance that was sent to me yesterday or late**

17 **yesterday evening. And then I -- I had some discussion**

18 **with -- with some of our operational people to kind of**

19 **get prepared for some of the -- some of the items that**

20 **you wanted to talk about.**

21   Q. Okay. Who -- what operational folks did you

22 speak with?

23   **A. You know, I looked at -- I talked to some of**

24 **the people in the logistics group, and I also talked to**

25 **our -- our head of drilling at LLOG.**

Page 12

1   Q. Do you know the names of the folks in the

2 logistics group that you spoke to?

3   **A. Yes, yes. I talked to David Guidry. David**

4 **manages our boats and helicopters. And I talked to**

5 **Steve Stegeman, who is our head of our drilling group**

6 **here at LLOG in the office.**

7   Q. Okay. Was -- was David Guidry the only person

8 in the logistics group that you spoke with?

9   **A. Yes.**

10   Q. What did you and David Guidry talk about?

11   **A. Well, I asked him who -- who was Gulf**

12 **Logistics, who was GIS, and just to familiarize myself**

13 **with the contractors that -- that we had hired to**

14 **perform this task.**

15   Q. Okay. Which contractors does LLOG say that

16 they've hired for this task?

17   **A. Well, I think -- I think I know. We used Gulf**

18 **Island Shipyard for -- for handling our -- our transfer**

19 **from the shore to the boats. And we -- we hired our**

20 **contractor, Gulf Logistics, to -- and -- and I think**

21 **there's -- there's a Gulf Logistics Operating, which I**

22 **believe performs the task. And I'm not exactly sure**

23 **how -- how that corporation is set up. But we hired**

24 **them to -- to transfer some materials from the shore to**

25 **the rig.**



Page 13

1    Q.   And then how long -- I'll get to this in a
2 little bit.  But -- we'll leave that there for -- for
3 now.
4        Is there anything else that you spoke to David
5 Guidry about?
6    A.   No, no.  That's what we -- what I spoke to him
7 about.
8    Q.   Okay.  About how long was your conversation
9 with Mr. Guidry?
10   A.   Probably 10 or 15 minutes.
11   Q.   Okay.  And you also say that you spoke with --
12 is it Steve Stegeman?
13   A.   Yes.
14   Q.   Okay.  And he's the head of drilling?
15   A.   Yes, at LLOG Exploration.
16   Q.   Okay.  And what -- what is -- I have an idea of
17 what that is, but can you explain to us what the head of
18 drilling for -- for LLOG does?
19   A.   Yeah.  He -- he manages the plan that we --
20 that we deliver to our contractors offshore.  LLOG is
21 set up like every other oil and gas exploration company
22 that I know of in the Gulf of Mexico -- is that we have
23 an office staffed with scientists and -- and drilling
24 engineers and construction engineers and production
25 engineers that actually come up with the ideas of where

Page 14

1 to drill, what to find, or what we think we're going to
2 find, and -- and design the -- the casing design, design
3 the well plan, provide all the information to the
4 regular authorities to get the permits.
5        And then -- and then LLOG does not actually
6 have the expertise to -- in-house -- to go and -- and
7 execute that plan.  So we hire just about -- in fact, I
8 think everything we do offshore we hire offshore
9 contractors to do.
10   Q.   Okay.  One of -- so the West Neptune that's
11 the -- that's the drill ship that was out there in the
12 gulf that was picking up the CONEX box, right?
13   A.   Yes, sir.
14   Q.   Okay.  And West Neptune, did you guys -- I know
15 there's charting agreements that people have with
16 vessels and boats.  Did y'all become the charter of the
17 vessels?  You had control over it?
18        MR. MECHE:  Objection.  Form.
19        You can answer.
20   A.   We have a drilling contract with the -- with
21 Seadrill, who is the owner of the West Neptune, and they
22 are tasked with -- and in general terms, they are tasked
23 with executing the plan that we provide for them to
24 drill the well.
25   Q.   (BY MR. SHEPPARD)  Okay.  Did you look at any

Page 15

1 deposition transcripts or anything like that?
2    A.   I did not look at a specific deposition or --
3 or prior deposition related to this incident, but I
4 did -- I did review some materials that our -- that our
5 attorney provided that gave me some summary information
6 from -- from a couple of -- from one deposition.
7    Q.   Okay.
8    A.   I apologize if I'm wandering.  I don't know
9 what to look at.
10   Q.   Wherever you want.  You can look at the camera.
11 You can look at the TV.
12   A.   I'm looking at the camera.  It's hard to hear
13 your voice coming from a different direction.
14   Q.   You can look at -- look at your watch and look
15 really frustrated, however you want to handle it.
16   A.   I'm already there.
17   Q.   Okay.  So I kind of want to get back to you a
18 little bit.  What does the chief risk and accounting
19 officer for LLOG do?
20   A.   You know, when we decided who to -- who to put
21 forth on this -- on this deposition, one of the things
22 we looked for was people that had a general knowledge of
23 everything that LLOG does.  I've been with the company
24 now -- I've been in the oil and gas business for --
25 for -- or attached to the oil and gas business for about

Page 16

1 45 years now.  I've been with LLOG almost 18 years
2 and -- and, you know, kind of ridden the wave of LLOG
3 kind of going from a small company to the company we are
4 today, you know, a still small company, but not -- not a
5 shelf company.  We're primarily in the deep water.
6        The chief risk officer is, in our context -- is
7 a -- basically what I do is manage the insurance.  And
8 one of the reasons that that title fell on to me was
9 because I understand, you know, where our -- our
10 operations are, where our wells are, and, you know, have
11 managed that process now for the -- for the last 18
12 years for LLOG.  It became a more important job after
13 the hurricanes when we tried to find out where all the
14 damage was.
15        The chief accounting officer -- my role as
16 chief accounting officer has -- we have hired some --
17 some pretty qualified individuals that -- so right now,
18 all I do on the finance side and the accounting side is
19 to -- is to be consulted on problems.  I have ultimate
20 responsibility for the financial statements, but -- but
21 we have some -- some CPAs on staff that -- that manage
22 that process.  And as a private company, it's not
23 that -- we don't have regulatory authorities looking
24 over our shoulders like a public company would have.
25        So that's generally what I do.  And I also -- I



1 manage -- one of my primary tasks lately has been, in
2 the last few years -- is managing issues that come up
3 between us and our -- our -- our working interest
4 partners in a particular lease.
5   Q.  Okay.  Do you have that proposal to Grand Isle
6 Shipyard that I popped up on the screen a little while
7 ago?
8   A.  I -- I don't -- I don't remember seeing that.
9        MR. MECHE:  I have a copy.  Daniel, do you
10 want me to hand him a copy?
11        MR. SHEPPARD:  If it's easier for him.  I
12 don't know if it's easier for the screen or the copy.  I
13 don't know.  Sometimes people have a harder --
14        MR. MECHE:  If you'll put it up on the
15 screen, I'll see it.
16        MR. SHEPPARD:  Okay.  That works for me.
17   Q.  (BY MR. SHEPPARD)  Let's see.  Actually, sorry.
18 I'm getting ahead of myself a little bit.
19      Aside from the -- the incident report that --
20 that LLOG provided to us, are there any other written
21 statements concerning the incident?
22   A.  Well, you're -- I did name, I think, four or
23 five different incident reports.  Collectively, I assume
24 that's what you're talking about.
25   Q.  Right.

1   A.  Those -- yeah.
2   Q.  Sorry.
3   A.  Those are what I looked at, primarily, to get
4 an understanding of what -- what this case is about.
5   Q.  Gotcha.
6      I'll show you what I'm -- what I'm talking
7 about.  So we were given this -- this LLOG incident
8 reporting program document.  And it's Bates GLO 266
9 through 272.  And in it, it has a, you know,
10 supervisor's first report of incident, personnel
11 injury/illness report.  It has a facility name.  It has
12 an incident description.  And it has the name of the
13 person who's filling out the report, Mr. Scott
14 Sepulvado.  And it also seems to be signed by Wilson
15 Walley.  This was for the incident on May 25th, 2017,
16 involving the plaintiff.  And that's what I'll refer to
17 as the incident.
18      Does -- were there any other reports that --
19 that LLOG created as a result of this incident?
20   A.  Not that I'm aware of.
21   Q.  Okay.
22        MR. MECHE:  Daniel --
23        MR. SHEPPARD:  Yes, sir.
24        MR. MECHE:  Okay.  You cut out a little
25 bit.  Can you -- can you tell me what your last question

1 was?
2        MR. SHEPPARD:  Sure.
3   Q.  (BY MR. SHEPPARD)  I was showing you that
4 document, because it's an incident report that we got
5 from LLOG.  I was wondering if there's any other
6 statements from LLOG or any other reports from LLOG that
7 we don't have.
8   A.  I --
9        MR. MECHE:  Let me just object to the
10 form.  Go ahead, sir.
11   A.  Yeah.  Let me -- let me correct my answer also.
12 That document was created by a -- a contractor of LLOG,
13 not -- not by LLOG itself.
14   Q.  (BY MR. SHEPPARD)  Okay.  It's -- it's a LLOG
15 document, right?
16   A.  Yes.
17   Q.  LLOG retains this document, right?
18   A.  Yes.
19   Q.  Are there any other reports or statements that
20 LLOG has retained that relate to this incident?
21   A.  Not that I'm aware of.
22   Q.  Okay.  Does LLOG have any safety manuals or a
23 safety management system related to the work involved
24 with exploration and -- and obtaining petroleum products
25 in the outer Continental Shelf?

1   A.  Yes, we do.
2   Q.  What sort of manual does LLOG have?
3   A.  It's -- it's -- it's a regulatory document that
4 we have that -- that I guess summarizes, and in great
5 detail, everything that we do in the Gulf of Mexico.
6 From a regulatory standpoint, it's called our SEMS
7 manual.  It's Safety and Environmental Management
8 Systems.
9   Q.  Gotcha.
10      And the SEMS manual, does it outline the LLOG's
11 duties and obligations that they -- that they undertook
12 to do?
13   A.  From a regulatory standpoint, yes.
14   Q.  Okay.  Because I'll probably ask for those.
15      But if the -- if I see something in the manual
16 that says this is something that LLOG is -- that LLOG
17 does and this is something that they require people to
18 do, I can trust that to be an accurate statement, right?
19        MR. MECHE:  Objection.  Form.
20   A.  Well, I will tell you that -- that we rely on
21 our contractors' safety systems and management systems
22 to -- to perform the work that we require to be done,
23 that we contract for them to do.  In some cases, LLOG's
24 SEMS manual does not come into play for certain tasks.
25 So it's my understanding of that's how it works.

1   Q.  (BY MR. SHEPPARD)  Okay.  But if there's
2 something in LLOG's SEMS manual that relates to work
3 that was being done at the time of this incident, that
4 would apply, wouldn't it?
5        MR. MECHE:  Objection.  Form.
6   A.  Well, you know, I -- I think your -- there's a
7 reasonable answer.  But, yes, that's true.  However,
8 your -- to be more specific, from the incident involved,
9 I don't believe LLOG's manual was -- was -- was the --
10 was the pertinent manual -- safety manual.  That's --
11        MR. SHEPPARD:  Object to everything after
12 "yes" as -- I'm sorry.  I didn't mean to interrupt you.
13        THE WITNESS:  Yeah.
14        MR. SHEPPARD:  Object to everything after
15 "yes" as nonresponsive.
16   Q.  (BY MR. SHEPPARD)  Other than the SEMS manual,
17 is there any other manual --
18   A.  No.
19   Q.  -- that would relate to the work going on in
20 the shelf and the drilling operations going on out
21 there?
22   A.  Not that I'm aware of.
23   Q.  Okay.  Does LLOG have rules that it seeks to
24 enforce against the folks that it hires to do work?
25   A.  We hire contractors to perform a task.  You

1 know, we can't give them direction -- or we don't give
2 them direction.  We ask -- we develop a plan, and we ask
3 them to execute that plan.  Those are the people that
4 have the expertise in -- in handling the tasks that we
5 contract for.
6        You know, we don't have rules and regulations
7 on how they do their work, because we don't -- we're
8 not -- for instance, in this situation, there's a boat
9 company involved, you know.  We -- we're not experts in
10 what -- what the boat's rules and regulations are of how
11 to operate a boat, of how to, you know, load a boat,
12 those kind of things.  You know, those things are left
13 to our contractors.  We don't -- we don't actually have
14 people that do that.
15   Q.  Okay.  Okay.  I've got this website pulled up,
16 and I'll show it to you.  It's from offshoremag.com.
17 I'm going to try to make it big so you can see it.  Let
18 me know if there's anything I need to change.  Do you
19 see the paragraph that I'm highlighting?
20   A.  Yes, sir.
21   Q.  Okay.  So this says that -- that LLOG is going
22 to utilize the West Neptune to complete some of LLOG's
23 wells, correct?
24   A.  That's correct.
25   Q.  Okay.  So is LLOG able to tell the -- the West

1 Neptune where to go, where to drill, and what to do?
2        MR. MECHE:  Objection.  Form.
3   A.  The way -- the way it works is we contract a
4 rig to -- we develop a plan, and the plan determines
5 where we drill, how we drill, as far as the depth and --
6 and the casing plan and the drilling plan for how to
7 come -- that's blessed by the -- by the federal
8 government, because these are federal leases.
9        And so once the well plan is -- is -- is
10 completed, the -- the -- the government blesses it and
11 then provides -- we provide that plan to the drilling
12 rig, to our contractor, and then our contractor executes
13 that plan.
14   Q.  (BY MR. SHEPPARD)  Okay.
15   A.  We -- we don't tell them how to drill.  We tell
16 them -- we give them a plan, and they execute the plan.
17   Q.  Okay.  So LLOG comes up with a plan, right?
18   A.  Yes.
19   Q.  And that plan is going to say, "We need to
20 drill in this area.  We want to go exploring here,"
21 right?
22   A.  Yes.
23   Q.  And then LLOG hands that plan over to the
24 contractor, which is telling them to go to that area and
25 drill in that area, right?

1   A.  Correct, yes.
2   Q.  Okay.  If LLOG wanted to, they could tell
3 the -- they could tell the ship to go to somewhere else
4 and drill there, right?
5   A.  That's correct.  But that would change the
6 plan, which -- which has to be approved by the -- by the
7 federal government, by the regulatory authorities.
8   Q.  Okay.  Assuming that the plans are getting
9 approved, you could tell the ship, "I need you to go
10 over here now," right?
11   A.  Theoretically, yes.
12   Q.  Okay.  And if the -- the folks that you had
13 going out there and doing the drilling, if you didn't
14 like how they were doing it, you could tell them to do
15 it a different way.  You could say, "This is what the
16 plan says.  You need to do it this way," right?
17        MR. MECHE:  Objection.  Form.
18   A.  Would you -- would you repeat that question?
19   Q.  (BY MR. SHEPPARD)  Sure.
20        As part of the plan, if you don't like what
21 the -- the contractors are doing, how they're drilling,
22 the work they're performing, you can tell the
23 contractor, "Hey, you need to do it this way," correct?
24        MR. MECHE:  Hold on.
25        Are you finished with your question,



Page 25

1 Daniel?

2      MR. SHEPPARD: I am.

3      MR. MECHE: Okay. Sorry. There's a

4 little bit of a delay.

5      Objection. Form.

6    A. I disagree with that statement to the extent

7 that -- that what we do is we have people that monitor

8 on board, usually a company man that -- and he could

9 either be an employee or a contractor -- that monitor

10 the plan and monitor what the -- what the contractor --

11 in this case, Seadrill -- is doing on how they're

12 executing our plan.

13      Everyone on board has stop work authority. If

14 they want to -- if they see something that's unsafe, if

15 they want to -- you know, if they have a question about

16 something, you know, then they should -- they should

17 stop what we're doing. Everyone would get together.

18 The contractor and LLOG, who's the customer, would get

19 together, and they would review the plan and either

20 change the plan or keep going in that direction.

21      It's -- it's -- it's not as simple. These are

22 very complicated operations. We do not give direction

23 to Seadrill on how to perform their tasks.

24      MR. SHEPPARD: Okay. Object to the

25 nonresponsive portions.

Page 26

1    Q. (BY MR. SHEPPARD) You mentioned that you put a

2 company man on board the vessel, correct?

3    A. Yes.

4    Q. And he has the authority to act on behalf of

5 LLOG?

6    A. Yes, he does.

7    Q. Okay. And you said that the company man, he

8 would have the -- that LLOG puts aboard a vessel has the

9 authority to stop the work, as well as everyone else,

10 right?

11    A. Yes.

12    Q. The company man has the right to tell all the

13 contractors aboard the vessel -- and in this case, the

14 West Neptune -- that they need to stop what they're

15 doing and they need to do something -- they need to stop

16 what they're doing, correct?

17      MR. MECHE: Objection. Form.

18    A. Everyone on board has the ability to stop work

19 if they sense or see an unsafe working condition. Our

20 company man is there to execute or to -- to monitor the

21 execution of the plan by the contractor. Primarily,

22 what his responsibilities are are just to work on the

23 downhole issues, because that's what we're interested

24 in. We're interested in the results. We're interested

25 in getting a well drilled.

Page 27

1      How Seadrill maintains their rig, how Seadrill

2 accepts things on the rig, equipment on and off, how

3 they operate their equipment is -- is not our concern.

4 What our concern is -- is -- is the results that we get

5 from them drilling the downhole. And that's the purpose

6 of the company man -- is to -- to monitor that plan.

7 The plan is associated with drilling the well.

8      MR. SHEPPARD: Okay. Object as

9 nonresponsive.

10    Q. (BY MR. SHEPPARD) We -- you've testified that

11 the company man has the right to stop the work that's

12 taking place on -- on the Seadrill, right?

13    A. Every person on the rig, including the company

14 man, has the right to stop the work.

15    Q. So if the company man saw something that he

16 thought was unsafe, he should have stopped the work too,

17 correct?

18    A. That's correct.

19    Q. Okay. Where does the company man -- does he

20 sit inside the vessel somewhere, or is he walking around

21 the deck?

22    A. I don't know the answer to that question.

23    Q. What was the name of the company man that was

24 on the West Neptune on May 25th, 2017?

25    A. It's my understanding that -- that he was -- it

Page 28

1 was Wilson Walley -- is who was listed on the report, on

2 the incident report that you showed me earlier.

3    Q. If Wilson Walley is the company man for LLOG,

4 why is someone else filling out one of LLOG's reports?

5    A. We have an HSE contractor, Scott Sepulvado. I

6 can't pronounce his name, as you can't either. But

7 he -- I know. I thought yours was better than mine,

8 though.

9      At the end of the day, that's -- that's who --

10 our HSE person has to -- has to generate one of these

11 reports. And we have to turn it in to our regulatory

12 authorities, to BOEM.

13    Q. Okay. And -- and LLOG hired Scott Sepulvado to

14 perform the HSE tasks on board the -- on board the West

15 Neptune?

16    A. No. We hired him to monitor the plan and --

17 and take care of any incidences related to LLOG, to the

18 work LLOG was doing or -- or to the people that LLOG had

19 contracted on board. I believe that Seadrill has their

20 own HSE people on there that actually monitor the people

21 that work for them.

22    Q. Okay. And Mr. Sepulvado, he works for LLOG?

23    A. He's a contractor for LLOG, yes.

24    Q. Okay. Are you aware that he holds himself out

25 as being an employee of LLOG?



1          MR. MECHE:  Objection.  Form.

**2     A.  I have no knowledge of that.  I -- I would**

**3 assume he knows who he works for.**

4     Q.  (BY MR. SHEPPARD)  Okay.  I'll show you an

5 image that I've taken from his LinkedIn page.  Does that

6 look like Mr. Scott Sepulvado?

**7     A.  I don't know.  I've never met Mr. Sepulvado.**

8     Q.  Okay.  Could you read what it says is his job

9 title?

10          MR. MECHE:  Hold on.

11          Daniel, can you scroll down where the top

12 of that is cut off?

13          MR. SHEPPARD:  Sure.  I'll zoom out.

14          Can you see it?

15          MR. MECHE:  Yes.

16    Q.  (BY MR. SHEPPARD)  Could you read his job

17 title?

**18    A.  SEMS/HSE Manager D&C at LLOG Exploration**

**19 Company.**

20    Q.  Okay.  And the SEMS is the Safety Environmental

21 Management System, right?

**22    A.  Yes.**

23    Q.  HSE is Health Safety Environment?

**24    A.  Yes.**

25    Q.  Correct?  What's D&C?  Do you know?

**1     A.  Drilling and Completion.**

2     Q.  And it says -- at least he's representing that

3 he works at LLOG, correct?

4          MR. MECHE:  Objection.  Form.

**5     A.  It appears that's what he's saying there.**

6     Q.  (BY MR. SHEPPARD)  Okay.  Is that -- I'll --

7 I'll ask the question differently.

8          This -- this LinkedIn -- this image from

9 LinkedIn says that Mr. Sepulvado works for LLOG?

10          MR. MECHE:  Objection.  Form.

**11    A.  No.  I think -- I think that what he says on**

**12 there speaks for itself.  I -- you know --**

13    Q.  (BY MR. SHEPPARD)  Is that what this says, sir?

14          MR. MECHE:  Objection.  Form.

**15    A.  It appears that way, yes.**

16    Q.  (BY MR. SHEPPARD)  Okay.

17          MR. MECHE:  Daniel --

18          MR. SHEPPARD:  I'll mark this -- just let

19 me finish.

20          I'll mark this as Exhibit 2.

21          (Exhibit 2 introduced)

22          MR. MECHE:  Thank you.

23          MR. SHEPPARD:  Anything -- sorry.  I

24 didn't mean to interrupt you.  Anything you need, Alan?

25          MR. MECHE:  No.  I wanted to ask if you

1 were going to mark that before you let it go so we

2 wouldn't have to dig it out later.

3          MR. SHEPPARD:  Yeah.  No problem.

4          MR. MECHE:  Thank you.

5          MR. SHEPPARD:  Probably, just to make it

6 easier, I'll do, like, a -- see if I can print the web

7 page so that you'll have the link and stuff like that in

8 there as well.

