DOMESTIC DAYWORK DRILLING CONTRACT - OFFSHORE

THIS CONTRACT, dated the _16th_ day of _April_ 20 _13_, is made between LLOG BLUEWATER HOLDINGS, L.L.C. (a Delaware limited liability company), with offices located at 1001 Ochsner Blvd., Covington, Louisiana 70433, and hereinafter called "Operator" and SEADRILL DEEPWATER CONTRACTING, LTD., a Bermuda corporation, located at 4th Floor, Par-la-Ville Place, Par-la-Ville Road, Hamilton, Bermuda, hereinafter called "Contractor" Operator and Contractor shall hereinafter sometimes be referred to individually as "Party" or together as "Parties".

WHEREAS, Operator desires to have offshore wells drilled or worked over in the Operating Area and to have performed or carried out all auxiliary operations and services as detailed in the Appendices hereto; and

WHEREAS, Contractor is willing to furnish the drilling vessel "West Neptune" together with drilling and other equipment (hereinafter called the "Drilling Unit"), insurance and personnel, all as detailed in the Appendices hereto, for the purpose of drilling said wells and performing said auxiliary operations and services for Operator.

NOW THEREFORE THIS AGREEMENT WITNESSETH that in consideration of the covenants herein it is agreed as follows:

**ARTICLE I - INTERPRETATION**

101. <u>Definitions</u>

In this Contract, unless the context otherwise requires:

(a) "Acceptance Testing" means such testing protocols as the Operator and Contractor agree which demonstrate that the Contractor's Drilling Unit is prepared to commence operations in the initial Operating Area. Operator and Contractor to agree on portion of the Acceptance Testing to be conducted prior to departing the shipyard in Korea. Such testing if conducted during the loading of Contractor equipment and bunkering prior to the Korean shipyard departure will be conducted at zero ($0) day-rate. Contractor shall allow seven (7) days for remaining or additional Acceptance Testing in the Gulf of Mexico at eighty percent (80%) of the Operating Rate (as hereinafter defined) the "Acceptance Testing Allowance", and thereafter any such remaining Acceptance Testing shall be charged at the Operating Rate.

(b) "Affiliated Company" means, with respect to any Entity (in such capacity, the "subject Entity"), (i) any other Entity directly or indirectly owning ten percent (10%) or more of the outstanding voting equity of the subject Entity; (ii) any other Entity ten percent (10%) or more of whose outstanding voting equity is directly or indirectly owned by a natural person or Entity who likewise directly or indirectly owns ten percent (10%)

or more of the subject Entity's outstanding equity; and (iii) any Entity ten percent (10%) or more of whose outstanding voting equity is directly or indirectly owned by the subject Entity. For purposes of this definition, "indirectly owning" means ownership through one or more intermediate Entities.

(c) "Contractor's Items" mean the Drilling Unit, equipment, material and services owned by Contractor or which are listed in Appendices B and D that are to be provided by or at expense of Contractor; and the equipment and materials provided by Contractor's subcontractors.

(d) "Contractor's Personnel" means the personnel to be provided by Contractor from time to time to conduct operations hereunder as listed in Appendix C and personnel of Contractor's subcontractors.

(e) "Drilling Unit Departure Date" is the earlier of such date when Drilling Unit is fully prepared to depart Korea in route to the Gulf of Mexico, or upon loading of Operator's Items while the Drilling Unit is at anchor in Korea. Such date will occur following the Drilling Unit completing sea trials and Contractor's system integration testing ("SIT") protocols. This date shall also be considered the Contract commencement date.

(f) "Entity" means any corporation, limited liability company, trust, joint venture, association, company, partnership, limited partnership, governmental authority or other entity of any form, excluding only natural persons.

(g) "Operating Area" means waters offshore of the state or area specified in Appendix A in which Operator is entitled to conduct drilling operations.

(h) "Operating Base" means the place onshore designated by Operator and specified in Appendix A.

(i) "Operations Commencement Date" shall be the date that the Drilling Unit has completed the Gulf of Mexico Acceptance Testing and is within one (1) nautical mile of the first drilling site specified by the Operator.

(j) "Operator's Items" mean the equipment, material and services owned by Operator or which are listed in Appendix D that are to be provided by or at expense of Operator and the equipment and materials provided by Operator's other contractors.

(k) "Operator's Personnel" means the personnel of Operator, and personnel of Operator's other contractors, to be provided by Operator from time to time in connection with operations hereunder.

(l) "Regulator" and/or "Regulatory Authority" means individually or collectively the Bureau of Safety and Environmental Enforcement (BSEE), the United States Coast

Guard, the United States Environmental Protection Agency, and/or any successors or applicable additions to the foregoing.

102. Currency

In this Contract, all amounts expressed in dollars are United States dollar amounts.

103. Conflicts

Appendices A, B, C, D, E, F, G, H I and J attached hereto are incorporated herein by reference. If any provision of the Appendices conflicts with a provision in the body hereof, the body hereof shall prevail. Note: Need to update to ensure all final Appendices are listed.

104. Headings

The paragraph headings shall not be considered in interpreting the text of this Contract.

105. Further Assurances

Each Party shall perform the acts and execute and deliver the documents and give the assurances necessary to give effect to the provisions of this Contract.

106. Operator's Status

Notwithstanding any contrary or inconsistent provisions herein, the sole "Operator" entity bound to this Agreement is LLOG Bluewater Holdings, LLC.

107. Contractor's Status

Contractor shall be an independent contractor in performing its obligations hereunder.

108. Governing Law and Dispute Resolution

This Contract shall be construed and the relations between the Parties determined in accordance with the General Maritime Law of the United States of America, not including, however, any of its conflicts of law rules which would direct or refer to the laws of another jurisdiction. Where the General Maritime Law of the United States of America is inapplicable, the laws of the State of Texas shall apply, not including, however, any of its conflicts of law rules which would direct or refer to the laws of another jurisdiction.

Any dispute between the Parties arising under this Contract shall be resolved by means of the following procedure:

(a) the dispute shall initially be referred to the respective representatives of each Party who shall discuss the matter in dispute and make all reasonable efforts to reach an agreement;

(b) if no agreement is reached between the respective representatives of each Party, the dispute shall be referred to the Parties' respective senior management who shall make all reasonable efforts to reach an agreement;

(c) in the absence of an agreement being reached on a particular dispute in accordance with the above noted procedure, either Party may pursue litigation and the Parties agree that venue shall be proper in either the United States courts or the courts of the State of Texas that are located in Harris County and waive any objection to the bringing of any action or proceeding in such venue; provided, however, that the foregoing shall not be construed to limit the rights of a Party to enforce a judgment or order from a Harris County court in another jurisdiction. With respect to claims between the Parties, the Parties agree to waive trial by jury;

(d) or, if both Parties agree to arbitrate, the dispute shall be settled in accordance with the Commercial Rules of Arbitration of the American Arbitration Association in force at the effective date of this Contract. In that situation, the arbitration shall be by three (3) arbitrators, or if the Parties otherwise agree, by a sole arbitrator, appointed in accordance with these rules. The arbitration proceedings shall be conducted in the English language and such proceedings shall be held in Houston, Texas. Judgment upon the arbitrators' award may be entered into any court having jurisdiction.

## ARTICLE II - TERM

201. Effective Date

The Parties shall be bound by this Contract when each of them has executed it (hereinafter referred to as "Effective Date").

202. Duration

This Contract shall, subject to Paragraphs 203 and 204 below, be for the term specified in Appendix A.

203. Termination

This Contract shall terminate:

(a) immediately if the Drilling Unit becomes an actual loss or the date Contractor's Marine Surveyor determines a constructive or arranged total loss to have occurred;

(b) after the number of days or on the date specified in Appendix A or, if operations are then being conducted on a well, as soon thereafter as such operations are completed and the Drilling Unit has been safely prepared for transit, is making way and is one (1) nautical mile from the last location (meaning unmoored or, for dynamically positioned Drilling Units, site cleared) or has reached the Demobilization Location specified in Appendix A (unless some other location or port is mutually agreed) and all of Operator's Items have been offloaded (or responsibility therefor has been transferred to Contractor's next operator), whichever is latest;

(c) in accordance with Paragraph 708;

(d) in accordance with Paragraph 802.

(e) following thirty (30) days prior written notice from Operator to Contractor of a material breach and provided that Contractor after having received such notice from Operator setting forth the nature of such breach has failed within such thirty (30) day period to reasonably and diligently commence to remedy said breach. A material breach shall mean serious and significant non-compliance by Contractor with any of its fundamental obligations, responsibilities, and specifications pursuant to the Contract;

(f) in the event work cannot be performed due to failure or breakdown of the Drilling Unit which are within Contractor's power to prevent or correct, Operator upon notice to Contractor shall have the right to terminate if any of the preceding occurrences are ongoing upon the expiry of one hundred eighty (180) days from such notice;

(g) Following thirty (30) days prior written notice from Operator to Contractor if Contractor fails to provide and maintain any part of the Drilling Unit or Contractor Items in good condition and suitable for the purpose for which it was provided and such failure to provide and maintain results in the work being substantially impeded; provided that Contractor after having received such notice from Operator setting forth the nature of such breach has failed within such thirty (30) day period to reasonably and diligently commence to remedy said failure, breach or default;

(h) Delayed Delivery

The Delivery Date window "Delivery Date Window" for the Drilling Unit "West Neptune" means a five (5) month period between June 8, 2014 and November 8, 2014, during which such Delivery Date Window, the Drilling Unit Departure Date shall have been effected unless delayed by Operator Upgrades or loading of Operator Items.

On or before March 7, 2014, Contractor shall notify Operator if the Delivery Date Window is extended. Where delays result from Operator Upgrades or loading of Operator Items, such delays shall automatically extend the Delivery Date Window. Where the Delivery Date Window is extended by seven (7) days or more due to delays within Contractor's control, Operator may within five (5) business days of such

notice from Contractor terminate the Contract. If Operator does not terminate the Contract within five (5) business days, then the Delivery Date Window shall be extended by a period of three (3) months. In case of further delays, Contractor shall again notify Operator in accordance with the terms of this Paragraph 203(g).

204. Option to Extend

Operator may extend the duration of this Contract for one (1) additional one (1) year term by giving notice thereof to Contractor no later than the first anniversary of the Operations Commencement Date, subject to mutually agreed rates, terms and conditions on the time schedule as specified in Appendix A.

205. Continuing Obligations

Notwithstanding the termination of this Contract, the Parties shall continue to be bound by the provisions of this Contract that reasonably require some action or forbearance after such termination.

206. Return of Operator's Items

Prior to termination of operations, Contractor shall return to Operator on board the Drilling Unit, or as directed by Operator at Operator's sole cost, any of Operator's Items which are at the time in Contractor's possession.


## ARTICLE III - CONTRACTOR'S PERSONNEL

301. Number, Selection, Hours of Labor and Remuneration

Except where herein otherwise provided, the number, selection, replacement, hours of labor and remuneration of Contractor's Personnel shall be determined by the Contractor. Such employees or subcontractors' employees shall be the employees solely of Contractor or its subcontractors.

302. Contractor's Representative

Contractor shall nominate one of its personnel as Contractor's Representative who shall be in charge of the remainder of Contractor's Personnel and who shall have full authority to resolve all day-to-day matters which arise between Operator and Contractor.

303. Increase in Contractor's Personnel

Operator may, at any time, with Contractor's approval require Contractor to increase the number of Contractor's Personnel, and the day rates provided herein shall be adjusted accordingly.

304. Replacement of Contractor's Personnel

Contractor will remove and replace in a reasonable time any of Contractor's Personnel if Operator so requests in writing and if Operator can show reasonable grounds for its request.

305. Immigration Laws

For any periods in which Operator's use of the Drilling Unit is prevented by Contractor's failure to comply with applicable US immigration laws, a zero ($0) day-rate shall apply.


## ARTICLE IV - CONTRACTOR'S ITEMS

401. Obligation to supply

Contractor shall provide Contractor's Items and Personnel and perform the services to be performed by it in accordance with Appendices B, C and D.

402. Maintain Stocks

Contractor shall be responsible, at its cost, for maintaining adequate stock levels of Contractor's Items and replenishing as necessary, including full compliance with Contractor's parts/warehouse management system.

403. Maintain and Repair Equipment

Contractor shall, subject to Paragraphs 707 and 901, be responsible for the maintenance and repair of all Contractor's Items and shall provide all spare parts and materials required therefore. Contractor shall provide Operator with a Preventative Maintenance Program as defined in Paragraph 707(d) and perform such work in accordance with that schedule, or any schedule deviations agreed upon with the Operator. For preventative maintenance and inspection activities that will shut down Drilling Unit for twelve (12) or more consecutive hours Contractor shall provide Operator with forty five (45) days advance written notice to allow the Parties to schedule such work effectively and efficiently.

Should the performance of any Contractor's Items decrease to an unsatisfactory level or should the general performance of the Drilling Unit be reduced, in Operator's opinion, due to Contractor's failure to use diligence to maintain the Drilling Unit in sound, efficient operating condition, Operator shall so inform Contractor in writing, and Contractor shall take prompt steps to remedy the situation.

## ARTICLE V - CONTRACTOR'S GENERAL OBLIGATIONS

501. <u>Contractor's Standard of Performance</u>

(a) Contractor shall carry out all operations hereunder on a daywork basis. For purposes hereof the term "daywork basis" means Contractor shall furnish equipment, labor, and perform services as herein provided, for a specified sum per day. When operating on a daywork basis, Contractor shall be fully paid at the applicable rates of payment and assumes only the obligations and liabilities stated in this Contract and its Appendices.

(b) Contractor represents that all work will be performed safely and in a good and workmanlike manner; that Contractor has the equipment as specified in Appendix B in good working order and fully trained personnel capable of efficiently and safely operating such equipment and performing services for Operator; that Contractor regularly conducts training and safety programs; that all materials, equipment, goods, supplies or manufactured articles furnished by Contractor in the performance of the work or services shall be of suitable quality and workmanship for their intended purposes, in accordance with Contractor's rig management system, including Contractor's Safety and Environmental Management System (SEMS), and shall be free from known defects. Contractor will not knowingly employ in any work for Operator any employee whose employment violates applicable labor, immigration or other laws. Contractor further represents that all work performed by it hereunder shall be conducted in accordance with all applicable safety regulations, and by employing such required protective equipment and devices.

(c) Contractor represents compliance with all regulatory requirements for certification and inspection requirements as of the Effective Date with respect to all major equipment including but not limited to BOP's, choke manifold, diverter components, derrick, top drive, crown, drawworks, mud pumps, drill pipe, drill collars, and mooring equipment, and will in writing advise Operator of the dates when the next certifications and or inspections are due. Where such certifications and inspections are not current, Operator shall provide Contractor notice in writing and Contractor shall correct such discrepancies. Where such non-compliance with such existing certification and inspection requirements are material, preventing Contractor from conducting operations, Contractor shall remedy the non-compliance pursuant to the Repair Rate provision.

(d) Contractor shall comply with equipment changes or re-inspections/re-certifications required to meet regulatory requirements enacted after the Effective Date through the rule making provision or new interpretations of existing regulations issued by the Regulatory Authority through the Notice to Lessees process, or emergency safety alerts. Operator shall provide Contractor with copies of such regulatory changes or notices which affect Contractor within seven working days of Operator's receipt of such changes/notices. For any periods in which the Drilling Unit is taken out of service to accommodate the

foregoing, the New Regulations Compliance Rig Modification Rate specified in Appendix A line 501 (d) will apply.

(e) In the event Contractor's Items are subject to a manufacturer's recall notice, costs to comply with such notice shall be for Contractor's account (subject to Paragraph 501(g)). In the event that following such a manufacturer's recall notice, a Regulator requires that Contractor's Items be taken out of service for inspection that is not covered by subsections (c) and (d) above, then upon such inspection if it is discovered that Contractor is not in compliance with regulations as of the Effective Date, the Repair Rate (subject Paragraph 501(g)) shall be in effect following securing of the well until Contractor's Items are returned to service. Where it is discovered that Contractor is in compliance, the Operating Rate shall be effective during the time required to comply with such inspections. In all events covered in this Paragraph 501(e), Operator shall bear the cost of securing the well. In cases where a Contractor proposed risk analysis of the matter is approved by Operator (and Regulator, when required), the Parties may agree to defer interrupting operations and address the matter at an agreed later date.

(f) Contractor will replace, at its sole expense, any of its employees whose replacement is requested by Operator in writing for reasonable cause.

(g) For situations in which the Drilling Unit would otherwise be under Repair Rate provisions or the Regulator requires equipment to be taken out of service, and the Drilling Unit is utilized for alternate Operator activity that does not require the equipment under repair, the Operating Rate shall apply.

(h) Contractor shall provide reasonable assistance to Operator in connection with Operator's BSEE application for a drilling permit, including providing the documents, certifications and data identified in Appendix I as requested by Operator. At least sixty (60) days prior to the Drilling Unit's first arrival in the Operating Area, Contractor shall supply to Operator the documents identified by underline in Appendix I. If Contractor is late in providing such identified documents and Operator's drilling permit is delayed by the Regulator resulting in delays to the Operations Commencement Date, and such delays are solely and directly due to Contractor's tardiness in providing the identified documents, the daily rate shall be reduced to a zero ($0) day-rate, up to a maximum period equal to the number of days Contractor was late in delivering such identified documents to Operator.