9          Can we take a quick break?  I'm sorry.

10 I'm getting -- I have a frantic phone call, and I'm

11 concerned it might be a emergency.  Could we take a

12 five-minute break?

13          MR. MECHE:  Absolutely.  I need -- we need

14 to break -- a bathroom break here anyway.

15          MR. SHEPPARD:  Thank you very much.

16          THE VIDEOGRAPHER:  Off the record at

17 10:47 a.m.

18          (Recess from 10:47 a.m. to 11:03 a.m.)

19          THE VIDEOGRAPHER:  Back on the record.

20 11:03 a.m.  Tape 2.

21    Q.  (BY MR. SHEPPARD)  All right.  We have just

22 taken a little break, Mr. Bassi.  Have you had the

23 opportunity to speak to your lawyer about anything?

**24    A.  Yes.**

25    Q.  Did you speak with your lawyer during the

1 break?

**2     A.  Yes.**

3     Q.  Are there any answers that you would like to

4 change now?

**5     A.  No.**

6     Q.  Okay.  One of the documents that I was provided

7 was a cargo manifest that I'm going to pull up for you.

8 Could you describe how this document is created?

9          MR. MECHE:  Objection.  Form.

**10    A.  I don't have knowledge of how this document is**

**11 created.**

12    Q.  (BY MR. SHEPPARD)  Okay.  Do you know the --

13 what the purpose of this document is?

**14    A.  No, sir, I don't.**

15    Q.  Okay.  Is there anyone at the company that

16 would know?

**17    A.  I'm sure there would be.**

18    Q.  Do you know who would know?

**19    A.  I would assume that David Guidry, who is our**

**20 logistics manager, would know.**

21    Q.  Okay.

**22    A.  I'm not familiar with every form that we use.**

23    Q.  Right.

**24    A.  I've never seen this form before.**

25    Q.  Okay.  Have you ever seen a cargo manifest

Page 33

1 before?

2    A.   Yes.

3    Q.   Is this a LLOG cargo manifest?

4    A.   It says it is.

5    Q.   Does this look like other cargo manifests for
6 LLOG that you've seen in the past?

7    A.   I've never seen a cargo manifest for LLOG.
8 This is the first one I'm looking at.

9    Q.   Do you know what a cargo -- the purpose of a --
10 what the purpose is for a cargo manifest?

11    A.   I think the purpose of a cargo manifest is to
12 list the items of materials that are going to be shipped
13 somewhere or provided to some location.

14    Q.   Do you know who John Friesenhahn/Bubba is?

15    A.   No, sir, I don't.

16    Q.   Okay.  I've gone to what I think is
17 Mr. Friesenhahn's Facebook page.  I've done that before.
18 Can you see this image that I've -- on your screen?

19    A.   Yes, sir.

20    Q.   Do you recognize that person?

21    A.   I may have seen him before.

22    Q.   Okay.  I realize -- sorry.  On his work and
23 education on his Facebook page, it says he's LLOG's
24 deepwater logistics coordinator at EPS.  Do you know
25 what EPS is?

Page 34

1    A.   No, sir, I don't.

2    Q.   Okay.  If that's a correct -- is there a way to
3 determine if he's a LLOG employee?

4    A.   Yes.  I would have to go and check with our
5 payroll group.

6    Q.   Okay.

7         MR. MECHE:  Daniel, can you mark that
8 document or make it available to mark later?

9         MR. SHEPPARD:  Sure.  What I'm going to do
10 is I'm going to right now --

11         MR. MECHE:  Thank you.

12         MR. SHEPPARD:  -- print -- I'm going to
13 print this to a PDF, and it'll look a little different
14 than it did on the screen just because of how it prints.
15 But I will email that out to everyone after the
16 deposition.

17         (Exhibit 3 introduced)

18         MR. MECHE:  Okay.  Are we going to mark
19 that as Exhibit 3?

20         MR. SHEPPARD:  And I'll mark it as
21 Exhibit 3, yeah.

22         MR. MECHE:  Thank you.

23    Q.   (BY MR. SHEPPARD)  So when these cargo
24 manifests are created, it appears that it itemizes the
25 materials that are going to be transported by LLOG from

Page 35

1 GIS's dock in Port Fourchon onto the -- onto the West
2 Neptune.  Is that fair?

3    A.   It's what it appears to me, yes.

4    Q.   Okay.  And when LLOG is -- how does LLOG know
5 what materials need to be sent over to the West Neptune?

6    A.   The West Neptune, from what I understand -- and
7 it's on that manifest that you just showed -- the
8 customer is Seadrill, so they will order the materials
9 and then will ask us to provide transportation to the
10 rig.  The boat that -- that I believe is on there is on
11 long-term charter for LLOG, and it supports this rig for
12 trips like this.

13    Q.   Okay.  The -- the Maggie A.?  Is that the boat
14 you're talking about?

15    A.   Yes.

16    Q.   Okay.  Why is it that -- that the Seadrill or
17 West Neptune, they're asking LLOG to provide the West
18 Neptune with supplies?

19    A.   I think we're providing transportation.  I
20 think the manifest says that -- that West Neptune or the
21 Seadrill was the customer in this case.  I believe
22 that's what -- what the document said.

23         (Exhibit 4 introduced)

24    Q.   (BY MR. SHEPPARD)  Okay.  And I'll mark the
25 manifest as Exhibit 4.  And for the record, it is

Page 36

1 GLO-LLOG 442 and 443.

2    Q.   Does LLOG participate in JSA or toolbox talks
3 whenever there's operations on the -- on the vessels
4 like the West Neptune?

5    A.   So I'm not sure what a toolbox talk is.  LLOG
6 requires the contractors to hold the JSAs.

7         Like I say, we give them a task.  Their
8 regulatory authorities or their safety programs dictate
9 what they do when they're providing services to LLOG on
10 a contract basis.  You know, LLOG does not direct them.
11 LLOG does not interfere with their work.  We try to --
12 to provide them -- and it's the way most things are
13 handled in the gulf.

14         In fact, like I told you earlier, I don't know
15 of any company that -- that owns its own boats to
16 supply, you know -- to provide transportation to rigs.
17 It's a -- it's called a spread rate, if you will.  And
18 the spread rate is -- is all the things that are
19 necessary to the contractors that we have to cobble
20 together to -- to drill the well.

21    Q.   Okay.  I think it's fair to say not everyone
22 owns the things, but sometimes people charter the
23 vessels or they lease them.  They don't necessarily take
24 ownership of the vessel, but they do charter it and
25 control it, correct?



1    A.  I know --

2            MR. MECHE:  Objection.  Form.

3    A.  -- we don't -- as I say, we hire people to do a

4 task.  They control how they do that task.  We don't --

5 we don't give direction.  We don't -- we don't

6 interfere.  We don't have the expertise in-house to

7 manage these -- these processes.  So -- so what

8 we do is we hire it out.

9    Q.  (BY MR. SHEPPARD) Okay.  And I asked

10 earlier -- I know we were talking about JSAs, and you

11 said that you don't direct them or -- but I was

12 wondering, do -- do the company men for LLOG participate

13 at all in any of the JSAs that are taking place on

14 vessels like the West Neptune?

15           MR. MECHE:  Objection.  Form.

16    A.  It's my understanding that -- that they may --

17 if it involves something that they are responsible for

18 monitoring, they may participate.  I'm not sure they are

19 required.

20    Q.  (BY MR. SHEPPARD) Okay.  If there is an

21 incident that is reportable, does -- does -- does LLOG

22 report those things to BSEE?

23    A.  We have an HSE person on board the rig that --

24 that manages that process for us -- the contractor.  He

25 will report to us and decide whether it's something

1 that -- that our regulatory group needs to pass on to --

2 to BSEE.

3    Q.  Okay.  So you're saying a contractor determines

4 whether or not LLOG needs to make a report to BSEE?

5    A.  LLOG's regulatory group will make the ultimate

6 recommendation.

7    Q.  Okay.  And BSEE stands for Bureau of Safety and

8 Environmental Enforcement, correct?

9    A.  Yes.

10    Q.  Okay.  Did LLOG report this incident to BSEE?

11    A.  Yes.

12    Q.  Okay.  Did BSEE generate an accident

13 investigation report?

14    A.  I am not aware of that.  They may have.  I'm

15 not sure.

16    Q.  Okay.  When -- when LLOG reported this to BSEE,

17 did they complete any paperwork and send it on to the

18 agency?

19    A.  I do know that -- that the report -- that the

20 LLOG incident report is what was passed on to the

21 agency.  I'm not sure if there was additional paperwork

22 that went with it.

23    Q.  Okay.

24    A.  But I can get that for you if you need it.

25    Q.  Sure.  I'd appreciate that.

1        What does it mean to hire a vessel?

2    A.  I have no idea what that -- what that question

3 means.  I mean --

4    Q.  Sure.  I can try to put it in some context.

5    A.  Put it in some context for me.

6    Q.  Sure.  I'd seen some -- some articles that said

7 things like, you know, that LLOG is -- is, you know --

8 hires the -- the drill ship.  LLOG extends the hire of

9 the drill ship, those sorts of things.

10        So if someone were to say, "LLOG hired the West

11 Neptune," what does that mean?

12           MR. MECHE:  Objection.  Form.

13    A.  You know, I think that's a legal question

14 you're asking me.  I'm not an attorney.  But I will tell

15 you that -- that, generally, what I understand is

16 that -- is that we have a contract with that vessel to

17 direct them to perform a task.  And, you know, at the

18 end of the day, they are the ones that are responsible

19 for performing that task and all that goes along with

20 it.

21        I think what -- what you're -- the articles

22 that you're reading are written by people that -- that

23 don't understand the nuances and don't understand the

24 detail and actually provide a simplistic description of

25 what's actually going on.  As we all know, the world is

1 a lot more complicated than that.  And -- and to be

2 honest with you, we're governed by the agreements that

3 we all sign in this industry.

4    Q.  (BY MR. SHEPPARD) Gotcha.

5    A.  I can't answer it any -- any differently than

6 that.  I -- I'm not a lawyer, like I say.  What -- what

7 somebody -- what "hires" means for somebody may mean

8 something different for -- for somebody else.

9    Q.  Would it be fair to say that the agreement

10 between you and -- or between LLOG and -- not the West

11 Neptune but the -- the company who -- I lost my train of

12 thought, so I'm sorry.

13           MR. MECHE:  Seadrill.

14    A.  Seadrill.

15    Q.  (BY MR. SHEPPARD) Thank you.  Would it be fair

16 to say that the agreements between LLOG and Seadrill,

17 any sort of obligations or agreements that are contained

18 in the contracts between the two companies would govern

19 and outline the responsibilities that each company had

20 to one another?

21           MR. MECHE:  Objection.  Form.

22    A.  I -- I'm not sure what -- what you mean by

23 "would it be fair to say."  I think it does govern the

24 actions between the two companies.  At the end of the

25 day, Seadrill is the -- or -- or the owner of the West



1 Neptune, which is Seadrill, is the ultimate authority
2 out there on the -- on the rig. I mean, they -- they
3 trump everyone. So, you know, they are the ones that
4 are responsible.
5    Q. (BY MR. SHEPPARD) Okay. But kind of a point
6 of pride for LLOG is that it develops its own SEMS
7 manual in-house and then speaks to everyone else to see
8 what their SEMS manual says and makes sure that there's
9 no gaps whatever between the SEMS manuals, right?
10    A. That's a fair statement. However, I believe
11 that -- and I think I'm -- I don't know if I'm positive
12 about this, but I believe that -- that the -- that the
13 West Neptune -- we operate under their SEMS or safety
14 manual, because they are the responsible party.
15    Q. Right. But is it -- is it true that LLOG's
16 approach is significantly different than what other
17 companies do? While other companies hire consultants to
18 write their SEMS manual, LLOG writes their own, then
19 compares their plan to others to make sure there are no
20 gaps?
21        MR. MECHE: Objection. Form.
22    A. You know, I don't know where you got that --
23 that -- I think we had -- our SEMS manual is a
24 combination. And we have separate SEMS manuals for
25 different types of work that we do. And I -- I believe,

1 from a regulatory standpoint, I agree that -- that we
2 would be -- we would have to understand the gaps.
3        But -- but here again, at the end of the day,
4 for this task that we're doing, Seadrill is the ultimate
5 authority and -- and is the ultimate responsibility for
6 drilling this well that we've contracted them to do.
7    Q. (BY MR. SHEPPARD) Have you heard of the
8 Buckskin magazine?
9    A. I've heard of our Buckskin field that we --
10 that we're the operator of.
11        (Exhibit 5 introduced)
12    Q. (BY MR. SHEPPARD) Okay. I want to show you
13 something from it. We'll mark it as Exhibit 5,
14 something from Ridgewood Energy. It's a quote from Mike
15 Vercher. He's a VP at LLOG; is that correct?
16    A. That's correct. He's actually a senior vice
17 president.
18    Q. This might have been a little bit -- this looks
19 like it's from, I think, 2019, maybe. Some things have
20 changed. So I wasn't trying to be disrespectful or
21 anything like that. I just saw his title on the --
22 under his photo.
23        MR. MECHE: What year did you say, Daniel?
24 I didn't catch that.
25        MR. SHEPPARD: I thought it was '19 -- let

1 me see. What page am I on? 37. Let's go to the top
2 here. I thought it had a date. I could be wrong,
3 though. I'm not entirely sure. I thought I saw a date.
4 Sorry about that.
5    Q. (BY MR. SHEPPARD) Okay. It appears that
6 Mr. Vercher was quoted saying -- and let me know if I
7 misspeak here -- saying, "Our approach is significantly
8 different than what other companies do, but our safety
9 record is exceptional. While other companies hire
10 consultants to write their SEMS manuals, we write our
11 own, then compare our plan to others to make sure there
12 are no gaps."
13        Did I read that correctly?
14    A. Yes, you did.
15    Q. (BY MR. SHEPPARD) Okay. Is it also fair to
16 say that LLOG's approach is to keep its SEMS manuals
17 relevant, readable, and useful, and direct? After all,
18 the binder is worthless if it's just gathering dust on
19 someone's shelf?
20    A. That's correct.
21    Q. Okay. Would you agree with that statement? Is
22 that one of the -- one of the things that LLOG attempts
23 to do, make its manuals relevant, readable, useful, and
24 direct?
25    A. I would say that Mr. Vercher's description is

1 better than mine.
2    Q. He probably had a bit more time to put this --
3 put his thoughts together when -- for this article.
4        I believe you mentioned that LLOG, you know,
5 hires out for people to perform various tasks. Is it
6 fair to say that LLOG has the ultimate authority on, you
7 know, the companies that are going to be hired to crew
8 the vessel or to perform certain tasks as part of your
9 plan? You would be able to say which company gets to
10 take part in the plan and which company does not,
11 correct?
12    A. So I think there were a number of questions in
13 that sentence.
14    Q. Yeah. I'll -- let me reask it. I'll reask.
15        If LLOG doesn't want a company to work on a
16 project, to be part of its plan, LLOG can make sure that
17 that company's not part of the plan, correct?
18    A. So -- so, stated a different way that you
19 stated, LLOG has a plan and hires the appropriate
20 vendors and contractors to initiate that plan, to --
21 to -- to prosecute that plan. That's the way I would
22 say that. I -- I don't know why we would -- we would
23 look at it from a different direction.
24    Q. Okay. That --
25    A. I'm trying to understand what you're --



Page 45

1    Q.  Sure.

2    **A.  Yeah.**

3    Q.  I'll try to ask it a -- the opposite way.

4        LLOG hired GLO to transport materials from Port

5  Fourchon over to the West Neptune, correct?

6    **A.  Correct.**

7    Q.  And -- and LLOG hired folks to crew and man the

8  West Neptune, correct?

9    **A.  No.  We hired Seadrill to crew and man the West**

10  **Neptune.**

11   Q.  Okay.

12   **A.  Those are Seadrill employees.  Those are not**

13  **LLOG employees.**

14   Q.  Right.

15   **A.  As I stated before, the LLOG employees that**

16  **are -- that are on there are just there to -- to monitor**

17  **and -- and to not interfere with the -- with the work**

18  **that Seadrill's performing.  As I've said before, also,**

19  **Seadrill also has the ultimate authority on the rig;**

20  **LLOG does not.**

21   Q.  LLOG -- LLOG hired the, you know -- hired the

22  West Neptune so that it could perform work, correct?

23   **A.  That's correct.**

24   Q.  Okay.  And then LLOG hired Seadrill to crew and

25  man the vessel, correct?

Page 46

1    **A.  I disagree, but I -- you're blending some**

2  **things here.  LLOG hired or contracted with Seadrill to**

3  **provide a rig and the employees that -- Seadrill**

4  **employees to man that rig and perform the tasks.  They**

5  **own both the equipment and the people -- Seadrill does.**

6    Q.  Okay.  Do the contractual agreements between

7  LLOG and Seadrill require LLOG to provide any sort of

8  maintenance for the West Neptune?

9    **A.  It's my understanding that the maintenance on**

10  **the West Neptune is Seadrill's issue.**

11   Q.  Okay.  Is that something that would be outlined

12  in the contract between LLOG and Seadrill?

13   **A.  I believe it would be, yes.**

14   Q.  Okay.  What other companies did LLOG hire to

15  support the operations that were taking place on the

16  West Neptune?

17   **A.  I didn't realize this was going to be a test**

18  **about the West Neptune.**

19       **We hired -- I do know that GIS, or Gulf Island**

20  **Shipyard, is our -- and Port Fourchon is our -- is where**

21  **we have our logistics space located.  We hired them**

22  **to -- to manage that base for us.  We had several boat**

23  **companies.  The only one I know of is particular to this**

24  **incident.  I didn't go back to look to see who all the**

25  **other contractors were that were on the -- that were**

Page 47

1  providing support or what we call a spread rate to

2  the -- to the drilling rig.

3        And I also don't know -- Seadrill has a number

4  of contractors on the -- on the -- on the rig that

5  performed work for them as -- as part of the overall

6  package.  I can get that information for you at a later

7  date.  Or, you know, if you request it from our

8  attorney, we can provide that information to you.  I

9  only dealt with -- with the contractors that I thought

10  that were relevant to this issue -- this incident.

11   Q.  Okay.  You had said that GIS, you hired them to

12  manage the base for LLOG.  What does that mean?

13   **A.  Well, here again, we don't -- we don't have a**

14  **need or -- a desire to -- to own a shore-based**

15  **facility that -- that would be able to safely conduct**

16  **business and provide support or -- logistically, as you**

17  **can imagine, there are a lot of things moving back and**

18  **forth to the rig on a -- on an almost daily basis.**

19       **And so, you know, we have to have a shore base,**

20  **if you will, where our people and -- and the -- provide**

21  **the -- the transportation.  Even if, say, BSEE wants to**

22  **go out to look at the rig, you know, they have to have a**

23  **point of departure.  I believe that -- and I'm not sure**

24  **if -- I know that boats go out of this GIS location.**

25  **I'm not sure -- the helicopter location may be in the --**

Page 48

1  in Fourchon also, but I think it's changed since then.

2  But at this time, I think everything was out of

3  Fourchon.

4        So as you can imagine, there are a number of --

5  of needs for transportation to and from the rig, and we

6  have to have a central place to -- to -- for everyone

7  to -- and especially when Seadrill has a crew change,

8  they -- I would assume that they would go out of the

9  same -- same location.

10   Q.  Okay.  Is one of the things that you hired GIS

11  to do, would it be to load the boats that were providing

12  support to the West Neptune?

13   **A.  Yes.  I think that -- that we -- we require**

14  **Seadrill to -- I mean, excuse me -- we require GIS to,**

15  **as a contractor, to perform the tasks that's necessary**

16  **to -- to load those boats.**

17   Q.  Okay.  So it would have been GIS personnel

18  using the cranes to load the CONEX boxes on the -- on

19  the Maggie A.?

20   **A.  That is my understanding, yes.**

21       MS. FORDYCE:  Objection.  Form.

22       MR. MECHE:  That was the lawyer for GIS.

23       **THE WITNESS:  Okay.**

24   Q.  (BY MR. SHEPPARD)  What do you base that

25  understanding on?