502. Operation of Drilling Unit

Subject to Paragraph 606, Contractor shall be responsible for the operation of the Drilling Unit, including, supervising moving operations and positioning on drilling locations as required by Operator. Operations under this Contract will be performed on a twenty-four (24) hour per day basis.

503. <u>Compliance with Operator's Instructions</u>

Contractor shall coordinate its operations with Operator' instructions consistent with the provisions of this Contract including, without limitation, drilling, well control, safety instructions and Contractor's operations procedures. Such instructions shall, if Contractor so requires, be confirmed in writing by the authorized representative of Operator. However, Operator shall not knowingly issue any instructions which would be inconsistent with Contractor's rules, policies or procedures pertaining to the safety of its personnel, equipment or the Drilling Unit, or knowingly require Contractor to exceed the rated capacities of Contractor's Items or the minimum or maximum water depths or maximum well depth set forth in Appendix A. Should Operator make such a request, the request shall be in writing and operations will not proceed until Contractor approves the request in writing.

Upon request Contractor will furnish Operator with copies of the following Contractor documents:

(a)     Safety Regulations;
(b)     Operating Procedures Manuals
(c)     Emergency Procedures Manual;
(d)     Accident Reporting Procedure; and
(e)     Work Permit Procedures;

504. <u>Adverse Weather</u>

Contractor's representative and Operator's representative shall consult with Offshore Installation Manager (OIM) if either believes that there exists or are impending adverse weather or other adverse conditions which might require precautionary measures in order to safeguard Personnel, the Well, the Well equipment and the Drilling Unit. Should any of the above notify another of his decision in good faith that it is necessary to cease operations, or to evacuate Personnel from the Drilling Unit, or to undertake other precautionary measures in order to safeguard Personnel, the Well or equipment, as aforesaid, such measures shall be undertaken notwithstanding the failure of the other representative to agree that such measures are necessary. Such conditions may include the time required to evacuate the Drilling Unit in advance of forecast impending adverse weather conditions. At any time where work on the Drilling Unit is suspended in accordance with this Paragraph 504, the Standby Rate shall be applicable.

505. <u>Drilling, Fluids and Casing Program</u>

Contractor shall follow the Drilling Fluid and Casing Program as specified by Operator. Operator shall provide Contractor with these programs reasonably in advance of the spud date of each well to be drilled hereunder, and Contractor shall respond thereto within ten

(10) working days with any comment. Operator shall invite Contractor to attend and participate in DWOP meetings.

### 506. Drill Cuttings Sampling Program

Contractor shall save and identify cuttings and cores according to Operator's instructions and requirements and place them in containers furnished by Operator.

### 507. Records to be Kept by Contractor

Contractor shall keep and furnish to Operator an accurate record of the work performed and formations drilled on the IADC-API Daily Drilling Report Form or other form acceptable to Operator. A legible copy of said form signed by Contractor's Representative shall be furnished by Contractor to Operator, and shall signify acceptance subject to Paragraph 802 and Operator's right to audit pursuant to Paragraph 1304.

Contractor shall also maintain for the required time period all SEMS mandated regulatory documentation.

### 508. Difficulties during Drilling

In the event of any difficulty arising which precludes either drilling ahead under reasonably normal procedures or the performance of any other operations planned for a well, Contractor may suspend the work in progress and shall immediately notify the representative of Operator, in the meantime exerting reasonable effort to overcome the difficulty. In the event Contractor is required by Operator to drill a relief well(s) with the Drilling Unit, relief well operations may be subject to the consent of, and additional conditions imposed by, Contractor's underwriters. Any additional premiums and all deductibles shall be for Operator's account during such operations.

### 509. Well Control Equipment and Personnel

Subject to Article IX, Contractor shall maintain its well control equipment listed in Appendices B and D in good condition at all times and shall use all reasonable means to control and prevent fires and blowouts and to protect the wellbore. Contractor's responsibility for BOP's, choke manifolds, diverter components and other related equipment being in compliance with all applicable local, state and federal rules, laws and regulations, including timely certifications and inspections, are as set forth in Paragraphs 501(c) and (d). Contractor's Personnel shall be competent and properly trained as per Contractor's SEMS so as to understand and carry out their duties with regard to well control in accordance with all current and future BSEE and other applicable regulations.

510. Inspection of Materials Furnished by Operator

Contractor agrees to visually inspect all materials furnished by Operator before using same and to notify Operator of any apparent defects therein. In no event shall Contractor be responsible to Operator for latent defects in Operator items, equipment and materials. Contractor shall not be liable for any loss or damage to materials furnished by Operator.

511. Repeated BSEE Incidents of Non-Compliance

If the Bureau of Safety and Environmental Enforcement (BSEE) issues repeated incidents of non-compliance (INC) for the same condition due solely to Contractor's failure to respond to the initial INC, Operator shall notify Contractor in writing (including email), and Contractor shall reply in writing (including email) as to how the Drilling Unit or operations will be remedied to address the Incidents of Non-Compliance. If the Operator is prevented by the BSEE, BOEM, US Coast Guard, or EPA from continuing with drilling operations due to such repeated Contractor-caused identical INCs, then Contractor shall remedy such repeated non-compliances, with a zero ($0) day-rate applying until the Drilling Unit can resume operations.

512. Acceptance Testing

The Parties hereto acknowledge that Operator, in consultation with Contractor, shall be provided full access to the Drilling Unit to allow Operator and its third party inspection teams to perform pre-acceptance regulatory and operability compliance for the purpose of developing and executing an Acceptance and Testing Program ("ATP"). Contractor and Operator shall work together in good faith to create and implement within six (6) months of the Effective Date a mutually agreeable ATP for the Drilling Unit and all acceptance testing under the ATP shall be performed as a joint effort of Operator and Contractor at the Shipyard, at sea trials, in transit and/or at such other location in the Gulf of Mexico as the Parties shall mutually agree. Components of the plan are shown in Appendix H

During the performance of the ATP, should a defect occur that prevents any further continuance of the ATP or prevents the Contractor from safely commencing Operations (either from a regulatory or functional basis), the Repair Rate provisions will apply until such defect is corrected. Where delays are the result of regulatory changes occurring after the Effective Date, the provisions of Paragraph 501(d) shall apply. During any period where such repair work cannot progress due to Contractor waiting on weather, the Standby Rate shall apply. Non-critical punch list items identified during the performance of the ATP which do not impact Contractor's ability to safely commence operations shall be corrected by Contractor in a diligent manner. During the ATP, time spent on Repair Rate provisions or Standby does not count against the Acceptance Testing Allowance.

During the time as Contractor is loading the second BOP stack on the Drilling Unit in the Gulf of Mexico and such loading operation prevents Operator from conducting work

including any ongoing ATP, the rate at such times shall be zero ($0) day-rate; otherwise the applicable rates shall apply.

Upon completion of the ATP, the Standby Rate shall apply during the Drilling Unit's move from the ATP site to the first well site.

513 - Quiet Enjoyment Letters

At least sixty (60) days prior to the Drilling Unit's first arrival in U.S. waters, Contractor shall deliver to Operator (i) quiet enjoyment letters from any of Contractor's lenders which are Contractor's Affiliated Companies and that hold or are intended to hold mortgages or other similar encumbrances that could entitle such lenders to seize or foreclose on the Drilling Unit, (ii) a summary of the ownership and charter structure pursuant to which Contractor holds rights or will hold rights to the Drilling Unit (including a description of all charters pursuant to which Contractor directly or indirectly derives its rights to the Drilling Unit from the Drilling Unit's owner), and (iii) quiet enjoyment letters from the Drilling Unit's owner and all parties to charters described in clause (ii) other than Contractor. If, after arrival of the Drilling Unit in U.S. waters, any additional mortgage or similar encumbrance is placed upon the Drilling Unit in favor of an Affiliated Company of Contractor, Contractor shall, prior to the effective date of such instrument, deliver to Operator a quiet enjoyment letter from the lender who will hold such mortgage or similar encumbrance. Each such quiet enjoyment letter shall confirm to Operator that Contractor's possession of and right to use the Drilling Unit, and Operator's rights under this Contract to the services of the Drilling Unit, shall not be disturbed or terminated by any foreclosure, seizure or charter termination by the party granting the quiet enjoyment letter while this Contract remains in effect.

At least twenty (20) days prior to execution of any mortgage or similar encumbrance of the Drilling Unit in favor of a lender which is not an Affiliated Company of Contractor, Contractor shall use reasonable efforts to deliver to Operator a quiet enjoyment letter from such lender in a form mutually acceptable to Operator, Contractor, and such lender confirming Operator's rights pursuant to this Contract to the Drilling Unit in the event of any default under the indebtedness secured by the mortgage or other encumbrance.

## ARTICLE VI - OPERATOR'S OBLIGATIONS

601. Equipment and Personnel

Operator shall at its cost provide Operator's Items and Operator's Personnel and perform the services to be provided or performed by it according to Appendix D. In addition to providing the initial supply of Operator's Items, Operator shall be responsible, at its cost, for maintaining adequate stock levels and replenishing as necessary. When, at Operator's request and with Contractor's agreement, the Contractor furnishes or subcontracts for

certain items which Operator is required herein to provide, for purposes of this Contract said items or services shall be deemed to be Operator furnished items or services. Any subcontractors so hired shall be deemed to be Operator's contractor, and Operator shall not be relieved of any of its liabilities in connection therewith. For furnishing said items and services, Operator shall reimburse Contractor its entire cost plus a handling charge as specified in Appendix A.

602. <u>Maintenance and Repair of Operator's Items</u>

Operator shall be responsible, at its cost, for the maintenance and repair of all Operator's Items on board the Drilling Unit. To the extent possible Contractor shall provide personnel to assist Operator with such work.

603. <u>Operator's Personnel</u>

Operator shall designate a senior representative to resolve day-to-day matters requiring decision by Operator who will be present on board the Drilling Unit. Contractor may treat Operator's senior representative for the time being on board the Drilling Unit as being in charge of all Operator Personnel on board. Operator agrees that Operator's Personnel shall be subject to Contractor's policies regarding prohibition of alcoholic beverages, controlled substances and contraband, including the right to conduct random searches and tests.

604. <u>Replacement of Operator's Personnel</u>

Contractor shall have the right to request in writing Operator to remove and replace any Operator Personnel on board the Drilling Unit if the Contractor can show reasonable grounds for such request.

605. <u>Operator Representatives</u>

Operator shall nominate one of its personnel as Operator's Representative who shall be in charge of the remainder of Operator's Personnel and who shall have full authority to resolve all day-to-day matters which arise between Operator and Contractor. In addition, Operator may, from time to time, designate representatives for the purpose of this Contract who shall at all times have access to the Drilling Unit and may, among other things, observe tests, examine cuttings and cores, inspect the work performed by Contractor, or examine the records kept on the Drilling Unit by Contractor.

606. <u>Drilling Site and Access</u>

Operator will be responsible for selecting and marking the site in the Gulf of Mexico where any Acceptance Testing will be conducted and drilling locations within a sixteen hundred feet (1,600') radius or within the anchor pattern (whichever is applicable) for

providing proper and sufficient certificates, including, without limitation, the Certificate of Financial Responsibility required pursuant to the OCS Lands Act as amended, permits or permission necessary to enter upon and operate on the drilling site, and for notifying Contractor of any impediments or hazards to operations at the Acceptance Testing site and each drilling location within a sixteen hundred feet (1,600') radius or within the anchor pattern.

Operator will provide Contractor two surface assessments and one subsurface assessment. The surface assessments are the archaeological survey and water bottom profile with impediments and hazards noted on the assessments. Assessments extend to 15,000 feet from the wellsite. In all cases, the sea floor is analyzed and Operator shall select well locations that are a safe distance from any naturally occurring or man-made impediment to safe execution of a drilling operation.

The subsurface assessment is the shallow hazard analysis. This analysis covers shallow faults, water-bearing zones, and any potential gas-bearing zones. Operator shall use ~~all~~ geologic information to select safe well locations and modify well designs to account for potential issues in a given wellbore.

Should there be third party property properly identified (including correct location) on the hazard survey within the area of the Acceptance Testing site or the drill site and Contractor's equipment damages such properly identified third party property, Contractor's liability (if any) to the third party property owner shall be "at law".

Should damage to third party property within the sixteen hundred foot (1,600') radius result from the property not being properly identified (including location) on the hazard survey, Operator shall hold harmless, defend, release and indemnify Contractor for all such resulting damage to such third party property.

Unless otherwise agreed, Contractor shall not move the Drilling Unit for distances greater than two hundred feet (200') from site to site with Contractor's Items suspended in or over the water. Where required and in conjunction with a proper risk assessment, endorsement by the Parties' insurance underwriters and the Parties agreement, a move greater than that distance may be made.

Contractor shall have the right to reject any location that imposes a potentially unacceptable hazard after notifying Operator of such hazard and allowing Operator to address/mitigate the hazard.

607. State or Local Tax Liability

In the event that the Contractor, as a result of operations under this Contract in any state waters, receives an assessment of tax directly by an appropriate taxing authority, Contractor will, prior to making any payment, notify Operator of such assessment. If

Contractor is required to pay the tax, Operator agrees to be responsible for and hold harmless and indemnify Contractor from any and all claims with respect thereto. In addition, Operator will reimburse Contractor any sums so paid.

608. Operator Upgrades

"Operator Upgrades" means all repairs, replacements and modifications to the Drilling Unit which are requested in writing by Operator after the Effective Date.

In the event that Operator wishes to undertake any Operator Upgrades prior to the delivery date of the Drilling Unit from the shipyard, the Parties hereto shall negotiate in good faith to schedule the construction of such Operator Upgrades: (i) so as to complete the same, to the fullest extent possible, while the Drilling Unit is in the shipyard; and (ii) so as to minimize the construction costs and any resultant impact on the proposed scheduling of the shipyard delivery date. Operator shall pay all properly documented costs associated with such Operator Upgrades, including any costs charged by the Shipyard to Contractor in respect of any changes to the construction schedule for the Drilling Unit. If the Drilling Unit is ready for Shipyard departure and Operator Upgrades result in additional Shipyard Days, such days shall be paid for by Operator at the Operating Rate. The Operating Rate for such Days shall be payable only if the sole cause of the delay is Operator Upgrades.

On or before performance by Contractor of an Operator Upgrade the following must occur:

(a)     All Operator Upgrades and associated costs must be agreed in writing prior to commencement of the Operator Upgrade.

(b)     Operator shall notify Contractor in writing whether or not Operator wishes to have the Operator Upgrade removed at some future point in time;

(c)     On or before performance by Contractor of an Operator Upgrade the following must occur:

(i)     All Operator Upgrades and associated costs must be agreed in writing prior to commencement of the Operator Upgrade.

(ii)     Operator shall notify Contractor in writing whether or not Operator wishes to have the Operator Upgrade removed at some future point in time;

(iii)     if Operator elects to have the Operator Upgrade removed, Operator and Contractor shall agree in writing the point in time when the removal is to occur, and which Party is to bear the cost of such removal.

609.  Change in Laws/Regulations

As set forth below in this Paragraph 609, Operator shall pay for any modifications to the Drilling Unit of a material cost that are the direct result of changes in any applicable U.S. laws or regulations, which have occurred after the Effective Date.  Contractor shall provide cost estimates for such changes to Operator and any such costs shall be agreed in writing between Operator and Contractor prior to such modifications being made.

Operator shall reimburse Contractor for costs associated with changes in law, new regulations, or modifications to this Contract required by Paragraph 1305 after the Effective Date which directly require during the term of the Contract increased operational expenses or additional expenditures by Contractor.  Notwithstanding the previous sentence, if Contractor is obligated to incur a capital expenditure (excluding the applicable day rate charges including those provided for in Paragraph 501(d)) in excess of five million dollars ($5,000,000) that must be completed within three hundred and sixty five (365) days or less of the expiration of the term of this Contract, Operator shall pay the first five million dollars ($5,000,000) and Operator and Contractor shall share in paying the excess over five million dollars ($5,000,000) on the basis of Operator's share being calculated as the percentage of days remaining in the final 365 days of the Contract Term.  For example, if 200 days remain of the final year, Operator's share of the amount in excess of five million dollars ($5,000,000) shall be 200 days divided by 365 days, which yields a percentage of 55%, with Contractor's responsibility being the balance of such excess.


## ARTICLE VII - RATES OF PAYMENT

701. Payment

Operator shall pay to Contractor during the term of this Contract the amounts from time to time due calculated to the nearest half-hour according to the rates of payment herein set forth and in accordance with the other provisions hereof.

702.  Mobilization Fee

Operator shall pay Contractor the Mobilization Fee as specified in Appendix A which shall be payable monthly, pro-rated by the distance traveled to the total transit distance, with the final invoice for mobilization reflecting the remaining balance.  Fuel and logistics during the mobilization shall also be billed on a monthly basis.  The Drilling Unit's arrival in the Gulf of Mexico for Acceptance Testing and/or loadout at Operator's designated point shall complete Contractor's mobilization obligations.  Following the Acceptance Testing Allowance, the Operating Rate will be in effect for any further Acceptance Testing required by Operator.  Upon completion of the Acceptance Testing, the Standby Rate (as hereinafter defined) shall apply during transit of the Drilling Unit

from the Acceptance Testing site to within one (1) nautical mile of the first well location, whereupon the Operations Commencement Date will occur and, the Operating Rate shall apply. Operator shall also pay for fuel and logistics during mobilization from the Korean shipyard.