1   A.  I did -- did have a -- when I was asking David
2 Guidry -- as I discussed earlier, I was just
3 explaining -- I said, "Who would -- who would -- who
4 would load the -- load the boat?  Would GIS be loading
5 the boat?"  And he said, "Yes."
6   Q.  Okay.
7   A.  Excuse me.  "Would provide the crane to load
8 the boat at the direction of the boat company."
9   Q.  Okay.  And did he -- did he also mention that
10 GIS would be the ones performing -- performing the
11 operations for the -- of loading the boats?
12      MS. FORDYCE:  Objection.  Form.
13   A.  I think that's what I just said.
14   Q.  (BY MR. SHEPPARD)  Okay.  I just wanted to make
15 sure I heard you right.
16   A.  Yeah.
17   Q.  Gotcha.
18      If LLOG sees an unsafe operation taking place,
19 like a crane operation, during a -- kind of rough seas,
20 they would have an obligation to stop the operation,
21 correct?
22      MR. MECHE:  Objection.  Form.
23   A.  At -- at the risk of repeating myself, everyone
24 that observes -- everyone on the rig or in any operation
25 involving a federal lease has the obligation and has the

1 right to stop work.  It is not -- that right is not
2 centered upon any one individual or any one company.
3      Here again, we hire contractors that are
4 experts at what they do.  They provide the safety and
5 training for their employees.  Their employees have the
6 knowledge, and they also have the -- the right to stop
7 work.  It's -- it's a -- it's pretty much a -- a given
8 out there.  I mean, everybody understands this.
9      I -- ever since I've worked or -- or been
10 involved with companies that work offshore, we -- it's
11 been drilled into everyone's head.  It's not -- not any
12 one particular person's responsibility or company's
13 responsibility.
14      MR. SHEPPARD:  Okay.  I'll object as
15 nonresponsive.
16   Q.  (BY MR. SHEPPARD)  I'm not asking if it's
17 everyone's responsibility.  I'm asking, if LLOG sees an
18 unsafe crane operation taking place, does LLOG have an
19 obligation -- irrespective if other people have an
20 obligation -- but does LLOG have an obligation to stop
21 the work?
22      MR. MECHE:  Objection.  Form.
23   A.  If a LLOG employee sees something that is
24 unsafe, they are required or have an obligation -- if
25 they believe it is unsafe, then they have an obligation

1 to -- to stop work, yes.
2   Q.  (BY MR. SHEPPARD)  Okay.  Before the
3 incident -- this incident, LLOG was aware that people
4 had been hurt during crane operations, correct?
5      MR. MECHE:  Objection.  Form.
6   A.  I have no knowledge of that.  I don't -- I
7 don't understand -- when did somebody get hurt?
8   Q.  (BY MR. SHEPPARD)  Sure.
9   A.  A LLOG employee got hurt?
10      MR. MECHE:  Let him ask his question.
11   Q.  (BY MR. SHEPPARD)  Sure.
12      Is LLOG aware of a person that was injured
13 during a crane operation on April 7th, 2017, aboard
14 the Seadrill Sevan Louisiana?
15   A.  I'm not familiar with that incident.
16   Q.  Okay.  But is -- is LLOG aware that -- of crane
17 operations being potentially dangerous?
18   A.  I will -- I will answer that yes, but I believe
19 that everything out there is potentially dangerous.  It
20 is a dangerous situation we have, and that's why we
21 focus on safety so much.
22   Q.  Okay.
23   A.  And we require our contractors to focus on
24 safety.
25   Q.  Okay.  Is -- is LLOG aware of an incident on

1 May 5th, 2016, on the Seadrill West Neptune where a
2 individual was injured during a crane operation?
3      MR. MECHE:  Objection.  Form.
4   A.  Here again, I'm sure LLOG, as a company --
5 there's someone at LLOG that may be aware of that.  I --
6 I am not -- these incidents, they get reported.  I
7 sometimes look at the reports.  I participate in -- in
8 incident -- we have an incident review of all the
9 incidents that happen in the gulf on all the -- the rigs
10 and -- and the information that BSEE provides.
11      And so I probably have seen both of those
12 incidents that you talked about.  I'm just not -- don't
13 remember the details of them.  I'm not -- I was not
14 prepared to -- to go back in time and try to understand
15 all of the incidents that happened at LLOG.
16   Q.  (BY MR. SHEPPARD)  Sure.  Do you know what a
17 incident of noncompliance is?
18   A.  Yes.
19   Q.  What is that?
20   A.  It is a -- it's a -- I guess the slang term is
21 it's an INC, I-N-C.  It's generated by the -- by BSEE
22 against an operator in the Gulf of Mexico as a -- as a
23 regulatory -- I guess a -- a -- a black mark or that --
24 that gives you a -- you know, basically says you weren't
25 in compliance with something.



1   Q.  Okay.  Has a INC ever been issued against LLOG?

**2   A.  Yes.**

3   Q.  Has it ever been -- has a INC ever been issued

4 against LLOG for activities aboard the West Neptune?

**5   A.  I'm not sure if I know the answer to that**

**6 question.**

7   Q.  Okay.

**8   A.  You know, I look at what you -- in your -- in**

**9 your documents today that you had, Exhibit A, you said**

**10 we were going to discuss these things.  And so now we're**

**11 looking -- we're talking about things that actually**

**12 weren't on this list, so I apologize if I'm not prepared**

**13 in answering these specific questions.**

14   Q.  Earlier you had said after incidents that are

15 reported to BSEE, there's a sit-down at LLOG where you

16 kind of go over what happened and recommendations from

17 BSEE, reports that you might get from the government.

18 How often are those meetings held?

**19   A.  I'm not sure that's what I said, "after every**

**20 incident."  I said that there's a -- we have some**

**21 quarterly and safety -- quarterly and annual safety**

**22 meetings at LLOG where we discuss items that happened**

**23 during the previous year quarter and -- and talk about**

**24 some of the things that -- that we could do and whether**

**25 the vendor or the contractor, you know -- what was done,**

**1 and maybe some lessons learned.  It's not always done on**

**2 every incident.  And so I did not look to see -- I asked**

**3 around.  I did not remember this incident.  But it could**

**4 have been.  I'll get you that information if I can.**

5   Q.  Okay.  Sorry.  I didn't mean to misquote you,

6 so I'll kind of correct myself here.

7      Quarterly and annually, the folks at LLOG hold

8 meetings where they discuss some incidents that may have

9 happened, you know, on a -- during operations that LLOG

10 was involved.  Is that a fair statement?

**11   A.  And -- and the industry was involved in and any**

**12 recommendations or bulletins that BSEE puts out.**

13   Q.  Got it.

14      So if there's some other -- like, you know,

15 Exxon Valdez, you guys are going to -- even though

16 you're not involved in that, you're going to sit down

17 and be like, "Guys, we've got to make sure this doesn't

18 happen to us"?

**19   A.  We don't have anything that has anything to do**

**20 with what happened with Exxon Valdez.**

21   Q.  Right.  I'm using it as an example.  I'll try

22 to use something different.

**23   A.  Not even -- it's not a good example for us.**

24   Q.  Right.  I was going to try to fix it.

**25   A.  Yeah.  We don't have --**

1   Q.  Sorry.

**2   A.  Yeah.**

3   Q.  What I was going to say is, if there is a -- if

4 there is an event involving some other developer and

5 something that's kind of bad, you guys want to -- you're

6 going to look at that to make sure that you don't fall

7 into the same traps?

**8   A.  That's correct.**

9   Q.  Okay.  That's all I meant by it.  I wasn't

10 comparing you to Exxon Valdez.  So, apologies.

**11   A.  Everyone else does.**

12   Q.  I sensed that it was a sensitive thing once I

13 said it, and I didn't mean any offense by it, so --

14      When you guys sit down and have these quarterly

15 and annual discussions of events that happened during

16 LLOG operations or BSEE bulletins or operations that

17 other companies had, do you, you know, develop any other

18 plans to address those problems and prevent them from

19 happening in the future?

**20   A.  Depends on the incident.  You know, I -- I**

**21 think, you know, the worst thing that can happen,**

**22 obviously, is -- is -- is a death or severe injury or**

**23 death.  Those are the ones that -- that people**

**24 concentrate on.  Each incident -- even a near miss is,**

**25 you know -- is discussed in some cases.**

**1      Here again, you know, it's relative to our**

**2 contractors.  We -- we -- one of the things that we do**

**3 is we look at our contractor safety records, and we try**

**4 to form long-term relationships with our contractors.**

**5 And the people that we ultimately contract with, you**

**6 know, they have ultimate authority on how to do their**

**7 job.  And, you know, you can't -- you can't afford to --**

**8 to do business with someone that's not safe.**

9   Q.  So, you know, incidents like this where a

10 person claims they're injured because of a problem with

11 the crane operation, maybe some rough seas, do you guys

12 kind of go back in-house and evaluate that and try to

13 find ways that you can prevent it, or do you just kind

14 of move on?

**15   A.  Well, no.  I mean, in this case, you know, it**

**16 was not -- it was -- we were not aware of an injury.  We**

**17 understand that the -- the report that Seadrill wrote**

**18 and -- and that our contract HSE guy wrote, at the time**

**19 of the incident, said that he was not hurt and that he**

**20 went back to work, I believe, the next day.**

**21      So at the end of the day, this would not have**

**22 been something that -- that rose to the -- to the**

**23 occasion of -- of having a, you know, an**

**24 all-hands-on-deck safety meeting where we needed to**

**25 maybe look at a contractor differently.**



Page 57

1    Q.  If you had to -- if you had to report something
2 to BSEE, was that something that you may look a little
3 closer at?
4    A.  You know, we have to report everything to BSEE.
5 So -- so I don't think that -- and just because
6 something is or is not reported to BSEE, you know,
7 doesn't -- doesn't mean we don't take safety seriously.
8    Q.  Do you know the name of the crane operator --
9    A.  No, I do not.
10    Q.  -- for Seadrill?  Okay.
11    A.  I'm sorry.  No, I do not.
12    Q.  Is there any way that -- does LLOG have a way
13 to figure that out?
14    A.  I believe that I had his -- I read his -- his
15 statement.  I just don't remember his name regarding the
16 incident.
17    Q.  Do you know who the crane operator worked for
18 at the time of the incident?
19    A.  It's my understanding he worked for Seadrill.
20    Q.  Okay.  Have LLOG -- have LLOG employees had any
21 personal interactions with Mr. Flora?
22        MR. MECHE:  Objection.  Form.
23    A.  I'm not aware of any.
24    Q.  (BY MR. SHEPPARD)  Okay.  Does LLOG have any
25 position on whether Mr. Flora is honest or not?

Page 58

1    A.  I cannot answer that question.  I don't --
2 that's something that I have no knowledge of.
3    Q.  Okay.  Does LLOG have any reason to think
4 Mr. Flora was a bad worker or unsafe worker?
5    A.  LLOG has no -- no knowledge of any information
6 that would form those conclusions.
7    Q.  I want to have here -- I told you we'd get back
8 to the proposal.  It just took me a while to get there.
9        What I see here is -- what I have on the screen
10 for you, this is the Fourchon Shore Base Support for
11 Production and Drilling, and it says that they're
12 pleased to have an opportunity to submit pricing for
13 your production, construction, and rig support at their
14 facility -- Fourchon facility.
15        Was this a -- is this a purchase order or --
16 because it says, at the end, you know -- it's "We look
17 forward to discussing questions, comments, concerns you
18 may have in regard with our services.  Again, we
19 appreciate the opportunity to service your needs."
20        Was there a formal contract or agreement
21 between LLOG and GIS for shore base services at the dock
22 in Fourchon?
23    A.  Yes.  There should be, yes.
24    Q.  Okay.  And would that agreement outline the
25 duties, responsibilities, obligations, and undertakings

Page 59

1 of the parties?
2        MR. MECHE:  Objection.  Form.
3    A.  I would assume it would.
4    Q.  (BY MR. SHEPPARD)  Okay.  Did -- did LLOG
5 accept this proposal as written?
6    A.  I'm not -- I'm not aware of that information.
7 I would assume that we -- we came to some agreement --
8    Q.  Okay.
9    A.  -- after this proposal.
10    Q.  And one of the things for the shore base
11 services is, you know, you come up to their dock and
12 they would load the materials that you needed to have
13 transported over to the West Neptune, right?
14    A.  Yes.
15    Q.  Okay.  Let's see if we can walk us through this
16 process.  You get a notification from the Seadrill that
17 they need something.  You then -- LLOG creates a
18 manifest or something like that and gets all those
19 materials, and then those materials are brought to GIS's
20 dock.  And then GIS loads them onto a boat, and in this
21 case it was the Maggie A.  And then that boat transports
22 the materials back to the Seadrill.
23        Is that a fair kind of explanation of how this
24 process works?
25        MS. FORDYCE:  Objection.  Form.

Page 60

1        MR. MECHE:  Objection.  Form.
2    A.  Okay.  So that was a lot that you said.
3    Q.  (BY MR. SHEPPARD)  Well, it may be better to do
4 it this way.
5    A.  Here again -- here again, you know -- I mean, I
6 think we've talked about this before.  I think we've
7 talked about how --
8    Q.  If I could --
9    A.  -- it --
10        MR. MECHE:  Hold on.  Let him finish his
11 answer.
12        MR. SHEPPARD:  I was going to withdraw the
13 question, because I wanted -- since y'all had objections
14 to it, I was going to try to rephrase it.
15        MR. MECHE:  Okay.  Thank you.
16    Q.  (BY MR. SHEPPARD)  Could you describe how this
17 process works of, you know, the how to create -- "how
18 the Congress creates a bill" version of how materials
19 get from shoreside onto the -- the Seadrill?
20    A.  Not many people play that analogy now.
21        Okay.  So -- so let's talk specifically,
22 because I'm sure that -- that different types of
23 material or different types of equipment -- you are
24 making a general statement, and the point I was going to
25 make was -- is specifically, it could happen a little

LEXITAS

Page 61

1 differently than what you say, okay?

2      We could order the material for Seadrill.

3 Seadrill could order the material. Their -- the West

4 Neptune could order it. Their people could order it

5 together or independently of us and tell us about it,

6 that they want -- they're going to have it shipped to

7 the Fourchon dock. It just depends on the situation.

8 It's not one size fits all.

9      However, having said that, some of the material

10 in this case -- and I believe this was groceries or food

11 materials -- were delivered to Fourchon, okay, at the

12 GIS dock, which is -- which we contracted GIS to handle

13 this type of material. And at the direction of the --

14 of the boat that was supposed to pick it up, they were

15 loaded onto the boat, and the boat delivered this

16 material to Seadrill, who had the ultimate authority and

17 responsibility to see that it was loaded onto the --

18 onto the West Neptune and -- and wherever it was

19 directed, wherever it was going to go. That's generally

20 how it's done.

21      But it's not specific to every -- and it could

22 be -- it could be delivered by helicopter. It could be

23 delivered, you know, by another boat or a bigger boat.

24 There are certain materials that doesn't necessarily all

25 come out of Fourchon. There's things that are on the

Page 62

1 rig that are put on the rig when the rig was delivered

2 that we -- that we -- some consumables that Seadrill

3 uses in -- in their drilling operations.

4      So that's the point I want to make, that

5 it's -- generally, what you said was true, and

6 specifically in this case, I believe that is correct,

7 what you said, that -- that that material -- that's how

8 the material got to the rig.

9      MR. SHEPPARD: Okay. Okay. If I could

10 just have five minutes, just run to the restroom, take a

11 quick break, try to do this hourly so everyone will have

12 some time, is that all right?

13      MR. MECHE: Hold on just a second. The

14 witness has asked about lunch. I don't know -- Daniel,

15 how much longer do you anticipate that you have?

16      MR. SHEPPARD: I think I'd wrap it up in,

17 you know, 30, 40 minutes, 30 seconds if he says that

18 he's entirely responsible and will accept liability.

19      MR. MECHE: Melanie, how much do you think

20 you have?

21      MS. FORDYCE: I don't think I have much.

22 Maybe about 20 minutes, if that.

23      MR. MECHE: All right. Mr. Bassi, it's

24 really up to you. If you want to break for lunch for,

25 you know --

Page 63

1      THE WITNESS: I'd like -- I'd like about

2 30 minutes. I've got some things that I've seen pop up

3 that I'm going to have to -- have to look at --

4      MR. SHEPPARD: Sure.

5      MR. MECHE: -- if that's okay.

6      MR. SHEPPARD: Let's do 45 so that you've

7 got a little wiggle room there.

8      THE WITNESS: That's even better.

9      MR. SHEPPARD: All right. We'll be back

10 in here at 12:45.

11      THE VIDEOGRAPHER: Off the record at

12 12:00 p.m. End of Tape 2.

13      (Lunch recess from 12:00 p.m. to

14 1:01 p.m.)

15      THE VIDEOGRAPHER: Back on the record at

16 1:01 p.m. Beginning Tape 3.

17      MR. SHEPPARD: Tape 3. Woo. That's a

18 long one.

19      Q. (BY MR. SHEPPARD) Okay. Is LLOG aware of how

20 folks aboard the West Neptune would communicate with

21 ships that were coming to deliver supplies?

22      A. You know, as we've said before, LLOG hires

23 contractors to do their job. We don't tell them how to

24 do it. You know, we don't -- we don't need to

25 necessarily understand how they communicate. It's

Page 64

1 logical to me that -- that there would be some form of

2 communication -- sophisticated communication between

3 them and -- and -- and vessels that are approaching the

4 West Neptune.

5      I -- you know, you'd have to ask somebody on

6 the West Neptune what kind of system they use and

7 whether they're in communication and what type of

8 communication they have.

9      Q. Okay.

10      A. I don't think anybody at LLOG has any intimate

11 details of what our contractor has or how they --

12      (Reporter requests clarification)

13      A. -- on how they manage that.

14      Q. (BY MR. SHEPPARD) Okay. So the company man

15 wouldn't be able to say, "This is what I saw the various

16 contractors doing on the vessel"?

17      A. You know, the -- the company man is there to

18 monitor the rig on a downhole operation. I -- I have no

19 idea whether the company man -- who's also, in this

20 case -- also a contractor -- you know, he could be

21 looking over there. I don't know. I just don't know.

22      Q. Okay.

23      A. At the end of the day, he's more concerned

24 downhole than he is -- it's my understanding he is more

25 concerned downhole than he is with what's going on in



Page 65

1 the running of the -- of the rig and the maintenance
2 type issues, like providing groceries to -- to stock the
3 kitchen.
4    Q.   Okay.  Does LLOG have any knowledge of how the
5 CONEX boxes were hooked up or moved when the -- between
6 the Maggie A. and the West Neptune?
7    A.   As I've said before, you know, Seadrill is
8 responsible.  They are the responsible party.  They
9 are -- they do have the -- the OAM, who is in charge of
10 everything.  They, I assume, determine that since
11 they're -- it's their crane guy that would lift the
12 boxes.  I assume that they would have a procedure for
13 doing that.  LLOG would not -- it's my understanding
14 LLOG would let -- would let all that be handled by the
15 contractor.
16    Q.   Okay.  And I'm not -- I'm not trying to fuss at
17 you.  I'm just trying to see if there's something you
18 know that I kind of need to know.  So if y'all don't
19 know, that's fine.  I'm just trying to figure that out.
20    A.   Yeah.
21    Q.   Does -- strike that.
22         Aside from what's written in the statements
23 that have been produced in this case, and the incident
24 reports, does LLOG have any other independent documents
25 or information about how this incident occurred or what

Page 66

1 was going on between the two vessels at the time of the
2 incident?
3         MR. MECHE:  Objection.  Form.
4    A.   What -- what LLOG knows is -- is -- is what we
5 received from our contractor, Scott, on -- on the
6 incident report that he prepared.  We -- we also looked
7 at all the documents that -- that Seadrill, as the
8 responsible party, prepared and looked at.  So we saw
9 their report.
10        And I also -- I looked at -- at the witness
11 statements which -- which included Mark Flora's.  And,
12 you know, other than that, I'm not aware of LLOG having
13 anything -- any other knowledge, other than what's in
14 those reports, that were obviously written at the time
15 of the incident, that, you know, I'm sure there's maybe
16 some testimony or something that's come out since then
17 that's -- that adds to it.  I just -- I just know what
18 I've seen.
19    Q.   (BY MR. SHEPPARD)  Okay.  Did LLOG perform any
20 investigation, root cause analysis, anything like that,
21 concerning this incident?
22    A.   Not speaking for our contractors, I could --
23 which I don't know whether they did or not -- we never
24 got a root cause analysis report from anybody.  We did
25 not --

Page 67

1    Q.   Okay.
2    A.   -- because we were not -- again --
3         MR. MECHE:  Excuse me.
4    A.   I'm sorry.  LLOG did not.  LLOG is not the
5 responsible party.  It would be Seadrill, I assume, that
6 would conduct that -- that type of investigation if they
7 thought it was necessary.
8    Q.   (BY MR. SHEPPARD)  Okay.  That's fine.  I'm
9 just seeing if -- what LLOG did do and what LLOG didn't
10 do.  That's all I'm trying to figure out.
11    A.   Right.
12    Q.   Does -- well, if you're aware, does LLOG's SEMS
13 manual require the company to investigate incidents that
14 happened on -- while the company's performing work --
15 while LLOG's performing work?
16    A.   I don't have that intimate knowledge of the
17 SEMS manual, so --
18    Q.   Okay.
19    A.   Here again, I --
20    Q.   Were there any actions taken by LLOG against
21 any of the contractors following this incident?
22    A.   I am not aware of any.
23    Q.   Okay.  Has LLOG made any changes to its -- the
24 way that it performs or the way that -- strike that.
25        As a result of the incident, has -- has LLOG

Page 68

1 made any changes to its practices at all?
2    A.   Here again, LLOG was not on the rig when the
3 incident happened.  We were not performing the work.  We
4 hired a contractor to perform the work.  The two
5 contractors have, I'm sure, safety and -- and manuals
6 that they have to follow and rigging techniques that
7 they have to use.  I assume that they looked at that
8 when they -- when they reevaluated this incident.  I
9 don't have any direct knowledge of that, though, whether
10 they changed any of their practices.
11        MR. SHEPPARD:  I object as nonresponsive.
12    Q.   (BY MR. SHEPPARD)  Has LLOG made any changes to
13 its practices as a result of this incident?
14    A.   I'm not aware of any.
15    Q.   Okay.  Aside from the -- the folks that have
16 authored the incident reports and the folks that have
17 provided written statements in this case, are you -- is
18 LLOG aware of any other personnel that is -- that was
19 involved in this incident?
20        MR. MECHE:  Objection.  Form.
21    A.   LLOG doesn't have any knowledge of any other
22 personnel --
23    Q.   (BY MR. SHEPPARD)  Okay.
24    A.   -- involved in this incident, other than what's
25 written on the reports.  As I said, the contractors



Page 69

1 were -- were the ones that -- that reported the
2 incident. Seadrill admitted -- or, in their report,
3 says they are the responsible party. And their OIM is
4 the person that should be contacted if there's anybody
5 else that needs to provide any information.
6        MR. SHEPPARD: Object to, "as I said," and
7 going forward as nonresponsive.
8   Q.  (BY MR. SHEPPARD) Does -- aside from the folks
9 that authored the reports and the folks that have
10 provided written witness statements, does LLOG know the
11 identity or the responsibilities -- or -- sorry -- the
12 identities or roles of the people that were responsible
13 for offloading the CONEX box from the Maggie A. and
14 putting it onto the -- I keep forgetting the name --
15  A.  West Neptune.
16  Q.  Thank you.
17  A.  And I assume you're through with the question?
18  Q.  Yeah. I thought you -- I'm going to ask it
19 again --
20  A.  Yeah, please.
21  Q.  -- because I'm losing my head.
22  A.  Yeah.
23  Q.  Aside from the folks that issued or provided
24 statements and the folks that authored the incident
25 reports that we've discussed previously, is LLOG aware

Page 70

1 of the names and roles of anyone else that could be
2 responsible for offloading materials from the Maggie A.
3 and putting them onto the West Neptune?
4        MR. MECHE: Objection. Form.
5   A.  As I said before -- and I apologize for
6 repeating again -- LLOG hires a contractor to perform
7 those tasks for us. Those people would be better suited
8 to answer those questions. LLOG does not have any
9 knowledge of what those roles are or who those people
10 are or anyone else that would be involved in the
11 incident, other than what's on the reports that we saw.
12  Q.  (BY MR. SHEPPARD) Okay.
13        MR. SHEPPARD: Object to everything
14 before, "LLOG does not have," as nonresponsive.
15  Q.  (BY MR. SHEPPARD) Did LLOG provide any
16 training to the crane operator on the West Neptune?
17  A.  Again, LLOG does not -- we hire contractors to
18 do the work. Our goal is for them to execute our plan.
19 How they execute that plan is important to us, but it's
20 left up to them. They would be the ones that would
21 better answer that question. They would be the ones
22 that, I assume, would train the crane operator, not
23 LLOG.
24        MR. SHEPPARD: Object to as nonresponsive.
25  Q.  (BY MR. SHEPPARD) Did LLOG provide any

Page 71

1 training to the crane operator aboard the West Neptune?
2   A.  No.
3   Q.  Did LLOG inspect any of the equipment in use at
4 the time of the incident, including the crane, prior to
5 the incident involving Mr. Flora?
6   A.  No.
7   Q.  Okay. Same question but as it relates to a
8 headache ball. Did LLOG perform any inspection of the
9 headache balls, stringers, tag lines, or D rings?
10  A.  No.
11  Q.  Are you aware of any communications that Scott
12 Sepulvado or Wilson Walley had with anyone concerning
13 this incident?
14  A.  No, other than -- let me rephrase that -- other
15 than the incident report that I reviewed that was
16 prepared by our contractor.
17  Q.  Is LLOG aware of any changes made to the crane,
18 the stringers, the headache ball that are being used on
19 the West Neptune now versus at the time of the incident?
20        MR. MECHE: Objection. Form.
21  A.  Not that I'm aware of.
22  Q.  (BY MR. SHEPPARD) Okay. Does LLOG have
23 documents or information that could be used to identify
24 the individuals that were working on the West Neptune at
25 the time of the incident?