While the Drilling Unit is at anchor offshore Korea following completion of sea trials and Contractor's SIT, Operator may perform certain of its Acceptance Testing protocols at no additional charge if such Acceptance Testing procedures do not prevent bunkering and loading of Contractor Items, however limited to the number of days Contractor will be at anchor conducting such activities (currently estimated at seven (7) days or less).

In the event Operator loads Operator Items, performs Rig Upgrades or Acceptance Testing at the shipyard(s) or bunkering points during transit of the rig from Korea to the Gulf of Mexico, and such work causes delays to Contractor's transit, such delays will be charged to Operator at the Operating Rate.

703. Demobilization Rate

Operator shall pay Contractor a Demobilization Rate as specified in Appendix A which shall be payable from the time Operator's identified equipment has been off-loaded and the Drilling Unit is making way one (1) nautical mile from the last well location until the Drilling Unit arrives at the Demobilization Location designated in Appendix A, or released to another Operator.

704. Deliberately Omitted

705. Operating Rate

The Operating Rate specified in Appendix A will become payable from the moment when the Drilling Unit has completed the ATP and is within one (1) nautical mile of the first well location. Completion of the ATP will be as per Paragraph 512. The Operating Rate shall continue to be payable throughout the duration of the Contract so long as operations are being conducted as provided in this Contract, except as herein otherwise provided until the Drilling Unit is ready to commence demobilization activity as defined in Paragraph 703, at which time the Demobilization Rate will be payable.

706. Standby Rate

The Standby Rate specified in Appendix A will be payable as follows and as elsewhere provided for in this Contract:

(a) During any period of delay when Contractor is unable to proceed as a direct result of an act, instruction or omission of Operator including, without limitation, the failure of

any of Operator's Items, or the failure of Operator to issue instructions, provide Operator Items or furnish services;

(b) During any period after Operations Commencement Date that the Drilling Unit is under tow, or under way, provided that if, at the termination of this Contract, the Drilling Unit does not go to the Demobilization Location specified in Appendix A the period shall be the reasonably estimated time required to go no further than said Demobilization Location or released to another operator one mile from the last Operator location;

(c) During any period, up to a maximum of ninety (90) days when operations are suspended to repair the Drilling Unit or other Contractor Items due to blowout, well fire, or adverse weather or currents at a drilling location, unless Drilling Unit is a total loss, as per Paragraph 203(a).

(d) During any period, when operations are suspended as a result of atmospheric/sea conditions being outside Contractor's operating envelope.

707. Rates During Repair and Preventative Maintenance

(a)   Repair Rate

(i.)      The Repair Rate set forth in Appendix A shall be payable by Operator per twenty-four (24) hour Day or part thereof during any period when operations are suspended on account of breakdown, maintenance or repair of Contractor's Items. During any such suspension the following shall apply:

(ii.)     During the initial thirty (30) Day period following the Operations Commencement Date, (the "**Initial Operating Period**"), the Allowance for Repair at Operating Rate (per Appendix A, 705) shall apply for a cumulative maximum thirty (30) hours.  For the next cumulative thirty (30) hour period, the Allowance for Repair at Operating Rate will be reduced by fifty (50%) percent, after which a zero ($0) day-rate shall apply.  If repairs are commenced but not completed during the Initial Operating Period, then a zero ($0) day-rate shall apply until all repairs commenced within the Initial Operating Period are completed and the Drilling Unit is fully operational.  If weather conditions interrupt a repair commenced during the Initial Operating Period, then the Initial Operating Period shall be extended by the same number of days as caused by the weather delay.  During any period where the repair work cannot progress due to Contractor waiting on weather, the Standby Rate shall apply

(b)   Following the Initial Operating Period, the Repair Rate shall apply for a cumulative maximum of twenty-eight (28) hours per calendar month for surface equipment and forty (40) hours per calendar month for sub-surface equipment. During any period where the repair work cannot progress due to Contractor

waiting on weather, the Standby Rate shall apply. Subject to Paragraph 707(c) below, in the event of a repair to Contractor's BOP equipment, the time required for pulling, re-running and initial post repair subsea BOP testing of Contractor's BOP equipment shall be part of the repair and payable per the Repair Rate provisions.

In the event of failure of Contractor's equipment (unless caused by Operator or its other contractors) which requires a suspension of operations to repair such Contractor equipment, and further such suspension requires the well to be secured, Contractor shall be paid as follows:

(i)     ninety percent (90%) of the Operating Rate during the time required to secure the well;

(ii)    subsequent to those operations set out in Paragraph 707(b) (i) above, the Repair Rate provisions set out in this Contract shall apply while the Contractor's equipment is being repaired or spare equipment is put into service;

(iii)   following the work as described in Paragraph 707(b) (ii), the Contractor shall then resume work at ninety percent (90%) of the Operating Rate during the time required to remove the barriers installed to secure the well, and return operations to the point where Contractor's equipment failed. In the event such repairs are to subsea equipment the time period from the completion of subsea BOP testing to the point in operations just prior to Contractor's equipment failure will also be at ninety percent (90%) of Operating Rate, thereafter the applicable rate shall apply. Resumption of operations is the operation just prior to the failure of Contractor's equipment.

For the avoidance of doubt, the periods of time when Contractor is performing work hereunder at ninety percent (90%) of Operating Rate shall not count towards the Repair Rate allowances provided for in this Contract.

(c)     BOP Preventative Maintenance

Contractor will be allowed to round trip the BOP (a "Pull") at the Operating Rate after one-hundred-fifty (150) days of continuous underwater deployment.

A "Well Program" shall be defined as the time from Spud of the Well to the time the BOP has been racked and the Drilling Unit is ready to move to the next location.

(d)     Planned Preventative Maintenance

Planned preventative maintenance is considered part of normal operations and shall be charged at the Operating Rate for up to a total of twenty-six (26) hours per month, and with the Repair Rate thereafter applying. Preventative maintenance will be carried out in accordance with a preventative maintenance program ("**Preventative Maintenance Program**"). Operator and Contractor shall work together in good faith to create a mutually acceptable Preventative Maintenance Program for the next following month. Contractor shall provide at least three (3) Days notice of all planned preventative maintenance. Contractor shall, to the extent possible, schedule planned preventative maintenance during periods where such maintenance will have the least interference with ongoing operations. All maintenance work not included in the Preventative Maintenance Program shall be considered repair work and charged at the Repair Rate. Neither Party shall amend the Preventative Maintenance Program without prior written consent from the other Party. Nothing in this Paragraph 707(d) shall constitute a waiver by Operator of any of its rights under this Contract and Operator's involvement with respect to the Preventative Maintenance Program shall not negate Contractor's obligations hereunder, including those related to the quality, fitness or condition of Contractor's Items.

(e)     New Regulations Compliance Rig Modification Rate

The New Regulations Compliance Rig Modification Rate shall be as set forth in Paragraph 501(d) and in Appendix A, 501(d).

708. Force Majeure Rates

The Force Majeure Rates specified in Appendix A will be payable during any period in which operations are not being conducted because of Force Majeure as defined in Paragraph 1303, up to a maximum of ninety (90) consecutive days, after which and during the continuous existence of the Force Majeure either Party may then terminate the Contract subject to Operator's obligations for demobilization as provided in Paragraphs 703 and 705(c), or in the event both Parties agree to leave the Contract in effect, at a rate the Parties hereto otherwise agree.

709. Additional Payments

Operator shall, in addition, pay to Contractor:

(a) the cost of any overtime paid by Contractor to Contractor's Personnel in respect of the maintenance or repair on board the Drilling Unit of Operator's Items or other overtime required by the Operator;

(b) Contractor's costs associated with waiting on Operator furnished transportation or for time in excess of six hours in transit to or from the Drilling Unit, or as a direct result of an act, instruction or omission of Operator;

(c) Contractor's costs associated with evacuations and accommodations of personnel caused by named tropical storms and hurricanes;

(d) Contractor's costs associated with moving Contractor's Items, Personnel, and their personal effects, if Operator requires Contractor to change Operating Base;

(e) Drill String Upgrade – As a result of Operator's agreement to compensate Contractor for an upgrade to the Drill String from that which was to be furnished as standard equipment with the Drilling Unit, Operator shall pay Contractor the Drill String Upgrade rate as provided for in Appendix A. The Drill String Upgrade rate shall come into effect on the Operations Commencement Date and shall remain in effect through the primary term of the Contract (1095 days). This rate shall remain in effect no matter what other rate may be in effect for the Drilling Unit during the aforesaid primary term even if the Contract is assigned or novated. If the Contract is terminated prior to the aforesaid Primary Term, Operator shall pay Contractor the remaining balance associated with the Drill String Upgrade.

710. Variation of Rates

The rates and payment herein set forth shall be revised (a) by the actual amount of the change in Contractor's cost if Operator and/or a Regulatory Authority requires Contractor to increase the number of Contractor's Personnel, or (b) as Operator and Contractor agree.

711. Adjustment of Rates and Payments

Eighteen (18) months after the Effective Date of this Contract, and annually thereafter, the following escalation provisions will apply.

Application for any adjustment to the rates and prices set out in this Paragraph 711 must be made in writing by Contractor and such escalation of rates shall be documented via an executed amendment to this Contract or other agreed form.

| Item | Operational Element | Operating Rate per Day Baseline Cost (US$) |
|------|---------------------|--------------------------------------------|
| 1. | Contractor Personnel (excluding onshore crew), including salaries, wages, benefits and payroll burdens [1] | $90,000 |
| 2. | Catering including food and catering personnel costs[2] | $ 11,000 |
| | Overall Total | $101,000 |

[1] Rate to be adjusted based upon Oil & gas Extraction Production worker,

Average Hourly earnings of production workers Series (ID:CEU1021100008)

[2] Rate to be adjusted based upon US Dept. of Labor, Bureau of Labor Statistics, Produce Price Index, Food Mfg., (ID: PCU311---311---)

All indices are derived from the US Bureau of Labor Statistics (www.bls.gov).

The adjustments to be made shall take effect as from the relevant rate adjustment date according to the following formula using the indices identified above:

$$Rn = Ro \; x \; \frac{In}{Io}$$

Where:     Rn = new operating rate per day;

Ro = initial or previous operating rate as previously adjusted in accordance with this Paragraph 711;

In = new index value (using the latest final published index identified above);

Io = initial index per January 2013 for the first rate adjustment and thereafter the previous index value for each subsequent rate adjustment.

## ARTICLE VIII - INVOICES AND PAYMENTS

801. Monthly Invoices

Contractor shall bill Operator at the end of each month, or at the end of each well, if sooner, for all daily charges earned by Contractor. Other charges shall be billed as earned. Billings for daily charges will reflect details of the time spent (calculated to the nearest half hour) and the rate charged for that time. Billings for other charges requested in writing by Operator will be accompanied by invoices supporting costs incurred for Operator or other substantiation as reasonably required (as well as copies of Operator's written request.)

802. Payment

Operator shall pay all invoices within thirty (30) days after the receipt thereof except that if Operator disputes an item invoiced, Operator shall within twenty days after receipt of the invoice notify Contractor in writing (if provided by email such notice to be confirmed by fax or letter) of the amount disputed, specifying the reason therefore, and payment of the disputed amount may be withheld until settlement of the dispute, but payment shall be made of any undisputed portion. Any sums (including amounts ultimately paid with respect to a disputed invoice) not paid within thirty days after receipt of invoice shall bear interest at the rate specified in Appendix A or the maximum allowed by law, whichever is less, from said due date until paid. Contractor shall have the right, upon ten (10) days

prior written notice, to terminate this Contract if Operator fails or refuses to timely pay Contractor amounts due and owing to Contractor. Neither Operator's payments nor its failure to dispute shall constitute waiver of Operator's rights to later dispute and/or to pursue recovery of payments.

803. Manner of Payment

All payments due by Operator to Contractor hereunder shall be made by check or as otherwise agreed to Contractor's bank account which is specified in Appendix A.

## ARTICLE IX – LIABILITY

901. Equipment or Property

Except as specifically provided herein to the contrary, each Party hereto shall at all times be responsible for and hold harmless, indemnify and release the other Party from and against damage to, or loss of, its respective Company's Items and Contractor's Items.

(a) Operator shall be responsible for and hold harmless, indemnify and release Contractor for loss or destruction of, or damage to, Contractor's drill pipe, drill collars, subs, reamers, bumper subs, stabilizers and other in-hole equipment when such equipment being used in the hole below the rotary table, but excluding normal wear as well as loss, destruction or damage to the extent caused by the Contractor's negligence or willful misconduct. Such abnormal wear and/or damage for which Operator shall be responsible shall include, but not be limited to, wear and/or damage resulting from the presence of H2S or other corrosive elements in the hole, including those introduced into the drilling fluid, excessive wear caused by sandcutting, damage resulting from excessive or uncontrolled pressures, such as those encountered during testing, blowout, or in a well out of control, excessive deviation of the hole from vertical, dog-leg severity, excessive over-pull, fishing, cementing or testing operations, and from any unusual drilling practices employed at Operator's request, as well as such abnormal wear and/or damage to Contractor's choke hoses and manifolds, BOP and other appurtenant equipment.

(b) Operator's liability pursuant to Paragraph 901 (a) shall be limited to the lesser of: (i) the actual repair cost, (ii) the percent (%) of the replacement cost as specified in Appendix A, subject to two percent (2%) depreciation per month capped at 50% of the replacement cost, and (iii) $ 3 million per occurrence.

902. The Hole

In the event the hole should be lost or damaged, Operator shall, be responsible for and hold harmless, indemnify and release Contractor from such damage to, or loss of, the hole, including all Operator Items, provided, however, to the extent such loss or damage

results, in whole or in part, from Contractor's negligence, at Operator's option and as Operator's sole remedy for such loss or damage, Contractor shall repair the damaged portion or redrill to the depth at which the loss occurred at eighty percent (80%) of the Operating Rate set forth herein.

### 903. Contractor's Personnel

Contractor shall be responsible for and hold harmless, indemnify and release Operator from and against all claims, demands and causes of action of every kind and character arising in connection herewith in favor of Contractor's Personnel, on account of bodily injury, death or damage to their property.

### 904. Operator's Personnel

Operator shall be responsible for and hold harmless, indemnify and release Contractor from and against all claims, demands, and causes of action of every kind and character arising in connection herewith in favor of Operator's Personnel, on account of bodily injury, death or damage to their property.

### 905. Pollution and Contamination

Notwithstanding anything to the contrary contained herein, the responsibility for pollution or contamination shall be as follows:

(a) Contractor shall be responsible for and hold harmless, indemnify and release Operator for claims, demands or causes of action resulting from, or for control and cleanup and removal of pollution or contamination which originates above the surface of the water from spills of fuels, lubricants, motor oils, normal water base drilling fluid and attendant cuttings, pipe dope, paints, solvents, ballast, bilge, garbage, sewage or any other materials in Contractor's possession or control. For purposes hereof the term "normal water base drilling fluid" means drilling fluid which does not exceed toxicity limits specified for offshore discharges by the environmental protection entity having jurisdiction over the Operating Area.

(b) Operator shall be responsible for and hold harmless, indemnify and release Contractor against all claims, demands, and causes of action of every kind and character (including control and removal of the pollutant involved) arising directly or indirectly from all pollution or contamination, other than that described in Paragraph 905(a) above, which may occur as a result of operations hereunder, including, but not limited to, that which may result from fire, blowout, cratering, seepage or any other uncontrolled flow of oil, gas, water or other substance, as well as the use or disposition of lost circulation and fish recovery materials and fluids, oil emulsion, oil base or chemically treated drilling fluids, and drilling fluids other than "normal water base drilling fluid" defined in Paragraph 905(a) above.

906. Debris Removal; and Cost of Well Control

(a) Operator shall be responsible for and hold harmless, indemnify and release Contractor for the cost of removal of Operator's debris. Contractor shall be responsible for and hold harmless, indemnify and release Operator from the cost of removal of the Drilling Unit and Contractor's debris to the extent such removal is required by a Regulatory Authority.

(b) Operator shall be responsible for and hold harmless, indemnify and release Contractor for the cost of regaining control of any wild well.

907. Underground Damage

Operator shall be responsible for and hold harmless, indemnify and release Contractor for any and all claims resulting from operations under this Contract on account of injury to, destruction of, or loss or impairment of any property right in or to oil, gas or other mineral substance or water, if at the time of the act or omission causing such injury, destruction, loss, or impairment, said substance had not been reduced to physical possession above the seabed, and for any related loss or damage to any formation, strata, or reservoir beneath the seabed, subsurface trespass, cratering, or underground blowouts.

908. Patent Liability

Contractor shall be responsible for and hold harmless, indemnify and release Operator against any and all loss or liability arising from infringement of patents of the United States covering any property, equipment, methods or processes furnished or directed by Contractor. Operator shall be responsible for and hold harmless and indemnify Contractor against any and all loss or liability arising from infringement or alleged infringements of patents covering the property, equipment, methods or processes furnished or directed by Operator.