Page 72

1   A.  Yes.
2   Q.  Okay. What -- what documents would that be?
3   A.  It would be the PO -- POB list, which is
4 personnel on board.
5   Q.  Would that list identify the company that they
6 were employed by?
7   A.  Yes.
8   Q.  Okay. What --
9   A.  Or -- or contracted by. Not all the people on
10 there -- I don't want you to get the impression that the
11 people on there, that list -- it's my understanding that
12 some people -- for instance, Seadrill, it may be
13 identified as a Seadrill employee, but that may be a
14 contract employee for Seadrill.
15  Q.  Okay. Would the list identify the role -- the
16 job title for the personnel on board?
17  A.  Not that I remember. It may, but I don't
18 think -- I don't know if it does or not. I just know
19 there's a POB list. I've looked at drilling reports
20 before, and they have a POB number. And -- and I've
21 seen POB lists before. And I think on this particular
22 West Neptune, there was roughly 170 people on board.
23  Q.  Okay. Does the -- are the -- does the list
24 focus day by day, or is it kind of general, "These are
25 the people that were on there during that month"?



1   A.  You know, I don't know how the -- I believe the
2 report's generated every day, but I'm not sure.  You'd
3 have to ask Seadrill.  They're the ones that are
4 responsible for providing that information.
5   Q.  Okay.  But Seadrill would provide that
6 information to LLOG?
7   A.  Yes.
8   Q.  Okay.  And that's somewhere in the file -- I
9 guess, the Seadrill file?
10      THE REPORTER:  I'm sorry.  The answer?  My
11 screen froze.
12  A.  Yes.
13      MR. SHEPPARD:  And he followed that with,
14 "We were completely responsible."  I'm kidding.
15  Q.  (BY MR. SHEPPARD)  Does LLOG have its own
16 policies regarding the use of cranes?
17      MR. MECHE:  Objection.  Form.
18  A.  I don't know.
19  Q.  (BY MR. SHEPPARD)  Okay.
20  A.  I really don't.  I -- here again, all those
21 types of things that -- that involve the use of a crane
22 are hired out through our contractor who, you know, we
23 assign a task to.  It's not -- it's not something
24 that -- that -- most of LLOG's work is focused in the
25 office.  It's finding the plan and hiring the vendors

1 and contractors to do the work.
2   Q.  Okay.  Is there anything contained in LLOG's
3 SEMS manual or any other manual about the use of cranes?
4   A.  I am not intimately aware of anything in there
5 that talks about the use of cranes.  I suspect there may
6 be.  I just don't know.  I would -- I suspect you're
7 going to want to see our SEMS manual.
8   Q.  Probably.
9   A.  But that would probably answer all of your
10 questions.
11  Q.  Okay.  Is there -- is there someone at the
12 company that's more intimately familiar with the SEMS
13 policies that LLOG has developed?
14  A.  A lot more than I am, yes.
15  Q.  Is it -- could you identify that person?
16  A.  I'll have to get that person for you.  You
17 know, we'd have to decide who that best person is,
18 otherwise you would end up -- you may end up with
19 somebody like me.
20  Q.  Okay.  So would it be fair to say that you're
21 not able to talk about Topic 13 on the deposition
22 notice?  And feel free to take your time to look at it.
23      MR. MECHE:  Objection.  Form.
24  A.  Well, 13 was a strange one for me, as was 12,
25 14, and 15.

1   Q.  (BY MR. SHEPPARD)  Okay.
2   A.  I assumed that -- that on those -- those
3 questions, you were talking about our contractor's
4 policies and procedures, because LLOG didn't do any of
5 the work.  And so it would seem to me that the -- that
6 you were looking forward to the policies and procedures
7 that the contractors were using to -- to perform the
8 task.  You know, and even 16 and 17.
9   Q.  Okay.
10  A.  You know, it -- it's -- it was strange to me
11 that you would -- you would want to know what LLOG was
12 doing when -- when we weren't out there actually doing
13 the work.  So that's -- I kind of thought you were going
14 to ask questions about it, because I am prepared to tell
15 you that -- that Seadrill, in their report, did say they
16 were the responsible party for this incident and that,
17 you know, that they were the ones that -- that were
18 going to manage this incident.  And that's -- what I
19 know is what's in those reports.
20      MR. SHEPPARD:  I'll Object to the
21 nonresponsive portions.
22  Q.  (BY MR. SHEPPARD)  Are you prepared to discuss
23 Topic 13 as it relates to LLOG?
24  A.  No.
25  Q.  Okay.  Would that be true for Topic 14?

1   A.  Yes.  I think that would be more appropriate to
2 our contractors.
3   Q.  Okay.  So it's not something that you're
4 prepared to discuss today, correct?
5   A.  I -- I have no knowledge of it.
6   Q.  Okay.  Is it -- I'm just -- I'm not fussing at
7 you.  I'm just trying to parse out what you --
8   A.  No, I'm not prepared to talk about that,
9 because I --
10      MR. MECHE:  Objection.  Form.  Asked and
11 answered.
12  Q.  (BY MR. SHEPPARD)  Okay.  Would that be --
13 would it also be true for Topic 15, that LLOG is not
14 prepared to discuss that as well?
15  A.  LLOG does not have knowledge of the types of
16 documents kept on the vessel in the ordinary course of
17 business.
18  Q.  Okay.  Does LLOG, during the -- while it's on
19 the vessel, does it keep any documents on board the
20 vessel?
21  A.  LLOG is not on the vessel, from what I
22 understand.
23  Q.  Okay.  No -- no employees of LLOG, no company
24 man, no anyone with the responsibility to kind of speak
25 on behalf of LLOG are ever on the vessel?



1          MR. MECHE:  Objection.  Form.

**2    A.  So -- so what's -- what's your definition of a**

**3 vessel?  I'm assuming you're talking about the boat.**

4    Q.  (BY MR. SHEPPARD)  No.  I was -- I'm talking

5 about the drill ship.

**6    A.  Oh, okay.  All right.  I'm sorry.  I thought**

**7 all of these were -- were associated with the boat,**

**8 since the accident happened on the boat.  I'm not -- not**

**9 prepared to talk about those types of documents, no.**

10    Q.  Okay.  But there -- there are LLOG people on

11 board the drill ship, right?

**12  A.  Yes, yes, yes.**

13    Q.  I was going to clarify that, because I thought

14 it went a little both ways when we were talking.  So I

15 was going to get to that, but it's okay to do it now.

**16  A.  Yeah.**

17    Q.  Would the same be true for Topic 16 as it

18 relates to LLOG?

19          MR. MECHE:  Objection.  Form.

20    Q.  (BY MR. SHEPPARD)  And just so I have a clear

21 question, is LLOG prepared to discuss Topic 16, as it

22 relates to LLOG?

23          MR. MECHE:  Daniel, I need a

24 clarification, because I don't understand your question.

25 Are you trying to find out whether LLOG has knowledge,

1 or are you trying to find out what their knowledge is of

2 what he's already described, what he's already testified

3 to of the other folks' materials?  I'm not -- I'm not

4 entirely clear what you're asking.

5          MR. SHEPPARD:  I'm asking him is he

6 prepared to talk about the policies and procedures that

7 LLOG has, if any, for safely transporting, arranging,

8 lifting, moving, and adjusting CONEX boxes.

9          MR. MECHE:  Okay.

10          MR. SHEPPARD:  They're not limited to --

11 that's -- I'm focused on whether LLOG has any of these

12 policies or procedures.

13          MR. MECHE:  Okay.  And I'm fine with that.

14 Just Item No. 16 doesn't -- doesn't differentiate.  But

15 I understand your question now.  You're asking whether

16 he's prepared to talk about what LLOG policies may or

17 may not exist.  Understood.  Thank you.

**18  A.  No, I'm not prepared -- I'm not prepared to**

**19 talk about what LLOG's policies are, because I assumed**

**20 that this -- these policies and procedures you were**

**21 referring to in No. 16 was related to our contractors,**

**22 who we hired to do the work.  And we would not have**

**23 knowledge of the contractors' policies and procedures in**

**24 detail enough for us to talk about them, because we**

**25 weren't there and we don't know exactly what they had**

**1 two years ago.**

2    Q.  (BY MR. SHEPPARD)  Okay.  Would the same be

3 true for Topic 17?

**4    A.  I think my answer would be the same for 17.**

5    Q.  Okay.  I think you've provided the insurance

6 coverage.  I'm not sure if there's -- but I would assume

7 so.

8          Okay.  All right.  Now, I'm going to do all the

9 tricky questions, since you're tired.

**10  A.  I know that is a trick question too.**

11    Q.  Okay.  Have any of my questions to you been

12 particularly tricky, or have you felt manipulated in any

13 way?  Because if you have, I kind of just kind of want

14 to go back and make sure that we fix that.

**15  A.  No.**

16    Q.  Okay.  Have you been given a fair and full

17 opportunity to answer all my questions?

**18  A.  Yes.**

19    Q.  Did I, in any way, make you feel stressed

20 during this, besides the fact of just having your

21 deposition taken?

**22  A.  No.  I know you can't kill me or eat me, so I'm**

**23 okay.  I'm too old to be worried about that.**

24    Q.  Alan said that I had to do this remotely,

25 because he was afraid if we got in a room together, it

1 would just be rough.  I'm kidding.

**2    A.  Thank you.**

3    Q.  Did I ever, you know, cut off your answer so

4 that you couldn't get out the words?

**5    A.  No.**

6    Q.  Okay.  You were given all the -- all the times

7 you needed to take a break?

**8    A.  Yes.**

9    Q.  Okay.  Is there any question that you don't

10 feel like you fully answered that you'd like to take

11 another stab at?

**12  A.  You know, no, you know.**

13    Q.  Okay.  Is there any answer that you want to

14 change?

**15  A.  No.**

16          MR. SHEPPARD:  Okay.  I can pass the

17 witness.

18          EXAMINATION

19 BY MS. FORDYCE:

20    Q.  Mr. Bassi, this is Melanie Fordyce.  I

21 represent Grand Isle Shipyard.

22          Do you want to take a break now, or would you

23 like to go ahead and continue?

**24  A.  No.  Let's go ahead if it's not going to be too**

**25 long.**



Page 81

1    Q.  Earlier, you mentioned that -- we've been --
2 you tried --
3          (Reporter requests clarification)
4          MS. FORDYCE:  Can you hear me better now?
5          THE REPORTER:  Not really, but go ahead
6 and try.
7          MS. FORDYCE:  Should I use my phone, like
8 Daniel?
9          MR. SHEPPARD:  I can hear you.  There's a
10 slight --
11         MR. MECHE:  There's an echo.
12         MS. FORDYCE:  Yeah.  That's what I hear
13 too.  Let me -- let me switch to my phone.  I think it
14 has a better microphone, if you want to take a short
15 break.
16         MR. MECHE:  Or we'll wait here.  We'll
17 wait here.
18         MR. SHEPPARD:  Sure.  Make sure you turn
19 off your microphone and sound for your computer when you
20 connect with your phone.
21         MS. FORDYCE:  Okay.
22         All right.  Can you hear me better now, or
23 is there still an echo?
24         MR. SHEPPARD:  Sounds good.
25         MS. FORDYCE:  Okay.

Page 82

1    Q.  (BY MS. FORDYCE)  Okay.  Mr. Bassi --
2    A.  Yes.
3    Q.  -- earlier you mentioned that LLOG contracted
4 with a Gulf Island Shipyard in Port Fourchon.  Is that
5 correct?
6    A.  Well, I may have -- the name is GIS.  Is
7 that --
8    Q.  Either --
9    A.  Grand Isle Shipyard?
10   Q.  There is -- I think -- I represent Grand Isle
11 Shipyard --
12   A.  Yeah.
13   Q.  -- and that's what --
14   A.  It's GIS.  I -- I apologize for getting the
15 name wrong.
16   Q.  Okay.  But you're certain --
17   A.  There's two or three "Gulfs" in this thing
18 that -- that I assume that the "G" stood for "Gulf."
19   Q.  Okay.  But you're certain that the GIS in this
20 that you contracted with is Grand Isle and not Gulf
21 Island?  Because I think Gulf Island is also a company
22 similar to us.
23   A.  I assume -- I assume you know better than I do,
24 but yes.  I -- I do know that there's a GIS logo on
25 the -- on the invoices and on the --

Page 83

1          (Reporter requests clarification)
2    A.  -- on the reports, on the accident reports or
3 the incident reports.
4    Q.  (BY MS. FORDYCE)  So you've seen GIS accident
5 reports for this matter?
6    A.  No.  I'm sorry.  I'm sorry.  Here again, I'm
7 getting another -- another company with the name "G"
8 confused.  No, I have not seen anything from GIS.
9    Q.  And the proposal that Mr. Sheppard showed you
10 earlier, do you know if it ever resulted in a contract
11 with Grand Isle Shipyards?
12   A.  I assume it did.  I don't know that for
13 certain, but I'm assuming it did.
14   Q.  Do you know if LLOG had a -- any sort of master
15 service agreement with GIS?
16   A.  We typically do, yes, or some kind of master
17 service contract.
18   Q.  The person listed on this for Grand Isle
19 Shipyards was named Daniel DeRosio.  Have you ever
20 talked with Daniel?
21   A.  No.
22   Q.  Do you -- do you know who that is?
23   A.  No.
24   Q.  And who would have been the person at LLOG
25 handling this proposal?

Page 84

1    A.  David Guidry.
2    Q.  And that is the person you talked about earlier
3 that you spoke with briefly?
4    A.  Yes.
5    Q.  Is that correct?
6    A.  Yes.
7    Q.  Now, earlier you mentioned that -- that GIS
8 would provide a crane to load the boat but the loading
9 would be at the direction of the boating company; is
10 that correct?
11   A.  That's the way it was explained to me by David
12 Guidry.  And like I said, it makes sense, right?
13 Because the captain of the boat or the -- the people
14 that -- that the boat would -- they would know how they
15 want their boat loaded, I guess, for weight purposes.
16   Q.  And I assume at the direction of the boating
17 company, so the captain would be the person telling the
18 crane operator which boxes to place where on the deck;
19 is that right?
20         (Reporter requests clarification)
21         MR. MECHE:  Hold on.  Sorry.
22         Daniel, did you get your objection in?
23         MR. SHEPPARD:  I just objected to the
24 form.
25         MR. MECHE:  Okay.  Objection.  Form.



Page 85

1          Don't assume anything.  If you know the
2 answer, tell her.  If you don't know the answer, tell
3 her you don't know.
4    **A.  I don't know the answer.**
5    Q.  (BY MS. FORDYCE)  Now, do you know anything
6 about these CONEX boxes?
7    **A.  No.**
8    Q.  Have you ever seen them?
9    **A.  No.**
10   Q.  Have you ever been out to the -- the -- I
11 guess -- I think you called it an onshore type of
12 headquarters or support base?
13   **A.  No.**
14   Q.  Do you know anything about the loading
15 procedure at -- at the onshore base?
16   **A.  No.**
17   Q.  So you wouldn't know who -- who was operating
18 the crane loading the ship at the time, correct?
19   **A.  Correct.**
20   Q.  And I want to make sure.  You said you haven't
21 seen any reports from GIS regarding this incident,
22 correct?
23   **A.  That's correct.**
24          MS. FORDYCE:  All right.  I'll go ahead
25 and pass the witness.

Page 86

1          MR. MECHE:  All right.  Can we take a
2 ten-minute break?  I need to make a phone call before I
3 finish up ours.
4          MR. SHEPPARD:  Sure.
5          MS. FORDYCE:  Sure.
6          MR. MECHE:  Thank you.
7          THE VIDEOGRAPHER:  Off the record at
8 1:39 p.m.  Ending Tape 3.
9          (Recess from 1:39 p.m. to 2:00 p.m.)
10          THE VIDEOGRAPHER:  Back on the record at
11 2:00 p.m.  Beginning of Tape 4.
12              EXAMINATION
13 BY MR. MECHE:
14   Q.  All right.  Mr. Bassi, we took a short break.
15 Are you ready to proceed, sir?
16   **A.  Yes.**
17   Q.  Are you comfortable with all the answers you've
18 already given?
19   **A.  Yes.**
20   Q.  I want to make sure I understand some of the
21 testimony that you -- you gave earlier.
22          You testified that there was an individual
23 named David Guidry, and I think you said he was
24 logistics and he was a payroll employee of LLOG.  Do you
25 remember that testimony?

Page 87

1    **A.  Yes.**
2    Q.  Did David Guidry have anything to do with the
3 loading of the Maggie A. at the dock on May 24th,
4 2017, or the unloading of the Maggie A. at the drill
5 ship on May 25th, 2017?
6    **A.  No.**
7    Q.  Is he a shore-based employee?
8    **A.  He is an office-based employee.**
9    Q.  And when you say "office," you mean --
10          (Reporter requests clarification)
11   **A.  He is in the LLOG Covington, Louisiana, office.**
12   Q.  (BY MR. MECHE)  Were there any payroll
13 employees of LLOG working at the dock that loaded or
14 unloaded the Maggie A. on May 24th or 25th, 2017?
15   **A.  None.  There were none.**
16   Q.  At least in my mind, there's still a little bit
17 of confusion in terms of the whole dock process.  My
18 understanding, from what has been testified to before,
19 is that this vessel was loaded at the GIS dock in Port
20 Fourchon on May 24th, 2017; is that correct?
21   **A.  Yes.**
22   Q.  Now, you testified that the information you
23 received was that the -- that GIS was involved in the
24 loading of the Maggie A. at the direction of the vessel
25 crew.  Is that correct?

Page 88

1    **A.  Yes.  That was -- that was how the procedure**
2 **was explained to me --**
3    Q.  Okay.
4    **A.  -- by David Guidry.**
5    Q.  Do you know -- do you know one way or another
6 whether there were any other contractors that were
7 working at the dock that were -- were not GIS people and
8 not Gulf Logistics people?
9    **A.  There could have been, you know.  I'm not aware**
10 **of any, but there could have been.**
11   Q.  Who would we need to talk to if we wanted to
12 find out whether other contractors participated in that
13 task or not?
14   **A.  We could -- we could talk to David Guidry,**
15 **and -- and he could provide us with a list of those**
16 **people at that time --**
17   Q.  Okay.  Whoever --
18   **A.  -- or those contractors.  I'm sorry.**
19   Q.  Whoever loaded the boat on May 24th, 2017,
20 I'm assuming that LLOG paid them?
21   **A.  That's correct.**
22   Q.  Would you have invoices that we could look at?
23   **A.  That's correct.**
24   Q.  Because, at least in my mind, I'm not sure that
25 it's settled -- me personally -- who loaded the boat.



Page 89

1 And so I'm trying to understand what documents might
2 exist. If you have invoices -- you've testified earlier
3 that you would expect there to be a contract?

**4   A.   Yes.**

5   Q.   We have been provided with the proposal. I
6 don't recall if it was marked -- an unsigned proposal
7 that has the logo of Grand Isle Shipyards. Do you know
8 one way or another whether there is a signed copy of
9 this proposal that exists?

**10   A.   No. There again, it's easy enough to find the**
**11 documents associated with the work that was done that**
**12 day.**

13   Q.   Okay. Fair enough. Moving on --
14         MR. MECHE: Daniel, could I trouble you to
15 pull up Exhibit No. 2, which was the LinkedIn page of
16 Mr. Sepulvado?
17         MR. SHEPPARD: Sure.
18         Can you see it?
19         MR. MECHE: Yes. I -- yes. Thank you.
20         MR. SHEPPARD: You're welcome.
21         MR. MECHE: I'll pull up a little bit to
22 it.
23   Q.   (BY MR. MECHE) Okay. You were asked a number
24 of questions about Mr. Sepulvado. Under his name, it
25 says "SEMS/HSE Manager D&C at LLOG Exploration Company."

Page 90

1 Is -- is Mr. Sepulvado -- was Mr. Sepulvado a payroll
2 employee of LLOG on the date of this incident?

**3   A.   No. He was a contract employee.**

4   Q.   Does LLOG have anything to do with setting up
5 or maintaining this LinkedIn account?

**6   A.   No.**

7   Q.   Does -- is there anything on Exhibit No. 2 that
8 identifies the date that this LinkedIn account was
9 created or -- or copied?