Notwithstanding anything to the contrary contained herein, in the event that Operator instructs Contractor to remove Contractor installed impediments and perform dual drilling operations, Operator shall release, defend, indemnify and hold harmless Contractor from and against all resulting claims, losses, damages, expenses (including without limitation legal costs and expenses and other costs of defense) and liabilities arising out of any alleged infringement of any patent or proprietary or protected right arising out of such instruction, or in connection with the performance of the obligations of Operator under this Contract or the use by Contractor of information or instructions provided by Operator.

909. Punitive and Consequential Damages

Neither Party shall be liable to the other for punitive, special, indirect, or consequential damages resulting from or arising out of this Contract, including, without limitation, loss of profits, or business interruptions, however same may be caused.

910. Indemnity Obligation

(a) EXCEPT AS OTHERWISE STATED, THE PARTIES INTEND AND AGREE THAT THE PHRASE "BE RESPONSIBLE FOR AND HOLD HARMLESS, INDEMNIFY AND RELEASE" IN PARAGRAPHS 606, 607 AND 901 THROUGH 908 (AS WELL AS THE PROVISIONS OF PARAGRAPH 909) HEREOF MEAN THAT THE PARTY ACCEPTING SUCH RESPONSIBILITY (THE "INDEMNIFYING PARTY") SHALL RELEASE, INDEMNIFY, HOLD HARMLESS AND DEFEND (INCLUDING PAYMENT OF REASONABLE ATTORNEY'S FEES AND COSTS OF LITIGATION) THE OTHER PARTY (THE "INDEMNIFIED PARTY") FROM AND AGAINST ANY AND ALL CLAIMS, DEMANDS, CAUSES OF ACTION, DAMAGES, JUDGMENTS AND AWARDS OF ANY KIND OR CHARACTER, WITHOUT LIMIT AND WITHOUT REGARD TO THE CAUSE OR CAUSES THEREOF, INCLUDING PRE-EXISTING CONDITIONS, WHETHER SUCH CONDITIONS BE PATENT OR LATENT, THE UNSEAWORTHINESS OF ANY VESSEL OR VESSELS, BREACH OF REPRESENTATION OR WARRANTY (EXPRESS OR IMPLIED), STRICT LIABILITY, TORT, OR THE NEGLIGENCE OF ANY PERSON OR PERSONS, INCLUDING THAT OF THE INDEMNIFIED PARTY, WHETHER SUCH NEGLIGENCE BE SOLE, JOINT, CONCURRENT, ACTIVE OR PASSIVE, OR FROM ANY OTHER THEORY OF LEGAL LIABILITY.

(b) An indemnifying Party's obligations contained in this Contract shall also extend to the indemnified Party, its Affiliated Companies, contractors and subcontractors, and, in the case of Operator, its co-lessees, co-owners, partners, joint interest owners, co-venturers, and joint venturers, if any, and its and their Affiliated Companies officers, directors, employees, owners, members, shareholders and insurers of each. Operator's obligations as an indemnifying party shall extend to actions against the Drilling Unit, its legal and beneficial owners, whether in rem or in personam.

(c) The terms and provisions of Paragraphs 606, 607 and 901 through 909 shall have no application to claims or causes of action asserted against Operator or Contractor which arise solely by reason of any agreement of indemnity with a person or entity not a party hereto. Except as otherwise stated, nothing contained herein shall confer any rights upon any third party beneficiary.

(d) In situations in which Operator has agreed to be responsible for, hold harmless, indemnify and release Contractor, Operator's obligations shall be secondary to any such obligations owed to Contractor by any other entities (other than Contractor's insurers),

including Operator's other contractors. In situations in which Contractor has agreed to be responsible for, hold harmless, indemnify and release Operator, Contractor's obligations shall be secondary to any such obligations owed to Operator by any other entities (other than Operator's insurers), including Contractor's subcontractors.

(e) Contractor agrees that the voluntary and mutual indemnity agreement in Paragraphs 901 through 909 will be supported by insurance with at least the minimum amounts set forth in Appendix E.

(f) Operator agrees that the voluntary and mutual indemnity agreements set forth in Paragraphs 901 through 909 will be supported by insurance or self-insurance with at least the minimum amounts set forth in Appendix E.

911. General Intent

The Parties recognize that the performance of well drilling, workover and associated activities such as those to be performed under this Contract have resulted in bodily injury, death, damage or loss of property, well loss or damage, pollution, loss of well control, reservoir damage and other losses and liabilities. It is the intention of the Parties hereto that the provisions of this Article IX and Paragraphs 606 and 607 shall exclusively govern the allocation of risks and liabilities of said Parties without regard to cause (as more particularly specified in Paragraph 910), it being acknowledged that the compensation payable to Contractor as specified herein has been based upon the express understanding that risks and liabilities shall be determined in accordance with the provisions of this Contract.

912. Statutory Employees

Anything to the contrary contained herein notwithstanding and to the extent, and only to the extent, that the laws of the State of Louisiana are applicable to any performance, services, work or operations conducted under the terms and provisions of this Contract, Operator and Contractor acknowledge and agree that all work and operations performed by Contractor and its employees pursuant to this Contract are an integral part of, and are essential to, the ability of Operator to generate Operator's goods, products or services. Without limiting the foregoing, Operator and Contractor agree that Operator is recognized as, and shall be deemed, a statutory employer of Contractor's employees (both direct employees and statutory employees) for purposes of La. R.S. 23:1061 (A)(3), as the same may be amended from time to time. In further consideration of the amounts to be received by Contractor pursuant to this Contract, Operator and Contractor agree that Contractor shall be responsible for the payment of all compensation benefits paid to, or for the benefit of, Contractor's employees. Contractor and/or Contractor's underwriters agree that they shall have no right to seek and shall not seek any contribution or indemnity from Operator for any compensation benefits paid by Contractor and/or Contractor's underwriters.

# ARTICLE X - INSURANCE

## 1001. Contractor's Insurance

Contractor shall carry and maintain insurance coverages of the type and in the minimum amounts set forth in Appendix E. Contractor shall have the right to self-insure any or all of that portion of insurance relating to loss or damage to Contractor's Items.

## 1002. Certificates

Each Party hereto shall furnish the other, on request, with certificates indicating that the required insurance is in full force and effect and that the same shall not be canceled or materially and adversely changed without thirty (30) days prior written notice to the other Party.

## 1003. Subrogation

Solely with respect to the risks within the release, defense and indemnity obligations specifically assumed in this Contract by Contractor, Contractor's insurance shall be endorsed to provide that the underwriters waive their right of subrogation against Operator, its Affiliated Companies, co-lessees, co-owners, co-venturers, joint interest owners, and partners, other contractors and subcontractors, and all of its and their respective officers, directors, employees, owners, members, shareholders, and insurers of each. Solely with respect to the risks within the release, defense and indemnity obligations specifically assumed in this Contract by Operator, Operator will, as well, cause its insurers to waive subrogation against Contractor and Contractor's Affiliated Companies, subcontractors, and the officers, directors, employees, owners, members, shareholders, and insurers of each.

## 1004. Additional Insured

Contractor shall name Operator, its Affiliated Companies, co-lessees, co-owners, co-venturers, joint interest owners, and partners, other contractors and subcontractors and all of its and their respective officers, directors, employees, owners, members, shareholders and insurers of each as additional insureds, where permitted, under its policies of insurance, but solely with respect to the risks within the release, defense and indemnity obligations specifically assumed by Contractor in this Contract. Operator shall name Contractor, its Affiliated Companies and co-lessees, co-venturers, joint interest owners, and partners, and the officers, directors, employees, owners, members, shareholders and insurers of each as additional insureds, where permitted, under its policies of insurance, but solely with respect to the risks within the release, defense and indemnity obligations specifically assumed by Operator in this Contract.

1005. <u>Insurance Coverage</u>

The policies of each Party shall be endorsed to provide that the protection provided to additional insureds is primary as respects other insurances maintained by the additional insureds regardless of any "other insurance," "cover elsewhere," or similar provisions. Further, each Party's Commercial General Liability policies shall delete any provisions that might exclude coverage to the additional insureds for claims by the named insured's employees on the grounds of that employment relationship. It is further agreed that the additional assured status and subrogation waivers shall be enforceable even if the contractual release, defense and indemnity obligations assumed by the named insured party in this Contract are invalidated or unenforceable by application of any state or federal law, including, without limitation, the Longshore and Harbor Workers' Compensation Act. All premiums and deductibles shall be for the named insured's sole account; provided, however, that if there are any additional premiums due to obtain the additional insured status required by this Contract, upon written request by the additional insured party, the named insured party will submit the insurers' additional premium statements to the additional insured party for direct payment or reimbursement. In that situation, the payment or reimbursement of the additional premium shall be on behalf of all additional insureds.

## ARTICLE XI - SUBLETTING AND ASSIGNMENT

1101. <u>Subcontracts</u>

Operator may employ other contractors to perform any of the operations or services to be provided or performed by it.

Contractor may employ subcontractors to perform any of the operations or services to be provided or performed by it with the prior consent of Operator, which consent shall not be unreasonably withheld.

In the event Contractor subcontracts any of the work to be performed or services to be rendered hereunder, or contracts for the furnishing of any services or material by a subcontractor, then Contractor shall use best efforts to arrange so that such contracts shall contain release, defense, indemnity and insurance protection for Operator as required herein.

1102. <u>Assignment</u>

A Party may not assign its rights or obligations under this Contract without the prior written consent of the other Party, except that without such consent, a Party may assign to an Affiliated Company if (i) the Original Party retains its full obligations under this Contract and (ii) in the case of an assignment by Contractor, the Affiliated Company is simultaneously acquiring the ownership or bareboat charter of the Drilling Unit. If an

Affiliated Company receives an assignment of this Contract and subsequently re-assigns this Contract to the Original Party or if the Original Party reacquires the Contract upon expiration of the assignment period, the Affiliated Company shall be automatically released from any further obligations under this Contract. For purposes of this Paragraph 1102, "Original Party" means either LLOG Bluewater Holdings, L.L.C. or SEADRILL DEEPWATER CONTRACTING, LTD., as applicable. Prompt notice of any intent to assign shall be given to the other Party. For assignments that require the prior written consent of the other Party, such consent shall not be unreasonably conditioned, withheld or delayed

## ARTICLE XII - NOTICES

1201. Notices

Notices, reports and other communications required or permitted by this Contract to be given or sent by one Party to the other shall be delivered by hand and/or mailed to the address as specified in Appendix A. Either Party may by notice to the other Party change its address. Notices shall be effective upon receipt. The Parties agree that invoicing notice requirements in Paragraph 802 may be given by email.

## ARTICLE XIII - GENERAL

1301. Confidential Information

All Confidential Information obtained by Contractor in the conduct of operations hereunder shall be held strictly confidential by Contractor. As used herein, "Confidential Information" means any information pertaining to the Operator's or any of its Affiliated Companies' businesses which is not available to the public, whether written, oral, electronic, visual form or in any other media, including, without limitation, such information that is proprietary, confidential or concerning the Operator's or any of its Affiliated Companies' ownership and operation of wells planned or operated by LLOG Exploration Company , LLC, LLOG Exploration Offshore, LLC and / or LLOG Bluewater Holdings, LLC or related matters, including any actual or proposed operations or development project or strategies, other operations and business plans, actual or projected revenues and expenses, finances, contracts and books and records

The provisions of this Paragraph 1301 shall not apply to any information which:

(a) is or becomes part of the public domain;
(b) is in the possession of Contractor prior to the Effective Date and which was not subject to any obligation of confidentiality owed to Operator;

(c) is received from a third party whose possession is lawful and who is not under obligation not to disclose;

(d) is developed by Contractor independently of this Contract;

(e) is required to be disclosed in order to comply with the requirements of any law, rule or regulation of any governmental or regulatory body having jurisdiction over the work or Contractor;

(f) is required to be disclosed in order to comply with the rules and regulations of any relevant stock exchange; or

(g) is used or disclosed by Contractor five years after either the completion or termination of this Contract, whichever shall occur earlier.

### 1302. Attorney's Fees

If this Contract is the subject of any judicial action between the Parties hereto or is placed in the hands of an attorney for collection of any sums due hereunder, or suit is brought on same, or sums due hereunder are collected through bankruptcy or arbitration proceedings, then the prevailing Party shall be entitled to recover reasonable attorney's fees and costs.

### 1303. Force Majeure

Except as otherwise provided in this Paragraph 1303, each Party to this Contract shall be excused from complying with the terms of this Contract, other than the payment of monies when due, if and for so long as such compliance is hindered or prevented by riots, strikes, wars (declared or undeclared), insurrection, rebellions, terrorist acts, civil disturbances, dispositions or order of governmental authority (but specifically excluding Operator's inability to obtain permits from Regulators), acts of God (except however adverse sea or weather conditions not reaching the status of named tropical storms or hurricanes), or by any act or cause (other than financial distress, inability to pay debts when due) which is reasonably beyond the control of such Party, such cause being herein sometimes called "Force Majeure." In the event that either Party hereto is rendered unable, wholly or in part, by any of these causes to carry out its obligation under this Contract, such Party shall give notice and details of Force Majeure in writing to the other Party as promptly as possible after its occurrence. In such cases, the obligations of the Party giving the notice shall be suspended during the continuance of any inability so caused except that Operator shall be obliged to pay to Contractor the Force Majeure Rate provided for in Paragraph 707. Force Majeure shall not suspend or otherwise affect the Parties' respective release, defense, indemnity and insurance rights and obligations.

### 1304. Right to Audit

For a period of two years from termination of the Contract, Contractor shall keep proper books, records and accounts of operations hereunder and shall permit Operator at all reasonable times to inspect the portions thereof related to any variation of the rates hereunder or charges for reimbursable items.

1305. Compliance with Laws

Each Party hereto agrees to comply with all laws, rules and regulations of any federal, state or local government authority which are now or may become applicable to that Party's operations covered by or arising out of the performance of this Contract. In the event any provision of this Contract is inconsistent with or contrary to any applicable federal, state or local law, rule or regulation, said provision shall be deemed to be modified to the extent required to comply with said law, rule or regulation, and as so modified said provision and this Contract shall continue in full force and effect. Each Party represents that it will comply with all laws, rules and regulations, federal, state and local, which are now or may become applicable to this Agreement and any work or purchase order issued in connection herewith, and except with respect to matters for which a Party is otherwise indemnified by the other Party in Article IX hereinabove, each Party agrees to indemnify the other from and against any fines, penalties, damages, environmental cleanup and remediation costs, demands, losses, claims, suits, judgments, expenses (including reasonable attorneys' fees or any other expenses) or causes of action resulting from its failure to comply with all applicable laws, rules and regulations. All work under this Contract shall comply with Operator's SEMS. Any conflict or inconsistency between Operator's SEMS and Contractor's SEMS shall be addressed in a formal bridging document. In addition, Contractor is aware that Operator is an equal opportunity employer, and Contractor warrants that it will comply with all Equal Employment Opportunity ("EEO") provisions referred to in Appendix F, any other applicable EEO provisions (whether resulting from amendment, new legislation, or otherwise), and the other provisions of Appendix F. Contractor will advise Operator in writing if it is a qualified minority contractor (and will similarly provide written notice in the event it ceases to be a qualified minority contractor).

1306. Waivers

It is fully understood and agreed that none of the requirements of this Contract shall be considered as waived by either Party unless the same is done in writing, and then only by the persons executing this Contract, or other duly authorized agent or representative of the Party.

1307. Entire Agreement

This Contract supersedes and replaces any oral or written communications heretofore made between the Parties relating to the subject matter hereof.

1308. Enurement

This Contract shall enure to the benefit of and be binding upon the successors and assigns of the Parties.

1309. <u>Survival</u>

The provisions of this Agreement which are intended to extend beyond its termination, including without limitation, the liability, indemnity, warranty and confidentiality provisions, and the provisions applicable to the enforcement of those provisions and/or the enforcement of rights and obligations incurred hereunder that are not fully discharged prior to the termination of this Agreement, shall survive termination to the extent necessary to effect the intent of the Parties and/or enforce such rights and obligations.

**IN WITNESS WHEREOF THE PARTIES HAVE EXECUTED THIS CONTRACT ON THE DAY AND YEAR FIRST ABOVE WRITTEN.**

**OPERATOR:**

**WITNESS:   LLOG BLUEWATER HOLDINGS, L.L.C.**

_____         **BY:** _John W. Newman_
                                       JOHN W. NEWMAN
_____         **TITLE:** _CFO & TREASURER_

                                  **DATE:** _____

**CONTRACTOR:**

**SEADRILL DEEPWATER CONTRACTING, LTD.**

**WITNESS:**

_____         **BY:** _Ian Hope_   IAIN HOPE

_____         **TITLE:** _SNR VICE PRESIDENT_

                                  **DATE:** _April 16, 2013_

Para Nos.:

101 (b)        Operations Commencement Date: _____
                                         To be confirmed by the Parties in writing when effected

101 (f)      Operating Area:              USA Gulf of Mexico or other area as mutually agreed subject to rate adjustments

101 (g)     Operating Base:             Operating base for materials and equipment shipment offshore shall be Port Fourchon, La,  Operating base for personnel shall be Venice or Houma La

101 (j)      Drilling Unit Departure Date:_____
                                         To be confirmed by the Parties in writing when effected

202          Duration:                   1,095 days from the Operations Commencement Date

203          (b) Termination:          1,095 days from the Operations Commencement Date

203          (b) Demobilization Location:  Agreed Location near Port Fourchon La. USA

204          Option Term:               1 year

                     Option Notice:             Prior to first anniversary of Operations Commencement Date

                     Deadline for Mutual - Agreement:             Prior to first anniversary of Operations Commencement Date

501 (d)     New Regulations Compliance
                     Rig Modification Rate:     U.S.$  90%  of the Operating Rate per day for the first 21 days and 98% thereafter.