**10   A.   No. It just gives a range of when he was**
**11 working, I guess.**

12   Q.   I notice at the second-to-the-last paragraph at
13 the bottom --

**14   A.   I didn't even know this was associated with**
**15 his -- I was just looking at the -- at the top part.**

16   Q.   Okay. Hold on.
17         Describe what you mean. What part are you
18 saying --

**19   A.   I'm seeing now that he says he's an advisor.**

20   Q.   Where are you seeing that?

**21   A.   Right here, on the -- at the bottom.**

22   Q.   Okay. So -- and again, to make sure it's
23 accurate on the record, the -- the LinkedIn page appears
24 to have three bubbles. The bottom bubble has an entry
25 on April '14 to May 2019, and it appears that he

Page 91

1 describes himself as an HSE/SEMS advisor on location in
2 deepwater GoM. Is that what --

**3   A.   Yeah, that's what I'm seeing now.**

4   Q.   All right. As you sit here today, do you
5 recall what contractor Mr. Sepulvado worked for that was
6 hired by LLOG around the time of the -- you know, to do
7 the work around the time of the incident involving
8 Mr. Flora?

**9   A.   Was it Rusco?**

10   Q.   Do you recall --

**11   A.   No.**

12   Q.   -- what city Rusco is out of?

**13   A.   No, I don't.**

14   Q.   All right. You mentioned that -- that's all we
15 need this exhibit for. Thank you.
16         MR. SHEPPARD: Sure.
17   Q.   (BY MR. MECHE) You mentioned a man by the name
18 of Wilson Walley that was a contractor of LLOG --

**19   A.   Right.**

20   Q.   -- on the drill ship at the time of the
21 incident. Do you recall what company LLOG contracted
22 with that resulted in him working on this project?

**23   A.   Yes, I do know. We -- he was an employee of**
**24 Eagle Consulting with -- they provide a number of**
**25 employees for LLOG -- contract employees -- and does**

Page 92

**1 contract work. We -- we have used Eagle Construction --**
**2 or Eagle Consulting to provide not only employees on the**
**3 drill ship but on our production platforms also --**
**4 advisors.**

5   Q.   Now, you had -- you were -- you answered some
6 questions earlier about a POB list, the personnel on
7 board list. Who is the author of that document?

**8   A.   I believe I said before the author of that**
**9 document is -- is Seadrill.**

10   Q.   All right. And I think you testified that your
11 recollection of that document might have names
12 associated with a company where you don't know one way
13 or another whether they were a payroll employee of that
14 company or a contractor of that company?

**15   A.   That's correct.**

16   Q.   So, for example, if we had the POB list and it
17 listed, under LLOG, someone like Wilson Walley, your
18 testimony is he's not an employee of LLOG; he's a
19 contractor of LLOG?

**20   A.   Correct.**

21   Q.   All right. And would you expect that to be the
22 same for the other contractors who might be identified
23 on that POB list?

**24   A.   Yes, I would. And -- and I know that for a**
**25 fact, obviously.**



1    Q.   Which company maintains and makes changes and
2 updates to the POB list?
3    **A.   It's my understanding that Seadrill does.**
4    Q.   We also talked about Exhibit No. 4, the cargo
5 manifest.
6         MR. MECHE:  Daniel, could you pull that up
7 on the screen?  I have a copy, but it may be easier for
8 the witness to view it on the big screen.
9         MR. SHEPPARD:  Sure.
10        MR. MECHE:  Thank you.
11   Q.   (BY MR. MECHE)  All right.  Do you know one way
12 or another whether this John Friesenhahn/Bubba, whether
13 that person is a payroll employee of LLOG or not?
14   **A.   I've never seen that person's name as an**
15 **employee of LLOG, so I don't know.**
16   Q.   Do you know one way or another whether
17 employees of LLOG -- payroll employees -- have any input
18 or responsibility with regard to a cargo manifest?
19   **A.   Not that I'm aware of.  This is different.**
20   Q.   I'm sorry?
21   **A.   The vendor was Seadrill on some of this before.**
22 **Is this the same document?**
23   Q.   I think it's the same one that we --
24        MR. SHEPPARD:  Oh, it might be the second
25 page.

1         **THE WITNESS:  This is the one I remember**
2 **seeing (indicating).**
3         MR. SHEPPARD:  Sorry.  There's multiple
4 pages.
5         **THE WITNESS:  That's quite all right.**
6         MR. MECHE:  Daniel, at the risk of pushing
7 my limit, can you shift the document over to the left a
8 little bit?  I didn't -- the date is just a little cut
9 off, and that's probably why I didn't recognize that we
10 were on the wrong page.
11        **THE WITNESS:  Crank it up.**
12        MR. MECHE:  Right there.
13        **THE WITNESS:  Yeah.**
14   Q.   (BY MR. MECHE)  All right.  So just for
15 purposes of the record, GLO-LLOG Document 442 is a cargo
16 manifest under the name of LLOG Exploration Company,
17 LLC, and it's dated May 25th, 2017; is that correct?
18   **A.   Yes.**
19   Q.   All right.  And -- is it still your
20 testimony that you're not aware one way or another who
21 this John Friesenhahn works for?
22   **A.   That's correct.**
23   Q.   If we assume that LLOG has been consistent with
24 regard to contracting out the work on this project,
25 would you expect him to be an employee of one of your

1 contractors?
2    **A.   I would -- that's what I would --**
3         MR. SHEPPARD:  Object to form.
4         (Reporter requests clarification)
5    **A.   I would expect that to be true.**
6    Q.   (BY MR. MECHE)  But as you sit here today, you
7 don't know one way or another?
8    **A.   No.**
9    Q.   Would your HR or personnel department here at
10 LLOG have the information to tell us one way or another
11 whether this gentleman is or was a payroll employee of
12 LLOG?
13   **A.   Yes.**
14        MR. MECHE:  We'll provide that information
15 to all parties.
16        MR. SHEPPARD:  If you still need that --
17 sorry.  I took it down, because --
18        MR. MECHE:  Okay.  That's all I needed,
19 Daniel.  Thank you.
20        MR. SHEPPARD:  You're welcome.
21   Q.   (BY MR. MECHE)  In terms of your testimony
22 about the various contractors, it's my understanding
23 that the dock services that were provided to LLOG in
24 this case were done by a contractor.  Is that true or
25 false?

1    **A.   That's true.**
2         MR. SHEPPARD:  Form.
3    Q.   (BY MR. MECHE)  The loading of the Maggie A.
4 was done by contractors, or was it done by LLOG payroll
5 employees?
6         (Reporter requests clarification)
7         MR. SHEPPARD:  Object to the form.
8    **A.   It was done by a contractor.**
9    Q.   (BY MR. MECHE)  All right.  Let me -- let me
10 rephrase my questions to, hopefully, cure the objection.
11        What I'm trying to find out is whether LLOG
12 payroll employees did a task, or a contractor, so that
13 we're clear about this.
14   **A.   Okay.**
15   Q.   And so in your answer, if you choose, tell me
16 which one it is.  Who performed the dock services?
17   **A.   A contractor.**
18   Q.   Who performed the loading of the Maggie A.?
19   **A.   A contractor.**
20   Q.   Who performed the transport from the GIS dock
21 in Fourchon on May 25th, 2017, to the West Neptune?
22   **A.   A contractor.**
23   Q.   Who unloaded the West -- the Maggie A. to the
24 West Neptune?
25   **A.   A contractor.**

Page 97

1    Q.  Who carried out the drilling plan of LLOG with
2 respect to this job?
3    A.  A contractor.
4    Q.  All right.  I have just a few questions on
5 Exhibit No. 1, which was the notice of deposition, and
6 the list of 20 topics that you were to be prepared to
7 testify about.  Do you still have your copy?
8    A.  Yes.
9    Q.  All right.  Let's take a look at No. 13.  There
10 were some questions about that.
11       To LLOG's knowledge, what contractors were
12 involved with the use of the crane, headache balls,
13 D rings and associated equipment?
14    A.  My understanding, that was Seadrill's.
15    Q.  With regard to the loading and unloading of the
16 Maggie A. on the day of this incident, which company's
17 safety policies were used to conduct that operation?
18       MR. SHEPPARD:  Object to form.
19    A.  I believe it was Seadrill's.  And -- and here
20 again, I'm going off of what Seadrill responded on
21 their -- on their incident report who is the responsible
22 party.
23    Q.  (BY MR. MECHE)  Okay.  Take a look at Item
24 No. 14.  I think you may have testified to this earlier,
25 so if you did, just let me know.  It says, "The nature

Page 98

1 of the vessel, what type of work and services were
2 performed by the vessel, and what type of work and
3 services were performed on the date of the incident."
4 How did you interpret that?
5    A.  I interpreted that to be the boat that brought
6 the supplies out, not -- not the rig itself.
7    Q.  Okay.  What can LLOG tell us about the nature
8 of the boat that was used to bring out those items that
9 were offloaded to the West Neptune?
10    A.  Here again, I think you would be better served
11 to ask the contractor, because I don't think LLOG -- I
12 don't have any knowledge, and LLOG doesn't have any
13 knowledge of the nature of the vessel, other than what
14 we contracted for.
15    Q.  Okay.  So whatever it is --
16       MR. SHEPPARD:  Objection.  Form.
17       (Reporter requests clarification)
18       MR. SHEPPARD:  I was going to object to
19 the nonresponsiveness of it.
20    Q.  (BY MR. MECHE)  The vessel --
21       (Reporter requests clarification)
22       MR. MECHE:  I'm sorry.  Is somebody
23 still --
24       MR. SHEPPARD:  I was -- I was going to say
25 you can go, and then we talked over each other again.

Page 99

1       MR. MECHE:  Oh.
2    Q.  (BY MR. MECHE)  There were two vessels that
3 were involved in the incident, so to speak, right?
4    A.  Right.
5    Q.  And I think you testified the Maggie A. was
6 contracted to bring out supplies and crews to the West
7 Neptune?
8    A.  Correct.
9    Q.  And that's the nature of what it did for LLOG?
10    A.  Correct.
11    Q.  And what was the nature of what the West
12 Neptune did for LLOG procedurally?
13    A.  The West Neptune was -- was contracted to
14 implement and execute the drilling plan for the
15 particular well that we were on.
16    Q.  In terms of how Seadrill performed whatever
17 obligations it had under the contract, who provided the
18 equipment for Seadrill to do that?
19    A.  Seadrill did.
20    Q.  Who provided the equipment for Gulf Logistics
21 to bring equipment and personnel to and from the West
22 Neptune?
23    A.  Gulf Logistics did.
24    Q.  Who provided the equipment at the dock, if we
25 assume that Grand Isle Shipyards was involved -- and I'm

Page 100

1 not saying that they were -- but if they were, who would
2 have provided that equipment?
3    A.  GIS, whoever they were.
4    Q.  Did LLOG provide any of that equipment?
5    A.  No.
6    Q.  Did LLOG provide anything to GLO, Gulf
7 Logistics, to provide the vessel transportation?
8    A.  No.
9    Q.  Did payroll employees of LLOG physically
10 participate in the operation of the crane?
11    A.  No.
12    Q.  Did LLOG payroll employees physically
13 participate in the loading and unloading of the
14 Maggie A. on the day of the incident?
15    A.  No.
16    Q.  You testified earlier that the contract company
17 man that was out there -- I believe his name was Wilson
18 Walley -- would have monitored certain things pursuant
19 to their agreement or the agreement of his employer with
20 LLOG.  Do you remember that testimony?
21    A.  Yes.
22    Q.  In terms of the operations that were being
23 conducted on the date of this incident out at the drill
24 ship, did LLOG provide any step-by-step supervision over
25 the work that was being done by the contractors?



1   A.  No.

2       MR. SHEPPARD:  Object to form.

3   Q.  (BY MR. MECHE)  Did LLOG have a payroll

4 employee out on location that was at least in the

5 pecking order over Seadrill, over Gulf Logistics, and

6 over the other contractors that were out there?

7   A.  No.

8   Q.  Hypothetically, if there was a dispute or a

9 difference on whether something was going to -- to

10 happen or how it was going to happen between the

11 contractors who were all doing their work, who is the

12 highest authority on location on that date that would

13 settle that disputed difference?

14   A.  Seadrill OIM.  He's the -- he's the man in

15 charge.  He has ultimate authority.

16       MR. MECHE:  All right.  I suspect the

17 other lawyers have a few more questions, so I'm going to

18 pass the witness back to Mr. Sheppard.

19           FURTHER EXAMINATION

20 BY MR. SHEPPARD:

21   Q.  Okay.  Let's see here.

22       Is Rick Fowler still LLOG's COO?

23   A.  No.

24   Q.  When was he -- when did he retire or leave?

25   A.  I want to say he retired probably before the

1 end of last year.

2   Q.  Okay.  I have this quote by him, and first let

3 me know if it sounds like him, because it's kind of

4 folksy.  "Oil companies only compete for the lease and

5 the grease.  That's it.  With the mechanics of actually

6 drilling the well, drilling engineers from all" --

7       (Reporter requests clarification)

8   Q.  (BY MR. SHEPPARD)  -- "from all operators will

9 share stories.  When it comes to safety, we're all on

10 the same team."

11       Does that sound like something that Mr. Fowler

12 would say?

13       MR. MECHE:  Objection.  Form.

14   A.  Yes, it does.

15   Q.  (BY MR. SHEPPARD)  Okay.  Because as a -- I

16 would expect you to say -- is everyone on board the West

17 Neptune is responsible for safety.  Everyone's part of

18 that team.

19   A.  Is that a question?

20   Q.  Correct?

21   A.  Is that a question?

22   Q.  Yes, sir.  I'll ask it again.

23       Everyone on board the West Neptune at the time

24 of the incident, they were -- they were all on the same

25 team when it comes to safety, and they're all

1 responsible for making sure things are safe?

2   A.  That's correct.  For the work they're

3 performing, they are responsible for making things safe.

4   Q.  Okay.

5       You answered some questions about some of the

6 contractors that we're saying were out there.  LLOG

7 chose and hired contractors, correct?

8   A.  Correct.

9   Q.  Selected who they were?

10   A.  Correct.

11   Q.  Gave them a plan and said, "You need to follow

12 this plan," correct?

13   A.  That's correct.

14   Q.  Okay.  And this plan, is it -- is it -- I would

15 imagine, since you're going to be drilling at incredible

16 depths, it's not going to be a very short plan; it's

17 going to be a long plan, exhibits, things like that?

18       MR. MECHE:  Objection.  Form.

19   A.  It is an extremely complex and extremely

20 long -- it's -- it is submitted to the government,

21 approved by the government.  And then we hire

22 contractor -- we even -- you know, we have to name the

23 contractors and then go out and have them execute the

24 plan.

25   Q.  (BY MR. SHEPPARD)  Okay.  Is this -- is this

1 document ten pages?  A thousand pages?

2   A.  I would guess more towards a thousand pages.

3   Q.  Okay.  And then does it outline, you know, all

4 of the work that LLOG is going to be doing at that

5 particular lease in the Gulf of Mexico?

6   A.  It -- it -- it outlines all of the work that

7 our contractor is going to be hired to do, yes.

8   Q.  Okay.  And in that, it's going to explain the

9 plan that LLOG wants all of its contractors to follow,

10 correct?

11   A.  That's correct.

12   Q.  Okay.  Does LLOG still have a copy of this

13 document that was submitted to the government?

14   A.  Yes.

15   Q.  Okay.  All right.  You were asked some

16 questions earlier about Mr. Sepulvado.  In looking at

17 this document, it shows that -- it states that he works

18 for LLOG, correct?

19       MR. MECHE:  Objection.  Form.

20       Which document, Dan?

21   A.  Yeah.  Which document?

22   Q.  (BY MR. SHEPPARD)  Sure.  The -- the LinkedIn

23 page for Scott Sepulvado, the page itself states that

24 Mr. Sepulvado works for LLOG, correct?

25       MR. MECHE:  Can you pull that up so we can



Page 105

1 look at it?

2          MR. SHEPPARD:  Sure.

3          MR. MECHE:  Thank you.

4    Q.   (BY MR. SHEPPARD)  Are you able to see it, sir?

5    **A.   Thanks.**

6    Q.   And let me know if I need to zoom in or

7 anything.

8    **A.   No.  And -- and here again, when I saw this for**

9 **the first time, I looked at only that top box.  I didn't**

10 **come down far.  And now I see that -- that he says he's**

11 **an advisor.**

12       **And here again, what people say on their**

13 **Facebook page is not something that I can control or --**

14 **or, you know -- I think the best thing to do is ask**

15 **Scott Sepulvado what he meant by all this on this page.**

16          MR. SHEPPARD:  Object as nonresponsive.

17    Q.   (BY MR. SHEPPARD)  Does the LinkedIn page

18 itself state that Mr. Sepulvado worked for LLOG between

19 April 2014 until the present?

20    **A.   No, it does not say he works for LLOG.**

21    Q.   Who does it state he works for?

22    **A.   It says -- it doesn't say he works for anybody.**

23    Q.   Okay.  You see at the --

24    **A.   I'm trying to see the -- I'm trying to see**

25 **where it says he states that he works for LLOG.**

Page 106

1    Q.   Okay.  Do you see the portion right under

2 "Experience"?  Could you tell me what company is listed?

3    **A.   Point to it with your -- with your pointer.**

4    Q.   Sure.

5    **A.   Okay.  Yeah.  It doesn't say --**

6    Q.   Which company --

7    **A.   It doesn't say he works for LLOG Exploration**

8 **Company.  It's got LLOG Exploration Company's name.  And**

9 **I know we're splitting hairs here, but you're asking me**

10 **a question and making an opinion on something that I'm**

11 **not going to be comfortable saying it says those exact**

12 **words.  It doesn't.**

13    Q.   Okay.  I'll ask the question differently.

14       Underneath "Experience," when Mr. Sepulvado has

15 listed two positions, SEMS/HSE manager and SEMS/HSE

16 advisor, what company is listed?

17    **A.   LLOG Exploration Company.**

18    Q.   Okay.  And below that, it looks like at some

19 point he may have worked for another company where he

20 was the regional HSSE manager for East Texas and

21 Northern Louisiana.  And what company does he have

22 listed there?

23    **A.   I think it's implied.  You know, I don't see it**

24 **shows that he works there.**

25    Q.   Okay.  What company does he list that he --

Page 107

1 that he held the role of regional HSSE manager --

2       (Reporter requests clarification)

3    Q.   (BY MR. SHEPPARD)  -- regional HSSE manager,

4 East Texas/Northern Louisiana?

5          **THE WITNESS:  Ready for my answer?**

6          THE REPORTER:  Yes.

7    **A.   Underneath that it says "Select Energy**

8 **Services."**

9    Q.   (BY MR. SHEPPARD)  Okay.  It doesn't say

10 "Rustics," correct?  Part of this -- none of this says

11 "Rustics" or "Eagle Consulting," correct?

12    **A.   No, no.**

13    Q.   Okay.  When Mr. Guidry said that the -- when

14 you say he intimated to you that the boating company

15 directed the loading of the Maggie A., do you have -- do

16 you know what he based that on?

17    **A.   I assume it was his experience.**

18    Q.   Okay.  And again, since LLOG would have paid

19 for the loading services, there's going to be receipts

20 or invoices associated with that loading, correct?

21    **A.   Yes, sir.**

22          MR. SHEPPARD:  Okay.  I can pass the

23 witness.

24          MR. MECHE:  Melanie, do you have any more?

25          MS. FORDYCE:  I just have one more

Page 108

1 question.

2          FURTHER EXAMINATION

3 BY MS. FORDYCE:

4    Q.   Mr. Bassi, when you were preparing for your

5 deposition, you said you had reviewed a -- a lot of

6 incident reports and witness statements; is that

7 correct?

8    **A.   That's correct.**

9    Q.   In any of those, did it attribute any fault to

10 the loading of the Maggie A. at the Port Fourchon?

11    **A.   Not that I saw on any of those incident**

12 **reports.**

13          MS. FORDYCE:  All right.  I'll go ahead

14 and pass the witness.

15          MR. MECHE:  All right.  We have no further

16 questions.

17          Mr. Bassi, you have the right, if you want

18 to, but not the obligation, to read and sign your

19 deposition transcript.  Would you like to do that?

20    **THE WITNESS:  I can.**

21          MR. MECHE:  Okay.  He would like to read

22 and sign.

23          Madam Court Reporter, I'll send you my

24 contact information, if you don't have it.  You can send

25 it directly to me, and I'll transmit it to the witness.



Page 109

1        THE REPORTER:  Okay.

2        THE VIDEOGRAPHER:  Off the record at

3 2:30 p.m.

4        (Deposition concluded at 2:30 p.m.)

5        (Exhibits 1 - 5 marked)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 110

1                   CHANGES AND SIGNATURE

2 WITNESS: JAMES BASSI                DATE: APRIL 7, 2021

3 PAGE LINE          CHANGE               REASON

4 _____

5 _____

6 _____

7 _____

8 _____

9 _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 _____

21 _____

22 _____

23 _____

24 _____

25 _____

Page 111

1    I, JAMES BASSI, have read the foregoing deposition

2 and hereby affix my signature that same is true and

3 correct, except as noted above.

4

5

6        _____

7                   JAMES BASSI

8

9 THE STATE OF _____)

10 COUNTY OF _____)

11

12    Before me, _____, on this day

13 personally appeared JAMES BASSI, known to me (or proved

14 to me under oath or through _____)

15 (description of identity card or other document) to be

16 the person whose name is subscribed to the foregoing

17 instrument and acknowledged to me that they executed the

18 same for the purposes and consideration therein

19 expressed.

20    Given under my hand and seal of office on this _____

21 day of _____, _____.

22

23        _____

24                   NOTARY PUBLIC IN AND FOR

25                   THE STATE OF _____

25                   COMMISSION EXPIRES:_____

Page 112

1              IN THE UNITED STATES DISTRICT COURT

             FOR THE SOUTHERN DISTRICT OF TEXAS

2                     HOUSTON DIVISION

3 MARK FLORA,                 )

       Plaintiff,           )

4                          ) CIVIL ACTION NO.