503          Maximum Water Depth: _____10,000'_____

                     Minimum Water Depth:      1,650'  Water depth less than 1650' shall be subject to Contractor risk analysis and approval.

|  | Maximum Well Depth: | 37,500 subject to drill-pipe availability' |
|---|---|---|
| 601 | Handling Charge: % | 10% |
| 702 | Mobilization Fee | U.S. $ 37,500,000.00 |
|  | Fuel and logistics for the account of Operator | |
| 703 | Demobilization Rate: | U.S. $ 85% of the Operating Rate |
| 705 | Operating Rate: | U.S. $ 570,000 per day |
| 706 | Standby Rate: | U.S. $ 98% of Operating Rate per day |
| 707 | Repair Rate: | U.S. $ 0 per day after repair time allowance as set out below |

Allowance for Repair at Operating Rate:
Surface Equipment: Twenty-eight (28) aggregate per calendar month

Subsea Equipment: Forty (40) hours aggregate per calendar month

<u>Note: BOP/Riser pulling due to BSEE regulation related to required inspection of BOP after each well to be compensated at Operating Rate.</u>

| 708 | Force Majeure Rates: | |
|---|---|---|
|  | Day 1 through 30 | U.S. $ 90% of Operating Rate per day |
|  | Day 31 through 60 | U.S. $ 75% of Operating Rate per day |
|  | Day 61 through 90 | U.S. $ 60% of Operating Rate per day |
| 709(e) | Drill String Upgrade | US $ 1,000/day |
| 711 | Rate adjustments: | See Paragraphs 710 and 711 |
| 802 | Interest Rate on Late Payments: | <u>10% per annum</u> |
| 803 | Address for Payment: | Seadrill Deepwater Contracting Ltd. 4th Floor, Par-la-Ville Place Par-la-Ville Road Hamilton, Bermuda |

901 (a) & (b)

Percentage of Replacement
Cost:                                    100%   (Refer to Paragraph 901)

---

1201      Address for Notices:

          Operator:

                              1001 Ochsner Blvd., Suite 200
                              Covington, LA 70433
                              Fax: (985) 801-4781
                              Attention: VP Drilling


          Contractor:

                              Seadrill Deepwater Contracting Ltd.
                              11025 Equity Drive
                              Houston, Texas 77041
                              Fax: 1.713.329.1179
                              Attention: Contracts Manager

# APPENDIX B

# DRILLING UNIT INVENTORY

<u>Attachment to be provided once rig arrives in U.S. Gulf of Mexico, prior to the onset of Operations</u>

# APPENDIX C
## PERSONNEL TO BE PROVIDED BY CONTRACTOR

| US GOM Drillship Manning | On Board | Current Manning Plan | Per Day | Per Hour |
|---|---|---|---|---|
| **MARINE** | | | | |
| Offshore Installation Mgr. (Master Unlimited and OIM) | 1 | 2 | 2218.69 | 184.89 |
| Marine Section Leader (Chief Mate) | 1 | 2 | 1703.74 | 141.98 |
| Dynamic Positioning Operator (DPO) (2nd or 3rd Mate Unlimited) | 4 | 8 | 1267.10 | 105.59 |
| Deck Supervisor | 2 | 4 | 859.89 | 71.66 |
| Crane Operator | 2 | 4 | 810.07 | 67.51 |
| Asst. Crane operator | 2 | 4 | 645.55 | 53.80 |
| Roustabout | 10 | 20 | 586.71 | 48.89 |
| Bosun | 2 | 2 | 810.07 | 67.51 |
| AB Seaman | 4 | 4 | 694.54 | 57.88 |
| SUBTOTAL MARINE | **25** | **50** | | |
| **DRILLING** | | | | |
| Drilling Section Leader | 1 | 2 | 2191.41 | 182.62 |
| Tool pusher | 2 | 4 | 1907.47 | 158.96 |
| Driller | 4 | 8 | 1630.11 | 135.84 |
| Assistant driller | 4 | 8 | 1029.14 | 85.76 |
| Derrick man | 2 | 4 | 760.97 | 63.41 |
| Assist Derrickman | 2 | 4 | 715.54 | 59.63 |
| Lead Roughneck | 2 | 4 | 693.06 | 57.75 |
| Roughneck | 8 | 16 | 645.55 | 53.80 |
| SUBTOTAL DRILLING | **25** | **50** | | |
| **MAINTENANCE** | | | | |
| Technical Section Leader (Chief Engineer Unlimited) | 1 | 2 | 1929.83 | 160.82 |
| Asst Technical Section Leader / Mech Supv (1st A/E or MODU) | 2 | 4 | 1729.43 | 144.12 |
| Engine Room Operator (2nd and 3rd A/E) | 4 | 8 | 1228.57 | 102.38 |
| Motorman | 2 | 4 | 762.71 | 63.56 |
| Sr. Mechanic | 2 | 4 | 1372.09 | 114.34 |
| Mechanic | 1 | 2 | 1263.09 | 105.26 |



| US GOM Drillship Manning | On Board | Current Manning Plan | Per Day | Per Hour |
|---|---|---|---|---|
| Electrical Supervisor | 1 | 2 | 1690.52 | 140.88 |
| Sr. Electrician | 1 | 2 | 1280.83 | 106.74 |
| Electrician | 2 | 4 | 1027.63 | 85.64 |
| Sr. Electronic Technician | 2 | 4 | 1259.79 | 104.98 |
| Electronic Technician | 1 | 2 | 1023.32 | 85.28 |
| Sub Sea Supervisor | 1 | 2 | 2013.46 | 167.79 |
| Sub Sea Engineer | 2 | 4 | 1635.94 | 136.33 |
| Sub Sea Trainee | 2 | 4 | 1010.12 | 84.18 |
| Welder | 2 | 4 | 789.56 | 65.80 |
| SUBTOTAL MAINTENANCE | 26 | 52 | | |
| **GENERAL & ADMIN** | | | | |
| Safety Officer | 2 | 4 | 860.72 | 71.73 |
| Medic | 1 | 2 | 788.71 | 65.73 |
| Materials Administrator | 2 | 4 | 837.60 | 69.80 |
| Rig Administrator | 1 | 2 | 682.95 | 56.91 |
| SUBTOTAL GENERAL & ADMIN | 6 | 12 | | |
| *TOTAL REGULAR CREW* | *82* | *164* | | |



# APPENDIX D
## CHECKLIST OF CONTRACTOR'S AND OPERATOR'S OBLIGATIONS
## DURING THE NORMAL COURSE OF OPERATIONS:

|  | | Category |
|---|---|---|
| | Furnished by Contractor, paid by Contractor | 1 |
| | Furnished by Contractor, paid by Operator, plus handling charge | 2 |
| | Furnished by Contractor, paid by Operator, no handling charge | 3 |
| | Furnished by Operator, paid by Operator | 4 |

| | | |
|---|---|---|
| 1 | Contractor's Item as set forth in Appendix "B". | 1 |
| 2 | Except as otherwise specified, maintenance and repair including repair parts of Contractor's Items. | 1 |
| 3 | Maintenance and repair including repair parts of Operator's Items except as provided in Paragraph 403. | 4 |
| 4 | All charges relative to acquisition, shipping and transportation (except charges as provided in Items 65, 71 and 74) of all Contractor's Items required as replacement or spare parts | 1 |
| 5 | Contractor's personnel as set forth in Appendix "C" including replacement, subsistence, insurance wages, benefits, and all other costs related thereto. | 1 |
| 6 | Extra personnel in excess of the complement of personnel set forth in Appendix "C" when requested in writing by Operator. | 3 |
| 7 | Overtime beyond normal work schedule for Contractor's personnel when requested in writing by Operator | 3 |
| 8 | Required licenses, permits, certificates of financial responsibility and clearances to enter upon and depart from drilling location, pursuant to Paragraph 606 | 4 |
| 9 | Surveying service and marker buoys to mark drilling location as per Paragraph 606. | 4 |
| 10 | Sea floor surveys required by Contractor's Marine Surveyor as per Paragraph 606 | 4 |
| 11 | Sea bottom coring services at the drilling location, if required by Contractor | 3 |
| 12 | Fuel, oil, greases, lubes and hydraulic fluid for Contractor's equipment:<br>     a. Fuel<br>     b. Oil, greases, lubes and hydraulic fluid. | <br>4<br>1 |
| 13 | Water for drilling, washdown and cementing and excess potable water, if required | 4 |
| 14 | Drilling fluid, additives and lost circulation material. Disposal of cuttings and liquid mud | 4 |
| 15 | Mud logging services | 4 |
| 16 | Normal welding services required on Operator's Items to the extent available from Contractor's Personnel | 1 |

| | | Category |
|---|---|---|
| | Furnished by Contractor, paid by Contractor | 1 |
| | Furnished by Contractor, paid by Operator, plus handling charge | 2 |
| | Furnished by Contractor, paid by Operator, no handling charge | 3 |
| | Furnished by Operator, paid by Operator | 4 |
| 17 | Welding materials used on Operator's Items | 2 |
| 18 | Pneumatic hoses between supply vessels and Drilling Unit for unloading fuel, water, bulk cement and mud materials including repair and replacement of same | |
| |     a. Initial hoses (new) | 1 |
| |     b. All replacements (only if initial hoses are new) | 3 |
| 19 | Mooring system between supply vessels and Drilling Unit including repair and replacement | |
| |     a. Initial (new) | 1 |
| |     b. All replacements (only if initial lines are new) | 3 |
| 20 | Cargo baskets for use in transporting Contractor's Items to and from supply vessels, and rig. | 1 |
| 21 | Cargo baskets for use in transporting Operator's Items to and from supply vessels, and rig. | 4 |
| 22 | Towing service for Drilling Unit moves as per Paragraphs 702, 703, as specified by Operator, and as approved by Contractor's insurance underwriters | 4 |
| 23 | Towing horsepower required as per Paragraphs 702, 703, and Appendix D-22, in addition to supply vessels | 4 |
| 24 | Anchor setting and retrieving with marine vessels including anchor handling crews during Mobilization and Demobilization, if required | 4 |
| 25 | Additional anchors and buoy lines, if required | 4 |
| 26 | Inspection of Contractor's drill pipe, drill collars and other inhole equipment according to API_IADC standards before operations commence under this Contract, if required | 1 |
| 27 | Inspection of Contractor's drill pipe, drill collars and other in hole equipment according to API_IADC standards after operations commence under this Contract at reasonable intervals, as requested by Operator | 4 |
| 28 | Drill pipe casing protectors on Contractor's drill pipe. | 4 |
| |     a. All additional rubbers or replacement rubbers | 4 |
| 29 | Drill pipe casing protectors on other drill pipe furnished by Operator, if required by Operator. | 4 |
| 30 | Deliberately Omitted | |
| 31 | Drill pipe wipers | 1 |
| 32 | Digital recorder (hookload, pump press, ROP, RPM, torq) | 1 |

|  |  | Category |
|---|---|---|
|  | Furnished by Contractor, paid by Contractor | 1 |
|  | Furnished by Contractor, paid by Operator, plus handling charge | 2 |
|  | Furnished by Contractor, paid by Operator, no handling charge | 3 |
|  | Furnished by Operator, paid by Operator | 4 |
| 33 | Fishing tools other than provided by Contractor as set forth in Appendix "B | 4 |
| 34 | Repair and/or replacement parts for Contractor furnished fishing tools. | 3 |
| 35 | Drilling bits, stabilizers, hole openers, reamers, under reamers, well scrapers, drilling bumper subs, drilling safety joints, hydraulic drilling jars, and other special in hole equipment, including replacement parts and repairs for same | 4 |
| 36 | Directional surveying equipment and service.<br><br>    a. 7 degree inclination tool<br>    b. all other directional tools | <br><br>1<br>4 |
| 37 | Deflection drilling tools and service | 4 |
| 38 | Drill pipe, drill collars and handling tools other than those specified in Appendix "B" | 4 |
| 39 | Blowout prevention equipment other than as listed in Appendix "B". | 4 |
| 40 | Wellhead equipment and supplies | 4 |
| 41 | Tubular goods, hangers, packers and accessories | 4 |
| 42 | Casing, casing shoes, float collars, baskets, centralizers, scratchers, scrapers, baffles and other casing accessories | 4 |
| 43 | Hammer, drive pipe, casing tools and services for all sizes of casing | 4 |
| 44 | Tubing tools, including slips, elevators, power tongs (or jaws for Contractor's power tongs), wrenches, and tubing pipe wipers | 4 |
| 45 | Swabbing equipment, including lubricator, swab valve, swabs, oil savers, sinker bars, rope sockets and jars, if required (except sand line). | 4 |
| 46 | Swab rubbers and oil saver rubbers | 4 |
| 47 | Core barrels and handling tools | 4 |
| 48 | Core heads and core catchers | 4 |
| 49 | Electric logging unit, maintenance of unit and logging services | 4 |
| 50 | Wireline formation testing and sidewall sampling equipment and services | 4 |
| 51 | Drill stem test equipment and services | 4 |
| 52 | Gun and perforating services | 4 |
| 53 | Cement and cementing services | 4 |
| 54 | Cementing unit.<br>Note: If Operator uses the services of a cementing service company other than the owner of the cementing unit, any charges imposed upon Contractor by the owner of the cementing unit as consequence thereof shall be for the Operator's account. | 4 |
| 55 | Repair and maintenance of Contractor furnished cementing unit | 3 |

| | | Category |
|---|---|---|
| | Furnished by Contractor, paid by Contractor | 1 |
| | Furnished by Contractor, paid by Operator, plus handling charge | 2 |
| | Furnished by Contractor, paid by Operator, no handling charge | 3 |
| | Furnished by Operator, paid by Operator | 4 |
| 56 | Labor to install servicing equipment by Operator aboard the Drilling Unit and for later removal, if required, such as, but not limited to:<br><br>Cementing Unit;<br>Electric Logging Unit;<br>Mud Logging Unit;<br>Diving Equipment;<br>Well Testing System<br>ROV units | 4 |
| 57 | Supplies and materials to install Operator's Items | 4 |
| 58 | Well testing system complete with separators, heaters, gas vents, metering, piping and valves oil and/or gas burner, necessary booms, piping ignitors, fabrication and installation | 4 |
| 59 | Test tanks for well fluid | 4 |
| 60 | Administrative center including offices, office furniture, equipment and supplies for Contractor's Personnel, warehousing and storage yard at Operating Base for Contractor's Items, if required. | N/A |
| 61 | Administrative center including offices, office furniture, equipment and supplies for Operator's Personnel, warehousing and storage yard facilities for Operator's Items | 4 |
| 62 | Port facilities and dockside area in vicinity of Operating Base for loading and unloading Contractor's and Operator's Items on and off supply vessels | 4 |
| 63 | Transportation for Contractor's Items and Personnel:<br><br>a. Transportation of Contractor's Items and Personnel except as specified in (b), (c), (d) and (e) below. | 1 |
| | b. Routine transportation from Operating Base to Drilling Unit and return to dockside | 4 |
| | c. Routine transportation from one Operating Base to another; | 4 |
| | d. Temporary lodging, if required and transportation from Operating Base to and return from dockside and/or heliport and between Operating Base during evacuation due to weather or other safety reasons in the event Operator is unable to provide adequate evacuation transportation pursuant to Paragraph 708(d). | 3 |
| | e. Emergency transportation for both Operator and Contractor, as required. | 4 |

| | | Category |
|---|---|---|
| | Furnished by Contractor, paid by Contractor | 1 |
| | Furnished by Contractor, paid by Operator, plus handling charge | 2 |
| | Furnished by Contractor, paid by Operator, no handling charge | 3 |
| | Furnished by Operator, paid by Operator | 4 |
| 64 | Transportation for Operator's Items and Personnel to dockside at Operating Base or point of departure and return | 4 |
| 65 | Dockside labor and equipment at Operating Base to load and unload Contractor's and Operator's Items from or to land transportation and from or to supply vessels | 4 |
| 66 | Marine transportation for Contractor's and Operator's Items and Personnel from dockside to Drilling Unit and return with supply vessels supplied by Operator<br><br>a. Crewboat to transport personnel of Operator and Contractor, if required:<br>b. Standby boat, if required | <br><br>4<br><br>4 |
| 67 | Marine transportation for Contractor's Personnel between Drilling Unit and Operations Base during evacuation due to weather or other safety reasons in the event Operator is unable to provide adequate evacuation transportation | 3 |
| 68 | Staging area at dock site for Contractor's Items | 4 |
| 69 | Storage space at dock site and Operating Base for Operator's Items | 4 |
| 70 | Onshore transportation for Contractor's shorebased personnel | 1 |
| 71 | Onshore transportation for Operator's shorebased personnel | 4 |
| 72 | Fees, licenses, pilotage fees, wharfage fees, harbor fees and costs or similar charges including any sales taxes or clearing agent or brokerage fees relating to Contractor's Items and replacement or spare parts | 3 |
| 73 | Fees, licenses, pilotage fees, wharfage fees, harbor fees and costs or similar charges including any sales taxes or clearing agent or brokerage fees relating to Operator's Items and replacement or spare parts | 4 |
| 74 | Radio system:<br>a. from Drilling Unit to supply vessel and supply vessel to Operator's Operating Base office or direct to Operating Base, including permits and licenses:<br>b. from Drilling Unit to Contractor's office or shore base, including permits and licenses: | <br><br><br>4<br><br>1 |
| 75 | All helicopter transportation as required including medical evacuation<br><br>a. Non-directional beacon for helicopter operations | 4<br><br>4 |
| 76 | Helicopter refueling aboard Drilling Unit – (Other than Helifuel AS refueling provided by Contractor) | 3 |
| 77 | Helicopter fuel and lubes | 4 |