  VS.                       ) 4:19-CV-2328

5                          )

  TRANSOCEAN DRILLING (USA),  )

6 INC., et al.,             )

       Defendants.          )

7

8            REPORTER'S CERTIFICATE

9 ORAL AND VIDEOTAPED AND VIDEOCONFERENCED DEPOSITION OF

10       LLOG EXPLORATION OFFSHORE, LLC

11 BY AND THROUGH ITS CORPORATE REPRESENTATIVE JAMES BASSI

12              APRIL 7, 2021

13           (Reported remotely)

14    I, Trisha Myler, Certified Shorthand Reporter in and

15 for the State of Texas, hereby certify to the following:

16    That the witness, JAMES BASSI, was duly sworn by the

17 officer and that the transcript of the deposition is a

18 true record of the testimony given by the witness;

19    That the original deposition transcript was

20 delivered to Mr. Daniel E. Sheppard;

21    That a copy of this certificate was served on all

22 parties and/or the witness shown herein on _____.

23    I further certify that, pursuant to

24 FRCP No. 30(f)(i), that the signature of the deponent

25 was requested by the deponent or a party before the



Page 113

1  completion of the deposition and that the signature is

2  to be returned within 30 days from date of receipt of

3  the transcript.  If returned, the attached Changes and

4  Signature page contains any changes and the reasons

5  therefor;

6      That pursuant to information given to the deposition

7  officer at the time said testimony was taken, the

8  following includes counsel for all parties of record and

9  the amount of time used by each party at the time of the

10  deposition:

11      Mr. Daniel E. Sheppard (02 hours 14 minutes)
           Attorney for Plaintiff, Mark Flora

12      Mr. Alan J. Meche (00 hours 20 minutes)
             Attorney for Defendants Gulf Logistics, LLC,

13         and Gulf Logistics Operating
       Ms. Melanie G. Fordyce (00 hours 09 minutes)

14          Attorney for Defendant Grand Isle Shipyard, LLC

15      I further certify that I am neither attorney or

16  counsel for, related to, nor employed by any parties to

17  the action in which this testimony is taken and,

18  further, that I am not a relative or employee of any

19  counsel employed by the parties hereto or financially

20  interested in the action.

21      SUBSCRIBED AND SWORN TO under my hand and seal of

22  office on this the 19th day of April, 2021.

23

24

25          TRISHA MYLER, CSR, RPR, CRR, RMR

Page 114

1          Texas CSR 3465
           Expiration Date: 04/30/2022

2          LEXITAS
           Firm Registration No. 459

3          325 N. St. Paul, Suite 1900
           Dallas, Texas 75201

4          (817) 810-0244

## Exhibits

**Bassi 001** 6:19,21 97:5

**Bassi 002** 30:20,21 89:15 90:7

**Bassi 003** 34:17,19,21

**Bassi 004** 35:23,25 93:4

**Bassi 005** 42:11,13

## 1

**1** 5:4 6:19,21 97:5 109:5

**10** 13:10

**10:09** 5:3

**10:47** 31:17,18

**11:03** 31:18,20

**12** 74:24

**12:00** 63:12,13

**12:45** 63:10

**13** 74:21,24 75:23 97:9

**14** 74:25 75:25 90:25 97:24

**15** 13:10 74:25 76:13

**16** 75:8 77:17,21 78:14,21

**17** 75:8 79:3,4

**170** 72:22

**18** 16:1,11

**19** 42:25

**1:01** 63:14,16

**1:39** 86:8,9

## 2

**2** 30:20,21 31:20 63:12 89:15 90:7

**20** 6:15 62:22 97:6

**2014** 105:19

**2016** 52:1

**2017** 18:15 27:24 51:13 87:4,5,14,20 88:19 94:17 96:21

**2019** 42:19 90:25

**2021** 5:3

**24th** 87:3,14,20 88:19

**25th** 18:15 27:24 87:5,14 94:17 96:21

**266** 18:8

**272** 18:9

**2:00** 86:9,11

**2:30** 109:3,4

## 3

**3** 34:17,19,21 63:16,17 86:8

**30** 62:17 63:2

**3465** 5:11

**37** 43:1

## 4

**4** 35:23,25 86:11 93:4

**40** 62:17

**442** 36:1 94:15

**443** 36:1

**45** 16:1 63:6

## 5

**5** 42:11,13 109:5

**5th** 52:1

## 7

**7th** 5:3 51:13

## 8

**8** 9:10

## A

**a.m.** 5:3 31:17,18,20

**ability** 26:18

**aboard** 26:8,13 51:13 53:4 63:20 71:1

**Absolutely** 31:13

**accept** 59:5 62:18

**accepts** 27:2

**accident** 38:12 77:8 83:2, 4

**account** 90:5,8

**accounting** 6:11 15:18 16:15,16,18

**accurate** 20:18 90:23

**act** 26:4

**actions** 40:24 67:20

**activities** 53:4

**acts** 11:1

**additional** 38:21

**address** 55:18

**adds** 66:17

**adjusting** 78:8

**admitted** 69:2

**advisor** 90:19 91:1 105:11 106:16

**advisors** 92:4

**afford** 56:7



**afraid** 79:25

**agency** 38:18,21

**agree** 42:1 43:21

**agreement** 40:9 58:20,24 59:7 83:15 100:19

**agreements** 14:15 40:2, 16,17 46:6

**ahead** 17:18 19:10 80:23, 24 81:5 85:24 108:13

**Alan** 5:17 30:24 79:24

**all-hands-on-deck** 56:24

**analogy** 60:20

**analysis** 66:20,24

**annual** 53:21 55:15

**annually** 54:7

**answering** 53:13

**answers** 7:17 10:25 32:3 86:17

**anticipate** 62:15

**apologies** 10:11 55:10

**apologize** 5:23 15:8 53:12 70:5 82:14

**appearances** 5:14

**appears** 30:5,15 34:24 35:3 43:5 90:23,25

**apply** 21:4

**approach** 41:16 43:7,16

**approaching** 64:3

**approved** 24:6,9 103:21

**approximately** 5:3

**April** 5:3 51:13 90:25 105:19

**area** 23:20,24,25

**arranging** 78:7

**article** 44:3

**articles** 39:6,21

**assign** 73:23

**assume** 8:5,25 17:23 29:3 32:19 48:8 59:3,7 65:10, 12 67:5 68:7 69:17 70:22 79:6 82:18,23 83:12 84:16 85:1 94:23 99:25 107:17

**assumed** 75:2 78:19

**assuming** 24:8 77:3 83:13 88:20

**attached** 15:25

**attempts** 43:22

**attorney** 10:2 15:5 39:14 47:8

**attribute** 108:9

**author** 92:7,8

**authored** 68:16 69:9,24

**authorities** 14:4 16:23 24:7 28:12 36:8

**authority** 25:13 26:4,9 41:1 42:5 44:6 45:19 56:6 61:16 101:12,15

**aware** 18:20 19:21 21:22 28:24 38:14 51:3,12,16, 25 52:5 56:16 57:23 59:6 63:19 66:12 67:12,22 68:14,18 69:25 71:11,17, 21 74:4 88:9 93:19 94:20

---

## B

**back** 15:17 31:19 46:24 47:17 52:14 56:12,20 58:7 59:22 63:9,15 79:14 86:10 101:18

**bad** 55:5 58:4

**ball** 9:21 71:8,18

**balls** 71:9 97:12

**base** 7:15 46:22 47:12,19 48:24 58:10,21 59:10 85:12,15

**based** 107:16

**basically** 16:7 52:24

**basis** 36:10 47:18

**Bassi** 5:6,21,22 6:1,6,7 31:22 62:23 80:20 82:1 86:14 108:4,17

**Bates** 18:8

**bathroom** 31:14

**beat** 8:8

**Beginning** 5:4 63:16 86:11

**behalf** 6:13 26:4 76:25

**big** 22:17 93:8

**bigger** 61:23

**bill** 60:18

**binder** 43:18

**binding** 6:13

**bit** 13:2 15:18 17:18 18:25 25:4 42:18 44:2 87:16 89:21 94:8

**black** 9:20 52:23

**blending** 46:1

**blessed** 23:7

**blesses** 23:10

**board** 25:8,13 26:2,18 28:14,19 37:23 72:4,16, 22 76:19 77:11 92:7 102:16,23

**boat** 22:8,11 35:10,13 46:22 49:4,5,8 59:20,21 61:14,15,23 77:3,7,8 84:8,13,14,15 88:19,25 98:5,8

**boat's** 22:10



**boating** 84:9,16 107:14

**boats** 12:4,19 14:16 36:15 47:24 48:11,16 49:11

**BOEM** 28:12

**bottom** 90:13,21,24

**box** 14:12 69:13 105:9

**boxes** 48:18 65:5,12 78:8 84:18 85:6

**break** 8:17 31:9,12,14,22 32:1 62:11,24 80:7,22 81:15 86:2,14

**briefly** 84:3

**bring** 98:8 99:6,21

**brought** 59:19 98:5

**BSEE** 37:22 38:2,4,7,10, 12,16 47:21 52:10,21 53:15,17 54:12 55:16 57:2,4,6

**bubble** 90:24

**bubbles** 90:24

**Buckskin** 42:8,9

**bulletins** 54:12 55:16

**Bureau** 38:7

**business** 15:24,25 47:16 56:8 76:17

**C**

**call** 31:10 47:1 86:2

**called** 20:6 36:17 85:11

**camera** 15:10,12

**captain** 84:13,17

**care** 28:17

**cargo** 32:7,25 33:3,5,7,9, 10,11 34:23 93:4,18 94:15

**carried** 97:1

**case** 18:4 25:11 26:13 35:21 56:15 59:21 61:10 62:6 64:20 65:23 68:17 95:24

**cases** 20:23 55:25

**casing** 14:2 23:6

**catch** 42:24

**centered** 50:2

**central** 48:6

**certificate** 11:15

**change** 22:18 24:5 25:20 32:4 48:7 80:14

**changed** 42:20 48:1 68:10

**charge** 65:9 101:15

**charter** 14:16 35:11 36:22,24

**charting** 14:15

**check** 34:4

**chief** 6:10,11 15:18 16:6, 15,16

**choose** 96:15

**chose** 103:7

**city** 91:12

**claim** 10:25

**claims** 56:10

**clarification** 64:12 77:24 81:3 83:1 84:20 87:10 95:4 96:6 98:17,21 102:7 107:2

**clarify** 77:13

**clear** 7:23 8:21 77:20 78:4 96:13

**closer** 57:3

**cobble** 36:19

**Collectively** 17:23

**combination** 41:24

**comfortable** 86:17 106:11

**comments** 58:17

**communicate** 63:20,25

**communication** 64:2,7,8

**communications** 71:11

**companies** 40:18,24 41:17 43:8,9 44:7 46:14, 23 50:10 55:17 102:4

**company** 6:8,11 13:21 15:23 16:3,4,5,22,24 22:9 25:8 26:2,7,12,20 27:6, 11,13,15,19,23 28:3 29:19 32:15 36:15 37:12 40:11,19 44:9,10,15 49:8 50:2 52:4 64:14,17,19 67:13 72:5 74:12 76:23 82:21 83:7 84:9,17 89:25 91:21 92:12,14 93:1 94:16 100:16 106:2,6,8, 16,17,19,21,25 107:14

**company's** 44:17 50:12 67:14 97:16 106:8

**compare** 43:11

**compares** 41:19

**comparing** 55:10

**compete** 102:4

**complete** 22:22 38:17

**completed** 23:10

**completely** 73:14

**Completion** 30:1

**complex** 103:19

**compliance** 52:25

**complicated** 25:22 40:1

**computer** 81:19

**concentrate** 55:24

**concern** 27:3,4

**concerned** 31:11 64:23, 25



**concerns** 58:17

**concluded** 109:4

**conclusions** 58:6

**condition** 26:19

**conduct** 47:15 67:6 97:17

**conducted** 5:7 100:23

**CONEX** 14:12 48:18 65:5 69:13 78:8 85:6

**confused** 83:8

**confusion** 87:17

**Congress** 60:18

**connect** 81:20

**consistent** 94:23

**construction** 13:24 58:13 92:1

**consultants** 41:17 43:10

**consulted** 16:19

**Consulting** 91:24 92:2 107:11

**consumables** 62:2

**contact** 108:24

**contacted** 69:4

**contained** 40:17 74:2

**content** 8:22

**context** 16:6 39:4,5

**Continental** 19:25

**continue** 80:23

**contract** 10:15 14:20 20:23 22:5 23:3 36:10 39:16 46:12 56:5,18 58:20 72:14 83:10,17 89:3 90:3 91:25 92:1 99:17 100:16

**contracted** 11:11 28:19 42:6 46:2 61:12 72:9 82:3,20 91:21 98:14 99:6, 13

**contracting** 94:24

**contractor** 11:3,10 12:20 19:12 23:12,24 24:23 25:9,10,18 26:21 28:5,23 37:24 38:3 48:15 53:25 56:3,25 64:11,20 65:15 66:5 68:4 70:6 71:16 73:22 91:5,18 92:14,19 95:24 96:8,12,17,19,22, 25 97:3 98:11 103:22 104:7

**contractor's** 75:3

**contractors** 12:13,15 13:20 14:9 21:25 22:13 24:21 26:13 36:6,19 44:20 46:25 47:4,9 50:3 51:23 56:2,4 63:23 64:16 66:22 67:21 68:5,25 70:17 74:1 75:7 76:2 78:21 88:6,12,18 92:22 95:1,22 96:4 97:11 100:25 101:6,11 103:6,7, 23 104:9

**contractors'** 20:21 78:23

**contracts** 40:18

**contractual** 46:6

**control** 14:17 36:25 37:4 105:13

**conversation** 13:8

**conversations** 9:18

**COO** 101:22

**coordinator** 33:24

**copied** 90:9

**copy** 6:21 10:4 17:9,10,12 89:8 93:7 97:7 104:12

**Corporate** 5:6

**corporation** 12:23

**correct** 19:11 22:23,24 24:1,5,23 26:2,16 27:17, 18 29:25 30:3 34:2 36:25 38:8 42:15,16 43:20

44:11,17 45:5,6,8,22,23, 25 49:21 51:4 54:6 55:8 62:6 76:4 82:5 84:5,10 85:18,19,22,23 87:20,25 88:21,23 92:15,20 94:17, 22 99:8,10 102:20 103:2, 7,8,10,12,13 104:10,11, 18,24 107:10,11,20 108:7,8

**correctly** 43:13

**counsel** 5:13

**couple** 9:17 15:6

**court** 7:18 108:23

**coverage** 79:6

**Covington** 5:10 87:11

**CPAS** 16:21

**crane** 49:7,19 50:18 51:4, 13,16 52:2 56:11 57:8,17 65:11 70:16,22 71:1,4,17 73:21 84:8,18 85:18 97:12 100:10

**cranes** 48:18 73:16 74:3,5

**Crank** 94:11

**create** 60:17

**created** 18:19 19:12 32:8, 11 34:24 90:9

**creates** 59:17 60:18

**crew** 44:7 45:7,9,24 48:7 87:25

**crews** 99:6

**CSR** 5:11

**cure** 96:10

**customer** 25:18 35:8,21

**cut** 18:24 29:12 80:3 94:8

---

**D**

**D&c** 29:18,25 89:25



**daily** 47:18

**damage** 16:14

**Dan** 104:20

**dangerous** 51:17,19,20

**Daniel** 5:15 17:9 18:22 25:1 29:11 30:17 34:7 42:23 62:14 77:23 81:8 83:19,20 84:22 89:14 93:6 94:6 95:19

**date** 5:2 43:2,3 47:7 90:2, 8 94:8 98:3 100:23 101:12

**dated** 94:17

**David** 12:3,7,10 13:4 32:19 49:1 84:1,11 86:23 87:2 88:4,14

**day** 28:9 39:18 40:25 42:3 56:20,21 64:23 72:24 73:2 89:12 97:16 100:14

**dealt** 47:9

**death** 55:22,23

**decide** 37:25 74:17

**decided** 15:20

**deciding** 9:18

**deck** 27:21 84:18

**deep** 16:5

**deepwater** 33:24 91:2

**defendant** 11:1

**defendants** 5:18

**definition** 77:2

**delay** 25:4

**deliver** 13:20 63:21

**delivered** 61:11,15,22,23 62:1

**department** 95:9

**departure** 47:23

**depends** 55:20 61:7

**depo** 10:19

**deposition** 5:5 6:14,21 7:3,7 9:13,25 10:22,24 11:6 15:1,2,3,6,21 34:16 74:21 79:21 97:5 108:5, 19 109:4

**depth** 23:5

**depths** 103:16

**Derosio** 83:19

**describe** 32:8 60:16 90:17

**describes** 91:1

**description** 18:12 39:24 43:25

**design** 14:2

**desire** 47:14

**detail** 20:5 39:24 78:24

**details** 52:13 64:11

**determine** 34:3 65:10

**determines** 23:4 38:3

**develop** 23:4 55:17

**developed** 74:13

**developer** 55:4

**develops** 41:6

**dictate** 36:8

**difference** 101:9,13

**differentiate** 78:14

**differently** 30:7 40:5 56:25 61:1 106:13

**dig** 31:2

**direct** 36:10 37:11 39:17 43:17,24 68:9

**directed** 61:19 107:15

**direction** 15:13 22:1,2 25:20,22 37:5 44:23 49:8 61:13 84:9,16 87:24

**directly** 11:9 108:25

**disagree** 25:6 46:1

**discuss** 6:15 53:10,22 54:8 75:22 76:4,14 77:21

**discussed** 10:2 49:2 55:25 69:25

**discussing** 58:17

**discussion** 11:17

**discussions** 8:23 55:15

**dispute** 101:8

**disputed** 101:13

**disrespectful** 42:20

**dock** 35:1 58:21 59:11,20 61:7,12 87:3,13,17,19 88:7 95:23 96:16,20 99:24

**document** 9:23 10:10,13 18:8 19:4,12,15,17 20:3 32:8,10,13 34:8 35:22 92:7,9,11 93:22 94:7,15 104:1,13,17,20,21

**documents** 10:23 11:4 32:6 53:9 65:24 66:7 71:23 72:2 76:16,19 77:9 89:1,11

**downhole** 26:23 27:5 64:18,24,25

**draw** 9:20

**drill** 14:1,11,24 23:1,5,15, 20,25 24:4 36:20 39:8,9 77:5,11 87:4 91:20 92:3 100:23

**drilled** 26:25 50:11

**drilling** 11:3,25 12:5 13:14,18,23 14:20 21:20 23:6,11 24:13,21 27:5,7 30:1 42:6 47:2 58:11 62:3 72:19 97:1 99:14 102:6 103:15



**duly** 6:2

**dust** 43:18

**duties** 20:11 58:25

---

### E

**Eagle** 91:24 92:1,2 107:11

**earlier** 28:2 36:14 37:10 49:2 53:14 81:1 82:3 83:10 84:2,7 86:21 89:2 92:6 97:24 100:16 104:16

**easier** 17:11,12 31:6 93:7

**East** 106:20 107:4

**easy** 89:10

**eat** 79:22

**echo** 81:11,23

**education** 33:23

**email** 34:15

**emergency** 31:11

**employed** 72:6

**employee** 25:9 28:25 34:3 50:23 51:9 72:13,14 86:24 87:7,8 90:2,3 91:23 92:13,18 93:13,15 94:25 95:11 101:4

**employees** 45:12,13,15 46:3,4 50:5 57:20 76:23 87:13 91:25 92:2 93:17 96:5,12 100:9,12

**employer** 100:19

**end** 28:9 39:18 40:24 42:3 56:21 58:16 63:12 64:23 74:18 102:1

**Ending** 86:8

**Energy** 42:14 107:7

**enforce** 21:24

**Enforcement** 38:8

**engineers** 13:24,25 102:6

**entry** 90:24

**Environment** 29:23

**Environmental** 20:7 29:20 38:8

**EPS** 33:24,25

**equipment** 27:2,3 46:5 60:23 71:3 97:13 99:18, 20,21,24 100:2,4

**estimate** 7:6

**evaluate** 56:12

**evening** 11:17

**event** 55:4

**events** 55:15

**everyone's** 50:11,17 102:17

**exact** 106:11

**EXAMINATION** 6:3 80:18 86:12 101:19 108:2

**exceptional** 43:9

**excuse** 48:14 49:7 67:3

**execute** 14:7 22:3 23:16 26:20 70:18,19 99:14 103:23

**executes** 23:12

**executing** 14:23 25:12

**execution** 26:21

**exhibit** 6:19,21 30:20,21 34:17,19,21 35:23,25 42:11,13 53:9 89:15 90:7 91:15 93:4 97:5

**exhibits** 103:17 109:5

**exist** 78:17 89:2

**exists** 89:9

**expect** 89:3 92:21 94:25 95:5 102:16

**experience** 106:2,14 107:17

**expertise** 14:6 22:4 37:6

**experts** 22:9 50:4

**explain** 13:17 104:8

**explained** 84:11 88:2

**explaining** 49:3

**explanation** 59:23

**exploration** 5:7,9,18 6:8, 11 13:15,21 19:24 29:18 89:25 94:16 106:7,8,17

**exploring** 23:20

**extends** 39:8

**extent** 25:6

**extremely** 103:19

**Exxon** 54:15,20 55:10

---

### F

**Facebook** 33:17,23 105:13

**facility** 18:11 47:15 58:14

**fact** 14:7 36:14 79:20 92:25

**fair** 8:2,4,14,15 35:2 36:21 40:9,15,23 41:10 43:15 44:6 54:10 59:23 74:20 79:16 89:13

**fall** 55:6

**false** 95:25

**familiar** 7:12 32:22 51:15 74:12

**familiarize** 12:12

**fault** 108:9

**federal** 23:7,8 24:7 49:25

**feel** 74:22 79:19 80:10

**fell** 16:8

**felt** 11:5 79:12

**field** 42:9



**figure** 57:13 65:19 67:10

**file** 73:8,9

**filling** 18:13 28:4

**finance** 16:18

**financial** 16:20

**find** 14:1,2 16:13 56:13
  77:25 78:1 88:12 89:10
  96:11

**finding** 73:25

**fine** 65:19 67:8 78:13

**finish** 30:19 60:10 86:3

**finished** 24:25

**fits** 61:8

**five-minute** 31:12

**fix** 7:25 8:12 54:24 79:14

**Flora** 57:21,25 58:4 71:5
  91:8

**Flora's** 66:11

**Flores** 5:12

**focus** 51:21,23 72:24

**focused** 73:24 78:11

**folks** 11:21 12:1 21:24
  24:12 45:7 54:7 63:20
  68:15,16 69:8,9,23,24

**folks'** 78:3

**folksy** 102:4

**follow** 68:6 103:11 104:9

**food** 61:10

**Fordyce** 5:19 48:21 49:12
  59:25 62:21 80:19,20
  81:4,7,12,21,25 82:1 83:4
  85:5,24 86:5 107:25
  108:3,13

**forgetting** 69:14

**form** 14:18 19:10 20:19
  21:5 23:2 24:17 25:5
  26:17 29:1 30:4,10,14

32:9,22,24 37:2,15 39:12
  40:21 41:21 48:21 49:12,
  22 50:22 51:5 52:3 56:4
  57:22 58:6 59:2,25 60:1
  64:1 66:3 68:20 70:4
  71:20 73:17 74:23 76:10
  77:1,19 84:24,25 95:3
  96:2,7 97:18 98:16 101:2
  102:13 103:18 104:19