| | | Category |
|---|---|---|
| | Furnished by Contractor, paid by Contractor | 1 |
| | Furnished by Contractor, paid by Operator, plus handling charge | 2 |
| | Furnished by Contractor, paid by Operator, no handling charge | 3 |
| | Furnished by Operator, paid by Operator | 4 |
| 78 | Special or additional helicopter safety equipment aboard Drilling Unit | 4 |
| 79 | Diver services as required for well operations | 4 |
| 80 | Meals and quarters for all of Contractor's Personnel and up to and including two<br>Operator's Personnel, as designated by Operator | 1 |
| 81 | Meals and quarters for Operator's personnel and Operator's third party personnel in excess of ten per day to be charged at $25.00 per casual meal and $ 150.00 per day per person for accommodation including meals. | 4 |
| 82 | Waste storage, removal and disposal, including any required registration and permits | 4 |
| 83 | Contractor Insurance as provided in Appendix "E".<br>Operator's Insurance as provided for in this Contract | 1<br>4 |
| 84 | Maintenance and repair including repair parts:<br>    a. Of Contractor's surface equipment;<br>    b. Replacement rubber goods in Contractor's BOP's<br>    c. Of Contractor's subsurface equipment, except as provided in Paragraph 901;<br>    d. Of Contractor's subsurface mooring equipment including pendant lines, except as provided in Paragraph 901.<br>    e. Riser seal kits | <br>1<br>3<br>1<br><br>1<br>3 |
| 85 | Extra labor (in excess of supply vessel's personnel) required aboard supply vessels when along side Drilling Unit to unload or load Contractor's and/or Operator's Items | 4 |
| 86 | Anchor piles, if required, and placement of same | 4 |
| 87 | Subsea equipment, if required:<br>    a. Wellhead equipment;<br>    b. Wellhead connector from BOP stack to wellhead (as set out in Appendix "B";<br>    c. Subsea running tools for wellheads if required;<br>    d. Contractor's surface or subsea blowout preventer system as described in Appendix "B:;<br>    e. Wellhead temporary guidebase, if required;<br>    f. Wellhead guide post structure, if required;<br>    g. Jetting tools for drilling in conductor casing, if required;<br>    h. Guide arms and bushings for drilling conductor hole and running conductor casing, if required; | <br><br>4<br>1<br>4<br><br>1<br>4<br>4<br>4<br>4 |

|  |  | Category |
|---|---|---|
|  | Furnished by Contractor, paid by Contractor | 1 |
|  | Furnished by Contractor, paid by Operator, plus handling charge | 2 |
|  | Furnished by Contractor, paid by Operator, no handling charge | 3 |
|  | Furnished by Operator, paid by Operator | 4 |
| 88 | Screens for shale shakers up to and including 84 mesh | 1 |
|  | a. Screens for shale shakers above 84 mesh. | 4 |
| 89 | All screens for mud cleaners to be specified by Operator | 3 |
| 90 | Bags for compactor | 3 |
| 91 | Super choke | 3 |

<h1>APPENDIX E</h1>

<h2>INSURANCE REQUIREMENTS</h2>

**Part I.** WORKER'S COMPENSATION AND EMPLOYER'S LIABILITY INSURANCE

1. Worker's Compensation and Employer's Liability Insurance shall be provided in accordance with all applicable federal, state, and maritime laws (including Death on the High Seas Act and Jones Act) which shall cover all Contractor's Personnel performing work under this Contract.

2. Employer's Liability Maritime Limit:

   U.S. $1,000,000 per occurrence.

3. Such insurance shall include an Alternate Employer endorsement in favor of Operator.

**Part II.** COMMERCIAL GENERAL LIABILITY INSURANCE

Such insurance shall include premises, operations, contractual, Contractor's protective liability with a total combined bodily injury and property damage limited of U.S. $1,000,000 per occurrence.

**Part III.** COMPREHENSIVE AUTOMOBILE LIABILITY

Such insurance shall cover all of Contractor's owned, non-owned and hired automobiles with a total combined injury and property damage limit of U.S. $1,000,000 per occurrence.

**Part IV.** MARINE INSURANCE

   a.      Hull and Machinery Insurance - Full Form Hull and Machinery insurance, in an amount at least equal to the declared value of the vessel and with navigational limits adequate for CONTRACTOR to perform the work and services hereunder. Where the vessel(s) engage in towing operations, said insurance shall include full Tower's Liability with the sistership clause unamended. Said policy shall be endorsed to provide that additional insureds may, but shall not be obligated to, sue and labor. This insurance may exclude coverage for Collision and Liability and Tower's Liability, provided such risks are covered under the Full Form Protection and Indemnity Liability insurance as described below. The "As Owner" and any other language in this policy which limits the

coverage to an insured who is not the CONTRACTOR or is not entitled to limitation of liability shall be deleted.

b.      Protection and Indemnity insurance - Coverage including, but not limited to, injuries to or death of masters, mates and crews of vessels with limits of not less than $1,000,000, including insurance for voluntary removal of wreck and/or debris, collision liability, diving operations, and liability for seepage, pollution, containment and cleanup per Water Quality Improvement Act as amended. This insurance shall be equivalent to Form SP-23 or Gard Statutes & Rules, including coverage for crew, Tower's Liability (with the sistership clause unamended), Collision and Liability (with the sistership clause unamended), sue and labor and salvage charges, and Contractual Liability. The "As Owner" and any other language in this policy which limits the coverage to an insured who is not the Owner or who is not entitled to limitation of liability shall be deleted

**Part V.** UMBRELLA/EXCESS LIABILITY INSURANCE

Such insurance shall be over and above underlying coverages with limit of U.S. $100,000,000.

**APPENDIX F**

(See Paragraph 1305)

The following clauses, where required by law, are incorporated in the Contract by reference as if fully set out:

1. The Equal Opportunity Clause prescribed in 41 CFR 60-1.4.

2. The Affirmative Action Clause prescribed in 41 CFR 60-250.4 regarding veterans and veterans of the Vietnam era.

3. The Affirmative Action Clause for handicapped workers prescribed in 41 CFR 60-741.4.

4. The Certification of Compliance with Environmental Laws prescribed in 40 CFR 15.20.

(Rev. 1-13 gg) G-1

# APPENDIX G

## ALCOHOL, DRUGS, FIREARMS, WEAPONS

It is of the utmost importance that all personnel working for LLOG, whether Operator or Contractor employees, have full control of their mental and physical faculties.

Alcohol and/or drugs cause impairment of these faculties and contribute to the frequency of accidents. Since the ill effects of alcohol and/or drugs can last for hours and in some cases days, it is potentially unsafe for any employee to be at a work site with these substances in his/her system.

The use or possession of alcoholic beverages, illegal drugs, designer drugs, look-alike drugs, drug paraphernalia, weapons, firearms, explosives and ammunition on Company property, whether leased or owned, or by LLOG employees on contractor property is potentially unsafe and is prohibited.

LLOG reserves the right to conduct searches and/or substance abuse screening for any of the above-mentioned items.

Failure to comply with this policy and its intent will result in disciplinary action up to and including termination of the affected employee.

| RIG SYSTEM/ COMPONENTS | TEST LOCATION | LLOG QA/QC PLAN | | | COMMENT |
|---|---|---|---|---|---|
| | | Documentation | Witness | Check doc. | |
| Hull/Structure | Shipyard, Korea | ABS main class certificate | No | ✓ | |
| DP System | Sea Trials, Korea | ABS main class certificate<br>FMEA report, Global Maritime | 3rd Party | ✓ | |
| Marine/Ballast | | | | | |
| · Fuel/Supply | Shipyard, Korea | Commissioning dossier, ABS sign. | No | ✓ | |
| · Rig Air | Shipyard, Korea | Commissioning dossier, ABS sign. | No | ✓ | |
| Life Saving System | GoM | COC from USCG | No | ✓ | |
| Communication System | | | | | |
|   –  Radio station | Shipyard, Korea | Radio survey Report, ABS | No | ✓ | |
|   –  PA/GA/PABX | Shipyard, Korea | Commissioning dossier, ABS sign. | No | ✓ | |
|   –  Drillers talkback | Shipyard, Korea | Commissioning dossier, ABS sign. | LLOG | | |
| Power Systems | | | | | |
| · Marine systems | Sea Trials, Korea | Sea trial report & ABS main cert. | 3rd Party | | |
| · Rig System Power | Sea Trials, Korea | Sea trial report & ABS main cert. | 3rd Party | | |
| · ESD | Shipyard, Korea | Commissioning dossier, ABS sign | 3rd Party | | |
| · Em. Gen. Backup | Sea Trials, Korea | Sea trial report & ABS main cert. | 3rd Party | | |
| · Fuel System | Shipyard, Korea | Commissioning dossier, ABS sign | 3rd Party | ✓ | |
| · Electric | Shipyard, Korea | Commissioning dossier, ABS sign | 3rd Party | ✓ | |
| Material Handling | | | | | |
| · Bulk Storage | Shipyard, Korea | Commissioning dossier, ABS sign. | 3rd Party | ✓ | |
| · Bulk Transfer | Shipyard, Korea | Commissioning dossier, ABS sign. | 3rd Party | ✓ | Note 1 |
| · Cranes | Shipyard, Korea | ABS certificates for lifting appliances | 3rd Party | ✓ | |
| Rig/Drill Package | | | | | |
| · PHS/PRS/Drawworks | Shipyard, Korea | Functional test & comm. dossier | LLOG | | |
| · Top Drive | Shipyard, Korea | Functional test & comm. dossier | LLOG | | |



LLOG _____ Seadrill _____

| RIG SYSTEM/ COMPONENTS | TEST LOCATION | LLOG QA/QC PLAN | | | COMMENT |
|---|---|---|---|---|---|
| | | Documentation | Witness | Check doc. | |
| Circulation System | | | | | |
| · Mud Pumps | Shipyard, Korea | Functional test & comm. dossier | LLOG | | |
| · Circulation System & Mixing | Shipyard, Korea | Functional test & comm. dossier | LLOG | | |
| · Mud Pits/Trip Tank(s) | Shipyard, Korea | Functional test & comm. dossier | LLOG | | |
| Fluid Transfer | | | | | |
| · PIT-PIT & PUT | Shipyard, Korea | Functional test & comm. dossier | LLOG | | |
| · Lower Storage Up to Surface | Shipyard, Korea | Functional test & comm. dossier | LLOG | | Note 1 |
| · Solids Control | Shipyard, Korea | Functional test & comm. dossier | LLOG | | |
| · Cutting Dryers (LLOG) | GoM | TBD | LLOG | | |
| · Cement Unit (LLOG) | | | LLOG | | |
| · Rates | Transit | Functional test & comm. dossier | LLOG | | |
| · Bulk Transfer | Transit | Functional test & comm. dossier | LLOG | | |
| · Chem Add System | Transit | Functional test & comm. dossier | LLOG | | |
| ROV (LLOG) | GoM | Functional test & comm. dossier | LLOG | | |
| Well Control/Subsea | | | | | |
| · Reg Spec Compl | Shipyard/Transit | ABS Drill notation & comm. doss. | 3rd Party | | |
| · ELEC/MUX System | Shipyard/Transit | ABS Drill notation & comm. doss. | 3rd Party | | |
| · PODS | Shipyard/Transit | ABS Drill notation & comm. doss. | 3rd Party | | |
| · BOP Elements | Shipyard/Transit | ABS Drill notation & comm. doss. | 3rd Party | | |

LLOG ᒎᑌᑎ        Seadrill _____

**Execution Version**

| RIG SYSTEM/ COMPONENTS | COMISSIONING LOCATION | LLOG QA/QC PLAN | | | COMMENT |
|---|---|---|---|---|---|
| | | Documentation | Witness | Check doc. | |
| Emergency Backup System | Shipyard/Transit | | | | |
| · Accumulator | Shipyard, Korea | Commissioning dossier, ABS sign | 3rd Party | ✓ | |
| · EDS | GoM | Functional test & ABS Drill not. | 3rd Party | | |
| · Deadman | GoM | Functional test & ABS Drill not. | 3rd Party | | |
| · Riser Recoil | GoM | Functional test & ABS Drill not. | 3rd Party | | |
| · C/K & HP System | Shipyard, Korea | Commissioning dossier, ABS sign | 3rd Party | ✓ | |
| · Gas Handling-Mud Cap | Shipyard, Korea | Functional test & ABS Drill not. | 3rd Party | | |
| · Diverter System | Shipyard, Korea | Functional test & ABS Drill not. | 3rd Party | | |
| · Tensioner | Shipyard, Korea | Functional test & ABS Drill not. | 3rd Party | | |
| · CMC (Crown Mounted Comp) | Shipyard, Korea | Functional test & ABS Drill not. | 3rd Party | | |
| · Moonpool BOP/Riser Handling System | Shipyard, Korea | Functional test & ABS Drill not. | 3rd Party | | |
| · Riser Inspection | GoM | ABS certificate | 3rd Party | | |
| · SS Tree Handling | GoM | TBD | 3rd Party | | |
| · Sub Sea Test System | GoM | TBD | 3rd Party | | |

Note 1: Bulk transfer will be functionally tested at shipyard with air. Calibration with Barite and Bentonite, will be done upon arrival in GoM. LLOG should provide Barite and Bentonite for final testing and calibration.

LLOG ‾س‾ت‾

Seadrill

# Appendix I

## CONTRACTOR ATTACHMENTS IN A TYPICAL BSEE RIG PACKAGE:

**Underlined Items required as per 501(h)**

1) ABS/Flag State Vessel Certificates – Contractor to Provide
2) USCG Certification of Compliance – Contractor to Provide
3) BOP Autoshear – Deadman Function Testing (Surface & Subsea) Work Instructions – Contractor to Provide
4) BOP Sketch with Diverter Operating Instructions. – Contractor to Provide
5) Operator Emergency Evacuation Plan – Operator to Provide
6) Operator Severe Weather document – Operator to Provide
7) Operator Negative Test Procedure – Operator to Provide
8) Rig Equipment List (IADC List) – Contractor to Provide
9) Rig Picture & other rig layout drawings – Contractor to Provide
10) ROV Intervention Testing (Surface & Subsea) Work Instructions – Operator to Provide
11) Safe Welding Drawing with documentation – Contractor to Provide
12) Well Control Standards document – Operator to Provide.
13) Subsea BOP Test Procedure – Contractor to Provide
14) Surface BOP Test Procedure – Contractor to Provide
15) Surface Testing of Emergency Disconnect System & Auto- Shear/Deadman System – Contractor to Provide
16) Emergency Disconnect Sequence Testing – Contractor to Provide

# APPENDIX J – Activity Map Drilling Unit Commissioning to Operations

Activity Map – Seadrill West Neptune - Completion of Shipyard Commissioning to Onset of GOM Operations



Seadrill W. Neptune- Shipyard & Sea Trials Completed (1) → Bunkering & Loading Equip at Anchor, Korea. LLOG provided Loading & Acceptance Testing Plan (ATP) access at zero rate → Loading & Bunkering Completed Ready to Depart Korea. → MOB to GOM → Rig Arrives in "Operating Area " Date A

MOB Covered by Mob Fee + Fuel & Logistics Costs

Seadrill Provided BSEE Rig Data as Specified in Exhibit I, >= 60 Days in advance of "Date A" ? → No → Rig may be at Zero rate if Waiting on Rig Data as Specified in Exhibit I results in APD Permit Delay

Yes ↓

USCG Certificate Of Compliance In Hand? → No → Rig at Zero rate if unable to work while waiting on USCG COC or USCG Approval to Work.

Yes ↓

Install 2nd BOP & Perform Seadrill GOM Preparation Work at Zero Rate if LLOG unable to conduct Acceptance Testing Plan (ATP) activities. → LLOG Conducts GOM ATP @ Acceptance Testing Rate for 7 Days. (2) For >7 Days at @ Operating Rate → LLOG GOM ATP Completed

LLOG Ready for Operations → NO → Rig Waiting on Permits, etc. at Stand-by Rate

Yes ↓

Rig Mobilization to 1st Well Location @ Stand- by Rate

Rig at 1 NM from Drill Site = Rig @ Operating Dayrate

(1) LLOG to provide LLOG witness for co-commissioning all relevant systems in Korea

(2) If during final GOM acceptance testing of the rig reveals failures delaying final acceptance of the rig, requiring repair of or change of equipment, the time delay for parts delivery and repairs will be @ rig repair rate provisions.