**formal** 58:20

**forward** 58:17 69:7 75:6

**found** 9:24

**Fourchon** 35:1 45:5 46:20
  48:1,3 58:10,14,22 61:7,
  11,25 82:4 87:20 96:21
  108:10

**Fowler** 101:22 102:11

**frantic** 31:10

**free** 74:22

**Friesenhahn** 94:21

**Friesenhahn's** 33:17

**Friesenhahn/bubba**
  33:14 93:12

**front** 6:22

**froze** 73:11

**frustrated** 15:15

**full** 79:16

**fully** 80:10

**fuss** 65:16

**fussing** 7:22 76:6

**future** 55:19

## G

**gaps** 41:9,20 42:2 43:12

**gas** 13:21 15:24,25

**gathering** 43:18

**gave** 15:5 86:21 103:11

**general** 14:22 15:22 60:24
  72:24

**generally** 7:12 16:25
  39:15 61:19 62:5

**generate** 28:10 38:12

**generated** 52:21 73:2

**gentleman** 95:11

**GIS** 10:6 12:12 46:19
  47:11,24 48:10,14,17,22
  49:4,10 58:21 59:20
  61:12 82:6,14,19,24 83:4,
  8,15 84:7 85:21 87:19,23
  88:7 96:20 100:3

**GIS's** 35:1 59:19

**give** 6:13 7:16 22:1 23:16
  25:22 36:7 37:5

**glasses** 10:11

**GLO** 18:8 45:4 100:6

**GLO-LLOG** 36:1 94:15

**goal** 70:18

**Gom** 91:2

**good** 8:7 54:23 81:24

**Gotcha** 18:5 20:9 40:4
  49:17

**govern** 40:18,23

**governed** 40:2

**government** 23:8,10 24:7
  53:17 103:20,21 104:13

**Grand** 5:19 17:5 80:21
  82:9,10,20 83:11,18 89:7
  99:25

**grease** 102:5

**great** 7:16 20:4

**groceries** 61:10 65:2

**group** 11:24 12:2,5,8 34:5
  38:1,5

**guess** 10:25 20:4 52:20,
  23 73:9 84:15 85:11



90:11 104:2

**Guidry** 12:3,7,10 13:5,9
32:19 49:2 84:1,12 86:23
87:2 88:4,14 107:13

**gulf** 5:18 11:13 12:11,17,
20,21 13:22 14:12 20:5
36:13 46:19 52:9,22 82:4,
18,20,21 88:8 99:20,23
100:6 101:5 104:5

**Gulfs** 82:17

**guy** 56:18 65:11

**guys** 14:14 54:15,17 55:5,
14 56:11

## H

**hairs** 106:9

**hand** 17:10

**handle** 15:15 61:12

**handled** 36:13 65:14

**handling** 12:18 22:4 83:25

**hands** 23:23

**happen** 6:22 10:6 52:9
54:18 55:21 60:25 101:10

**happened** 10:3 52:15
53:16,22 54:9,20 55:15
67:14 68:3 77:8

**happening** 55:19

**hard** 7:20 15:12

**harder** 17:13

**head** 7:18 11:25 12:5
13:14,17 50:11 69:21

**headache** 71:8,9,18 97:12

**headquarters** 85:12

**Health** 29:23

**hear** 15:12 81:4,9,12,22

**heard** 42:7,9 49:15

**held** 53:18 107:1

**helicopter** 47:25 61:22

**helicopters** 12:4

**Hey** 24:23

**highest** 101:12

**highlighting** 22:19

**hire** 14:7,8 21:25 37:3,8
39:1,8 41:17 43:9 46:14
50:3 70:17 103:21

**hired** 12:13,16,19,23
16:16 28:13,16 39:10
44:7 45:4,7,9,21,24 46:2,
19,21 47:11 48:10 68:4
73:22 78:22 91:6 103:7
104:7

**hires** 21:24 39:8 40:7
44:5,19 63:22 70:6

**hiring** 73:25

**hold** 24:24 29:10 36:6
54:7 60:10 62:13 84:21
90:16

**holds** 28:24

**honest** 40:2 57:25

**hooked** 65:5

**hourly** 62:11

**hours** 9:9,17

**HR** 95:9

**HSE** 28:5,10,14,20 29:23
37:23 56:18

**HSE/SEMS** 91:1

**HSSE** 106:20 107:1,3

**huh-uh** 7:20

**hurricanes** 16:13

**hurt** 51:4,7,9 56:19

**Hypothetically** 101:8

## I

**I-N-C** 52:21

**idea** 13:16 39:2 64:19

**ideas** 13:25

**identified** 72:13 92:22

**identifies** 90:8

**identify** 71:23 72:5,15
74:15

**identities** 69:12

**identity** 69:11

**image** 29:5 30:8 33:18

**imagine** 47:17 48:4
103:15

**implement** 99:14

**implied** 106:23

**important** 16:12 70:19

**impression** 72:10

**in-house** 14:6 37:6 41:7
56:12

**incidences** 28:17

**incident** 11:2,4,9,14 15:3
17:19,21,23 18:7,10,12,
15,17,19 19:4,20 21:3,8
28:2 37:21 38:10,20
46:24 47:10 51:3,15,25
52:8,17 53:20 54:2,3
55:20,24 56:19 57:16,18
65:23,25 66:2,6,15,21
67:21,25 68:3,8,13,16,19,
24 69:2,24 70:11 71:4,5,
13,15,19,25 75:16,18
83:3 85:21 90:2 91:7,21
97:16,21 98:3 99:3
100:14,23 102:24 108:6,
11

**incidents** 52:6,9,12,15
53:14 54:8 56:9 67:13



**included** 66:11

**including** 27:13 71:4

**incredible** 103:15

**independent** 65:24

**independently** 61:5

**indicating** 94:2

**individual** 11:8 50:2 52:2 86:22

**individuals** 11:8 16:17 71:24

**industry** 40:3 54:11

**information** 14:3 15:5 47:6,8 52:10 54:4 58:5 59:6 65:25 69:5 71:23 73:4,6 87:22 95:10,14 108:24

**initiate** 44:20

**injured** 51:12 52:2 56:10

**injury** 7:9 55:22 56:16

**injury/illness** 18:11

**input** 93:17

**inside** 27:20

**inspect** 71:3

**inspection** 71:8

**instance** 22:8 72:12

**insurance** 10:4 11:16 16:7 79:5

**interactions** 57:21

**interest** 17:3

**interested** 26:23,24

**interfere** 36:11 37:6 45:17

**interpret** 98:4

**interpreted** 98:5

**interrupt** 21:12 30:24

**intimate** 64:10 67:16

**intimated** 107:14

**intimately** 74:4,12

**introduced** 6:19 30:21 34:17 35:23 42:11

**investigate** 67:13

**investigation** 38:13 66:20 67:6

**invoices** 82:25 88:22 89:2 107:20

**involve** 73:21

**involved** 11:9 19:23 21:8 22:9 50:10 54:10,11,16 68:19,24 70:10 87:23 97:12 99:3,25

**involves** 37:17

**involving** 18:16 49:25 55:4 71:5 91:7

**irrespective** 50:19

**Island** 12:18 46:19 82:4, 21

**Isle** 5:20 17:5 80:21 82:9, 10,20 83:11,18 89:7 99:25

**issue** 46:10 47:10

**issued** 53:1,3 69:23

**issues** 17:2 26:23 65:2

**Item** 78:14 97:23

**itemizes** 34:24

**items** 6:15,17 11:19 33:12 53:22 98:8

**J**

**James** 5:21 6:1,6

**job** 6:9,10 7:16 8:7 16:12 29:8,16 56:7 63:23 72:16 97:2

**John** 33:14 93:12 94:21

**JSA** 36:2

**JSAS** 36:6 37:10,13

**K**

**kidding** 73:14 80:1

**kill** 79:22

**kind** 11:18 15:17 16:2,3 22:12 41:5 49:19 53:16 54:6 55:5 56:12,13 59:23 64:6 65:18 72:24 75:13 76:24 79:13 83:16 102:3

**kitchen** 65:3

**knowledge** 15:22 29:2 32:10 50:6 51:6 58:2,5 65:4 66:13 67:16 68:9,21 70:9 76:5,15 77:25 78:1, 23 97:11 98:12,13

**L**

**late** 11:16

**lawyer** 8:8 31:23,25 40:6 48:22

**lawyers** 8:23 9:3,7,12 101:17

**learned** 54:1

**lease** 17:4 36:23 49:25 102:4 104:5

**leases** 23:8

**leave** 13:2 101:24

**left** 22:12 70:20 94:7

**legal** 39:13

**Legalview** 5:8

**lessons** 54:1

**let all** 65:14

**letter** 10:5

**liability** 62:18



**lift** 65:11

**lifting** 78:8

**limit** 94:7

**limited** 78:10

**lines** 71:9

**link** 31:7

**Linkedin** 29:5 30:8,9 89:15 90:5,8,23 104:22 105:17

**list** 33:12 53:12 72:3,5,11, 15,19,23 88:15 92:6,7,16, 23 93:2 97:6 106:25

**listed** 11:3 28:1 83:18 92:17 106:2,15,16,22

**lists** 72:21

**LLC** 5:7,20 94:17

**LLOG** 5:6,9,17 6:8,11,13 9:19 11:12,25 12:6,15 13:15,18,20 14:5 15:19, 23 16:1,2,12 17:20 18:7, 19 19:5,6,12,13,14,17,20, 22 20:2,16 21:23 22:21, 25 23:17,23 24:2 25:18 26:5,8 28:3,13,17,18,22, 23,25 29:18 30:3,9 33:3, 6,7 34:3,25 35:4,11,17 36:2,5,9,10,11 37:12,21 38:4,10,16,20 39:7,8,10 40:10,16 41:6,18 42:15 43:22 44:4,6,15,16,19 45:4,7,13,15,20,21,24 46:2,7,12,14 47:12 49:18 50:17,18,20,23 51:3,9,12, 16,25 52:4,5,15 53:1,4, 15,22 54:7,9 55:16 57:12, 20,24 58:3,5,21 59:4,17 63:19,22 64:10 65:4,13, 14,24 66:4,12,19 67:4,9, 20,23,25 68:2,12,18,21 69:10,25 70:6,8,14,15,17, 23,25 71:3,8,17,22 73:6, 15 74:13 75:4,11,23 76:13,15,18,21,23,25

77:10,18,21,22,25 78:7, 11,16 82:3 83:14,24 86:24 87:11,13 88:20 89:25 90:2,4 91:6,18,21, 25 92:17,18,19 93:13,15, 17 94:16,23 95:10,12,23 96:4,11 97:1 98:7,11,12 99:9,12 100:4,6,9,12,20, 24 101:3 103:6 104:4,9, 12,18,24 105:18,20,25 106:7,8,17 107:18

**LLOG's** 20:10,23 21:2,9 22:22 28:4 33:23 38:5 41:15 43:16 67:12,15 73:24 74:2 78:19 97:11 101:22

**load** 22:11 48:11,16,18 49:4,7 59:12 84:8

**loaded** 61:15,17 84:15 87:13,19 88:19,25

**loading** 49:4,11 84:8 85:14,18 87:3,24 96:3,18 97:15 100:13 107:15,19, 20 108:10

**loads** 59:20

**locate** 10:3

**located** 5:9 46:21

**location** 33:13 47:24,25 48:9 91:1 101:4,12

**logical** 64:1

**logistically** 47:16

**logistics** 5:18 11:13,24 12:2,8,12,20,21 32:20 33:24 46:21 86:24 88:8 99:20,23 100:7 101:5

**logo** 82:24 89:7

**long** 9:7 13:1,8 63:18 80:25 103:17,20

**long-term** 35:11 56:4

**longer** 62:15

**looked** 10:13,14,18,23,24 11:10,23 15:22 18:3 66:6, 8,10 68:7 72:19 105:9

**losing** 69:21

**lost** 40:11

**lot** 40:1 47:17 60:2 74:14 108:5

**Louisiana** 5:10 51:14 87:11 106:21 107:4

**lunch** 62:14,24 63:13

---

## M

**Madam** 108:23

**made** 67:23 68:1,12 71:17

**magazine** 42:8

**Maggie** 35:13 48:19 59:21 65:6 69:13 70:2 87:3,4, 14,24 96:3,18,23 97:16 99:5 100:14 107:15 108:10

**maintaining** 90:5

**maintains** 27:1 93:1

**maintenance** 46:8,9 65:1

**make** 8:9,15 22:17 31:5 34:8 38:4,5 41:19 43:11, 23 44:16 49:14 54:17 55:6 60:25 62:4 79:14,19 81:18 85:20 86:2,20 90:22

**makes** 41:8 84:12 93:1

**making** 60:24 103:1,3 106:10

**man** 25:8 26:2,7,12,20 27:6,11,14,15,19,23 28:3 45:7,9,25 46:4 64:14,17, 19 76:24 91:17 100:17 101:14

**manage** 16:7,21 17:1 37:7 46:22 47:12 64:13 75:18



**managed** 16:11

**management** 19:23 20:7, 21 29:21

**manager** 29:18 32:20 89:25 106:15,20 107:1,3

**manages** 12:4 13:19 37:24

**managing** 17:2

**manifest** 32:7,25 33:3,7, 10,11 35:7,20,25 59:18 93:5,18 94:16

**manifests** 33:5 34:24

**manipulated** 79:12

**manual** 20:2,7,10,15,24 21:2,9,10,16,17 41:7,8, 14,18,23 67:13,17 74:3,7

**manuals** 19:22 41:9,24 43:10,16,23 68:5

**mark** 6:20 30:18,20 31:1 34:7,8,18,20 35:24 42:13 52:23 66:11

**marked** 89:6 109:5

**master** 83:14,16

**material** 60:23 61:2,3,9, 13,16 62:7,8

**materials** 12:24 15:4 33:12 34:25 35:5,8 45:4 59:12,19,22 60:18 61:11, 24 70:2 78:3

**matter** 83:5

**matters** 7:10

**means** 39:3 40:7

**meant** 55:9 105:15

**mechanics** 102:5

**Meche** 5:17 9:1,3 14:18 17:9,14 18:22,24 19:9 20:19 21:5 23:2 24:17,24 25:3 26:17 29:1,10,15 30:4,10,14,17,22,25 31:4,

13 32:9 34:7,11,18,22 37:2,15 39:12 40:13,21 41:21 42:23 48:22 49:22 50:22 51:5,10 52:3 57:22 59:2 60:1,10,15 62:13,19, 23 63:5 66:3 67:3 68:20 70:4 71:20 73:17 74:23 76:10 77:1,19,23 78:9,13 81:11,16 84:21,25 86:1,6, 13 87:12 89:14,19,21,23 91:17 93:6,10,11 94:6,12, 14 95:6,14,18,21 96:3,9 97:23 98:20,22 99:1,2 101:3,16 102:13 103:18 104:19,25 105:3 107:24 108:15,21

**meet** 9:3,5,7,12,15

**meeting** 56:24

**meetings** 53:18,22 54:8

**Melanie** 5:19 62:19 80:20 107:24

**men** 37:12

**mention** 49:9

**mentioned** 26:1 44:4 81:1 82:3 84:7 91:14,17

**met** 9:16 29:7

**Mexico** 13:22 20:5 52:22 104:5

**microphone** 81:14,19

**Mike** 5:5,11,22 42:14

**mind** 87:16 88:24

**mine** 28:7 44:1

**minutes** 13:10 62:10,17, 22 63:2

**misquote** 54:5

**misspeak** 43:7

**moment** 8:9

**monitor** 25:7,9,10 26:20 27:6 28:16,20 45:16 64:18

**monitored** 100:18

**monitoring** 37:18

**month** 72:25

**move** 56:14

**moved** 65:5

**moving** 47:17 78:8 89:13

**multiple** 94:3

**Myler** 5:11

## N

**named** 83:19 86:23

**names** 12:1 70:1 92:11

**nature** 97:25 98:7,13 99:9, 11

**necessarily** 36:23 61:24 63:25

**needed** 7:1 56:24 59:12 80:7 95:18

**Neptune** 14:10,14,21 22:22 23:1 26:14 27:24 28:15 35:2,5,6,17,18,20 36:4 37:14 39:11 40:11 41:1,13 45:5,8,10,22 46:8,10,16,18 48:12 52:1 53:4 59:13 61:4,18 63:20 64:4,6 65:6 69:15 70:3,16 71:1,19,24 72:22 96:21, 24 98:9 99:7,12,13,22 102:17,23

**nodding** 7:17

**noncompliance** 52:17

**nonresponsive** 21:15 25:25 27:9 50:15 68:11 69:7 70:14,24 75:21 105:16

**nonresponsiveness** 98:19

**Northern** 106:21



**notice**  6:14,22 74:22
90:12 97:5

**notification**  59:16

**nuances**  39:23

**number**  44:12 47:3 48:4
72:20 89:23 91:24

---

## O

**OAM**  65:9

**object**  19:9 21:11,14
25:24 27:8 50:14 68:11
69:6 70:13,24 75:20 95:3
96:7 97:18 98:18 101:2
105:16

**objected**  84:23

**objection**  8:10 14:18
20:19 21:5 23:2 24:17
25:5 26:17 29:1 30:4,10,
14 32:9 37:2,15 39:12
40:21 41:21 48:21 49:12,
22 50:22 51:5 52:3 57:22
59:2,25 60:1 66:3 68:20
70:4 71:20 73:17 74:23
76:10 77:1,19 84:22,25
96:10 98:16 102:13
103:18 104:19

**objections**  60:13

**obligation**  49:20,25
50:19,20,24,25 108:18

**obligations**  20:11 40:17
58:25 99:17

**observes**  49:24

**obtaining**  19:24

**occasion**  56:23

**occurred**  65:25

**offense**  55:13

**offer**  6:16

**office**  12:6 13:23 73:25
87:9,11

**office-based**  87:8

**officer**  6:10,11 15:19 16:6,
15,16

**offloaded**  98:9

**offloading**  69:13 70:2

**offshore**  5:7,10,18 13:20
14:8 50:10

**offshoremag.com.**  22:16

**oil**  13:21 15:24,25 102:4

**OIM**  69:3 101:14

**onshore**  85:11,15

**operate**  22:11 27:3 41:13

**operating**  12:21 85:17

**operation**  49:18,19,20,24
50:18 51:13 52:2 56:11
64:18 97:17 100:10

**operational**  11:18,21

**operations**  16:10 21:20
25:22 36:3 46:15 49:11
51:4,17 54:9 55:16 62:3
100:22

**operator**  42:10 52:22
57:8,17 70:16,22 71:1
84:18

**operators**  102:8

**opinion**  106:10

**opportunity**  9:2 31:23
58:12,19 79:17

**opposite**  45:3

**order**  10:15 35:8 58:15
61:2,3,4 101:5

**ordinary**  76:16

**outer**  19:25

**outline**  20:10 40:19 58:24
104:3

**outlined**  46:11

**outlines**  104:6

**owner**  14:21 40:25

**ownership**  36:24

**owns**  36:15,22

---

## P

**p.m.**  63:12,13,14,16 86:8,
9,11 109:3,4

**package**  47:6

**pages**  94:4 104:1,2

**paid**  88:20 107:18

**paperwork**  38:17,21

**paragraph**  22:19 90:12

**parse**  76:7

**part**  24:20 44:8,10,16,17
47:5 90:15,17 102:17
107:10

**participate**  36:2 37:12,18
52:7 100:10,13

**participated**  88:12

**parties**  59:1 95:15

**partners**  17:4

**party**  41:14 65:8 66:8 67:5
69:3 75:16 97:22

**pass**  38:1 80:16 85:25
101:18 107:22 108:14

**passed**  38:20

**past**  33:6

**payroll**  34:5 86:24 87:12
90:1 92:13 93:13,17
95:11 96:4,12 100:9,12
101:3

**PDF**  34:13

**pecking**  101:5

**people**  11:18,24 14:15
15:22 17:13 20:17 22:3,
14 25:7 28:18,20 36:22
37:3 39:22 44:5 46:5



47:20 50:19 51:3 55:23
56:5 60:20 61:4 69:12
70:7,9 72:9,11,12,22,25
77:10 84:13 88:7,8,16
105:12

**perform** 12:14 20:22
21:25 25:23 28:14 39:17
44:5,8 45:22 46:4 48:15
66:19 68:4 70:6 71:8 75:7

**performed** 47:5 96:16,18,
20 98:2,3 99:16

**performing** 24:22 39:19
45:18 49:10 67:14,15
68:3 103:3

**performs** 12:22 67:24

**permits** 14:4

**person** 9:16 11:11 12:7
18:13 27:13 28:10 33:20
37:23 51:12 56:10 69:4
74:15,16,17 83:18,24
84:2,17 93:13

**person's** 50:12 93:14

**personal** 7:9 57:21

**personally** 88:25

**personnel** 18:10 48:17
68:18,22 72:4,16 92:6
95:9 99:21

**pertinent** 21:10

**petroleum** 19:24

**phone** 31:10 81:7,13,20
86:2

**photo** 42:22

**physically** 100:9,12

**pick** 7:19 61:14

**picking** 14:12

**place** 27:12 37:13 46:15
48:6 49:18 50:18 84:18

**plaintiff** 5:16 18:16

**plan** 13:19 14:3,7,23 22:2,
3 23:4,6,9,11,13,16,17,
19,23 24:6,16,20 25:10,
12,19,20 26:21 27:6,7
28:16 41:19 43:11 44:9,
10,16,17,19,20,21 70:18,
19 73:25 97:1 99:14
103:11,12,14,16,17,24
104:9