## Amendment No. 01 to the Contract
### *Address for Payment and Notices*

Reference is made to Appendix A of the CONTRACT dated the 16th day of April, 2013, between LLOG BLUEWATER HOLDINGS, L.L.C., (a Delaware limited liability company) with offices located at 1001 Ochsner Blvd., Covington, Louisiana 70433, and hereinafter called "OPERATOR", and SEADRILL DEEPWATER CONTRACTING, LTD., (a Bermuda corporation), herinafter called "Seadrill Deepwater," which was assigned on August 1, 2014 to SEADRILL GULF OPERATIONS NEPTUNE, LLC, (a Delaware limited liability company), and hereinafter called "CONTRACTOR."

CONTRACTOR hereby wishes to amend Appendix A of the CONTRACT by making revisions to the following clauses, such additions to take effect the 1st of August, 2014.

**Appendix A:**

| 803 | **Address for Payment:** | Seadrill Gulf Operations Neptune, LLC C/O |
|---|---|---|
| | | Seadrill Americas Inc. |
| | | 11025 Equity Drive |
| | | Suite 150 |
| | | Houston, TX 77041 |
| | | Phone 713-329-1150 |
| | | Fax 713-329-1179 |
| | | Email: nick.brown@seadrill.com |
| | | Attn: Treasury |

**1201  Address for Notices:**

| | Contractor: | Seadrill Gulf Operations Neptune, LLC |
|---|---|---|
| | | 11025 Equity Drive |
| | | Suite 150 |
| | | Houston, TX 77041 |
| | | Phone: 713-329-1150 |
| | | Fax: 713-329-1179 |
| | | Email: scott.mcgrath@seadrill.com |
| | | Attn: VP Operations |

| | With Copy To: | Seadrill Americas Inc. |
|---|---|---|
| | | 11025 Equity Drive |
| | | Suite 150 |
| | | Houston, TX 77041 |
| | | Phone 713-329-1150 |
| | | Fax 713-329-1179 |
| | | Email: norman.wachtel@seadrill.com |
| | | Attn: Contracts Manager |

All other terms and conditions of the CONTRACT shall remain the same.

**AGREED AND ACCEPTED**

LLOG BLUEWATER HOLDINGS, L.L.C.

By: _____

Name: Scott R. Gutterman

Title: President and CEO

Date: November 24, 2014

**AGREED AND ACCEPTED**

SEADRILL GULF OPERATIONS NEPTUNE, LLC

By: _____

Name: IAIN HOPE

Title: PRESIDENT

Date: Nov 25, 2014.

**Amendment No. 2 to the Domestic Daywork Drilling Contract – Offshore between LLOG Bluewater Holdings, L.L.C. and Seadrill Deepwater Contractor, Ltd. dated April 16, 2013, which was assigned effective August 01, 2014 to Seadrill Gulf Operations Neptune L.L.C.**

Per this Amendment No. 2 to the above referenced contract (the "Contract"), LLOG Bluewater Holdings, L.L.C. and Seadrill Gulf Operations Neptune L.L.C. supplement the definition of "Operations Commencement Date" in Paragraph 101 (i) by adding to the end thereof the following: "However, if the Gulf of Mexico Acceptance Testing is successfully completed and the Drilling Unit is permitted to and does depart from the Acceptance and Testing Program well location underway to the first drilling site specified by Operator with the BOPs suspended, then the Operation Commencement Date shall be the date that such departure occurs."

All other terms and conditions of the Contract shall remain the same.

LLOG Bluewater Holdings, L.L.C.

By: _____

Name: _J M LEIMKUHLER_

Title: _VP- DRILLING_

Date: _Dec 10, 2014_

Seadrill Gulf Operations Neptune L.L.C.

By: _____

Name: ___IAIN   HOPE_

Title: _Dec 10, 2014_

Date: _SNR V.P._

**Amendment No. 03 to the**
**Domestic Daywork Drilling**
**Contract -Offshore**
*2014 Rate*
*Adjustment*

Reference is made to Paragraph 711 and Appendix A of the Domestic Daywork Drilling Contract –Offshore dated the 16th day of April, 2013, between LLOG BLUEWATER HOLDINGS, L.L.C., (a Delaware limited liability company) with offices located at 1001 Ochsner Blvd., Covington, Louisiana 70433, and SEADRILL DEEPWATER CONTRACTING, LTD., (a Bermuda corporation), which was assigned on August 1, 2014 to SEADRILL GULF OPERATIONS NEPTUNE, LLC, (a Delaware limited liability company) (the "Contract"). The parties shall hereinafter sometimes be referred to individually as "Party" or together as "Parties.

The Parties hereby agree to amend the Contract as follows:

1. **The text of the first two paragraphs of** Paragraph 711 of the Contract is deleted and replaced with the following:

   "As of the Operations Commencement Date of this Contract, mutually agreed by the Parties to be 16 December 2014, and annually thereafter, the following adjustment provisions will apply. The rates subject to adjustment as per the specified indices may be increased or decreased as per the specified formula; however, in no cases are the rates to drop below the initial baseline costs as listed in this the original version of this Paragraph 711.

   Application for any adjustments to the rates and prices set out in this Paragraph 711 must be made in writing and documented via an executed amendment to this Contract or other agreed form."

2. The Operating Rate set out in Appendix A line 705, shall be adjusted as provided for in Paragraph 711 of the Contract, so that effective from December 16, 2014, until otherwise adjusted or amended, the Operating Rate shall be U.S.$ **576,203.18 per day.**

3. The attached revision of "Appendix C Personnel to be Provided by Contractor" shall replace the version set out originally in the Contract and shall be effective from December 16, 2014, until otherwise adjusted or amended.

EXHIBIT 1 -OPERATING RATE ADJUSTMENT, attached hereto, sets out the indices employed and the calculation of the rate adjustment provided for in this Amendment No. 03.



1

Other than as provided for in this and previous amendments, all other terms and conditions of the Contract remain unchanged.

**AGREED AND ACCEPTED**

**AGREED AND ACCEPTED**

LLOG BLUEWATER HOLDINGS, L.L.C.

By: _~~JM Leimkuhler~~_

Name: _JOSEPH M LEIMKUHLER_

Title: _VP- DRILLING_

Date: _1 - JUNE - 2015_

SEADRILL GULF OPERATIONS NEPTUNE, LLC

By: _Svend A. Maier_

Name: _SVEND A. MAIER_

Title: _PRESIDENT_

Date: _29-MAY-15_

2



# Databases, Tables & Calculators by Subject



FONT SIZE: ☰ ☰

**Change Output Options:** From: `2004 ▼` To: `2014 ▼` **GO**

☑ include graphs      **More Formatting Options** ➡

Data extracted on: January 26, 2014 (3:16:51 PM)

**Employment, Hours, and Earnings from the Current Employment Statistics survey (National)**

```
Series Id:       CEU1021100008
Not Seasonally Adjusted
Super Sector:    Mining and logging
Industry:        Oil and gas extraction
NAICS Code:      211
Data Type:       AVERAGE HOURLY EARNINGS OF PRODUCTION AND
NONSUPERVISORY EMPLOYEES
```

**Download:** 🅺 xlsx

| Year | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Annual |
|------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|--------|
| 2004 | 18.85 | 18.75 | 18.75 | 18.78 | 18.49 | 18.21 | 17.94 | 18.17 | 18.82 | 18.77 | 18.84 | 18.55 | 18.58 |
| 2005 | 19.16 | 19.08 | 19.02 | 19.35 | 19.47 | 19.66 | 19.67 | 19.19 | 19.57 | 19.11 | 19.21 | 19.61 | 19.34 |
| 2006 | 20.10 | 20.32 | 20.58 | 20.98 | 20.95 | 21.20 | 20.87 | 21.92 | 22.29 | 22.52 | 22.36 | 22.44 | 21.39 |
| 2007 | 22.97 | 23.30 | 23.62 | 24.11 | 24.10 | 23.90 | 24.36 | 24.69 | 24.73 | 25.35 | 24.57 | 24.48 | 24.20 |
| 2008 | 25.07 | 25.59 | 26.56 | 26.84 | 26.89 | 26.76 | 27.53 | 28.36 | 27.88 | 28.15 | 28.73 | 28.65 | 27.28 |
| 2009 | 28.10 | 27.90 | 27.82 | 28.22 | 27.38 | 27.44 | 27.46 | 27.28 | 27.68 | 27.26 | 27.33 | 27.28 | 27.60 |
| 2010 | 27.19 | 27.47 | 27.38 | 27.18 | 27.58 | 27.63 | 27.87 | 27.55 | 27.55 | 27.13 | 26.95 | 26.88 | 27.36 |
| 2011 | 27.14 | 27.65 | 28.01 | 27.56 | 27.70 | 27.15 | 27.39 | 27.19 | 27.38 | 27.08 | 26.52 | 26.81 | 27.27 |
| 2012 | 27.25 | 27.60 | 28.20 | 28.76 | 28.09 | 28.32 | 29.06 | 28.62 | 28.98 | 28.80 | 28.77 | 29.75 | 28.52 |
| 2013 | 29.79 | 30.37 | 30.33 | 30.92 | 30.60 | 30.62 | 30.26 | 29.68 | 29.79 | 29.77 | 30.43 | 30.56 | 30.26 |
| 2014 | 30.83 | 30.31 | 30.46 | 30.52 | 30.57 | 30.95 | 32.72 | 32.09 | 31.62 | 31.67 (P) | | | |

P : preliminary





# Databases, Tables & Calculators by Subject

FONT SIZE: ☰ ✛

**Change Output Options:**   From: 2004 ▾   To: 2014 ▾    GO

☐ include graphs          **More Formatting Options** ➡

Data extracted on: January 26, 2014 (3:19:14 PM)

**Producer Price Index Industry Data**

```
Series Id:   PCU311---311---
Industry:    Food mfg
Product:     Food mfg
Base Date:   198412
```

| Year | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Annual |
|------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|--------|
| 2004 | 139.3 | 140.4 | 142.4 | 146.1 | 149.1 | 148.6 | 146.5 | 144.6 | 143.8 | 143.5 | 143.3 | 144.2 | 144.3 |
| 2005 | 144.7 | 145.0 | 146.0 | 146.3 | 147.1 | 146.4 | 146.3 | 146.0 | 146.3 | 146.7 | 146.1 | 146.2 | 146.1 |
| 2006 | 146.4 | 145.1 | 145.2 | 144.1 | 144.7 | 146.4 | 147.4 | 147.5 | 147.9 | 147.6 | 149.0 | 149.8 | 146.8 |
| 2007 | 151.6 | 153.8 | 155.8 | 156.9 | 158.7 | 160.3 | 160.4 | 160.3 | 160.8 | 160.7 | 161.4 | 162.8 | 158.6 |
| 2008 | 165.8 | 167.5 | 169.8 | 171.2 | 174.0 | 176.1 | 180.3 | 180.5 | 179.2 | 176.4 | 173.4 | 171.1 | 173.8 |
| 2009 | 170.1 | 168.7 | 167.6 | 168.6 | 170.5 | 171.4 | 169.7 | 169.7 | 169.5 | 168.3 | 169.1 | 171.2 | 169.5 |
| 2010 | 172.2 | 172.4 | 172.6 | 173.6 | 175.8 | 174.6 | 174.6 | 175.3 | 177.3 | 178.2 | 179.4 | 179.8 | 175.5 |
| 2011 | 181.1 | 184.6 | 187.8 | 190.8 | 191.2 | 191.8 | 193.4 | 195.5 | 196.4 | 194.4 | 194.8 | 194.2 | 191.3 |
| 2012 | 194.9 | 194.9 | 195.7 | 196.0 | 196.6 | 197.1 | 198.2 | 200.6 | 202.1 | 202.4 | 202.6 | 201.7 | 198.6 |
| 2013 | 200.6 | 200.6 | 200.9 | 200.6 | 201.7 | 202.7 | 203.2 | 202.3 | 202.4 | 201.0 | 200.3 | 200.7 | 201.4 |
| 2014 | 201.4 | 202.3 | 205.9 | 210.9 | 211.0 | 211.8 | 212.9 | 212.9 | 212.0(P) | 211.8(P) | 210.4(P) | 208.7(P) | 209.3(P) |

P : Preliminary. All indexes are subject to revision four months after original publication.

## APPENDIX C
## PERSONNEL TO BE PROVIDED BY CONTRACTOR

| US GOM Drillship Manning | On Board | Current Manning Plan | Per Day | Per Hour |
|---|---|---|---|---|
| **MARINE** | | | | |
| Offshore Installation Mgr. (Master Unlimited and OIM) | 1 | 2 | 2354.98 | 196.25 |
| Marine Section Leader (Chief Mate) | 1 | 2 | 1808.4 | 150.7 |
| Dynamic Positioning Operator (DPO) (2nd or 3rd Mate Unlimited) | 4 | 8 | 1344.94 | 112.08 |
| Deck Supervisor | 2 | 4 | 912.71 | 76.06 |
| Crane Operator | 2 | 4 | 859.83 | 71.65 |
| Asst. Crane operator | 2 | 4 | 685.21 | 57.10 |
| Roustabout | 10 | 20 | 622.75 | 51.90 |
| Bosun | 2 | 2 | 859.83 | 71.65 |
| AB Seaman | 4 | 4 | 737.21 | 61.43 |
| SUBTOTAL MARINE | 25 | 50 | | |
| **DRILLING** | | | | |
| Drilling Section Leader | 1 | 2 | 2326.03 | 193.84 |
| Tool pusher | 2 | 4 | 2024.65 | 168.72 |
| Driller | 4 | 8 | 1730.25 | 144.19 |
| Assistant driller | 4 | 8 | 1092.36 | 91.03 |
| Derrick man | 2 | 4 | 807.72 | 67.31 |
| Assist Derrickman | 2 | 4 | 759.50 | 63.29 |
| Lead Roughneck | 2 | 4 | 735.63 | 61.30 |
| Roughneck | 8 | 16 | 685.21 | 57.10 |
| SUBTOTAL DRILLING | 25 | 50 | | |
| **MAINTENANCE** | | | | |
| Technical Section Leader (Chief Engineer Unlimited) | 1 | 2 | 2048.38 | 170.70 |
| Asst Technical Section Leader / Mech Supv (1st A/E or MODU) | 2 | 4 | 1835.67 | 152.97 |
| Engine Room Operator (2nd and 3rd A/E) | 4 | 8 | 1304.04 | 108.67 |
| Motorman | 2 | 4 | 809.56 | 67.46 |
| Sr. Mechanic | 2 | 4 | 1456.38 | 121.36 |
| Mechanic | 1 | 2 | 1340.68 | 111.72 |

| US GOM Drillship Manning | On Board | Current Manning Plan | Per Day | Per Hour |
|---|---|---|---|---|
| Electrical Supervisor | 1 | 2 | 1794.37 | 149.53 |
| Sr. Electrician | 1 | 2 | 1359.51 | 113.29 |
| Electrician | 2 | 4 | 1090.76 | 90.90 |
| Sr. Electronic Technician | 2 | 4 | 1337.18 | 111.43 |
| Electronic Technician | 1 | 2 | 1086.18 | 90.52 |
| Sub Sea Supervisor | 1 | 2 | 2137.15 | 178.10 |
| Sub Sea Engineer | 2 | 4 | 1736.44 | 144.70 |
| Sub Sea Trainee | 2 | 4 | 1072.17 | 89.35 |
| Welder | 2 | 4 | 838.06 | 69.84 |
| **SUBTOTAL MAINTENANCE** | **26** | **52** | | |
| **GENERAL & ADMIN** | | | | |
| Safety Officer | 2 | 4 | 913.59 | 76.13 |
| Medic | 1 | 2 | 837.16 | 69.76 |
| Materials Administrator | 2 | 4 | 889.05 | 74.09 |
| Rig Administrator | 1 | 2 | 724.90 | 60.41 |
| **SUBTOTAL GENERAL & ADMIN** | **6** | **12** | | |
| *TOTAL REGULAR CREW* | *82* | *164* | | |

Reference is made to Paragraph 711 and Appendix A of the Domestic Daywork Drilling Contract – Offshore dated the 16th day of April 2013, between LLOG BLUEWATER HOLDINGS, L.L.C., (a Delaware limited liability company) with offices located at 1001 Ochsner Blvd., Covington, Louisiana 70433, and SEADRILL DEEPWATER CONTRACTING LTD., (a Bermuda corporation) which was assigned on August 1, 2014 to SEADRILL GULF OPERATIONS NEPTUNE, LLC, (a Delaware limited liability company) (the "Contract"). The parties shall hereinafter sometimes be referred to individually as "Party" or together as "Parties".

The Parties hereby agree to amend the Contract as follows:

1. The Operating Rate set out in Appendix A line 705, shall be adjusted as provided for in Paragraph 711 of the Contract, so that effective from December 16, 2015, until otherwise adjusted or amended, the Operating Rate shall be **U.S. $573,180.00 per day**.

2. Appendix C – Personnel to be Provided by Contractor, as revised in ATTACHMENT 2, shall replace the version set out previously in Amendment No. 03 and shall be effective from December 16, 2015 until otherwise adjusted or amended.

ATTACHMENT 1 – OPERATING RATE ADJUSTMENT, attached hereto, sets out the indices employed and the calculation or the rate adjustment provided for in this Amendment No. 04.