**plans** 24:8 55:18

**platforms** 92:3

**play** 20:24 60:20

**pleased** 58:12

**PO** 72:3

**POB** 72:3,19,20,21 92:6,
16,23 93:2

**point** 41:5 47:23 60:24
62:4 106:3,19

**pointer** 106:3

**policies** 73:16 74:13 75:4,
6 78:6,12,16,19,20,23
97:17

**pop** 63:2

**popped** 17:6

**Port** 35:1 45:4 46:20 82:4
87:19 108:10

**portion** 106:1

**portions** 25:25 75:21

**position** 57:25

**positions** 106:15

**positive** 41:11

**possession** 10:2

**potentially** 51:17,19

**practices** 68:1,10,13

**preparation** 9:13

**prepare** 10:19,21

**prepared** 11:12,19 52:14
53:12 66:6,8 71:16 75:14,

22 76:4,8,14 77:9,21
78:6,16,18 97:6

**preparing** 9:25 108:4

**present** 105:19

**president** 42:17

**pretty** 16:17 50:7

**prevent** 55:18 56:13

**previous** 53:23

**previously** 69:25

**pricing** 58:12

**pride** 41:6

**primarily** 11:2 16:5 18:3
26:21

**primary** 17:1

**print** 31:6 34:12,13

**prints** 34:14

**prior** 9:12 15:3 71:4

**private** 16:22

**problem** 31:3 56:10

**problems** 16:19 55:18

**procedurally** 99:12

**procedure** 65:12 85:15
88:1

**procedures** 75:4,6 78:6,
12,20,23

**proceed** 86:15

**process** 16:11,22 37:24
59:16,24 60:17 87:17

**processes** 37:7

**produced** 65:23

**production** 13:24 58:11,
13 92:3

**products** 19:24

**program** 18:8

**programs** 36:8



**project** 44:16 91:22 94:24

**pronounce** 28:6

**proposal** 17:5 58:8 59:5,9 83:9,25 89:5,6,9

**prosecute** 44:21

**provide** 14:3,23 22:2 23:11 35:9,17 36:12,16 39:24 46:3,7 47:8,16,20 49:7 50:4 69:5 70:15,25 73:5 84:8 88:15 91:24 92:2 95:14 100:4,6,7,24

**provided** 15:5 17:20 32:6 33:13 68:17 69:10,23 79:5 89:5 95:23 99:17,20, 24 100:2

**providing** 35:19 36:9 47:1 48:11 65:2 73:4

**public** 16:24

**pull** 32:7 89:15,21 93:6 104:25

**pulled** 22:15

**purchase** 10:15 58:15

**purpose** 27:5 32:13 33:9, 10,11

**purposes** 84:15 94:15

**pursuant** 100:18

**pushing** 94:6

**put** 7:2,20 10:11 15:20 17:14 26:1 39:4,5 44:2,3 62:1

**puts** 26:8 54:12

**putting** 69:14 70:3

**Q**

**qualified** 16:17

**quarter** 53:23

**quarterly** 53:21 54:7 55:14

**question** 7:24 8:4,9,24 10:7 18:25 24:18,25 25:15 27:22 30:7 39:2,13 51:10 53:6 58:1 60:13 69:17 70:21 71:7 77:21, 24 78:15 79:10 80:9 102:19,21 106:10,13 108:1

**questions** 8:20 44:12 53:13 58:17 70:8 74:10 75:3,14 79:9,11,17 89:24 92:6 96:10 97:4,10 101:17 103:5 104:16 108:16

**quick** 31:9 62:11

**quote** 42:14 102:2

**quoted** 43:6

**R**

**range** 90:10

**rate** 36:17,18 47:1

**read** 29:8,16 43:13 57:14 108:18,21

**readable** 43:17,23

**reading** 39:22

**ready** 86:15 107:5

**realize** 33:22 46:17

**reask** 44:14

**reason** 58:3

**reasonable** 21:7

**reasons** 16:8

**recall** 89:6 91:5,10,21

**receipts** 107:19

**received** 6:14 66:5 87:23

**recess** 31:18 63:13 86:9

**recognize** 33:20 94:9

**recollection** 92:11

**recommendation** 38:6

**recommendations** 53:16 54:12

**record** 5:4,14 6:5 7:23 31:16,19 35:25 43:9 63:11,15 86:7,10 90:23 94:15 109:2

**records** 56:3

**reevaluated** 68:8

**refer** 18:16

**referring** 78:21

**regard** 58:18 93:18 94:24 97:15

**regional** 106:20 107:1,3

**regular** 14:4

**regulations** 22:6,10

**regulatory** 16:23 20:3,6, 13 24:7 28:11 36:8 38:1,5 42:1 52:23

**relate** 19:20 21:19

**related** 15:3 19:23 28:17 78:21

**relates** 21:2 71:7 75:23 77:18,22

**relationships** 56:4

**relative** 56:1

**relevant** 43:17,23 47:10

**rely** 20:20

**remember** 10:20 17:8 52:13 54:3 57:15 72:17 86:25 94:1 100:20

**remotely** 5:7 79:24

**repeat** 24:18

**repeating** 49:23 70:6

**rephrase** 60:14 71:14 96:10

**report** 11:4,9,12,13 17:19



18:10,11,13 19:4 28:1,2
37:22,25 38:4,10,13,19,
20 56:17 57:1,4 66:6,9,24
69:2 71:15 75:15 97:21

**report's** 73:2

**reportable** 37:21

**reported** 38:16 52:6 53:15
57:6 69:1

**reporter** 5:5,23 7:18 64:12
73:10 81:3,5 83:1 84:20
87:10 95:4 96:6 98:17,21
102:7 107:2,6 108:23
109:1

**reporting** 18:8

**reports** 11:2 17:23 18:18
19:6,19 28:4,11 52:7
53:17 65:24 66:14 68:16,
25 69:9,25 70:11 72:19
75:19 83:2,3,5 85:21
108:6,12

**represent** 5:14 80:21
82:10

**Representative** 5:6

**representing** 30:2

**request** 10:24 47:7

**requests** 64:12 81:3 83:1
84:20 87:10 95:4 96:6
98:17,21 102:7 107:2

**require** 20:17,22 46:7
48:13,14 51:23 67:13

**required** 37:19 50:24

**requires** 36:6

**respect** 97:2

**responded** 97:20

**responsibilities** 26:22
40:19 58:25 69:11

**responsibility** 16:20 42:5
50:12,13,17 61:17 76:24
93:18

**responsible** 37:17 39:18
41:4,14 62:18 65:8 66:8
67:5 69:3,12 70:2 73:4,14
75:16 97:21 102:17
103:1,3

**restroom** 62:10

**result** 18:19 67:25 68:13

**resulted** 83:10 91:22

**results** 10:5 26:24 27:4

**retained** 19:20

**retains** 19:17

**retire** 101:24

**retired** 101:25

**review** 10:21 11:15 15:4
25:19 52:8

**reviewed** 11:1 71:15
108:5

**Rick** 101:22

**ridden** 16:2

**Ridgewood** 42:14

**rig** 11:11 12:25 23:4,12
27:1,2,13 35:10,11 37:23
41:2 45:19 46:3,4 47:2,4,
18,22 48:5 49:24 58:13
62:1,8 64:18 65:1 68:2
98:6

**rigging** 68:6

**rigs** 36:16 52:9

**rings** 71:9 97:13

**risk** 6:10 15:18 16:6 49:23
94:6

**role** 16:15 72:15 107:1

**roles** 69:12 70:1,9

**room** 63:7 79:25

**root** 66:20,24

**rose** 56:22

**rough** 49:19 56:11 80:1

**roughly** 72:22

**rules** 7:13 21:23 22:6,10

**run** 62:10

**running** 65:1

**Rusco** 91:9,12

**Rustics** 107:10,11

---

**S**

**safe** 56:8 103:1,3

**safely** 47:15 78:7

**safety** 11:11 19:22,23
20:7,21 21:10 29:20,23
36:8 38:7 41:13 43:8 50:4
51:21,24 53:21 56:3,24
57:7 68:5 97:17 102:9,17,
25

**scientists** 13:23

**Scott** 18:13 28:5,13 29:6
66:5 71:11 104:23 105:15

**screen** 7:2 10:10 17:6,12,
15 33:18 34:14 58:9
73:11 93:7,8

**scroll** 29:11

**Seadrill** 11:2 14:21 25:11,
23 27:1,12 28:19 35:8,16,
21 40:13,14,16,25 41:1
42:4 45:9,12,19,24 46:2,
3,5,7,12 47:3 48:7,14
51:14 52:1 56:17 57:10,
19 59:16,22 60:19 61:2,3,
16 62:2 65:7 66:7 67:5
69:2 72:12,13,14 73:3,5,9
75:15 92:9 93:3,21 97:20
99:16,18,19 101:5,14

**Seadrill's** 45:18 46:10
97:14,19

**seas** 49:19 56:11

**second-to-the-last** 90:12

**seconds** 62:17



**seeks** 21:23

**sees** 49:18 50:17,23

**Select** 107:7

**Selected** 103:9

**SEMS** 20:6,10,24 21:2,16 29:20 41:6,8,9,13,18,23, 24 43:10,16 67:12,17 74:3,7,12

**SEMS/HSE** 29:18 89:25 106:15

**send** 38:17 108:23,24

**senior** 42:16

**sense** 26:19 84:12

**sensed** 55:12

**sensitive** 55:12

**sentence** 44:13

**separate** 41:24

**Sepulvado** 18:14 28:5,13, 22 29:6,7 30:9 71:12 89:16,24 90:1 91:5 104:16,23,24 105:15,18 106:14

**served** 98:10

**service** 58:19 83:15,17

**services** 36:9 58:18,21 59:11 95:23 96:16 98:1,3 107:8,19

**set** 12:23 13:21

**setting** 90:4

**settle** 101:13

**settled** 88:25

**Sevan** 51:14

**severe** 55:22

**share** 102:9

**shelf** 16:5 19:25 21:20 43:19

**Sheppard** 5:15 6:4,20 14:25 17:11,16,17 18:23 19:2,3,14 21:1,11,14,16 23:14 24:19 25:2,24 26:1 27:8,10 29:4,13,16 30:6, 13,16,18,23 31:3,5,15,21 32:12 34:9,12,20,23 35:24 37:9,20 40:4,15 41:5 42:7,12,25 43:5,15 48:24 49:14 50:14,16 51:2,8,11 52:16 57:24 59:4 60:3,12,16 62:9,16 63:4,6,9,17,19 64:14 66:19 67:8 68:11,12,23 69:6,8 70:12,13,15,24,25 71:22 73:13,15,19 75:1, 20,22 76:12 77:4,20 78:5, 10 79:2 80:16 81:9,18,24 83:9 84:23 86:4 89:17,20 91:16 93:9,24 94:3 95:3, 16,20 96:2,7 97:18 98:16, 18,24 101:2,18,20 102:8, 15 103:25 104:22 105:2, 4,16,17 107:3,9,22

**shift** 94:7

**ship** 14:11 24:3,9 39:8,9 77:5,11 85:18 87:5 91:20 92:3 100:24

**shipped** 33:12 61:6

**ships** 63:21

**Shipyard** 5:20 12:18 17:6 46:20 80:21 82:4,9,11

**Shipyards** 83:11,19 89:7 99:25

**shore** 12:19,24 47:19 58:10,21 59:10

**shore-based** 47:14 87:7

**shoreside** 60:19

**short** 9:20 81:14 86:14 103:16

**shoulders** 16:24

**show** 10:8 18:6 22:16

29:4 42:12

**showed** 28:2 35:7 83:9

**showing** 19:3

**shows** 104:17 106:24

**sic** 5:6

**side** 16:18

**sign** 40:3 108:18,22

**signed** 18:14 89:8

**significantly** 41:16 43:7

**similar** 82:22

**simple** 25:21

**simplistic** 39:24

**sir** 6:5 7:4 14:13 18:23 19:10 22:20 30:13 32:14 33:15,19 34:1 86:15 102:22 105:4 107:21

**sit** 27:20 54:16 55:14 91:4 95:6

**sit-down** 53:15

**situation** 22:8 51:20 61:7

**size** 61:8

**slang** 52:20

**slight** 81:10

**small** 16:3,4

**someone's** 43:19

**sophisticated** 64:2

**sort** 20:2 40:17 46:7 83:14

**sorts** 39:9

**sound** 81:19 102:11

**sounds** 81:24 102:3

**space** 46:21

**speak** 11:22 31:23,25 76:24 99:3

**speaking** 9:1 66:22

**speaks** 30:12 41:7

**specific** 15:2 21:8 53:13 61:21

**specifically** 60:21,25 62:6

**splitting** 106:9

**spoke** 12:2,8 13:4,6,11 84:3

**spread** 36:17,18 47:1

**stab** 80:11

**staff** 16:21

**staffed** 13:23

**standpoint** 20:6,13 42:1

**stands** 38:7

**starting** 9:10

**state** 5:13 6:5 105:18,21

**stated** 44:18,19 45:15

**statement** 20:18 25:6 41:10 43:21 54:10 57:15 60:24

**statements** 11:8 16:20 17:21 19:6,19 65:22 66:11 68:17 69:10,24 108:6

**states** 104:17,23 105:25

**Stegeman** 12:5 13:12

**step-by-step** 100:24

**Steve** 12:5 13:12

**stock** 65:2

**stood** 82:18

**stop** 25:13,17 26:9,14,15, 18 27:11,14 49:20 50:1,6, 20 51:1

**stopped** 27:16

**stories** 102:9

**strange** 74:24 75:10

**straw** 9:20

**stressed** 79:19

**strike** 65:21 67:24

**stringers** 71:9,18

**stuff** 31:7

**submit** 58:12

**submitted** 103:20 104:13

**suited** 70:7

**summarizes** 20:4

**summary** 15:5

**supervision** 100:24

**supervisor's** 18:10

**supplies** 35:18 63:21 98:6 99:6

**supply** 36:16

**support** 46:15 47:1,16 48:12 58:10,13 85:12

**supports** 35:11

**supposed** 61:14

**suspect** 74:5,6 101:16

**switch** 81:13

**sworn** 6:2

**system** 19:23 29:21 64:6

**systems** 20:8,21

---

### T

**tag** 71:9

**taking** 27:12 37:13 46:15 49:18 50:18

**talk** 11:20 12:10 36:5 53:23 60:21 74:21 76:8 77:9 78:6,16,19,24 88:11, 14

**talked** 11:23,24 12:3,4 52:12 60:6,7 83:20 84:2 93:4 98:25

**talking** 17:24 18:6 35:14 37:10 53:11 75:3 77:3,4,

14

**talks** 36:2 74:5

**Tape** 5:4 31:20 63:12,16, 17 86:8,11

**task** 12:14,16,22 21:25 36:7 37:4 39:17,19 42:4 73:23 75:8 88:13 96:12

**tasked** 14:22

**tasks** 17:1 20:24 22:4 25:23 28:14 44:5,8 46:4 48:15 70:7

**team** 102:10,18,25

**techniques** 68:6

**telephone** 9:18

**telling** 23:24 84:17

**ten** 104:1

**ten-minute** 86:2

**term** 52:20

**terms** 14:22 87:17 95:21 99:16 100:22

**test** 46:17

**testified** 6:2 27:10 78:2 86:22 87:18,22 89:2 92:10 97:24 99:5 100:16

**testify** 97:7

**testimony** 6:13,16 66:16 86:21,25 92:18 94:20 95:21 100:20

**Texas** 5:11 106:20

**Texas/northern** 107:4

**Theoretically** 24:11

**thing** 55:12,21 82:17 105:14

**things** 8:13 10:14 15:21 22:12 27:2 36:12,18,22 37:22 39:7,9 42:19 43:22 46:2 47:17 48:10 53:10, 11,24 56:2 59:10 61:25



63:2 73:21 100:18 103:1, 3,17

**thought** 27:16 28:7 40:12 42:25 43:2,3 47:9 67:7 69:18 75:13 77:6,13

**thoughts** 44:3

**thousand** 104:1,2

**time** 5:3 8:17 21:3 44:2 48:2 52:14 56:18 57:18 62:12 66:1,14 71:4,19,25 74:22 85:18 88:16 91:6,7, 20 102:23 105:9

**times** 7:6 80:6

**tired** 79:9

**title** 6:9,10 16:8 29:9,17 42:21 72:16

**today** 9:5,8,12,24 10:17 16:4 53:9 76:4 91:4 95:6

**Today's** 5:2

**told** 36:14 58:7

**toolbox** 36:2,5

**top** 29:11 43:1 90:15 105:9

**Topic** 74:21 75:23,25 76:13 77:17,21 79:3

**topics** 97:6

**touch** 7:1,15

**train** 40:11 70:22

**training** 50:5 70:16 71:1

**transcript** 108:19

**transcripts** 15:1

**transfer** 12:18,24

**transmit** 108:25

**transport** 45:4 96:20

**transportation** 35:9,19 36:16 47:21 48:5 100:7

**transported** 34:25 59:13

**transporting** 78:7

**transports** 59:21

**traps** 55:7

**trick** 79:10

**tricky** 79:9,12

**trips** 35:12

**Trisha** 5:10

**trouble** 89:14

**true** 21:7 41:15 62:5 75:25 76:13 77:17 79:3 95:5,24 96:1

**trump** 41:3

**trust** 20:18

**truth** 8:14

**turn** 28:11 81:18

**turned** 9:23

**TV** 15:11

**type** 61:13 64:7 65:2 67:6 85:11 98:1,2

**types** 41:25 60:22,23 73:21 76:15 77:9

**typically** 83:16

## U

**uh-huh** 7:20

**ultimate** 16:19 38:5 41:1 42:4,5 44:6 45:19 56:6 61:16 101:15

**ultimately** 56:5

**Underneath** 106:14 107:7

**understand** 6:12 7:25 8:1, 11,13 10:7 16:9 35:6 39:15,23 42:2 44:25 51:7 52:14 56:17 63:25 76:22 77:24 78:15 86:20 89:1

**understanding** 18:4 20:25 27:25 37:16 46:9 48:20,

25 57:19 64:24 65:13 72:11 87:18 93:3 95:22 97:14

**understands** 50:8

**understood** 8:5 78:17

**undertakings** 58:25

**undertook** 20:11

**unloaded** 87:14 96:23

**unloading** 87:4 97:15 100:13

**unsafe** 25:14 26:19 27:16 49:18 50:18,24,25 58:4

**unsigned** 89:6

**updates** 93:2

**utilize** 22:22

## V

**Valdez** 54:15,20 55:10

**vein** 9:2

**vendor** 53:25 93:21

**vendors** 44:20 73:25

**verbal** 7:17

**Vercher** 42:15 43:6

**Vercher's** 43:25

**version** 60:18

**versus** 71:19

**vessel** 26:2,8,13 27:20 36:24 39:1,16 44:8 45:25 64:16 76:16,19,20,21,25 77:3 87:19,24 98:1,2,13, 20 100:7

**vessels** 14:16,17 36:3,23 37:14 64:3 66:1 99:2

**vice** 42:16

**view** 93:8

**voice** 15:13



**VP** 42:15

---

**W**

---

**wait** 81:16,17

**walk** 59:15

**walking** 27:20

**Walley** 18:15 28:1,3 71:12
91:18 92:17 100:18

**wandering** 15:8

**wanted** 11:20 24:2 30:25
49:14 60:13 88:11

**watch** 15:14

**water** 16:5

**wave** 16:2

**ways** 56:13 77:14

**web** 31:6

**website** 22:15

**weight** 84:15

**wells** 16:10 22:23

**West** 14:10,14,21 22:22,
25 26:14 27:24 28:14
35:1,5,6,17,20 36:4 37:14
39:10 40:10,25 41:13
45:5,8,9,22 46:8,10,16,18
48:12 52:1 53:4 59:13
61:3,18 63:20 64:4,6 65:6
69:15 70:3,16 71:1,19,24
72:22 96:21,23,24 98:9
99:6,11,13,21 102:16,23

**wiggle** 63:7

**Wilson** 18:14 28:1,3 71:12
91:18 92:17 100:17

**withdraw** 60:12

**wondering** 10:17 19:5
37:12

**Woo** 63:17

**word** 8:11

**words** 80:4 106:12

**work** 6:7,8 7:25 8:12
19:23 20:22 21:2,19,24
22:7 24:22 25:13 26:9,18,
22 27:11,14,16 28:18,21
33:22 36:11 41:25 44:15
45:17,22 47:5 50:1,7,10,
21 51:1 56:20 67:14,15
68:3,4 70:18 73:24 74:1
75:5,13 78:22 89:11 91:7
92:1 94:24 98:1,2 100:25
101:11 103:2 104:4,6

**worked** 50:9 57:17,19
91:5 105:18 106:19

**worker** 58:4

**working** 17:3 26:19 71:24
87:13 88:7 90:11 91:22

**works** 17:16 20:25 23:3
28:22 29:3 30:3,9 59:24
60:17 94:21 104:17,24
105:20,21,22,25 106:7,24

**world** 39:25

**worried** 79:23

**worst** 55:21

**worthless** 43:18

**wrap** 62:16

**write** 41:18 43:10

**writes** 41:18

**writing** 7:21

**written** 17:20 39:22 59:5
65:22 66:14 68:17,25
69:10

**wrong** 43:2 82:15 94:10

**wrote** 56:17,18

---

**Y**

---

**y'all** 14:16 60:13 65:18

**year** 42:23 53:23 102:1

**years** 16:1,12 17:2 79:1

**yesterday** 9:16 11:16,17

---

**Z**

---

**zoom** 29:13 105:6