Other than as provided for in this and previous amendments, all other terms and conditions of the Contract remain unchanged.

**AGREED AND ACCEPTED**

LLOG BLUEWATER HOLDINGS, L.L.C.

*J M Leimkuhler*
Signature

*JM LEIMKUHLER*
Print Name

*VP DRILLING*
Title

*16 - DEC - 2015*
Date

**AGREED AND ACCEPTED**

SEADRILL GULF OPERATIONS NEPTUNE, LLC

*Svend H. Maier*
Signature

*Svend Anton Maier*
Print Name

*President*
Title

*16 - December - 2015*
Date



## LLOG West Neptune
### 2015 Rate Adjustment

Effective Date of Contract:    **16-Apr-13**
Rate Adjustment Date:      **16-Dec-15**

| Operational Element | Baseline | | Indices Dec-14 | Dec-15 | Factor | Adjusted Rate |
|---|---|---|---|---|---|---|
| Personnel (CEU 1021100008) | $ 90,000.00 | 29.79 | 31.62 | 30.79 | 0.973751 | $ 93,021.15 |
| Catering (PCU311---311---) | $ 11,000.00 | 200.6 | 212.9 | 203.5 | 0.955848 | $ 11,159.02 |
| | $ 101,000.00 | | | | | $ 104,180.17 |

| | | | |
|---|---|---|---|
| Personnel | 90,000 | 95,529 | 93,021 |
| Catering | 11,000 | 11,674 | 11,159 |
| **Total** | 101,000 | 107,203 | 104,180 |

| | | |
|---|---|---|
| Change in Cost | 6,203 | (3,023) |
| Previous Day Rate | 570,000 | 576,203 |
| Adjusted Rate effective 16 Dec 2015: | **$576,203** | **$573,180** |



# Databases, Tables & Calculators by Subject

**Change Output Options:**

From: 2005

☑ include graphs

Data extracted on: December 16, 2015 (9:15:57 AM)

## Employment, Hours, and Earnings from the Current Employment Statistics survey (National

```
Series Id:        CEU1021100008
Not Seasonally Adjusted
Super Sector:     Mining and logging
Industry:         Oil and gas extraction
NAICS Code:       211
Data Type:        AVERAGE HOURLY EARNINGS OF PRODUCTION AND NONSUPERVISORY EMPLOYEES
```



**Download:** 🗶 xlsx

| Year | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| 2005 | 19.16 | 19.08 | 19.02 | 19.35 | 19.47 | 19.66 | 19.67 | 19.19 | 19.57 | 19.11 | 19.21 | 19.61 |
| 2006 | 20.10 | 20.32 | 20.58 | 20.98 | 20.95 | 21.20 | 20.87 | 21.92 | 22.29 | 22.52 | 22.36 | 22.44 |
| 2007 | 22.97 | 23.30 | 23.62 | 24.11 | 24.10 | 23.90 | 24.36 | 24.69 | 24.73 | 25.35 | 24.57 | 24.48 |
| 2008 | 25.07 | 25.59 | 26.56 | 26.84 | 26.89 | 26.76 | 27.53 | 28.36 | 27.88 | 28.15 | 28.73 | 28.65 |
| 2009 | 28.10 | 27.90 | 27.82 | 28.22 | 27.38 | 27.44 | 27.46 | 27.28 | 27.68 | 27.26 | 27.33 | 27.28 |
| 2010 | 27.19 | 27.47 | 27.38 | 27.18 | 27.58 | 27.63 | 27.87 | 27.55 | 27.55 | 27.13 | 26.95 | 26.88 |
| 2011 | 27.14 | 27.65 | 28.01 | 27.56 | 27.70 | 27.15 | 27.39 | 27.19 | 27.38 | 27.08 | 26.52 | 26.81 |
| 2012 | 27.25 | 27.60 | 28.20 | 28.76 | 28.09 | 28.32 | 29.06 | 28.62 | 28.98 | 28.80 | 28.77 | 29.75 |
| 2013 | 29.79 | 30.37 | 30.33 | 30.92 | 30.60 | 30.62 | 30.26 | 29.68 | 29.79 | 29.77 | 30.43 | 30.56 |
| 2014 | 30.83 | 30.31 | 30.46 | 30.52 | 30.57 | 30.95 | 32.72 | 32.09 | 31.78 | 31.62 | 31.57 | 31.55 |
| 2015 | 29.65 | 29.64 | 29.95 | 29.12 | 29.16 | 29.46 | 29.67 | 29.94 | 30.79 | 31.45(P) | | |

P : preliminary



# Databases, Tables & Calculators by Subject

**Change Output Options:**

From: 20|

☑ include gra|

Data extracted on: December 16, 2015 (9:17:40 AM)

## Producer Price Index Industry Data

**Series Id:** PCU311---311---
**Industry:** Food mfg
**Product:** Food mfg
**Base Date:** 199412



Month

**Download:** 📊 xlsx

| Year | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| 2005 | 144.7 | 145.0 | 146.0 | 146.3 | 147.1 | 146.4 | 146.3 | 146.0 | 146.3 | 146.7 | 146.1 | 146.2 |
| 2006 | 146.4 | 145.1 | 145.2 | 144.1 | 144.7 | 146.4 | 147.4 | 147.5 | 147.9 | 147.6 | 149.0 | 149.8 |
| 2007 | 151.6 | 153.8 | 155.8 | 156.9 | 158.7 | 160.3 | 160.4 | 160.3 | 160.8 | 160.7 | 161.4 | 162.8 |
| 2008 | 165.8 | 167.5 | 169.8 | 171.2 | 174.0 | 176.1 | 180.3 | 180.5 | 179.2 | 176.4 | 173.4 | 171.1 |
| 2009 | 170.1 | 168.7 | 167.6 | 168.6 | 170.5 | 171.4 | 169.7 | 169.7 | 169.5 | 168.3 | 169.1 | 171.2 |
| 2010 | 172.2 | 172.4 | 172.6 | 173.6 | 175.8 | 174.6 | 174.6 | 175.3 | 177.3 | 178.2 | 179.4 | 179.8 |
| 2011 | 181.1 | 184.6 | 187.8 | 190.8 | 191.2 | 191.8 | 193.4 | 195.5 | 196.4 | 194.4 | 194.8 | 194.2 |
| 2012 | 194.9 | 194.9 | 195.7 | 196.0 | 196.6 | 197.1 | 198.2 | 200.6 | 202.1 | 202.4 | 202.6 | 201.7 |
| 2013 | 200.6 | 200.6 | 200.9 | 200.6 | 201.7 | 202.7 | 203.2 | 202.3 | 202.4 | 201.0 | 200.3 | 200.7 |
| 2014 | 201.4 | 202.3 | 205.9 | 210.9 | 211.0 | 211.8 | 212.9 | 212.9 | 212.6 | 211.8 | 210.0 | 208.5 |
| 2015 | 205.1 | 202.5 | 201.8 | 201.2 | 202.6 | 204.6 | 203.5 | 204.3(P) | 201.5(P) | 199.8(P) | 198.9(P) | |

P : Preliminary. All indexes are subject to revision four months after original publication.



**EXHIBIT C**
**PERSONNEL TO BE PROVIDED BY CONTRACTOR**

| US GOM Drillship Manning | On Board | Current Manning Plan | Per Day | Per Hour |
|---|---|---|---|---|
| **MARINE** | | | | |
| Offshore Installation Mgr. (Master Unlimited and OIM) | 1 | 2 | 2293.17 | 191.10 |
| Marine Section Leader (Chief Mate) | 1 | 2 | 1760.93 | 146.74 |
| Dynamic Positioning Operator (DPO) (2nd or 3rd Mate Unlimited) | 4 | 8 | 1309.63 | 109.14 |
| Deck Supervisor | 2 | 4 | 888.76 | 74.06 |
| Crane Operator | 2 | 4 | 837.26 | 69.77 |
| Asst. Crane operator | 2 | 4 | 667.22 | 55.60 |
| Roustabout | 10 | 20 | 606.40 | 50.53 |
| Bosun | 2 | 2 | 837.26 | 69.77 |
| AB Seaman | 4 | 4 | 717.85 | 59.82 |
| SUBTOTAL MARINE | **25** | **50** | | |
| **DRILLING** | | | | |
| Drilling Section Leader | 1 | 2 | 2264.97 | 188.75 |
| Tool pusher | 2 | 4 | 1971.50 | 164.29 |
| Driller | 4 | 8 | 1684.83 | 140.40 |
| Assistant driller | 4 | 8 | 1063.69 | 88.64 |
| Derrick man | 2 | 4 | 786.51 | 65.54 |
| Assist Derrickman | 2 | 4 | 739.56 | 61.63 |
| Lead Roughneck | 2 | 4 | 716.32 | 59.69 |
| Roughneck | 8 | 16 | 667.22 | 55.60 |
| SUBTOTAL DRILLING | **25** | **50** | | |
| **MAINTENANCE** | | | | |
| Technical Section Leader (Chief Engineer Unlimited) | 1 | 2 | 1994.61 | 166.22 |
| Asst Technical Section Leader / Mech Supv (1st A/E or MODU) | 2 | 4 | 1787.48 | 148.96 |
| Engine Room Operator | 4 | 8 | 1269.81 | 105.82 |

| (2nd and 3rd A/E) | | | | |
|---|---|---|---|---|
| Motorman | 2 | 4 | 788.31 | 65.69 |
| Sr. Mechanic | 2 | 4 | 1418.15 | 118.18 |
| Mechanic | 1 | 2 | 1305.49 | 108.79 |
| Electrical Supervisor | 1 | 2 | 1747.27 | 145.61 |
| Sr. Electrician | 1 | 2 | 1323.83 | 110.32 |
| Electrician | 2 | 4 | 1062.13 | 88.51 |
| Sr. Electronic Technician | 2 | 4 | 1302.08 | 108.51 |
| Electronic Technician | 1 | 2 | 1057.67 | 88.14 |
| Sub Sea Supervisor | 1 | 2 | 2081.05 | 173.42 |
| Sub Sea Engineer | 2 | 4 | 1690.86 | 140.90 |
| Sub Sea Trainee | 2 | 4 | 1044.03 | 87.00 |
| Welder | 2 | 4 | 816.06 | 68.01 |
| SUBTOTAL MAINTENANCE | 26 | 52 | | |
| **GENERAL & ADMIN** | | | | |
| Safety Officer | 2 | 4 | 889.61 | 74.13 |
| Medic | 1 | 2 | 815.19 | 67.93 |
| Materials Administrator | 2 | 4 | 865.72 | 72.14 |
| Rig Administrator | 1 | 2 | 705.88 | 58.82 |
| SUBTOTAL GENERAL & ADMIN | 6 | 12 | | |
| **VOR ADDL PERSONNEL** | | | | |
| Subsea Technician | 1 | 2 | 1288.27 | 107.36 |
| SUBTOTAL VOR ADDL PERSONNEL | 1 | 2 | | |
| ***TOTAL REGULAR CREW*** | *83* | *166* | | |

Seadrill Confidential

**Amendment No. 05 to the**
**Domestic Daywork Drilling Contract – Offshore**

***Change to Paragraph 802. _Payment_***

Reference is made to Paragraph 802 of the Domestic Daywork Drilling Contract – Offshore dated the 16th day of April 2013, between LLOG BLUEWATER HOLDINGS, L.L.C., (a Delaware limited liability company) with offices located at 1001 Ochsner Blvd., Covington, Louisiana 70433, and SEADRILL DEEPWATER CONTRACTING LTD., (a Bermuda corporation) which was assigned on August 1, 2014 to SEADRILL GULF OPERATIONS NEPTUNE, LLC, (a Delaware limited liability company) (the "Contract"). The parties shall hereinafter sometimes be referred to individually as "Party" or together as "Parties".

Effective immediately, the Parties hereby agree to amend the Contract by deleting the first two sentences of Paragraph 802 and replacing such with the following:

> "Operator shall pay all invoices within sixty (60) days after the receipt thereof except that if Operator disputes an item invoiced, Operator shall within twenty (20) days after receipt of the invoice notify Contractor in writing (if provided by email such notice to be confirmed by fax or letter) of the amount disputed, specifying the reason therefore, and payment of the disputed amount may be withheld until settlement of the dispute, but payment shall be made of any undisputed portion. Any sums (including amounts ultimately paid with respect to a disputed invoice) not paid within sixty days (60) days after receipt of invoice shall bear interest at the rate specified in Appendix A or the maximum allowed by law, whichever is less, from said due date until paid.".

Other than as provided for in this and previous amendments, all other terms and conditions of the Contract remain unchanged.

**AGREED AND ACCEPTED**

LLOG BLUEWATER HOLDINGS, L.L.C.

_____
Signature

PHILIP S. LEJEUNE
Print Name

TREASURER
Title

3/29/16
Date

**AGREED AND ACCEPTED**

SEADRILL GULF OPERATIONS NEPTUNE, LLC

_____
Signature

R.J. WATKINS
Print Name

S.V.P.
Title

1st April 2016
Date

## ASSIGNMENT OF DRILLING CONTRACT
## WEST NEPTUNE

This Assignment of Drilling Contract (*"Assignment"*) by and between Seadrill Deepwater Contracting, Ltd., a Bermuda corporation, located at 4th Floor, Par-la-Ville Place, Par-la-Ville Road, Hamilton, Bermuda, (*"Seadrill Deepwater"*), and Seadrill Gulf Operations Neptune LLC, a Delaware limited liability company (*"Seadrill Gulf Neptune"*), is effective as of August 1, 2014, (the *"Effective Date"*).

WHEREAS, Seadrill Deepwater is party to that certain Domestic Daywork Drilling Contract dated April 16, 2013, (the *"Drilling Contract"*), with LLOG Bluewater Holdings, LLC, a Delaware limited liability company, with offices located at 1001 Ochsner Blvd., Covington, Louisiana 70433 (*"LLOG"*), relating to the provision of the mobile offshore drilling unit *West Neptune*; and

WHEREAS, LLOG has notified Seadrill Deepwater that the initial area of operations under the Drilling Contract will be the waters of the US Gulf of Mexico; and

WHEREAS, Seadrill Deepwater desires to assign the Drilling Contract to Seadrill Gulf Neptune, an Affiliated Company of Seadrill Deepwater, and Seadrill Gulf Neptune desires to assume such contract, and all rights, liabilities and obligations thereunder;

NOW, THEREFORE, in consideration of the premises and mutual covenants herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seadrill Deepwater and Seadrill Gulf Neptune agree as follows:

1. Assignment of Drilling Contract

   1.1. Seadrill Deepwater hereby assigns to Seadrill Gulf Neptune all of its rights and obligations under the Drilling Contract as of the Effective Date of this Assignment, for the duration of operations located within the US Gulf of Mexico.

   1.2. Seadrill Gulf Neptune hereby accepts such assignment.

2. Continuing Obligations

   2.1. From the Effective Date of this Assignment, Seadrill Gulf Neptune shall be a party to the Drilling Contract and have the rights and obligations of Seadrill Deepwater thereunder. Seadrill Deepwater retains its full obligations under the Drilling Contract, and should Seadrill Gulf Neptune in any respect fail to perform any of its obligations under, arising out of or in connection with the Drilling Contract or otherwise be in breach of the Drilling Contract, Seadrill Deepwater shall upon simple demand of LLOG perform or take any steps necessary to achieve performance of the obligations of Seadrill Gulf Neptune under the Drilling Contract or cure the breach.

3. <u>Miscellaneous</u>

   3.1. <u>Capitalized Terms</u>: Capitalized terms used in this Assignment and not defined herein shall have the meaning set forth in the Drilling Contract.

   3.2. <u>Original Terms of Contract Maintained</u>: The parties hereby agree that the Drilling Contract shall remain in full force and effect following the execution of this Assignment and such contract is not amended by the terms hereof.

   3.3. <u>Disputes</u>: Any controversies or disputes arising out of and related to this Assignment shall be resolved in accordance with the procedures set forth in the Drilling Contract.

   3.4. <u>Governing Law</u>: This Assignment shall be governed, construed, applied and enforced in accordance with Article 108 of the Drilling Contract.

   3.5. <u>Successors & Assigns</u>: The terms of this Assignment shall bind and inure to the benefit of the parties hereto and their respective heirs, legal representatives and successors and assigns.

   3.6. <u>Further Assurances</u>: Each party hereto will take all actions necessary to effectuate this Assignment.

   3.7. <u>Counterparts</u>: This Assignment may be executed in multiple counterparts, each of which shall be deemed to be an original, but all of which shall collectively constitute one and the same instrument. Facsimile and electronic copies of this Assignment shall be given the full force and effect as an original.

[Signature Page to Follow]



IN WITNESS WHEREOF, the parties have executed this Assignment, effective as of the Effective Date.

**SEADRILL GULF OPERATIONS NEPTUNE LLC**

By Seadrill Americas Inc., its sole member

By: _____

Name: ___ IAIN HOPE ___

Title: ___ SNR V. P. ___

Date: ___ 8/25/14 ___

**SEADRILL DEEPWATER CONTRACTING, LTD.**

By: _____

Name: ___ GEORGINA E. SOUSA ___

Title: ___ DIRECTOR / SECRETARY ___

Date: ___ August 08, 2014 ___