## Page 1

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE SOUTHERN DISTRICT OF TEXAS
2          HOUSTON DIVISION
3  MARK FLORA,            *
                          *
4     Plaintiff,          *
                          *
5  VS.          * CIVIL ACTION NO.
                * 4:19-CV-2328
6  TRANSOCEAN DRILLING (USA), INC. *
   ET AL                  *
7                         *
     Defendants.          *
8  ************************************************
          THE ORAL VIDEOTAPED
9            DEPOSITION OF
           RALPH LAGARDE, JR.
10      CORPORATE REPRESENTATIVE FOR
        GULF LOGISTICS OPERATING, LLC
11          MARCH 17, 2021
        (REPORTED REMOTELY VIA LEGALVIEW/ZOOM)
12 ************************************************
13   ORAL VIDEOTAPED DEPOSITION OF RALPH LAGARDE, JR.,
14 CORPORATE REPRESENTATIVE FOR GULF LOGISTICS OPERATING,
15 LLC, produced as a witness at the instance of the
16 PLAINTIFF, and duly sworn, was taken in the above-styled
17 and numbered cause on the 17th of March, 2021, from
18 11:10 a.m. to 3:19 p.m. before Debbie Boothe, CSR, in
19 and for the State of Texas, reported by machine
20 shorthand remotely via LegalView/Zoom from my residence
21 in Houston, Texas, with the witness located in
22 Lafayette, Louisiana, pursuant to the Federal Rules of
23 Civil Procedure, the 36th Emergency Order regarding the
24 COVID-19 State of Disaster, and the provisions stated in
25 the record or attached hereto.

## Page 2

1      A P P E A R A N C E S
2
   FOR THE PLAINTIFF:
3
     Mr. Daniel E. Sheppard
4     Morrow & Sheppard, LLP
      5151 San Felipe Street, Suite 100
5     Houston, Texas 77098
      (713) 489-1206    (713) 893-8370 Facsimile
6     dsheppard@morrowsheppard.com
7
   FOR THE DEFENDANT GULF LOGISTICS OPERATING, INC., GULF
8  LOGISTICS, LLC, and LLOG:
9     Mr. Alan J. Meche
      Allen & Gooch
10    2000 Kaliste Saloom Road, Suite 400
      Lafayette, Louisiana 70508
11    (337) 3291-1000   (337) 291-1200 Facsimile
      AlanMeche@AllenGooch.com
12
13 FOR THE DEFENDANT GRAND ISLE SHIPYARD, LLC:
14    Mr. John G.H. Davis
      Brown Sims, PC
15    1177 West Loop South, Tenth Floor
      Houston, Texas 77027
16    (713) 629-1580    (713) 629-5027 Facsimile
      jdavis@brownsims.com
17
18 THE VIDEOGRAPHER:
19    Mr. Harshal Shah
      Lexitas
20
21
22          * * * * * *
23
24
25

## Page 3

1              INDEX
2
3  WITNESS:  RALPH LAGARDE, JR.
4                    PAGE
5  Appearances                    2
6  Examination by Mr. Daniel E. Sheppard      8
7    11:10 a.m. - 12:03 p.m.
8    12:13 p.m. - 1:45 p.m.
9    2:05 p.m. - 2:25 p.m.
10 Examination by Mr. John G.H. Davis       129
11   2:25 p.m. - 2:47 p.m.
12 Examination by Mr. Alan J. Meche         146
13   2:47 p.m. - 3:05 p.m.
14 Further Examination by Mr. Daniel E. Sheppard    162
15   3:05 p.m. - 3:19 p.m.
16 Reporter's Certificate              174
17
18          * * * * * *
19
20
21
22
23
24
25

## Page 4

1    REPORTER'S NOTE:  All quotations from exhibits are
2  reflected in the manner in which they were read into the
3  record and do not necessarily denote an exact quote from
4  the document.
5           EXHIBIT INDEX
6  NUMBER      DESCRIPTION              PAGE
7  Exhibit 1    SAMM Master Log, Log Date 5/24/17
8          (Bates GLO/LLOG 257 - 264)       33
9  Exhibit 2    Gulf Logistics Operating, Inc.
10         Safety and Environmental Management
11         System Manual, Conduct and Discipline
12         Section 6.2, Pages 3 and 4
13         (Bates GLO 00339 - 00340)        43
14 Exhibit 3    Gulf Logistics Operating, Inc.
15         Safety and Environmental Management
16         System Manual, Vessel Master
17         Responsibilities and Authorities,
18         Section 5.0, Pages 1 through 3
19         (Bates GLO 00317 - 00319)        58
20 Exhibit 4    Gulf Logistics Operating Root Cause
21         Analysis Form, Lessons Learned Form
22         and Incident Summary Sheet 5/27/17
23         (Bates GLO-LLOG 00444 - 00446)      69
24
25



Exhibit G

Page 5

1                    EXHIBIT INDEX - (Continued)

2  NUMBER        DESCRIPTION                     PAGE

3  Exhibit 5   Gulf Logistics Operating, Inc.

4           Safety and Environmental Management

5           System Manual, Injury Reporting,

6           Investigation & Corrective Action,

7           Section 9.2, Pages 2 through 4

8           (Bates GLO 00408 - 00410)        90

9  Exhibit 6   Gulf Logistics Operating, Inc.

10          Safety and Environmental Management

11          System Manual, Vessel Master

12          Responsibilities and Authorities,

13          Section 5.0, Page 1

14          (Bates GLO 00317 - 00319)        97

15 Exhibit 7  Gulf Logistics Operating, Inc.

16          Safety and Environmental Management

17          System Manual, Master's Management

18          Review, Section 5.1, Pages 1 through 9

19          (Bates GLO 00321 - 00329)        99

20 Exhibit 8   Gulf Logistics Operating, LLC's

21          Objections to Plaintiff's Notice of

22          Oral and Videotaped Deposition

23          (No Bates Numbers)               115

24

25

Page 6

1                    EXHIBIT INDEX - (Continued)

2  NUMBER        DESCRIPTION                     PAGE

3  Exhibit 9   Gulf Logistics Operating, Inc.

4           Incident Report 5/25/17

5           (No Bate Numbers)                172

6  Exhibit 10  LLOG Incident Reporting Program

7           (Bates GLO 00266 - 00272)        172

8

9                    * * * * * *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 7

1           THE VIDEOGRAPHER:  Good morning.  Today is

2  Wednesday, March 17, 2021.  The time is about 11:10 a.m.

3  We are now on the record.  Beginning Take 1.

4           THE REPORTER:  This deposition of

5  Ralph Lagarde, the corporate representative for

6  Gulf Logistics Operating, LLC, is being conducted

7  remotely via LegalView/Zoom.

8           The witness is located in Lafayette,

9  Louisiana.  My name is Debbie Boothe, CSR Number 4708,

10 and I am reporting this deposition remotely from my

11 residence in Houston, Texas.

12           Will Counsel state their appearances on the

13 record and where they are located, and then I will swear

14 in the witness.

15           MR. SHEPPARD:  Daniel Sheppard for the

16 Plaintiff.  I'm located in Houston, Texas, at

17 5151 San Felipe Street, Suite 100, Houston, Texas 77056.

18           MR. DAVIS:  John Davis for Grand Isle

19 Shipyard, LLC.  My offices are at 1177 West Loop South,

20 Tenth Floor, Houston, Texas 77027.

21           MR. MECHE:  Alan Meche representing

22 Gulf Logistics Operating, Inc., Gulf Logistics, LLC, and

23 LLOG.  And I'm at 2000 Kaliste Saloom Road in Lafayette,

24 Louisiana 70508.

25

Page 8

1           RALPH LAGARDE, JR.

2      CORPORATE REPRESENTATIVE FOR

3      GULF LOGISTICS OPERATING, LLC:

4           EXAMINATION

5  QUESTIONS BY DANIEL E. SHEPPARD:

6     Q.  Mr. Lagarde, could you state your name, please.

7     A.  Ralph Lagarde, Jr.

8     Q.  All right.  Is it okay if I call you

9  Mr. Lagarde?

10    A.  That's fine, sir.

11    Q.  Okay.  Mr. Lagarde, have you ever been deposed

12 before?

13    A.  Yes, sir.

14    Q.  Was that anything in addition to the employment

15 case a few years ago where there was a consent decree,

16 or is it something else?

17    A.  I'm sorry.  I didn't understand the question.

18    Q.  In what -- what case were you -- what sort of

19 cases have you had your deposition taken in before?

20    A.  Other cases with Gulf Logistics.

21    Q.  Okay.  Were they related to injuries that a

22 person suffered, or is there a wider spectrum of

23 categories or cases that you testified in?

24    A.  Most of them were injuries, that I remember.

25    Q.  Okay.  When was the last time that you provided



1 deposition testimony on behalf of -- and I'm going to
2 say GLO. You understand that to mean Gulf Logistics?
3  **A. Yes, sir.**
4    Q. It's just so I have a clear -- I'm going to ask
5 the question again because it's clear, and I kind of
6 broke myself up. I'm sorry about that. So, actually,
7 I'll kind of move forward to something else and come
8 back to it.
9       Are you familiar generally with the rules
10 in depositions?
11  **A. Yes, sir.**
12    Q. Okay. So yes and no answers. You can always
13 expand if you need to. I'd ask if after I ask a
14 question just take a beat. That will help your lawyer
15 make an objection if he wants to. And can you -- can
16 you help me with that?
17  **A. Yeah. I'm sorry, what?**
18    Q. After I ask a question, if you could just take
19 a beat. It's going to help your lawyer put in an
20 objection if he needs to. Is that okay?
21  **A. Oh, okay. Yes, sir.**
22    Q. Okay. And we'll -- we'll probably do this at
23 some point, but let's just try not to talk over one
24 another. Can we try to do that?
25  **A. Yes, sir.**

1    Q. Okay. And if I ask you a question and you
2 don't understand it, will you stop me so we can work out
3 the portion that you don't understand?
4  **A. Absolutely.**
5    Q. Okay. And if you don't understand a word that
6 I'm using, can you stop me so that we can work -- work
7 it out so that, you know, you fully understand the
8 question I'm asking?
9  **A. Yes. So a beat means pause; right?**
10    Q. Yes, sir.
11       If -- doing those things, is that a -- is
12 that a fair way to get at your truth? Is there anything
13 else that I can do to make this deposition fair for you?
14  **A. Seems fair.**
15    Q. Okay. If you need to take a break at any time
16 for any reason, even if you need to talk to your lawyer
17 or go to the bathroom, please do that. I'd ask if we --
18 if we have a question on the table, let's get to that
19 first before we take a break. Can we agree on that?
20  **A. Yes, sir.**
21    Q. Okay. Now, you had said that you've had your
22 deposition taken before. About how many times?
23  **A. A couple handfuls.**
24    Q. How big is a handful?
25  **A. Well, five plus two is ten.**

1    Q. So about ten times or so?
2  **A. Yeah.**
3    Q. Okay.
4  **A. I --**
5    Q. And for the -- go ahead. Sorry.
6  **A. I -- I -- I'm not 100 percent sure. I don't**
7 **remember.**
8    Q. Okay. That's not a problem. I'm just trying
9 to get a ballpark from you.
10       And in those -- in those ten or so cases,
11 what percentage of them related to personal injuries?
12  **A. Majority of them.**
13    Q. Okay. And of the -- those majority of the
14 cases, did they involve injuries that happened on
15 vessels or that happened somewhere else?
16  **A. Mostly vessels.**
17    Q. Okay. When was the last time that you recall
18 testifying on behalf of GLO?
19  **A. Maybe last year. I don't remember.**
20    Q. Do you have any recollection of what the matter
21 dealt with?
22  **A. No, sir, I sure don't.**
23    Q. Okay. Out of the handful of cases that you --
24 for the two handfuls of cases that you testified in, can
25 you recall any of the details of those cases?

1       MR. MECHE: Objection, form.
2  **A. I mean, I -- I -- I'd rather you ask me a**
3 **specific question about a specific case, and then I can**
4 **maybe elaborate on that. I mean, today I'm prepared**
5 **for -- semi-prepared for the Flora case, I mean.**
6    Q. (BY MR. SHEPPARD) Okay. Do you remember the
7 names of the folks that were injured in the cases that
8 you testified in?
9  **A. Not right offhand.**
10    Q. Okay. Do you remember where the cases were
11 filed? Were they filed in Louisiana? Were they filed
12 in Texas?
13  **A. I don't.**
14    Q. Okay. I want to be clear about this next
15 question. I don't want to know about content that you
16 may have had in any discussions with your lawyer. All
17 I'm asking you is: Have you had the opportunity to
18 speak to your lawyer about this case?
19  **A. Yes, sir.**
20    Q. Okay. Have you spoke to him once or more than
21 once?
22  **A. More than once.**
23    Q. How many times have you spoken with your --
24 with a lawyer in this case?
25       MR. MECHE: Objection, form.



Page 13

1          Daniel, do you mean since the inception of
2   the case how many times he's talked to me?
3          MR. SHEPPARD:  In preparation -- I'll ask
4   the question again.
5      Q.  (BY MR. SHEPPARD) In preparation of your
6   deposition, how many times have you spoken with
7   Mr. Meche?
8          MR. MECHE:  Objection, form.
9      A.  Maybe three or four times.
10     Q.  (BY MR. SHEPPARD) Okay.  When was the first
11  time that you recall speaking to Mr. Meche in
12  preparation of your deposition?
13     A.  A couple weeks ago, maybe.
14     Q.  Okay.  Do you recall how long that conversation
15  was?
16     A.  No, sir.
17     Q.  Okay.
18     A.  This -- okay.
19         MR. MECHE:  No, go ahead and finish your
20  answer.
21     Q.  (BY MR. SHEPPARD) Go ahead and finish.
22     A.  This -- this includes emails as well?
23     Q.  Any sort of communication that you had.
24     A.  Yes, three or four times.
25     Q.  Okay.  In terms of conversations that you've

Page 14

1   had with Mr. Meche, can you estimate how long you've
2   spoken to him?
3      A.  Not long.
4      Q.  Okay.  Would it be a few hours or more than a
5   few hours?
6      A.  Less than a few hours.
7      Q.  Okay.  Would that be two or three hours, or how
8   many hours would that be?
9      A.  That's probably close.
10     Q.  Okay.  And in addition to speaking with
11  Mr. Meche, have you reviewed any materials, documents,
12  discovery responses in preparation of your deposition
13  here today?
14     A.  I re -- I reviewed the file, the case file, the
15  deposition notice and a few things that my lawyer -- him
16  and I spoke about.
17     Q.  Okay.  Not getting into the content of the
18  conversation, were there other -- what are the documents
19  that you reviewed?
20     A.  Basically all of them that were provided to
21  you.
22     Q.  Okay.  There are some that were provided to me
23  over the past few days.  Did you locate those documents
24  or did somebody else?
25         MR. MECHE:  Which documents, Daniel?

Page 15

1      Q.  (BY MR. SHEPPARD) There was -- there was a
2   document produced to me about 30 minutes ago prior to
3   this deposition, the Root Cause Analysis Form.  When did
4   you discover that document?
5      A.  Yesterday.
6      Q.  Yesterday?  And when -- did you not look for
7   that document before yesterday?
8      A.  So when looking in our file, the hard file at
9   the office, we had it.  And we thought we had produced
10  it, but it was not in the file -- in the notes that the
11  lawyer -- my lawyer and I spoke about.  So I said,
12  "Well, maybe I'll just bring it today and present it."
13     Q.  Okay.  In addition to that, I think there are
14  some witness statements that were produced about a week
15  ago.  When were those discovered?
16         MR. MECHE:  Daniel, let me -- let me
17  just -- I want to make sure you understand that I'm
18  representing Gulf Logistics, but I'm also representing
19  LLOG.  We received from documents from LLOG.  And even
20  though they weren't produced to us by Gulf Logistics, in
21  an abundance of caution we produced them to you.  So I
22  just want to make sure you're aware that -- that I'm
23  representing three separate companies here.
24         So you many want to clarify what you're
25  looking for from this particular witness.

Page 16

1          MR. SHEPPARD:  Sure.
2      Q.  (BY MR. SHEPPARD) There is a Gulf Logistics
3   Operating witness report from Bruce Bolt that was
4   produced on March 5th of 2021.  When was that document
5   loc -- when was that document located?
6      A.  That was -- that was done in -- in the initial
7   investigation.
8      Q.  Okay.  So that -- when was that document
9   located and -- by you, or by whoever searched for
10  documents responsive to our discovery requests?
11     A.  So the initial file would have been submitted
12  to our attorney by -- by Randy Whittaker, our safe --
13  he's in safety for Gulf Logistics.
14     Q.  And that would have been done probably around
15  the time that you got the discovery responses -- or the
16  discovery requests; right?
17     A.  Yes, sir.  I would assume that it would have
18  been after that.
19     Q.  Okay.  I have a SAMM Master Log for the
20  MAGGIE A.  Do you know which document I'm referring to?
21     A.  Master Log?
22     Q.  Yes, sir.
23     A.  I'm assuming that's the boat logs.
24     Q.  I'll show you what -- I'll pull it up on the
25  screen so you can see it.



1        Are you able to see my screen, sir?

**2    A. Yes, sir.**

3    Q. Okay. This is -- just for the record, it's

4 GLO/LLOG 259 through 264 -- or sorry, 257 through 264,

5 and it's titled "SAMM Master Log." Do you see that?

**6    A. Yes, sir.**

7    Q. What is this document?

**8    A. It's their boat log.**

9    Q. Okay. Are boat logs written down, or are they

10 all electronic?

**11    A. Some are written; some are electronic.**

12    Q. Okay. Are the -- is the -- was the MAGGIE A

13 all electronic, or do they have written records for

14 their boat logs?

**15    A. For this particular job, it was electronic.**

16    Q. Okay. Aside from your attorneys, have you

17 spoken to anyone about the case of Mr. Flora's lawsuit?

18        MR. MECHE: Objection, form.

**19    A. Yes, sir. I spoke to the safety manager. I**

**20 spoke to the captain, and I think that's about it, sir.**

21    Q. (BY MR. SHEPPARD) Okay. What's the name of the

22 safety manager?

**23    A. Randy Whittaker.**

24    Q. Okay. When did you speak with Mr. Whittaker?

**25    A. Well, he's in the same office as me. So I**

1 mean, we see each other pretty much at least five days a

2 week, so...

3    Q. Okay. When did you speak to Mr. Whittaker

4 about Mr. Flora's lawsuit?

**5    A. The last time being probably an hour ago.**

6    Q. Okay. What did you guys talk about?

**7    A. We talked about how long did Flora -- how long**

**8 was he assigned to the MAGGIE A, when did the MAGGIE A**

**9 first come out, and I think that's about it.**

10    Q. How long was Mr. Flora assigned to the

11 MAGGIE A?

**12    A. So from what I gather, just over a month. He**

**13 was on the boat; and just over a month, his incident**

**14 occurred.**

15    Q. Okay. Is there any importance to how long

16 Mr. Flora was working aboard the MAGGIE A?

17        MR. MECHE: Objection, form.

**18    A. I was just wondering how long he was there.**

19    Q. (BY MR. SHEPPARD) Okay. I didn't know if there

20 was some importance to the question. Was it just some

21 information that you wanted, or is there -- or is there

22 some -- some --

**23    A. Just --**

24    Q. -- suggestion -- sorry, go ahead.

**25    A. Just information I wanted.**

1    Q. Okay. And the next -- the next question you

2 had was how -- how long the MAGGIE A had been in

3 service?

**4    A. Yes, sir.**

5    Q. Since inception, or are you talking about for

6 that particular stint?

**7    A. What do you mean by that stint?**

8    Q. Well, let me ask: What do you mean by how long

9 the MAGGIE A was in service?

**10    A. Okay. So she's a brand -- she was a brand-new**

**11 boat back in 2017, and LLOG was her first customer that**

**12 I -- that I remember, and I think that was correct. I**

**13 didn't get the full answer, but she was a brand-new**

**14 boat.**

15    Q. Okay. And was all the -- was that the first

16 trip that the MAGGIE A had, or did they have other

17 trips?

18        MR. MECHE: Object to form.

**19    A. No, it was not their first trip.**

20    Q. (BY MR. SHEPPARD) Okay. Was -- and I believe

21 you said you also spoke with the captain. That would be

22 Captain Lester James?

**23    A. Yes. Lester James and -- and Barry.**

24    Q. Sorry, can you say that other name?

**25    A. Barry. You got me on the last name right now.**

1 I'll think of it in a second.

2    Q. Okay. Who's -- who's Barry?

**3    A. He's -- he's another captain that works on that**

**4 boat.**

5    Q. Okay. Was he on that boat at the time of the

6 incident?

**7    A. No, sir.**

8    Q. Okay. What were you talking to Barry about?

**9    A. If he -- if he remembered Mark Flora. I mean,**

**10 he was -- he worked with Mark before. So, I mean, he**

**11 knows Mark.**

12    Q. Okay.

**13    A. He answered the phone. I was calling for**

**14 Lester, but he answered the phone.**

15    Q. Okay. What did -- what did Barry tell you

16 about Mr. Flora?

**17    A. He wasn't on the boat with him, but he said he**

**18 remembers him. He worked with him back at Seabulk.**

19    Q. Okay.

**20    A. I think he even said he knows his uncle.**

21    Q. Okay. Was there any information that you were

22 trying to seek by asking Mr. Barry information about

23 Mr. Flora?

**24    A. No, sir. I was just searching -- just talking**

**25 to him about the case.**



1    Q.  Okay.  And you spoke to Mr. --
2 Captain Lester James.  What did you and Mr. James talk
3 about?
4    **A.  We just reviewed what was on the report.**
5    Q.  Which report?
6    **A.  The accident report.**
7    Q.  Okay.  There's a few reports in this case.  I
8 have the -- let's see.  I have a -- did you go over the
9 LLOG incident reports, or did you just over the GLO
10 incident reports?
11    **A.  Just the GLO, sir.**
12    Q.  Okay.  Did you go over the -- the reports that
13 he made or all the reports?
14    **A.  Specifically the one that he made.**
15    Q.  Okay.  Did you go over the witness statement
16 from Bruce Bolt with --
17    **A.  I may --**
18    Q.  -- Captain Lester?
19    **A.  I may have asked him a question about that.**
20    Q.  Okay.  What was the question that you asked him
21 about that?
22    **A.  I wasn't sure if he -- if he remembers Bruce**
23 **taking the tag lines off Paul; and he was hooking them**
24 **up, according to what he told me.**
25    Q.  Who was hooking them up?

1    **A.  Bruce was.**
2    Q.  He was hooking the tag lines onto the Conex
3 box?
4    **A.  So -- so he -- he was just telling me what he**
5 **remembered about the case.**
6    Q.  Okay.  What did he tell you that he remembered?
7    **A.  Pretty much what his report says.**
8    Q.  Is -- is there anything that you -- that you
9 personally remember him saying that's not contained in
10 his report?
11    **A.  No, sir.**
12    Q.  Okay.  Aside from speaking to Mr. Whittaker,
13 Captain James and Captain Barry, is -- and excluding
14 your lawyers, is there anyone else that you've spoken to
15 about this case?
16    **A.  None that I remember.**
17    Q.  Okay.  Is Captain James still with the company?
18    **A.  Yes, sir.**
19    Q.  Is Bruce Bolt still with the company?
20    **A.  I don't think he is, no.**
21    Q.  Okay.  Do you have the contact information for
22 Mr. Bolt?
23    **A.  I don't with me, no.**
24    Q.  Is that something that the company would have
25 in their files?

1    **A.  Yes, sir.  We would probably have his last**
2 **contact.**
3    Q.  Okay.
4         MR. MECHE:  Daniel, I'll -- I'll verify
5 whether or not Bruce Bolt is employed by the company.
6 And if he's not, we will provide you with his last known
7 contact info.
8         MR. SHEPPARD:  Okay.
9    Q.  (BY MR. SHEPPARD) If you could do me a favor,
10 could you tell me three way -- three things that could
11 have been done that would have prevented this accident
12 from taking place?
13         MR. MECHE:  Objection, form.
14    **A.  You -- you want me to list three things?**
15    Q.  (BY MR. SHEPPARD) Yes, sir.
16    **A.  Okay.  Well, I think he should have -- Mark**
17 **should have called stop work authority.  I think he**
18 **should have waited for the tag lines to be placed on the**
19 **lift before he had the -- the headache ball lower that**
20 **rope.  And as far as the headache ball, it sounds --**
21 **sounds to me it was off center.  So he probably should**
22 **have told the crane operator to recenter it.**
23    Q.  Okay.  And these are all things that only Mark
24 could have done.  Is that something the captain should
25 have done, too?

1    **A.  No.  I think Mark was the one communicating**
2 **with the crane operator as far as the signal goes and**
3 **his -- his command.**
4    Q.  Okay.  And those three things are going to be
5 contained on the -- the Root Cause Analysis that you
6 produced today?
7    **A.  I don't know if they are or not.**
8    Q.  Okay.  So these are -- these may be new things
9 that have been -- that have -- that have come to light
10 after the Root Cause Analysis and after the lawsuit;
11 correct?
12    **A.  No, sir.**
13    Q.  Okay.  Well, one of the contributing factors
14 that I see on the lessons learned form is the vessel
15 went up on a swell.  You didn't mention that; correct?
16    **A.  Is that what it's on -- is that what's on**
17 **there?**
18    Q.  Yes, sir.
19    **A.  Yes.**
20    Q.  It's actually the first thing that's listed.
21    **A.  Okay.**
22    Q.  Okay.  Is there a reason you didn't mention
23 that?
24    **A.  That's not uncommon, no.**
25    Q.  Okay.  But is there a reason that wasn't



1 mentioned in one of the -- one of the things that could
2 have prevented this is if the captain had been watching
3 the seas and would have been able to stop the work from
4 happening whenever --
5    **A.  Sir, then back --**
6    Q.  -- whenever a swell was coming?
7    **A.  Sir, you asked me what I thought, three things,**
8 **and that was -- I told you what I thought.  I**
9 **don't think --**
10    Q.  Okay.
11    **A.  -- the weight of the boat going up and down had**
12 **any bearing.**
13    Q.  Okay.  We'll get to a few things later.  I just
14 wanted to check on that.
15        You're the general manager at GLO?
16    **A.  General manager/operations manager, yep.**
17    Q.  Okay.  What does the general manager/operations
18 manager do?
19    **A.  I oversee the daily operations.**
20    Q.  What does that mean?
21    **A.  Can you be more specific?**
22    Q.  I'm trying to understand what your job entails.
23 Would you be able to provide me with some of the things
24 that you're responsible for and what ultimately, you
25 know, the work it is that you do for GLO?

1    **A.  Yes, sir.  So I oversee the day-to-day**
2 **operations and the general knowledge for the personnel**
3 **department, the safety department, the maintenance**
4 **department, the purchasing department.**
5    Q.  Okay.  And what -- when you're overseeing the
6 day-to-day operations, what does that mean?  Are you
7 reviewing reports?  Are you conducting post-incident
8 safety meetings?  What -- what's -- what's sort of
9 your -- your role there?
10    **A.  I -- I honestly wish you'd be more specific,**
11 **sir, because my days, it's -- it's involved with a lot**
12 **of things.  I mean, it just depends on the day.  One day**
13 **I might be helping my personnel manager with a -- with**
14 **an issue or a safety manager with this -- this meeting**
15 **that we're preparing for, or the maintenance department**
16 **coordinating with the sales department about this**
17 **repair, or the purchasing department telling me how much**
18 **money this cost and how versus what it used to cost.**
19 **So, I mean, it's -- it's very involved, sir.**
20    Q.  Okay.  Are you in the management level of the
21 company?
22    **A.  Yes, sir.**
23    Q.  Okay.  So you're not generally going out on
24 vessels anymore?
25    **A.  No, sir, I go on vessels.**

1    Q.  Okay.  Do you go on there to do work, or do you
2 go on there to see what operations are being done?
3    **A.  What's your definition of "work"?**
4    Q.  Sure.  Do you work as a deckhand?
5    **A.  No, sir.**
6    Q.  Do you work as captain?
7    **A.  No, sir.**
8    Q.  Do you work as any member of the crew?
9    **A.  No, sir.**
10    Q.  Okay.  When you go onto the vessels, what is it
11 that you do?
12    **A.  I may be there for a meeting.  I may be there**
13 **to check out some work that's going on.  I may be**
14 **showing the boat with a customer.  It just varies, sir.**
15    Q.  Okay.  Before you were -- did -- did you ever
16 work as a crew member on vessels?  I imagine you have.
17    **A.  Not offshore, sir.**
18    Q.  Not offshore?
19        What sort of vessels did work on?
20    **A.  Growing up, I worked on some tugboats.  I did**
21 **some maintenance on some tugboats at the docks.**
22    Q.  Okay.  I'm not going to go back too far, but
23 how long have you worked as GLO -- at GLO?
24    **A.  It's not quite 20 years.  I'd give it 18 or so.**
25    Q.  Okay.  When you started out at GLO, what was

1 the role that you were placed into?
2    **A.  I came in as safety and then took on the**
3 **responsibility of personnel as well and then eventually**
4 **moved into the operational side of things/general**
5 **manager.**
6    Q.  Okay.  When was at the last time you worked on
7 a vessel as a crew member, if you -- just ballpark?
8 I'm -- I'm sure you won't have an exact date.
9    **A.  It might have been 18.  I don't -- I don't**
10 **know --**
11    Q.  Okay.
12    **A.  -- maybe younger.**
13    Q.  How old are you now?
14    **A.  I'll be 53.**
15    Q.  Okay.  So we're looking at about probably
16 35 years ago, more or less?
17    **A.  I guess so.**
18    Q.  All right.  I have a question about a few
19 documents that we got, and let -- let me know if you
20 know what these are.  I think it was produced by LLOG.
21        Have you seen this cargo manifest?
22    **A.  So I -- I saw a copy of that this morning, and**
23 **that's the first that I saw of that.**
24    Q.  Okay.  Is this -- is this something that's
25 provided --



1    A.  So to complete -- but to be honest with you, I
2 didn't even read it all.  I saw it was a cargo manifest,
3 and I'm like, "Okay."  I mean, they -- it's not much
4 sense to me; but, yeah, that's what that is.
5    Q.  Okay.  Are -- is it -- are cargo manifests,
6 if -- would you -- would GLO have been provided with
7 this document?
8         MR. MECHE:  Daniel, I don't know if you can
9 hear us, but you're cutting out.  We -- and we can't
10 hear you.
11        MR. SHEPPARD:  Sure.
12    Q.  (BY MR. SHEPPARD)  Would GLO have been provided
13 with a copy of this cargo manifest as part of its -- as
14 part of being hired to transport the materials out off
15 to the Seadrill?
16    A.  I'm sure that the -- the captain would have
17 receive a copy of that.
18    Q.  Okay.  And this says that this was at the --
19 the Fourchon base.  Do you see that?
20    A.  Yes, sir.
21    Q.  Okay.  I also want to note -- oh, that's why.
22        MR. SHEPPARD:  And sorry, I'm not -- I'm
23 trying to be rude.  I have two screens up here.  So if
24 you see me kind of looking away from the camera, that's
25 all I'm doing.

1    Q.  (BY MR. SHEPPARD) All right.  I've pulled up
2 what's marked GLO/LLOG 257.  It's the SAMM Master Log.
3 I see that this is for the 24th of May 2017.  And it
4 looks like is shows that the vessel goes to the LLOG
5 dock in Fourchon, Louisiana.  Do you see that?
6    A.  Yes, sir.
7    Q.  Is that dock within any specific facility, or
8 does LLOG own all the docks that are in the -- that area
9 of Fourchon, Louisiana, or do you know?
10        MR. MECHE:  Objection, form.
11    A.  So my understanding, that LLOG was working out
12 of the GIS dock in Fourchon.  I don't --
13    Q.  (BY MR. SHEPPARD)  Okay.
14    A.  I'm not 100 percent sure there, but that's
15 2017.  But I think they were GIS at that time.
16    Q.  (BY MR. SHEPPARD)  Okay.  And -- would it have
17 been GIS that performed the loading of the MAGGIE A for
18 the materials that were transported out to the Seadrill?
19    A.  They could have, but it could have been my crew
20 as well.  I -- I don't know.
21    Q.  Okay.  Is there any way to figure that out?
22    A.  I don't know.  I mean, maybe GIS could -- could
23 answer that one.
24    Q.  Okay.  Would -- would Gulf Logistics had to
25 have paid GIS to load materials onto its vessel?

1    A.  Did you say we would have paid GIS?
2    Q.  I'm asking if -- would GLO have had to pay GIS
3 to load materials onto the MAGGIE A?
4    A.  No, sir.
5    Q.  Who would have had to pay, then?
6    A.  I don't remember that contract.
7    Q.  Okay.  When materials are loaded on -- onto any
8 of GLO's vessels, what -- what sort of processes do you
9 have to ensure that the person has the right to load
10 those materials on the vessel?
11    A.  So when we go under contract with a company,
12 it's whatever they have contractually drawn up,
13 generally with the dock.
14    Q.  Okay.  And generally when -- when there's
15 someone at the dock, when you pull into somebody's dock
16 to have materials loaded onto a vessel, does the
17 material typically get loaded by the owner of the dock?
18        MR. DAVIS:  Objection, form.
19    A.  I've seen it both ways, sir.  I've seen -- I've
20 seen my guys assist on our deck with loading the boat,
21 rigging.
22    Q.  (BY MR. SHEPPARD)  Uh-huh.
23    A.  We never run the crane, if that's what you're
24 asking.  That's -- that's dock.
25    Q.  Okay.  And the -- the -- the folks that would

1 have run the crane to load the MAGGIE A, that would have
2 been GIS?
3    A.  I don't know who --
4        MR. DAVIS:  Objection, form.
5    A.  I don't know who loaded it.
6    Q.  (BY MR. SHEPPARD)  Okay.  Okay.  Who else would
7 have been working the crane at GIS's dock?  Do you have
8 any idea?
9    A.  No, sir.
10        MR. DAVIS:  Object -- objection, form.
11    A.  No, sir.
12    Q.  (BY MR. SHEPPARD)  Okay.  Who would know?
13        MR. DAVIS:  Objection, form.
14    A.  I don't know.  Maybe the GIS people, the log
15 people.
16    Q.  (BY MR. SHEPPARD)  if it -- Okay.  Does GLO have
17 any log whatsoever regarding when there was a crane
18 operation loading materials onto it's vessels?
19    A.  If it -- if -- if they do, it would on the --
20 on the -- on the Master Log; but, I mean, maybe not.
21    Q.  Okay.  Is that something that is typically put
22 down on the Master Log?
23        MR. DAVIS:  Objection, form.
24    A.  Not if it's load or unloading.
25        MR. SHEPPARD:  Okay.  I'd like to go



1 through this again and understand what this -- all
2 means.  So I'm pulling up the Master Log for the
3 MAGGIE A again.
4          And I'm -- I'm going to mark this as an
5 Exhibit 1 to the deposition.  It will be GLO 257 through
6 264.  Oh, it's not open.
7          (Exhibit 1 marked.)
8     Q.  (BY MR. SHEPPARD) In this corner here, they --
9 they have an area where they put remarks, and it says,
10 "3Lifts, 0Lifts."  Can you explain what that means?
11    **A.  No, sir.**
12    Q.  Okay.  Who would know what that means?
13    **A.  Ask the customer.  I -- I don't review the**
14 **logs.**
15    Q.  Right.  This is a GLO log.  Do you know -- GLO
16 completed this log; correct?
17    **A.  Right.  But, I mean, as far as the lifts and**
18 **stuff goes, I mean, that's -- it's not something that we**
19 **really track that much as far as, you know, like -- for**
20 **routine stuff like that, no.**
21    Q.  What does it mean when it says "3Lifts" or
22 "0Lifts"?
23    **A.  I don't know.  I didn't make that remark.**
24    Q.  Okay.  So the captain would be the person to
25 ask?

1    **A.  Yes, sir.**
2    Q.  And that would be either Lester James or
3 Jody Manuel?
4    **A.  Yes, sir.**
5    Q.  Okay.  On this next one, it's GLO/LLOG 259.
6 It's for the 25th of May 2017.  It says, "With 19 lifts
7 and 5 passengers" in the "Remarks" section for the
8 second activity on here.  Do you see that?
9    **A.  Yes, sir.  The same boxes you showed me**
10 **earlier?**
11    Q.  Yes, sir.
12    **A.  Yes, sir.**
13    Q.  It now says "with five passengers."  Do you
14 know what that means?
15    **A.  Yes, sir.**
16    Q.  What does that mean?
17    **A.  They were carrying passengers.**
18    Q.  Okay.  So the -- they were passengers aboard
19 the MAGGIE A that day?
20    **A.  Additional to the crew.**
21    Q.  Okay.  They don't appear to be listed on here.
22 Do you know who they are?
23    **A.  No, sir.**
24    Q.  Were they passengers going out to Seadrill or
25 were they -- what were -- what well, I'm sorry.

1 Strike that.
2          What was the purpose of the passengers
3 being aboard GLO a on May 25, 2017?
4    **A.  That was the customer's orders.  And that's**
5 **part of our job, is to bring crew and -- and cargo out.**
6    Q.  Okay.  When people get onboard GLO vessels, do
7 you keep any records of who they are?
8    **A.  Yes, sir.  So they would have signed the**
9 **manifest.**
10    Q.  Okay.  And I see that there was another two
11 lifts and five passengers a little bit later, at 9:30.
12 Was that -- do you know if that's an additional five
13 passengers or it's the same five passengers?
14    **A.  I -- I don't know.**
15    Q.  Okay.  How many -- are you aware of how many
16 sleeping quarters there are aboard the MAGGIE A?
17    **A.  The MAGGIE A probably has probably five bunk**
18 **rooms.  I don't know for sure.**
19    Q.  Okay.
20    **A.  I'd have to look at the spec sheets.**
21    Q.  Would there be enough for there to be two
22 captains, four deckhands and five passengers?
23    **A.  So those passengers wasn't going aboard to**
24 **sleep.  They were just going aboard to be transported,**
25 **and there's a passenger's quarter -- there's a passenger**

1 quarter in that boat.
2    Q.  Okay.  How large is the --
3    **A.  Passenger seat --**
4    Q.  -- passenger quarter?
5    **A.  Seating.  It's -- oh, God, you're asking me.  I**
6 **don't know the -- the square footage, but I can get you**
7 **the amount of seating that they have and the**
8 **Coast Guard-regulated amount of people that they can**
9 **carry if you'd like.**
10    Q.  Okay.  And on the 26th, GLO/LLOG 261, the
11 fourth item on the LLOG says "Lifeboat."  Do you know
12 what that means?
13    **A.  What are you saying it says, lifeboat?  Okay.**
14 **I see that.**
15    Q.  I'll zoom in for you.  That's easier.
16    **A.  They may have carried out a lifeboat.**
17    Q.  Okay.  Is there any reason why these -- why we
18 don't have detailed remarks in these blanks?
19    **A.  It's not required.**
20    Q.  Okay.  Would you agree with me that if there
21 was more detail in these blanks we would know precisely
22 what the remarks were that were being made?
23          MR. MECHE:  Objection, form.
24    **A.  I've never had -- had an issue with it before,**
25 **sir.**

1    Q.  (BY MR. SHEPPARD)  Okay.  But you agree with me
2  that you don't what many of these remarks mean; correct?
3        MR. MECHE:  Objection, form.
4    **A.  No, I'm not going to say I agree with you,**
5  **but...**
6    Q.  (BY MR. SHEPPARD)  Okay.  We'll go through the
7  remarks, then.
8        When it says, "With 6 Lifts" -- or
9  "W 6 lifts," what does that mean?
10   **A.  There's six lifts on the back deck.**
11   Q.  Okay.  And where are those going?
12   **A.  I don't know.**
13   Q.  Okay.  Where do they come from?
14   **A.  I don't know.**
15   Q.  Who put them on the boat?
16   **A.  I don't know.**
17   Q.  Do you keep -- and you-all don't keep any of
18  those records?
19   **A.  I'm not looking at the log right now; but, no,**
20  **I don't.  I mean --**
21   Q.  You're saying as a company --
22   **A.  They load it up, and we'll load it out at the**
23  **Grand Isle Shipyard dock, and then they would have**
24  **brought it out to whatever location the customer wanted**
25  **us to bring it to.  Now, I mean, that's -- that's --**

1  that's -- that's the gist of our job.  We do what the
2  customer says within our guidelines.
3    Q.  Got you.
4        But nowhere in your guidelines is it like
5  you were going to operate the crane to load the -- the
6  boxes and the -- the grocery boxes, the Conex boxes onto
7  the vessel; correct?
8    **A.  No, sir.  We don't run cranes.**
9    Q.  Okay.  And do you tell the crane operator where
10  to put the Conex boxes, or is that the decision that
11  they make entirely themselves?
12   **A.  The captain is -- takes part in where these**
13  **lifts go.**
14   Q.  Okay.  So the captain makes the decision on
15  where on the deck the lifts are going to be placed?
16   **A.  Yes, sir.**
17   Q.  Okay.  And in that case, that would have been
18  either Captain Lester James or Captain Manuel -- or
19  Jody Manuel?
20   **A.  Yes.**
21   Q.  Okay.
22   **A.  They would have had input on where the cargo**
23  **would have been placed.**
24   Q.  Okay.  Could the cargo have been placed
25  anywhere that the crane operator wanted to place it, or

1  ultimately would the captain make the decision where it
2  goes?
3    **A.  So when he's loading his boat, he's taking a**
4  **lot of things into consideration, the weight of the --**
5  **the cargo, where's it going to sit on the boat, how is**
6  **it going to be -- you know, there's just some things**
7  **that he's got to take into consideration.  And that's**
8  **what he's thinking about when asked about, "What do you**
9  **think about this load," and this, that and the other.**
10   **Now, a lot of it becomes standard because**
11  **they see a lot of the same things over and over, grocery**
12  **boxes, cutting boxes.  I mean, a lot of it becomes**
13  **standard, but he does get a chance to take a look at the**
14  **manifest and have -- and should have input.**
15   Q.  Okay.  And -- but the master ultimately is
16  controlled -- controls where things go on the vessel;
17  correct?
18        MR. MECHE:  Objection, form.
19   **A.  He has a say on where things go.**
20   Q.  (BY MR. SHEPPARD)  Okay.  Can I put something on
21  the vessel -- let's say I'm -- I'm putting a Conex box
22  onto the vessel.  Can I override the master and put it
23  where I want, or does he get to tell me where it goes?
24        MR. MECHE:  Objection, form.
25   **A.  At the end of the day, the master can say where**

1  the lift goes.
2    Q.  (BY MR. SHEPPARD)  Okay.
3    **A.  If there's a discussion.**
4    Q.  And ultimately it is -- it is the master's
5  responsibility and ultimately his decision as to where
6  something will be placed on the deck of the vessels that
7  he is the master of?
8        MR. MECHE:  Objection, form.  Asked and
9  answered.
10   **A.  Yes.  And that's all in accordance to where he**
11  **thinks it's needed.**
12   Q.  (BY MR. SHEPPARD)  Okay.  I just have a few
13  questions about Mr. Flora.  Did you know him personally?
14   **A.  Not really.**
15   Q.  Okay.  Had you ever met him before?
16   **A.  Man, I -- if he walked in the room, I don't**
17  **think I could pick him out.**
18   Q.  Okay.  In your discussions with folks in
19  getting prepared for this deposition, is there anything
20  that you learned about Mr. Flora?
21        MR. MECHE:  Objection, form.
22   **A.  I mean, can you be specific about what I**
23  **learned?**
24   Q.  (BY MR. SHEPPARD)  Sure.
25        As -- as you were preparing for your

1 deposition, did you learn anything about Mr. Flora's
2 work ethic?
3     **A. No, sir.**
4     Q. Did you learn anything about him being an
5 unsafe worker?
6     **A. No. But what was reminded to me is the fact**
7 **this guy has got -- he had -- he had a 1,600-ton**
8 **license. A very experienced seaman.**
9         MR. SHEPPARD: Okay. I object to
10 everything after "No" as nonresponsive.
11     Q. (BY MR. SHEPPARD) Did you learn of anything
12 that would make you think that Mr. Flora isn't a
13 truthful person?
14     **A. No, sir.**
15     Q. Were you made aware of any problems that other
16 workers had with Mr. Flora?
17     **A. Looking through his personnel file, I saw there**
18 **was a disciplinary form; but, I mean, noth -- nothing**
19 **really jumped out at me.**
20     Q. Do you remember what that disciplinary form was
21 for?
22     **A. If I remember correctly, it was about some**
23 **dirty dishes left in the sink.**
24     Q. Okay. Is that a -- a large infraction or a
25 minor infraction?

1     **A. In my opinion, minor.**
2     Q. Okay. It doesn't have to deal with him working
3 unsafely or not following the rules; right?
4     **A. I wasn't there. So, I mean, I hate to comment**
5 **on either way as far as that goes. But I mean, look, it**
6 **might have been something routinely he'd been doing. I**
7 **don't know. That's all I saw in his file.**
8     Q. Did you talk to Captain James about it?
9     **A. No, I didn't.**
10     Q. Okay. Aside from the -- the write-up for not
11 cleaning his -- cleaning dishes, are you aware of any
12 other infractions Mr. Flora may have committed while he
13 was working for GLO?
14     **A. No, sir.**
15     Q. Okay.
16         MR. MECHE: Daniel, when you get a good
17 stopping point, can we take a short five-minute bathroom
18 break?
19         MR. SHEPPARD: Sure. I just have a few
20 more questions with Flora then. It shouldn't take long
21 at all.
22         MR. MECHE: Sure.
23     Q. (BY MR. SHEPPARD) Okay. One of the rules that
24 GLO has is that, "Written communication (email or other
25 means) to the home office is required when an employee

1 has received verbal counseling but continues to
2 disregard or acknowledge problems"; correct?
3     **A. Okay.**
4     Q. Is that -- is that a true statement?
5     **A. Are you referring to the disciplinary report?**
6     Q. I'm referring to your SEMS manual, and I'll
7 point you to the particular passage.
8         MR. SHEPPARD: All right. I'll mark this
9 as Exhibit 2. It's going to be GLO 340. Alan, if you
10 need a second to get there, let me know.
11         MR. MECHE: Yeah, give me just one second.
12 You said 340?
13         MR. SHEPPARD: Yep. I'm going to pop it on
14 the screen for you.
15         MR. MECHE: Okay. Thank you.
16         MR. SHEPPARD: You're welcome.
17         I'm actually going to start at 339 and then
18 go to 340. I want him to have the whole thing in
19 context. So Exhibit 2 will be GLO 339 and 340.
20         (Exhibit 2 marked.)
21     Q. (BY MR. SHEPPARD) Do you see that on your
22 screen, sir?
23     **A. Yep.**
24     Q. Okay. It's for disciplinary action? Do you
25 see that, Section 2.9?

1     **A. Yes, sir.**
2     Q. Okay. And there's a highlighted section on
3 the -- beginning at the third paragraph. Do you see
4 that?
5     **A. So after "told" is there anything more to the**
6 **right?**
7         MR. MECHE: It's cut off because of the
8 video screen.
9         Daniel, if you want, I can show him a hard
10 copy I have with me.
11         MR. SHEPPARD: Let's see if I can zoom in.
12 Maybe that will be help.
13         MR. MECHE: Or if you can just shift it
14 over to the left. You'll have to go -- yeah, there we
15 go. Just shift the whole thing over to the left, and
16 we'll be able to see all of it.
17         MR. SHEPPARD: Okay. I'll try to do that.
18 Let's see. Are you able to see it? I can see it on
19 my -- my screen.
20         MR. MECHE: No. What -- what's happening
21 is as you're shifting it, it -- it magnifies and more of
22 it gets cut off. Again, I've got a copy I can show the
23 witness.
24         MR. SHEPPARD: I can zoom out if --
25 whatever works.



1          THE WITNESS:  Go back up one.

2          MR. MECHE:  There we go, right there.

3     Q.  (BY MR. SHEPPARD) Do you need me to move the

4 screen, or do anything on the screen, sir?

5     A.  No.  I'm actually reading right now.

6     Q.  Okay.

7     A.  (Reading document.)

8          Okay.  So do I read -- keep reading below

9 that as well?

10    Q.  Sure.

11    A.  (Reading document.)  Okay.

12    Q.  Okay.  I guess you'd agree with me that "No

13 employee can know that expectations are not being met,

14 unless told to do by their supervisor"; right?

15    A.  Yes, sir.

16    Q.  Okay.  And one of the rules that GLO has is

17 they need to provide "Written communication (email or

18 other means) to the home office when an employee has

19 received verbal counseling but continues to disregard or

20 acknowledge problems"; correct?

21    A.  Okay.  Yeah.

22    Q.  Is that GLO's policy?

23    A.  Yes.

24    Q.  Okay.  And the only -- the only written

25 communication that we have demonstrating that Mr. Flora

1 had exhibited any sort of problems involved the cleaning

2 of dishes; correct?

3     A.  So -- so, I mean, I kind of read that a little

4 differently than what you're thinking, I think, is that,

5 you know, Lester being his supervisor on the boat -- if

6 you're assuming it's Lester -- is that he may have -- he

7 may have warned him a few times and then finally wrote

8 him up on a hard copy and submitted that to the office.

9 Now, to me that's -- that's -- that's what you do.

10    Q.  Okay.  What I'm saying is if -- if Mr. Flora

11 had been disre -- continued to disregard problems after

12 he received a verbal warning there should be something

13 written down to that effect; correct?

14    A.  And it was -- it was submitted, apparently.

15    Q.  Yes.  Just for the dishes; right?

16    A.  That's what I saw.

17    Q.  Okay.  If there was something else out there

18 that Mr. Flora was disregarding, that should have been

19 written down; correct?

20    A.  It might -- may or may -- it may have not been

21 reported.  I don't know.  I mean, I don't know of any

22 other.

23    Q.  Okay.  I understand that it may not have been

24 reported.  What I'm saying, that it is GLO's policy that

25 it should have been reported; correct?

1     A.  Yes.  If you continually have a problem with an

2 employee or any kind of problem, you should report it to

3 the office.

4     Q.  Okay.  And there's no other evidence of

5 problems involving Mr. Flora contained in his personnel

6 file or any of the documents that GLO has?

7     A.  None that I'm aware of.

8     Q.  Okay.

9          MR. SHEPPARD:  Why don't we take a little

10 break if you need to.

11         MR. MECHE:  All right.  Just five minutes,

12 if you don't mind.

13         MR. SHEPPARD:  Sure.

14         THE VIDEOGRAPHER:  Off the record at

15 12:03 p.m.  Ending Take 1.

16         (Recess from 12:03 p.m. to 12:13 p.m.)

17         THE VIDEOGRAPHER:  We are now back on the

18 record at 12:13 p.m.  Starting Take 2.

19    Q.  (BY MR. SHEPPARD) All right.  Mr. Lagarde, we

20 are coming back from a break.  Again, without getting

21 into the content, did you have an opportunity to speak

22 to your lawyer?

23    A.  Briefly.  I went to the bathroom.  He did the

24 same.  We got water.

25    Q.  Okay.  Are there any answers that you've given

1 today that you'd like to change, modify or extend upon?

2     A.  No, sir.

3     Q.  Okay.  I'd like you to, if you know, generally

4 walk me through the process of how Conex boxes are

5 loaded onto GLO vessels.

6     A.  I don't know.  I don't -- I don't load boats.

7     Q.  Okay.  Who would know how that's generally

8 done?

9     A.  Well, I mean, I could give you the general idea

10 of what I think.

11    Q.  Sure.  Go for it.

12    A.  Okay.  Well, a crane either takes it off of a

13 truck or a dock and puts it on the back deck.

14    Q.  Okay.  And when that's happening, is there

15 communication between GLO crew members, GLO's master and

16 the crane operator?

17    A.  There's going to be communication between the

18 crane operator and probably whoever is rigging at that

19 point.

20    Q.  Okay.  Is the master watching the -- the

21 operation that's taking place, or who's standing watch?

22    A.  I don't know, I mean --

23    Q.  Okay.

24    A.  -- specific.  I mean, he would have had some --

25 some input on where he would think -- he would want

1  things put.

2      Q.  Who would be able to answer my last question as

3  to whether or not the master would be watching the

4  operation?

5      A.  You'd have to ask -- I mean, for what

6  specific -- that night?  I mean, where we at here?  I

7  mean, is it general you're asking me if -- if they're

8  supposed to watch the load-out?

9      Q.  If there's a crane operation taking place

10 onboard of one of GLO's vessels where materials are

11 being loaded onto GLO vessels, is the master or anyone

12 else supervising that?

13     A.  Well, it depends on who's -- who's doing the

14 rigging on the back deck.  If it's our riggers, then,

15 yes, our guys would be out there.  Everybody knows at

16 this point where the -- where the lifts are going.

17 Okay?  Now, at the dock, a lot of times the dock hands

18 load the boat.  So that communication on where things

19 were put would have been had, and now they're loading

20 the boat.  My guys would have taken -- my riggers will

21 come out and help if -- if needed.  They'll make their

22 walk-around, make sure everything is binded down before

23 navigation.

24     Q.  Okay.  Are the riggers shoreside personnel, or

25 are they crew members?

1          MR. MECHE:  Objection, form.

2      A.  So on the MAGGIE A at that time for this job,

3  it was -- it was all employees of Gulf Logistics.  Now,

4  at the dock, I don't know who loaded the boat.

5      Q.  (BY MR. SHEPPARD)  Okay.  When you say that it

6  was all employees of Gulf Logistics, what do you mean?

7  What was all employees of Gulf Logistics?

8      A.  I had six -- I had six guys on that boat, two

9  captains and four deckhands.

10     Q.  Uh-huh.

11     A.  All six are rigger certified.

12     Q.  Okay.  So the folks that were doing the rigging

13 would be the captains and the deckhands?

14         MR. MECHE:  Objection, form.  Asked and

15 answered.

16     A.  I don't know who was doing the rigging.

17     Q.  (BY MR. SHEPPARD)  Okay.  Who would know who --

18 who was doing the rigging?

19     A.  That night?

20     Q.  Yes, sir.

21     A.  You'd have to ask the crew or the dock.  I --

22 I wasn't there.

23     Q.  Who at GLO, if anyone, would know -- would --

24 or sorry.  Would the captains who were aboard the

25 MAGGIE A know who did the rigging?

1      A.  It's possible, sir.

2      Q.  Okay.  Does GLO maintain any sort of log for

3  this particular event?

4      A.  No, sir.

5      Q.  Okay.  I'm sorry for my density.  I just -- I'm

6  trying to make sure I understand it completely.

7      A.  It's all good.

8      Q.  If there is -- if there's rigging being done on

9  the vessel, the rigging itself was done by GLO

10 employees; correct?

11         MR. MECHE:  Objection, form.

12     A.  That's not what I said.

13     Q.  (BY MR. SHEPPARD)  Okay.  That's why I'm trying

14 to make sure I'm -- I'm getting it right.

15     A.  What I'm telling you is that all six of my guys

16 are rigger-certified onboard.  Okay?  I don't know if

17 they were the ones who loaded the boat at the dock that

18 night.  It could have been the dock crew.  That's what

19 I'm telling you, most of the time -- most of the time

20 you have a dock crew that will come on and load the

21 boat.  Okay?

22     Q.  Okay.

23     A.  But, again, that's not saying that my guys

24 aren't out there helping them, securing things down,

25 making sure everything is good.

1      Q.  Okay.  And then if it's the -- if -- if, let's

2  say, a dock crew goes out there and they're the ones who

3  load the boat, or load the vessel, do crew members and

4  the master kind of do -- do they check the work and make

5  sure that everything is on par with GLO's safety

6  requirements?

7      A.  Yes.

8          MR. DAVIS:  Objection, form.

9      Q.  (BY MR. SHEPPARD)  Okay.  And would that --

10 would that you include making sure that everything is

11 tied down appropriately?

12     A.  Yes.

13         MR. DAVIS:  Objection, form.

14     Q.  (BY MR. SHEPPARD)  Okay.  One of those -- when

15 a -- when the vessel is transporting the -- the Conex

16 boxes or other materials and it's tied down, that's to

17 prevent the materials from moving or shifting during

18 transit; correct?

19     A.  Yes, sir.  In rough weather.

20     Q.  Okay.  Is it still possible for materials to

21 shift or move if they're tied down properly?

22     A.  I would say, yes, that there is a chance that

23 something could happen to cause something to shift, yes.

24     Q.  Okay.  Is it going to be a large shift or a

25 small shift?  Is there any way to figure it out or --



1  I'm wondering is it going to -- is it going to shift

2  like a centimeter, or is it going to shift like a foot?

3  **A. I don't -- I don't even know how to answer**

4  **that. I mean, it could be big; it could be small.**

5  Q. Okay. When people tie down materials on -- on

6  trucks, they tie it down so that -- that things don't

7  move --

8  **A. And then you're telling me that they never move**

9  **on a truck?**

10  Q. Not what I'm getting at, sir. I'm just -- I'm

11  just kind of framing my question so you understand what

12  I'm asking.

13  **A. Okay.**

14  Q. When -- when the Conex boxes are tied down, is

15  there a tie that goes across it both ways so that it

16  prevents it from shifting, going both vertically and

17  horizontally across the Conex box so that it doesn't

18  shift, you know, port, starboard after -- is there -- is

19  that how it's done? How is it secured?

20  **A. Generally I've seen it side to side.**

21  Q. Okay. Is there any evidence that GLO has that

22  this -- these materials shifted during transit?

23  **A. No, sir.**

24  Q. Okay.

25  **A. This specific case you're talking about?**

1  Q. Yes, sir.

2  **A. No, sir.**

3  Q. So I'll ask the question again since -- since

4  you corrected me. And thank you for doing that. It's

5  helpful.

6      For the purposes of this question, I'm

7  going to focus on the materials in the Conex boxes that

8  were onboard the MAGGIE A when Mr. Flora was injured.

9      Is there any evidence that the materials

10  onboard the MAGGIE A when Mr. Flora was injured shifted

11  during transit?

12  **A. None that I'm aware of.**

13  Q. Okay. And can you remind me how many crew

14  quarters there are on the MAGGIE A?

15  **A. Well, I'd have to pull up the spec sheets to --**

16  **to know for sure; but, I mean, it's probably somewhere**

17  **around five. I don't think the MAGGIE has the crew**

18  **quarters upstairs, so...**

19      **I could pull it up if you'd like or get my**

20  **attorney to send it to you.**

21  Q. Sure.

22      One other general question: If there's

23  five crew quarters, would that be bunk beds in each one?

24  **A. Yes.**

25  Q. So would there be beds for ten?

1  **A. I don't know how many beds exactly they have on**

2  **it. But, yeah, there would be bunks in each room, sir.**

3  Q. Okay. And on the -- on the Master Log, it

4  shows two captains and four deckhands. Were there any

5  other crew members, like the folks that work in the

6  engine room or anything like that?

7  **A. No, sir.**

8  Q. Okay. Is a mate a separate position on -- on

9  vessels?

10  **A. Yes. A mate can run under a master. But I --**

11  **I don't hire mates to run our boats --**

12  Q. Okay.

13  **A. -- or we don't.**

14  Q. Is there a reason why GLO doesn't hire mates?

15  **A. Just never had to.**

16  Q. Okay.

17  **A. Now I can say that I did one time, but it was**

18  **if the boat came with it. But, you know, we just never**

19  **had to. We -- we hire masters.**

20  Q. Okay. What does it mean for the -- when --

21  when you said a mate can run under a master, what does

22  that mean?

23  **A. So he can't -- you can't have two mates running**

24  **a 100-ton vessel. You have to have at least one master.**

25  **A master's license -- master's license is bigger than a**

1  mate's license.

2  Q. Okay. So the master's license cover -- so the

3  master's license covers the mate. So the mate could

4  perform some of the duties of a master while the other

5  one is sleeping, I guess, or is that how it works?

6  **A. Yes, sir. He could -- he could cover his**

7  **shift.**

8  Q. Got you.

9      Okay. Ultimately the master is responsible

10  for implementing GLO's safety policies onboard their

11  vessel; correct?

12  **A. Yes, sir.**

13  Q. And the master is responsible for the

14  well-being of the vessel, the crew and all others

15  onboard the vessel; correct?

16  **A. Everybody has a take in their responsibility.**

17  **But, yeah, the master, he's -- he's in charge of the --**

18  Q. Okay.

19  **A. -- day-to-day.**

20  Q. And he's in charge of the well-being of the

21  vessel, the crew and the others onboard the vessel;

22  correct?

23  **A. He -- he's got his hand in that, yes.**

24  Q. Okay. And the master is responsible for the

25  safe navigation of the vessel at all times; correct?

1    A.  Safe navigation, yeah.  And, I mean, the crew
2  has a part -- has their part in that as well.
3    Q.  Okay.  Does the crew actually steer the vessel
4  in any way?
5    A.  In some cases.
6    Q.  Okay.  A deckhand is a -- is authorized to
7  steer a -- the -- the MAGGIE A under --
8    A.  In -- in Flora's case, he could have took the
9  wheel.  Yes.  I mean, a captain may step aside for one
10  second.  "Here, deckhand, hold this wheel for one
11  second.  I'm right here.  I can see what's going on,"
12  yeah.
13    Q.  Okay.
14    A.  He'll stay and watch with the captain.
15    Q.  Okay.  But ultimately the master is responsible
16  for the safe and economical navigation of the vessel at
17  all times; correct?
18    A.  That's fair.
19    Q.  Okay.  And the master is responsible for the
20  condition and stability of the vessel at all times;
21  correct?
22    A.  Everybody has got a responsibility on the boat.
23  But, yeah, at the end of day if the vessel is not being
24  kept up or -- or -- or -- if it's -- yeah, the master
25  would be responsible.

1    MR. SHEPPARD:  All right.  I'm going to
2  pull up GLO 317, 318, 319, and I'll mark this as
3  Exhibit 3.
4    (Exhibit 3 marked.)
5    Q.  (BY MR. SHEPPARD)  Are you able to see my
6  screen, sir?
7    A.  I am.
8    Q.  Okay.  This comes from Section 5 of GLO's
9  operations manual, Vessel Master Responsibilities and
10  Authorities.  Can you read what it says -- read aloud
11  what it says for master's authority I've highlighted in
12  blue.
13    A.  "The Master shall have the OVERRIDING AUTHORITY
14  and RESPONSIBILITY -- (technical difficulty with Zoom,
15  no audio) -- "or otherwise, shall reduce the authority.
16  The Master will set a high standard of personal,
17  professional conduct to provide leadership onboard the
18  vessel."
19    Q.  Okay.
20    MR. SHEPPARD:  Debbie, I had a -- a pause
21  in that -- in that.  Did every -- did you-all get all
22  the testimony there?
23    THE REPORTER:  It was not read verbatim,
24  what I heard.
25    MR. DAVIS:  I -- I also had a pause.

1    MR. SHEPPARD:  Okay.  Sorry about that.
2    Q.  (BY MR. SHEPPARD)  There was -- there was a
3  little technical glitch there, sir.  Would you mind
4  reading that section again?
5    A.  "Master shall have the OVERRIDING AUTHORITY and
6  RESPONSIBILITY to make decisions with respect to safety
7  and pollution preventions, conditions or activities.
8  Nothing stated in any agreement, contractual or
9  otherwise, shall reduce this authority.
10    "The master will set a high standard of
11  personal, professional conduct to provide leadership
12  onboard the vessel."
13    Q.  Okay.  We talked about this earlier.  I
14  highlighted in blue and yellow again.  One of the
15  responsibilities of the master is to monitor the
16  condition of stability of the vessel at all times;
17  correct?
18    A.  Yes, sir.
19    Q.  And one of the things the master is supposed to
20  do is standing a navigation watch; correct?
21    A.  Yes, sir.
22    Q.  And he's acting as the vessel's safety and
23  security officer; correct?
24    A.  Yes, sir.
25    Q.  And the vessel master is responsible for

1  implementing the GLO's safety and environmental policies
2  onboard; correct?
3    A.  Yes.
4    Q.  These are his responsibilities; correct?
5    A.  Yeah.  He's -- it's his responsibility to make
6  sure that everyone onboard is onboard.
7    Q.  Okay.  Since the master is responsible for the
8  condition and stability of the vessel at all times, that
9  would mean if the vessel is rocking too much during an
10  operation the master must end the operation; correct?
11    MR. MECHE:  Objection, form.
12    A.  He's -- he's -- he's one of them onboard that
13  can call stop work authority at that point, yes.
14    Q.  (BY MR. SHEPPARD)  Okay.  But this
15  specifically is -- that's one of the responsibilities
16  that the master has; correct?
17    A.  He has that authority to use stop work
18  authority, just like everybody else onboard.
19    Q.  He has that responsibility, correct, because he
20  has the responsibility --
21    A.  Yes, sir.
22    Q.  -- to maintain the safety and well-being of the
23  vessel and the crew; correct?
24    MR. MECHE:  Objection, form.  Asked and
25  answered.

Page 61

1    A.  Yes, sir.  He has that -- he has that
2  authority.
3    Q.  (BY MR. SHEPPARD) Okay.
4        MR. SHEPPARD:  I'm going to -- I'll object
5  as nonresponsive.
6    Q.  (BY MR. SHEPPARD) Does he have the
7  responsibility to stop an operation if a vessel is
8  rocking too much during that operation?
9        MR. MECHE:  Objection, form.
10   A.  If he feels it is too rough or if it's rocking
11  too much, yes, he has that authority to stop the job.
12   Q.  (BY MR. SHEPPARD) Does he have the
13  responsibility to do it, sir?
14   A.  Yes.  I mean, if he thinks it's too rough or
15  too -- that the job can't be done, he's going to -- he's
16  going to call stop the job.  But anybody can call -- use
17  stop work authority at any time.
18   Q.  Okay.
19       MR. SHEPPARD:  Object as nonresponsive to
20  everything after stop the job.
21   Q.  (BY MR. SHEPPARD) If the master notices a swell
22  that could cause a vessel to rock, the master should
23  stop the operations so that crew members are not
24  adversely affected by that; correct?
25       MR. MECHE:  Objection, form.

Page 62

1        Do you want to quantify Daniel?  Are we
2  talking about any swell?
3    Q.  (BY MR. SHEPPARD) Sir, you understand --
4        MR. SHEPPARD:  And I'm going to kind of
5  pause here, if -- just if you have an objection, make
6  that.  But if we're going into speaking things,
7  please -- I know you're not -- you're just kind of
8  helping.  I appreciate that.  But I want to make sure
9  that we're kind of limiting it.
10       MR. MECHE:  All right.  You're right.
11       Objection, vague.
12   Q.  (BY MR. SHEPPARD) You -- you're aware that one
13  of the root causes for this incident was a swell;
14  correct?
15   A.  I read that.
16   Q.  Okay.  That is a -- that is a root cause
17  determination that was made by GLO; correct?
18   A.  Okay.
19   Q.  Is that correct?
20   A.  I think it was from information gathered
21  from -- from Flora.
22   Q.  Sir, did GLO commit a -- did GLO complete a
23  Root Cause Analysis?
24   A.  Yes, sir.
25   Q.  Okay.  Was the Root Cause Analysis comp --

Page 63

1  completed by Randy Whittaker?
2    A.  Yes, sir.
3    Q.  Okay.  Is Randy Whittaker an employee of GLO?
4    A.  Yes, sir.
5    Q.  Is he in charge of safety at GLO?
6    A.  Yes, sir.
7    Q.  Okay.  And Randy Whittaker, the head safety guy
8  for GLO, said that one of the contributing factors to
9  this incident was that the vessel went up on a swell;
10  correct?
11   A.  That's what he said in the report, and that's
12  what he had at the time.
13   Q.  Okay.  Has that changed?
14   A.  Well, there's a lot test -- there's some
15  testimony that's -- that's been said since then; but,
16  yeah, that's what he had, sir.
17   Q.  Okay.  Has -- what's -- what are the changes
18  that need to be made to the contributing factors in this
19  that weren't contained in the report?
20   A.  You're going to have to be a little more
21  specific.  I --
22   Q.  Well, so there are three contributing factors
23  in the report that was prepared by GLO on May 27, 2017.
24  Do you recall that?
25   A.  Yes.

Page 64

1    Q.  And there -- what additional factors does GLO
2  now want to put into this report?
3        MR. MECHE:  Objection, form.
4    A.  I mean, I don't want to add anything.
5    Q.  (BY MR. SHEPPARD) Okay.  So what I'm going to
6  talk about is the swell that is noted in the
7  Contributing Factor Number 1 to this incident.  If the
8  master notices a swell that could cause a vessel to
9  rock -- and we're talking about the swell involved in
10  this case -- should the master stop operations in order
11  to prevent people from being injured?
12       MR. MECHE:  Objection, form.
13   A.  So -- and -- and you're saying this as in one
14  wave or several waves?  You're talking about a swell.
15  Now, if the captain sees a big wave or a big swell
16  coming, he -- he -- yeah, he's going to say, "Hey, wait.
17  Where's this coming from?  Hey guys, get ready."  But, I
18  mean, if it -- if -- if it was -- if it was steady, like
19  most seas are, then you know what I mean, if the boat is
20  holding and that's his job and the guys are okay on the
21  deck and doing their job then everything is pretty much
22  business as usual at that point.
23       But to answer your question, if he sees one
24  big giant wave coming like you said, yeah, he's going to
25  let the crew know.



1    Q.  (BY MR. SHEPPARD) Okay.  If he sees -- what's a
2  giant wave?
3    **A.  I don't know.  You said "a swell."  So I'm**
4  **assuming --**
5    Q.  You're --
6    **A.  -- it means something big and out the norm.**
7    Q.  You're -- you're using the number -- "a giant
8  wave."  Can you -- can you articulate that in feet?
9    **A.  Well, I mean, you said a swell; but, I mean,**
10  **I'm assuming you mean something out the norm, sir.**
11    Q.  Well, no, sir.  You've -- you've now said if
12  there was a giant swell.  What -- please quantify that
13  in feet.
14    **A.  What was the question again?**
15    Q.  You used the word, "If there is a giant swell,
16  the captain should get on there and say, 'Hey, guys
17  watch out.'"  What is a giant swell?
18        MR. MECHE:  Objection, form.
19    **A.  Something out the norm, big.**
20    Q.  (BY MR. SHEPPARD) How -- please quantify that
21  in feet.
22    **A.  Look, I -- I've never been one to use feet as**
23  **far as measuring waves because I just -- I don't know**
24  **the accuracy on that.**
25    Q.  Okay.  What -- what form of measurement would

1  you like to use?
2    **A.  If the boat -- if -- if -- if all the crew**
3  **mem -- crew members are comfortable with the seas and**
4  **they're able to operate, then that's okay.  If it's not,**
5  **then it's too rough.**
6    Q.  Okay.  And you never personally worked out at
7  sea; correct?
8    **A.  No, sir.**
9    Q.  Okay.  And you're unable to quantify with a
10  number sitting here today what amounts to a giant swell?
11        MR. MECHE:  Objection, form.  Asked and
12  answered.
13    **A.  Well, I mean, I -- I've seen some numbers where**
14  **people say that it was 10 to 15, 20 foot.  And that's --**
15  **that's significant.  That's -- that's rough.  That's --**
16  **that's huge.  Now, it could be less than that and still**
17  **can't operate.  It all depends.  There's other things**
18  **involved, wind, current, other boat wakes.  There's such**
19  **a thing as a rogue wave.  So it's...**
20    Q.  (BY MR. SHEPPARD) Is -- is the rogue wave the
21  same thing as a swell?
22    **A.  So I don't know.  I've never did my research on**
23  **a rogue, but...**
24    Q.  If -- if Mr. Whittaker is using the term
25  "swell," do you understand what he intends to say by

1  that?
2        MR. MECHE:  Objection, form.
3    **A.  So he was probably talking about when asked**
4  **what the sea conditions were like, and they made -- or**
5  **whoever he was talking to -- I'm assuming Flora -- he**
6  **may have made mention that it was 6 or 7 foot, I think**
7  **is what the report says.  So that may be what -- the**
8  **swells he's talking about.**
9    Q.  (BY MR. SHEPPARD) Okay.  And that was listed as
10  a contributing factor; correct?
11    **A.  According to what Mr. Whittaker was told.**
12    Q.  Okay.  And Mr. Whittaker determined that one of
13  the things that should have happened is the -- due to
14  the sea conditions stop work authority should have been
15  used; correct?
16    **A.  If they --**
17        MR. MECHE:  Objection, form.
18    **A.  If -- if they thought at the time that it was**
19  **too rough to operate, yes, sir, everybody involved can**
20  **use stop work authority.**
21    Q.  (BY MR. SHEPPARD) Okay.  And that includes the
22  master of the vessel who has the best vantage point;
23  correct?
24        MR. MECHE:  Objection, form.
25    **A.  Well, I don't know that he has the best vantage**

1  **point.  What do you mean by "vantage point"?**
2    Q.  (BY MR. SHEPPARD) The captain of the vessel is
3  up in the -- the wheelhouse; correct?
4    **A.  Yes, sir.**
5    Q.  The wheelhouse on the MAGGIE A is elevated,
6  what, 20 feet above the deck?
7    **A.  Okay.**
8    Q.  Is that correct?
9    **A.  Yes, sir.**
10    Q.  And when you're elevated above the deck, that
11  means you can see over the bulwarks and you can see over
12  everything that you have on the deck; correct?
13    **A.  Pretty much, yeah.**
14    Q.  Okay.  So he -- he'd be able to see what --
15  what's going on with the seas, wouldn't he?
16    **A.  The sea is not always the factor.  It's whether**
17  **or not the boat and people can operate during this.**
18    Q.  Sir, you understand that the safety person for
19  GLO said that sea conditions was a factor?
20    **A.  Okay.  I mean, he -- look, he's just gathering**
21  **information at that point, sir.**
22    Q.  But this is -- this isn't him gathering inf --
23  information.  These are things saying probable cause.
24  You understand that; right?
25    **A.  Yes, sir.**



Page 69

1        MR. MECHE:  Objection, form.

2    Q. (BY MR. SHEPPARD) Okay.  And the probable cause

3 was the sea conditions; correct?

4        MR. MECHE:  Objection, form.

5    A. Okay.  That's what's on the form.  I mean, I

6 didn't write the form.

7    Q. (BY MR. SHEPPARD) Well, I don't want to try to

8 trick you here, but let's look at it.  And we're on

9 GLO 445.

10       MR. SHEPPARD:  I'd like to make the Root

11 Cause Analysis Exhibit 4.

12       (Exhibit 4 marked.)

13   Q. (BY MR. SHEPPARD) Let's look at Contributing

14 Factor Number 3, sir.  Do you see that?

15   A. Yes.

16   Q. What does it say the probable cause for the

17 incident was?

18   A. "Sea conditions."

19   Q. What does it say the contributing factor was?

20   A. So it says "6- to 7-foot swell."

21   Q. Okay.  And what does it say the preventative

22 measure that should be taken so that this incident

23 doesn't happen again?

24   A. "Use stop" --

25       MR. MECHE:  Objection, form.

Page 70

1    A. "Use Stop Work Authority is elevated sea

2 conditions."

3    Q. (BY MR. SHEPPARD) Okay.  And it's your

4 testimony here today that the captain who's sitting

5 20 feet up in a wheelhouse wouldn't have a better

6 vantage point to determine the sea conditions at the

7 time of this incident?

8    A. He can see.  But the guys on the deck can see.

9    Q. Do the guys on the decks have -- have a -- have

10 a complete view of the entire sea while they're doing

11 their work?

12   A. So, yes, the captain can see the sea

13 conditions.

14   Q. Okay.  And the captain -- the captain could

15 also say, "Hey, guys there's a 6- to 7-foot swell

16 coming.  Watch out"?

17   A. Yes, sir.

18   Q. Any evidence that that was done here?

19   A. None that I know of.

20   Q. Okay.  Did you talk to Captain Lester about

21 that?

22   A. Well, I mean, we may have talked about the sea

23 conditions and him saying that the -- the boat was

24 holding fine.

25   Q. Did you talk to Captain Lester about whether he

Page 71

1 radioed down to any of the deckhands that were putting

2 on tag lines that there's a 6- to 7-foot swell coming

3 and they need to brace themselves or get out of the way?

4    A. No, sir, that wasn't mentioned.

5    Q. Okay.  Is that something that you would expect

6 the master to do if he noticed a 6- to 7-foot swell

7 coming across the sea when there's an operation taking

8 place on the deck?

9    A. Yes, sir.  I -- I would -- I would assume that

10 if he thought a 6- or 7-foot swell coming at the boat

11 would have made a difference, if he would have saw it he

12 would have called down and said, "Hey, guys look out."

13   Q. Did you read Mr. Flora's deposition testimony

14 in its entirety?

15   A. No, sir.

16   Q. What portions did you read?

17   A. A summary that my attorney would have supplied

18 for me.

19   Q. Okay.  So you didn't read the testimony itself.

20 You read a summary?

21   A. That I can remember, yes.

22   Q. Okay.  Are you personally familiar with the

23 work that Mr. Flora was doing at the time of the

24 incident?

25   A. At the time of the incident, he was -- he was

Page 72

1 rigging.

2    Q. Okay.  Are you familiar with the -- what the --

3 what you have to do in order to, you know, attach the --

4 the D-ring to the stinger and things like that?

5    A. So I'm not rigger certified.  But, I mean, I

6 could give you a general idea of what I think.

7    Q. Okay.  What is -- I think it will kind of bear

8 out with this next question.  What is your understanding

9 of what happened?

10   A. So as I understand it, they were low -- they

11 lowered down some tag lines.  It was full.  Took the tag

12 lines off and was in the process of hooking the tag

13 lines to the box.  In the meantime, apparently the ball

14 was still low and Mark was holding onto the D-ring and

15 the hook, and some kind of way the headache ball hit the

16 bulwarks and/or the box, because I've read a couple

17 things where they said maybe the box or the bulwarks.

18 Either/or, he's holding on to the hook and the D-ring,

19 and when that ball makes contact, that's a contributing

20 factor.

21       And, I mean, to me he probably shouldn't

22 have been holding onto the hook.  He should have sent

23 the hook up a little bit so that -- so that Bruce can

24 finish with the tag lines, have him recenter that

25 headache ball over the lift and come down over the lift;

1 and then if he needed assistance from Bruce at that
2 point, he could have helped him with the D-ring.
3    Q.  Okay.  Is there any evidence that you're aware
4 of that Mr. Flora was aware that the headache ball was
5 caught on the cargo rail or the box or the bulwarks?
6    A.  So I read I think in his accident report where
7 he said that he -- it -- it hit the headache box and
8 then I think I saw maybe in his testimony that he was --
9 he was fighting it.  He was trying to pull it to the
10 D-ring, which, I mean, he shouldn't have been trying to
11 muscle that up.  He should have pulled it up, you know,
12 Stop the job or have the crane operator pick it up at
13 that point and -- and reposition it.
14         And, of course, I mean, I think Bruce was
15 still hooking the tag lines up.  So, you know, I mean,
16 he didn't have that assistance, you know.
17         MR. SHEPPARD:  I object as nonresponsive.
18    Q.  (BY MR. SHEPPARD) What I'm ask -- what my
19 question to you is:  Do you know of any evidence that
20 Mr. Flora was aware that when he was hooking the stinger
21 to the D-ring that the headache ball was caught on the
22 bulwarks or the box or the cargo rail?
23         MR. MECHE:  Objection, form.
24    A.  So if you're ask -- you're asking me if Mark
25 knew if it was caught?

1    Q.  (BY MR. SHEPPARD) Yes.  Is there anything
2 showing that Mark knew that the headache ball was caught
3 on the cargo rail, the Conex box or the bulwarks while
4 he was performing his duties?
5    A.  I --
6         MR. MECHE:  Objection, form.
7    A.  I don't know if he knew if it was caught or
8 not.
9    Q.  (BY MR. SHEPPARD) Okay.  If the -- if the
10 captain was up in -- up in the wheelhouse monitoring the
11 work taking place on the deck, he would have been at a
12 vantage point to be able to see that the headache ball
13 was caught on either the cargo rail, the bulwarks or the
14 Conex box; correct?
15         MR. MECHE:  Objection, form.
16    A.  Not necessarily.  But I mean if he would have
17 saw it, he would have told him that it was caught.
18    Q.  (BY MR. SHEPPARD) When you're -- when you're
19 20 feet up elevated in the air looking over the entire
20 deck, are you able to see the bulwarks, the Conex box
21 and the cargo rail that Mr. Flora was around at the time
22 of the incident?
23         MR. MECHE:  Objection, form.  Speculation.
24    A.  Yes, sir.
25    Q.  (BY MR. SHEPPARD) Okay.  And you're able to --

1 you would able -- then be able to see if the headache
2 ball was caught on the box or the rail or the bulwarks;
3 correct?
4    A.  I -- I don't -- I mean, yeah, he probably could
5 have saw as well.  But, I mean, I would think that Mark
6 and -- and Bruce would have had a better vantage point
7 and/or the crane operator as to what the bul may have
8 been sitting on, if it was actually sitting on anything.
9 They were right there.  You know, if -- if it were
10 sitting on something -- it's -- it's off center.  If
11 it's centered on the top of the bul -- on the bulwarks,
12 it's off center.  It should have been picked up at that
13 point.  So I --
14         MR. SHEPPARD:  Object as non --
15    Q.  (BY MR. SHEPPARD) Sorry.  Go ahead.  I didn't
16 mean to interrupt.
17    A.  I don't know if he knew if it was caught on
18 anything and -- and --
19         MR. SHEPPARD:  Object -- object to
20 everything after -- everything beginning he could have
21 seen as well.
22    Q.  (BY MR. SHEPPARD) Would you agree with me that
23 the type of incident that Mark Flora was involved in
24 should never have happened?
25    A.  I think it could have been prevented, yes.

1    Q.  Okay.  Could more -- could GLO having more
2 people aboard the vessel have prevented this from
3 happening?
4         MR. MECHE:  Objection, form.
5    A.  I don't think that was the problem.
6    Q.  (BY MR. SHEPPARD) Could that have prevented
7 this from happening?
8    A.  I don't see how, sir.
9    Q.  Okay.  Could having someone other than the
10 master watching the operation on the deck have prevented
11 this from happening?
12    A.  No, sir.
13    Q.  Okay.  If the master had been in constant
14 communication with Mr. Flora and advised him of the
15 swells that were approaching, would that have prevented
16 this from happening?
17    A.  I don't think it had any bearing on it.  But if
18 there had an issue -- if there was an issue at the time
19 that the captain thought that the seas were affecting
20 the boat in any kind of way, he would have -- he would
21 have radioed down and said, "Look, guys, this ain't
22 happening right now."
23    Q.  Okay.  Fair to say that the safety manager who
24 prevent -- who completed the Root Cause Analysis
25 determined that the sea conditions did play a factor in



1 this --

2          MR. MECHE:  Objection, form.

3      Q. (BY MR. SHEPPARD) -- incident; correct?

4      **A. It was noted on the root cause, which is**

5 **information he gathered after the incident.**

6      Q. Okay.  I'm going to ask the ques --

7          MR. SHEPPARD:  I'm going to object as

8 nonresponsive.

9      Q. (BY MR. SHEPPARD) Because you keep saying if

10 the captain would have thought that the -- the swell was

11 too much then, yeah, he should have done something.  But

12 I want to -- I want to point to you that your safety

13 manager for GLO has stated that the sea conditions did

14 play a factor.  Do you remember that?

15         MR. MECHE:  Are you testifying, Daniel?

16 Because --

17         MR. SHEPPARD:  I'm asking if he remembers

18 it.

19         MR. MECHE:  If he remembers what?

20      Q. (BY MR. SHEPPARD) Do you recall reviewing the

21 Root Cause Analysis Form where the safety manager for

22 GLO has -- has written down that the sea conditions were

23 a contributing factor -- where the sea conditions were a

24 probable cause and a contributing factor to this

25 incident with a 6- to 7-foot swell?  Do you recall

1 reviewing that?

2          MR. MECHE:  Objection, form.

3      **A. Yes.**

4      Q. (BY MR. SHEPPARD) Okay.  And part of your

5 testimony -- and I want to make sure I got this right --

6 is that if the master had witnessed this swell then he

7 should have stopped the work from happening.  Is that --

8          MR. MECHE:  Object --

9      Q. (BY MR. SHEPPARD) -- a fair statement?

10         MR. MECHE:  Objection, form.

11      **A. If -- if the master would have seen a big swell**

12 **that he thought would affect the vessel, yes.  If the**

13 **master operating in the sea conditions that he was**

14 **operating in thought that the boat wasn't holding good**

15 **enough to where he needed to stop the job, he would have**

16 **stopped it.**

17      Q. (BY MR. SHEPPARD) Okay.  And if the master was

18 wrong and should have stopped the job when he didn't,

19 the master and the company bear responsibility for that;

20 correct?

21         MR. MECHE:  Objection, form.

22      **A. Yeah.**

23      Q. (BY MR. SHEPPARD) Okay.  Would you agree that

24 crane operations where you're moving Conex boxes from

25 the vessel to platform or another vessel is a --

1 requires a team effort?

2      **A. Yes, sir.**

3      Q. Okay.  And that's where you would have the

4 folks on the deck that are part of the team.  You have

5 the master in the wheelhouse and, you know, he's also

6 part of the team; right?

7          MR. DAVIS:  Objection, form.

8          MR. MECHE:  Objection, form.

9      **A. Yes, sir, they are part of the team.**

10      Q. (BY MR. SHEPPARD) Okay.  Would you agree that

11 the master needs to be watching operations, especially

12 those involving cranes and headache balls?

13      **A. He -- he does watch that, yes.**

14      Q. Okay.

15      **A. But he watches other things as well.**

16      Q. Okay.  Because the -- the master should know

17 that if someone gets hit by a -- by a headache ball they

18 could get seriously injured; right?

19      **A. Yes, sir.**

20      Q. If the master can't watch the operation because

21 he said he's doing some other things up there, if he

22 can't watch the operation he should probably get

23 somebody else in the wheelhouse to do that; right?

24         MR. MECHE:  Objection, form.

25      **A. I -- I disagree.**

1      Q. (BY MR. SHEPPARD) Okay.

2      **A. You got two guys --**

3      Q. So --

4      **A. -- two guys on the deck that are rigging.**

5      Q. Uh-huh.

6      **A. Those guys are communicating generally with**

7 **the -- with the crane operator.**

8      Q. Okay.  And one of the -- one of the things

9 that's going on is there's parts -- part of this --

10 strike that.

11         Part of this operation is dictated by

12 elements outside of what's happening on deck and what's

13 happening at the -- at the crane; correct?

14      **A. I'm not sure I understand what you're asking**

15 **me.**

16      Q. I was getting back to the sea conditions.

17 There's other things going on besides what's happening

18 on deck and with the crane; correct?

19      **A. Absolutely.**

20      Q. Okay.  And one of the reasons you have somebody

21 up in the wheelhouse -- I think you testified to that --

22 is, you know, they can see what's going on at -- on at

23 sea as well; correct?

24      **A. I guess, yeah.  I mean --**

25      Q. Okay.  And if the captain has got other things



Page 81

1 that he's doing where he's not able to -- to, you know,
2 watch what's happening out at sea, he should probably
3 get somebody else in the wheelhouse to help him out,
4 shouldn't he?
5        MR. MECHE: Objection, form.
**6   A. Sir, I'm going to have to disagree with you**
**7 there because he's going to know if something is**
**8 happening with the sea because his boat that he's**
**9 operating is going to tell him that.**
10   Q. (BY MR. SHEPPARD) Okay. Wouldn't it --
11 wouldn't it tell him that after it's already happened?
12        MR. MECHE: Objection, form.
**13   A. The boat was holding fine. The boat --**
14   Q. (BY MR. SHEPPARD) Okay.
**15   A. -- was operating fine.**
16   Q. Okay. And what are you basing that on, sir?
**17   A. Everything -- well, some of the things that**
**18 I've read since then.**
19   Q. Okay. You say the -- the captain, the master,
20 is doing other things while the operation is taking
21 place. What other things was -- was the captain doing?
22        MR. MECHE: Objection, form.
**23   A. Well, one of the things, what I understood is**
**24 he didn't -- he didn't witness this of Mark get**
**25 hit because he was checking his DP screen.**

Page 82

1   Q. (BY MR. SHEPPARD) Okay. How long does it --
2 and that's the dynamic positioning?
**3   A. Yes, sir.**
4   Q. How long does it take to check a dynamic
5 positioning screen?
**6   A. You'd have to ask the captain. I really don't.**
7   Q. Okay. That's not something you've done before?
**8   A. No, sir.**
9   Q. Okay. Would you agree that the captain needs
10 to be in communication with everyone involved when
11 there's a crane operation taking place?
**12   A. Yes, sir.**
13   Q. Okay. If the captain doesn't remain in
14 communication with everyone involved in the crane
15 operation, someone could get hurt; right?
**16   A. Yes, sir.**
17   Q. Like Mr. Flora got hurt?
18        MR. MECHE: Objection, form.
**19   A. I don't know if that was a contributing factor.**
**20 I thought they were all in communication.**
21   Q. (BY MR. SHEPPARD) Okay. What are you basing
22 that on?
**23   A. Well, I didn't hear no different.**
24   Q. Have -- is there any evidence that you have
25 reviewed that says that the captain was in constant

Page 83

1 communication with Mr. Flora and the other deckhand?
**2   A. I can tell you, the only -- the only lack of**
**3 communication that I'm assuming happened here was**
**4 between probably Mark Flora and the crane operator.**
5        MR. SHEPPARD: Okay. I object as
6 nonresponsive.
7   Q. (BY MR. SHEPPARD) Sir, is there any evidence
8 that you have reviewed or anyone that you have talked to
9 that has said that the captain, Mr. Flora and the other
10 deckhand were in constant communication?
11        MR. MECHE: Hold on. Objection, form.
12        Daniel, are you excluding attorney-client
13 communications?
14        MR. SHEPPARD: Yes. I'm not talking about
15 attorney-client communications.
16        MR. MECHE: Okay. Thank you.
17        Objection, form.
**18   A. Ask the question again. I don't --**
19   Q. (BY MR. SHEPPARD) Sure.
20        And this is will exclude attorney-client
21 communications. I don't want you ever talking about
22 stuff you talked to your attorney with. So I'll ask the
23 question again.
24        Sorry, I lost my train of thought.
**25   A. That's okay. I do, too.**

Page 84

1   Q. Have you -- have you reviewed any documents or
2 have you spoken to anyone who has stated that Mr. Flora,
3 the other deckhand and the master were in communication
4 during the entirety of this crane operation?
**5   A. No, nobody has told me that they were not in**
**6 communication via radio or hand signals.**
7   Q. Okay. Have they told you that they were in
8 constant communication?
**9   A. No. No. I didn't talk to anybody about that.**
10   Q. Okay. The -- the master needs to stop an op --
11 operation if the vessel is rocking too much; correct?
12        MR. MECHE: Objection, form.
**13   A. That is one of the reasons to cop -- call stop**
**14 work authority, yes, sir.**
15   Q. (BY MR. SHEPPARD) Okay. If the captain doesn't
16 stop an operation when the vessel is rocking too much, a
17 person could get hurt, couldn't they?
**18   A. Yes, sir.**
19   Q. Like Mr. Flora got hurt; correct?
20        MR. MECHE: Objection, form.
**21   A. No, sir.**
22   Q. (BY MR. SHEPPARD) Okay.
**23   A. I disagree with you. I mean, I -- I don't -- I**
**24 don't know that that was a contributing factor. But it**
**25 was on the root cause as what we had information -- I**



1  mean, at the time the information we had.

2          If it was too rough, Mark Flora should have

3  called stop work authority.  The boat was doing fine.

4  The captain was doing his job.  The boat was handling.

5  If there was an issue downstairs that the riggers

6  thought they couldn't operate then they could have

7  called stop work at anytime.

8      Q.  (BY MR. SHEPPARD) That's something the captain

9  could have done as well; correct?

10     A.  Yes, sir.

11     Q.  And the captain didn't do it, did he?

12     A.  No, sir.

13     Q.  And someone was hurt when there was a 6- to

14  7-foot swell; correct?

15     A.  And someone didn't call it either, you're

16  right.

17          MR. SHEPPARD:  Object as nonresponsive.

18     Q.  (BY MR. SHEPPARD) There was somebody that was

19  hurt when there was a 6- to 7-foot swell when the

20  captain did not call stop work authority; correct?

21     A.  Well, he said it was 6 to 7, but I don't know

22  that it was or it wasn't.

23     Q.  Okay.  I'm going to ask the question again,

24  because we're still not getting it answered.  The

25  captain did not cause -- did not call for stop work

1  authority when there was a 6- to 7-foot swell and

2  someone was hurt; correct?

3      A.  Yes, sir.

4      Q.  Did you review Mr. Flora's testimony where he

5  said that the master could have also moved the position

6  of the vessel a little bit to give the MAGGIE A a break

7  from the sea and the winds?

8          MR. MECHE:  Objection, form.

9      A.  No, I -- I didn't -- I didn't review that.

10     Q.  (BY MR. SHEPPARD) Okay.  Is there any evidence

11  where the master asked the drillship to move a few

12  degrees to make the work safer?

13     A.  This was prior to them starting all these

14  operations or right before the incident happened --

15     Q.  Okay.

16     A.  -- because, I mean, look, that's -- that's --

17  that's broad, what you're asking me.  Because when they

18  come in and set up, there's some communication that goes

19  on there.

20     Q.  Okay.  Is there any evidence that you have seen

21  that the master of the -- of the MAGGIE A asked the

22  drillship to move its position somewhat to give the

23  MAGGIE A a break from the seas and the winds?

24     A.  I don't know if that conversation took place;

25  but, again, that's not an un-normal conversation.  When

1  a DP boat comes to set up a drillship, there's a pre --

2  pre -- pre-approach checklist that they'll go through

3  with that drillship.  So did they ask him to move the

4  drillship a little bit, I don't know.  Maybe they did.

5  But, again, that's not uncommon.

6      Q.  What I'm asking, sir, is:  Do you -- is there

7  anything -- any testimony you've seen, any persons that

8  you've spoken to, any documents that you've reviewed

9  that show that the master of the vessel asked the

10  drillship to move a few degrees to give the MAGGIE A a

11  break from the seas and the winds?

12     A.  No, sir.  I -- I don't recall reading anything.

13     Q.  Okay.  Okay.  After an incident like the one

14  involving Mr. Flora, one of the things that you want to

15  do is find out what happened so you can make sure it

16  won't happen again; right?

17     A.  Yes, sir.

18     Q.  That's true of anything, whether it's big or

19  small; correct?

20     A.  Yes.  I mean --

21     Q.  And that -- okay.  And that would be true even

22  if someone -- whether someone got hurt or if it was a

23  near miss?

24     A.  Yes.  So they -- they did their investigation.

25     Q.  Okay.  And one of the things you want to do is

1  perform an investigation as rapidly as practical;

2  correct?

3      A.  Yes, sir.

4      Q.  And that includes completing a postaccident

5  ledger; correct?

6      A.  Yes, sir.

7      Q.  A drug screen --

8      A.  Right.

9      Q.  -- correct?

10          One of the other things you want to do is

11  conduct a drug screen; correct?

12     A.  Yes.

13     Q.  Was there anything contained in Mr. -- a drug

14  screen that gave GLO any cause for concern?

15     A.  In -- in Mr. Flora's drug screen?

16     Q.  Yes, sir.

17     A.  Yeah.  So I didn't hear of anything, any

18  problems there.

19     Q.  Okay.  One other thing that you want to do is

20  conduct crew interviews and record statements; correct?

21     A.  Yes, sir.

22     Q.  Were there any statements recorded following

23  this incident?

24     A.  It's all been sent to you.  Yes, sir.

25     Q.  Were there -- were there any statements where



1  audio was recorded?

2      **A.  None that I'm aware of.**

3      Q.  Okay.  I have the written ones.  I didn't know

4  if there was any audio.

5      **A.  I'm not aware of any, sir.**

6      Q.  Okay.  What is a postaccident ledger?

7      **A.  Are you talking about the accident report or**

8  **the root -- the top of the root cause?  Oh, I can't look**

9  **at that.**

10         **I -- I'm assuming that that's the checklist**

11 **for what he's -- what he's -- you know, that goes in**

12 **the -- in the file.**

13     Q.  Okay.  Let me -- the reason I'm asking -- and

14 I'm in GLO 408.  Let's pull it up on the screen real

15 quick.  You know, the -- it says, "The investigation may

16 include the following steps," and it says "Post Accident

17 Ledger."  I wasn't sure if that's something different

18 than the incident reports and the Root Cause Analysis.

19 Do you know one way or another?

20     **A.  No, sir.  And prob -- it's going to be that --**

21 **that -- that all the boxes that are checked I think at**

22 **the beginning of the root cause that just show that the**

23 **drug screen was done and what have you.**

24     Q.  Okay.  Okay.  It also says on -- on 408 --

25         MR. SHEPPARD:  And I'll pull it back up.

1  This will be 408, 409 and 410.  And I'll make that the

2  next exhibit.  I think that's Exhibit 5.

3         (Exhibit 5 marked.)

4      Q.  (BY MR. SHEPPARD) One of the next things that

5  it suggests that you do is do a -- determine corrective

6  action and then -- or it says "Corrective action

7  determined, applied and verified."  What does that mean?

8      **A.  It means they would have found the cause and to**

9  **verify that it's been corrected.**

10     Q.  Okay.  And it also says one of the things

11 you'll do is "Management Review and Lessons Learned,"

12 you'll complete that; correct?

13     **A.  Yes, sir, I see that.**

14     Q.  Okay.  Is that a separate form?

15     **A.  I -- I -- I don't know the form.**

16     Q.  Okay.  The reason I'm asking is Mr. Whittaker

17 doesn't put down any lessons learned; correct?

18     **A.  I don't know if he did or if he didn't, sir.**

19     Q.  Okay.  I'll show it to you.  See on my screen,

20 sir?

21     **A.  Yes, sir.**

22     Q.  See where it says "Lessons Learned"?

23     **A.  Yes, sir.**

24     Q.  No lessens were learned; correct?

25     **A.  None noted.**

1      Q.  Okay.  And that's something that's supposed to

2  be completed; correct?

3      **A.  I don't think it's -- it's done every time, no.**

4      Q.  Okay.  GLO has identified certain actions that

5  have been effective when investigating an injury;

6  correct?

7      **A.  What's that?**

8      Q.  GLO has identified certain actions that have

9  been effective when investigating an injury; correct?

10     **A.  Okay.**

11     Q.  Is that correct?

12     **A.  I really don't know what you're asking, to be**

13 **honest with you --**

14         MR. MECHE:  Can you tell us --

15     **A.  -- what action --**

16         MR. MECHE:  -- where you're reading from

17 Daniel --

18         **THE WITNESS:  Yeah.**

19         MR. MECHE:  -- and we'll follow along.

20     Q.  (BY MR. SHEPPARD) I'm reading from the -- are

21 you -- I'll ask a different question, then.

22         Are you -- have you read the SEMS manual?

23     **A.  I've -- I've been through it, yes.**

24     Q.  Okay.  This is GLO 409, and I highlighted a

25 portion here.

1         On the -- and this is GLO 409.  On the

2  second paragraph, the last sentence says, "The following

3  have been -- have found to be effective when

4  investigating an injury."  Did I read that correctly?

5      **A.  So, yeah, "The following have found to be**

6  **effective when investigating an injury."  So what's your**

7  **question?**

8      Q.  Sure.  GLO has identified certain actions that

9  have been effective when investigating an injury;

10 correct?

11     **A.  Okay.  Yes.**

12     Q.  And one of the things is to go to the scene at

13 once; correct?

14     **A.  If possible.**

15     Q.  Does it say if possible?

16     **A.  If the boat is offshore, I mean, my guy is not**

17 **going.**

18     Q.  Okay.  Does it say if possible?

19     **A.  It does not say if possible.**

20     Q.  Okay.  It also says, "Talk with the injured

21 person if at all possible.  Talk to witnesses.  Stress

22 getting the facts"; correct?

23     **A.  Yes, sir.**

24     Q.  And that was done here; correct?

25     **A.  Yes.**



1    Q.  Okay.  "Listen for clues in the conversations
2 around you.  Unsolicited comments often have merit."
3 Did I read that correctly?
4    **A.  Yes, sir.**
5    Q.  That was done here?
6    **A.  Yes, sir.**
7    Q.  Okay.  One of the other things that -- that GLO
8 recommends is that you "Encourage all to share their
9 idea for preventing a similar occurrence" --
10    **A.  Yes --**
11    Q.  -- correct?
12    **A.  Yes, sir.**
13    Q.  Was that done here?
14    **A.  I'm assuming it was.**
15    Q.  Is there anything documenting that this was
16 done here?
17    **A.  I don't know.**
18    Q.  Okay.  "Write a -- write you" -- or is there
19 anyone who would know?
20    **A.  There may have been a safety meeting done on it**
21 **following that.  I -- there could be something**
22 **documented.**
23    Q.  Okay.  "Confer with all interested persons
24 about possible solutions."  Do you see that?
25    **A.  Yes, sir.**

1    Q.  Was that done here?
2    **A.  It may have been.  I mean, it could have**
3 **been -- been verbally.  The crews talk about it and say,**
4 **"The next time this is what we're going to do.  This is**
5 **what you need to do."  So, yeah, it -- it -- all of that**
6 **was probably done.**
7    Q.  Well, you said may at first, then probably.  Do
8 you have anything showing that it was done?
9    **A.  Not today.**
10    Q.  Okay.  It also says -- is there something
11 that you need to go look at to see if it was done?
12    **A.  No, I don't look.**
13    Q.  Is there someone that you need to talk to to
14 see if it was done?
15    **A.  Right now you mean?  No.  No.**
16    Q.  Well, you said -- you said, "Not right now.  I
17 don't have this now."  I want to -- you know, if there's
18 something that you need to look at or someone --
19    **A.  You asked me --**
20    Q.  -- you could to speak to, let me know.
21    **A.  You asked me if it was documented, and I said I**
22 **didn't know.**
23    Q.  Right.  And then -- oh, I thought you said
24 not -- not now.  Did I mishear?
25    **A.  I -- look, I don't know.**

1    Q.  Okay.  What I'm asking is:  Do you have
2 anything -- have you spoken to anyone or do you have any
3 documents that show that GLO, that there -- that there
4 was a conference with all interested persons about
5 possible solutions to prevent this from happening?
6    **A.  I know that everybody was talked to, yes.**
7    Q.  Okay.  And there were a -- there was an accident
8 report giving complete accurate accounts of the
9 incident; correct?
10    **A.  At the time, yes.**
11    Q.  Okay.  And there were -- did the company follow
12 up to make sure that all conditions were corrected?
13    **A.  Had there been anything -- any conditions to be**
14 **corrected, I'm sure they would.**
15    Q.  Okay.  Does -- does a condition include the --
16 the manner in which work is performed?
17    **A.  Possibly.**
18    Q.  Okay.  One of the things it says is to
19 "Publicize corrective action so that all may benefit
20 from the experience."  Was there anything publicized
21 about this?
22    **A.  I don't know if it was or if it wasn't.**
23    Q.  Okay.  Is -- how would you go about determining
24 whether or not GLO publicized corrective action?
25    **A.  I'd have to ask Randy, but I don't know.**

1    Q.  Do you personally recall seeing anything
2 publicized about this incident?
3    **A.  No, sir.**
4    Q.  Okay.  And this -- is that something that as
5 the operations manager you would have -- you would have
6 been part of creating?
7    **A.  Yes, sir.  On major incidents, yes.**
8    Q.  Okay.  But this doesn't say major incidents,
9 does it?
10    **A.  No, sir.**
11    Q.  Okay.  It says this is for all incidents, isn't
12 it?
13    **A.  So that all may benefit.**
14    Q.  Correct.  And you publicize -- you publicize
15 corrective action for all -- all incidents, not just --
16    **A.  But if you read the top, it says, "The**
17 **following have been found to be effective."**
18    Q.  Correct.  So is that something that the company
19 did, or is it something the company didn't do?
20    **A.  I -- honestly, sir, I don't know if they did on**
21 **this one or not.**
22    Q.  Okay.  One thing I found interesting is -- this
23 was "Considerations For the Master."  One of the things
24 that GLO tells the master is to "Never discuss or assess
25 blame when completing any verbal or written report of an



1 injury or casualty. Any verbal statements can be
2 overhead, and any written reports can be subpoenaed,
3 which could jeopardize any legal position the company
4 may have." Did I read that correctly?
5 **A. I mean, how do you take it?**
6 Q. I'm asking you if I read it correctly?
7 **A. Yeah, that's pretty much how I saw it.**
8 Q. Okay.
9      MR. SHEPPARD: And this is GLO 407. I'll
10 make this Exhibit 6.
11      (Exhibit 6 marked.)
12 Q. (BY MR. SHEPPARD) Do you under -- do you have
13 any idea why its company policy for the masters never to
14 discuss or assess blame when completing any verbal or
15 written report of an injury or casualty?
16 **A. No. I mean, he's supposed to report it to the**
17 **office. I mean, why would he want to start -- he just**
18 **needs to state the facts. I mean, he don't need to lay**
19 **blame. And the facts will give that. "Any verbal**
20 **statements can be overheard and any written report can**
21 **be subpoenaed," so -- which can jeopar -- yeah, I mean,**
22 **most -- nine times out of ten our reports are given to**
23 **the customer. So, I mean -- I mean, that's -- it says**
24 **what it says in there; but, I mean, we're not hiding**
25 **anything.**

1 Q. Okay. But one of the -- one of the reasons why
2 the company doesn't want the master to discuss or assess
3 blame when completing a verbal or written report is
4 because it can jeopardize GLO's legal positions that
5 they may take in the future if there's a lawsuit;
6 correct?
7 **A. That's what it says there, yes, sir.**
8 Q. Okay. That's an important policy for GLO?
9 **A. I think the facts are important, yeah.**
10 Q. Is that an important policy for GLO?
11 **A. Yes.**
12 Q. Okay.
13      MR. MECHE: Daniel, what Bates number is
14 that, if you don't mind? It's covered on our end.
15      MR. SHEPPARD: Sure. That's GLO 407.
16      MR. MECHE: All right.
17 Q. (BY MR. SHEPPARD) The master is required to
18 review the SEMS manual at least once a year; right?
19 **A. They actually dig into it once a week.**
20 Q. Right. But they have to review the entire
21 thing at least once a year; correct?
22 **A. The review is done weekly.**
23 Q. Okay.
24      MR. SHEPPARD: I'll make this Exhibit 7.
25 It's GLO 321.

1      (Exhibit 7 marked.)
2 Q. (BY MR. SHEPPARD) Do you see the text
3 highlighted in blue?
4 **A. Yes, sir.**
5 Q. Could you read it for me, please?
6 **A. "The Master's Review of the Safety and**
7 **Environmental Management System is performed aboard each**
8 **vessel at least once at periods, not to exceed twelve**
9 **months."**
10 Q. Okay. So the master is required to review the
11 entire manual at least once every 12 months. Is that a
12 fair statement?
13 **A. They dig into that, yes.**
14 Q. Okay. And one of the things that they -- they
15 do is they review safety topics; correct?
16 **A. Yes, sir.**
17 Q. And they identify corrective actions; correct?
18 **A. I'm sure it's talked about, yes, sir.**
19 Q. And the master is required to identify
20 corrective actions; correct?
21 **A. In -- in cases, yes, sir, he is.**
22 Q. And the master is required to determine the
23 overall effective of the SEMS manual; correct?
24 **A. Yes, sir. The whole crew takes part in that**
25 **training; but, yes, they have a say in it as well.**

1 Q. One thing that the master is required to do is
2 ensure that the vessel has a complete file of weekly
3 safety meeting reports onboard signed by all crew for a
4 52-week period; correct?
5 **A. Yes, sir.**
6 Q. And the master is -- or let's see. The master
7 must determine that all required safety meetings were
8 held; correct?
9 **A. Yes, sir.**
10 Q. And must determine that the topics used were
11 important to vessel operations and concerns; correct?
12 **A. Yes, sir.**
13 Q. And the master is supposed to review monthly
14 lessons learned with crew members; correct?
15 **A. If there's any sent out, yes, sir.**
16 Q. I'm assuming that they're sent out monthly,
17 just because of the title?
18 **A. It's when learned, yeah. I mean, it could be**
19 **as -- as simple as a phone call, an email, a letter, a**
20 **memo or something internally on the boat.**
21 Q. Okay.
22 **A. It's broad.**
23 Q. One of the things a master needs to do is
24 determine whether changes need to be made to the
25 SEMS manual; correct?



Page 101

1   A.  Yes.

2   Q.  One of the things that the master needs to do
3   is review all accident, injury and near miss reports;
4   correct?

5   A.  Yes.

6   Q.  Are you aware if any of those materials have
7   been produced to us in this case?

8       MR. MECHE:  What materials, Daniel?

9       MR. SHEPPARD:  I'm reading directly from
10  your-all's forms.

11      MR. MECHE:  Okay.  Can you give us page,
12  line and verse so we can look at it?

13      MR. SHEPPARD:  Sure.  GLO 324.

14      MR. MECHE:  Are you going to put it up on
15  the screen or --

16      MR. SHEPPARD:  Yeah.  Working on it.

17      MR. MECHE:  All right.  Thanks.

18      MR. SHEPPARD:  I want to make sure I've got
19  the right one.

20  Q.  (BY MR. SHEPPARD)  Let's see.  So there's a
21  Master's Management Review form that's supposed to be
22  completed.  Let me pull this up.  And this is -- let's
23  see, this is going to be GLO 321 through --

24  A.  I know the form you're talking about.

25  Q.  Okay.  I'm just trying to figure out where this

Page 102

1   ends.  Sorry.

2   A.  Yeah.  So -- so --

3   Q.  324 through 329.

4   A.  I -- for -- for -- for the vessels in my fleet
5   at this time, they're not ISM certified.  Okay?  So I
6   don't require them to fill that form out because there's
7   no -- that certification, that's what requires that
8   form.  Again, what we do is in our 52-week training,
9   sir, they dig into that -- into that manual every week
10  and they go over topics.  And that's their way of
11  reviewing it each week.

12  Q.  Okay.  Part of this manual -- this is
13  Chapter 5.1, Section 2.1, the last paragraph for it.
14  This is Bates Number 321.  It says that, "The review
15  will be returned to each vessel.  The Company will keep
16  a copy of each annual review on file."  Do you see that?

17  A.  Yes, sir.

18  Q.  GLO doesn't follow that policy for all of its
19  vessels?

20  A.  No, sir, not -- no, sir.  I don't have that for
21  that vessel.

22  Q.  The manual doesn't say that this policy applies
23  to certain vessels and not others; correct?

24  A.  No, sir, it doesn't.

25  Q.  It says that it replies -- it applies to each

Page 103

1   vessel; correct?

2   A.  Yes, sir.

3   Q.  Okay.  You just made the decision that you're
4   not going to require certain vessels to follow the
5   SEMS manual?

6   A.  That's not what I said.  I said some require
7   more than others.  A certifica -- that certification,
8   that end of the year review report is due.

9   Q.  Okay.  But this manual doesn't say that, "We're
10  only applying this to certain vessels that require this
11  annual review."  It says, "We're applying it to each
12  vessel"; correct?

13  A.  True.

14  Q.  And did you -- were you the one who personally
15  made the decision that you weren't going to require each
16  vessel to perform the annual review?

17  A.  I don't know who made the decision; but, I
18  mean, it's not something that we've been doing.

19  Q.  Okay.  Had the --

20  A.  Not on paper -- not on paper, at least.

21  Q.  Okay.  Had GLO followed its own manual, it
22  would have required the masters to review all accident,
23  injury and near miss reports; correct?

24      MR. MECHE:  Objection, form.

25  A.  And I said they are.

Page 104

1   Q.  (BY MR. SHEPPARD)  Okay.  And if they had done
2   that, it would have been documented on this form that
3   I'm pulling up -- and the page I'm on is GLO 324 --
4   correct?

5   A.  It's possible.

6   Q.  Okay.  And it would also have the corrective
7   actions required or suggestions for an improvement of
8   the things that the master would be required to
9   complete; correct?

10  A.  Correct.

11  Q.  And then the overall effectiveness; correct?

12  A.  Yes, sir.

13  Q.  Okay.  And then it also requires that the
14  master send to the shoreside folks, you know, copies of
15  the incident report; correct?

16  A.  Yes, sir.

17  Q.  And it -- it also ensure -- it also makes sure
18  that the vessel keeps these incident reports on file on
19  the ship in an easily accessible file; correct?

20  A.  Yes, sir.

21  Q.  And, again, this form is not completed, is it?

22      MR. MECHE:  Objection, form.

23  A.  I don't know if the form is completed, but they
24  do that stuff there.

25  Q.  (BY MR. SHEPPARD)  Okay.  But the -- the -- the



1 company has, at least in its own rules, that I guess
2 it's choosing not to follow, that this form needs to be
3 completed annually; correct?
4       MR. MECHE: Objection, form.
5 Mischaracterizes the witness' testimony.
6     **A. What's the question?**
7     Q. (BY MR. SHEPPARD) The company at least has made
8 a decision not to follow its own rules and make masters
9 complete this form for each vessel; correct?
10      MR. MECHE: Objection, form.
11    **A. Yeah. I don't -- I don't -- I don't make them**
12 **do that form.**
13    Q. (BY MR. SHEPPARD) Okay. Even though it is
14 company policy for that form to be completed for each
15 vessel?
16    **A. That's what it says in the manual.**
17    Q. Is it company policy for that to be -- is the
18 manual what we should be -- strike that.
19       Should we be looking at the manual to
20 determine what the company's policies are?
21    **A. Yes, sir.**
22    Q. Okay. So is it fair to say the company's
23 policy is for every single vessel to have completed
24 these forms on an annual basis?
25      MR. MECHE: Objection, form.

1     **A. What's the question?**
2     Q. (BY MR. SHEPPARD) Is it -- is it company
3 policy, then, for the master to complete the management
4 review for each vessel every year?
5     **A. According --**
6       MR. MECHE: Objection, form.
7     **A. According to that policy, yes.**
8     Q. (BY MR. SHEPPARD) Okay.
9     **A. And, look, they may have turned it in, but I**
10 **didn't see it.**
11    Q. Who would he have turned it into?
12    **A. Possibly Randy.**
13    Q. Okay. Anyone else?
14    **A. No, sir.**
15    Q. Okay. Is it true that the company holds
16 operations meetings once a month?
17    **A. Yes, sir.**
18    Q. Okay.
19    **A. Sometimes more than a month.**
20    Q. Got you.
21      MR. SHEPPARD: And just for the record, I'm
22 making -- if it's okay, I was just going to repurpose
23 Exhibit 7 because there was just 321 and make Exhibit 7
24 321 through the end of that section. 321 to 329, we'll
25 just make that Exhibit 7 so I'm not reusing specific

1 documents.
2     Q. (BY MR. SHEPPARD) Okay. So the company holds
3 operations meetings at least once a week; correct?
4     **A. Yes, sir.**
5     Q. And some of the topics at those meetings
6 include safety of operations, accident prevention and
7 injury prevention; correct?
8     **A. Yes, sir.**
9     Q. Okay. In terms of safety of operations, what,
10 if anything was discussed involving the incident with
11 Mr. Flora?
12    **A. Sir, that's 2017. I -- I don't know. I don't**
13 **remember that.**
14    Q. Okay. Has anything been documented -- do you
15 ever document these meetings?
16    **A. I don't think. I mean, some of it could be as**
17 **easy as, you know, just us three. There's only three of**
18 **us in that department in that -- in that front office.**
19 **So us meeting together and talking about what went on**
20 **that week, what we what we got coming up, just general**
21 **stuff like that, yes, sir. And -- and incident reports**
22 **are reviewed and talked about, yes.**
23    Q. Okay. Do you -- do you document the meeting
24 with anything?
25    **A. I don't have nothing documented.**

1     Q. Okay. It also says that quarter -- the company
2 holds a safety meeting in the shore-based office
3 quarterly and the agenda of the meetings includes but is
4 not limited to the review of all accidents, injuries,
5 near miss incidents, any needed corrective actions,
6 including new procedures, revisions or amendments of
7 operational procedures. Is that also correct?
8     **A. Yes, sir. And that's what I'm reflecting,**
9 **that's what I'm talking about.**
10    Q. Okay. And for the quarterly meetings, I guess
11 you-all don't document any of the topics discussed at
12 those either?
13    **A. It -- it could happen daily. It could happen**
14 **weekly. You know, I mean, we -- we do this often.**
15 **We're a small --**
16    Q. Okay.
17    **A. -- a small company, and we all work together**
18 **and we talk about all kind of stuff that -- you know, to**
19 **help better the company.**
20    Q. Okay. Regardless of if it's daily, weekly,
21 monthly, quarterly, there is nothing documented
22 regarding these meetings; correct?
23    **A. I can check. I don't know if it is or of it**
24 **isn't, sir.**
25    Q. Sitting here today, do you know if any of it's



1 documented?

2    A. It may be. I -- I don't know.

3    Q. Who would have documented the meeting?

4    A. May -- maybe Randy.

5    Q. Okay.

6    A. Are we talking -- what day are we talking

7 about?

8    Q. I'm just -- I'm trying to understand in

9 general. In general, do -- are there document -- is

10 there any documentation associated with these daily,

11 weekly or quarterly safety meetings?

12    A. Daniel, that's what I'm saying, is that, you

13 know, we -- we all work together. We all meet, and we

14 talk about these incidents. We talk about the -- the --

15 the safety meetings for the week, and it's -- it's a

16 topic that we talk about daily, weekly. It's -- it's a

17 daily occurrence sometimes.

18        MR. SHEPPARD: Object as nonresponsive.

19    Q. (BY MR. SHEPPARD) Does GLO have a policy where

20 they document these daily, weekly or quarterly or

21 monthly meetings involving accidents, injuries, near

22 misses, corrective actions and procedures? Is any of

23 that documented?

24    A. I don't know.

25        MR. MECHE: Objection, form.

1    A. I don't know if it is, if it isn't.

2    Q. (BY MR. SHEPPARD) Okay. And if -- if it

3 documented, it would be documented by the safety guy,

4 Randy Whittaker?

5    A. Yes, sir, he may have that.

6    Q. Okay.

7    A. I don't --

8    Q. And you said there's a -- there's a third

9 person. Who's the third person involved? And I'm

10 sorry, let me -- let me strike that. I didn't mean to

11 interrupt you.

12    A. No, sir. Go ahead.

13        The -- the third person involved today,

14 these days, Mr. Wade -- Wade Lee. He's our personnel

15 manager.

16    Q. Okay. So the three folks involved is

17 operations, personnel and safety?

18    A. Yes, sir. Right now.

19    Q. Okay. So we'll kind of go back to a few

20 questions. Was there any -- is there any documentation

21 associated with a daily, monthly or quarterly meeting,

22 or any meeting whatsoever, involving the incident and

23 Mr. Flora?

24    A. I'm not sure if there is anything documented.

25    Q. Okay.

1    A. It doesn't mean it wasn't discussed.

2    Q. Do you recall any particular discussion that

3 you had involving Mr. Flora's incident?

4        MR. MECHE: Objection, form.

5    A. I do know I was involved at the front side. I

6 was made aware of it.

7    Q. (BY MR. SHEPPARD) When were you made aware of

8 it?

9    A. Whew, probably that day.

10    Q. Okay. And then a week later, do you recall any

11 conversations -- or a day later or a week later, do you

12 recall any conversation that you had with Mr. Whittaker?

13    A. There was conversation that -- that he's been

14 taken to the doctor. There was conversation that he

15 took him to the doctor the second time. There were

16 con -- conversation that he took him to the doctor a

17 third time.

18    Q. Okay. Was that the extent of the

19 conversations?

20    A. I'm sure he told me the outcome of the visit as

21 well, but it's been awhile.

22    Q. Okay. Is there anything else that you recall

23 from these conversations?

24    A. No --

25        MR. MECHE: Objection, form.

1    A. No, sir.

2    Q. (BY MR. SHEPPARD) Okay. And is this something

3 that would fall within the daily, weekly, quarterly

4 meeting?

5    A. Yes, sir. That, and a whole bunch of other

6 stuff.

7    Q. Okay. But, you know, just the fact that

8 Mr. Flora was taken to the doctor, had some treatment

9 and the outcome of that treatment, that's about all you

10 recall as part of the discussions involving Mr. Flora at

11 these daily, weekly or quarterly meetings?

12        MR. MECHE: Objection, form.

13    A. No. I'm sure he -- I'm sure he told me what

14 the incident -- what happened, the whole incident. I

15 mean, I'm sure we talked about that. But, I mean, I

16 don't recall that day.

17    Q. (BY MR. SHEPPARD) Do you recall -- do you have

18 any independent recollection, or are you guessing at

19 this?

20    A. At this point I'd be guessing if I told you

21 exactly our conversation in 2017.

22    Q. Okay. And I'm not fussing at you. I'm just

23 trying to see if you have an independent memory of it.

24        Do you have an independent memory of the

25 discussion of the incident involving Mr. Flora at one of



1 these daily, weekly or quarterly meetings?

**2    A. I don't.  But I guarantee you it was talked**

**3 about.**

4    Q. Okay.

5        MR. SHEPPARD:  Sorry.  I'm experiencing a

6 technical stuff.  I just got kicked out of the Zoom.

7 I'm trying to get back in on the -- for the computer

8 portion of it.

9        THE VIDEOGRAPHER:  While we're on it, could

10 we take a short break?  I just need a break in the

11 video.  Oh, he's gone.

12        Off the record --

13        MR. SHEPPARD:  I'm here on the -- yeah.

14        THE VIDEOGRAPHER:  Okay.  I'm going to take

15 it off the record and go right back on.  Okay?

16        MR. SHEPPARD:  Well, let's -- can we do --

17 is it okay to take a five-minute break, guys?

18        MR. MECHE:  That's fine with us.

19        MR. SHEPPARD:  Okay.

20        THE VIDEOGRAPHER:  Off the record at --

21        MR. SHEPPARD:  I don't if you-all need -- I

22 don't know if you-all need food or anything.  Let me

23 know.  I'm not trying to ruin anyone's lunch.

24        MR. MECHE:  Daniel, can you ballpark how

25 much do you have left?

1        MR. SHEPPARD:  I've kind of jumped around.

2 So it's -- I'll -- I'll have that answer to you when we

3 come back.

4        MR. MECHE:  Okay.  John, you got a lot of

5 stuff?

6        MR. DAVIS:  No.  I probably have about five

7 minutes.

8        MR. MECHE:  Okay.  Well, we'll -- Daniel,

9 if you don't mind, when we come back on the record and

10 you give us an estimate, we'll decide whether or not we

11 need to take a break for lunch.  Is that -- is that okay

12 with everybody?

13        MR. SHEPPARD:  That's fine by me.

14        MR. DAVIS:  It works for me.

15        MR. MECHE:  All right.  Thanks.

16        THE VIDEOGRAPHER:  That was off the record

17 at 1:45 p.m.  Ending Take 2.

18        (Recess from 1:45 p.m. to 2:05 p.m.)

19        THE VIDEOGRAPHER:  We're now back on the

20 record at 2:05 p.m.  Starting Take 3.

21    Q. (BY MR. SHEPPARD) I meant to do this earlier,

22 just a little housekeeping thing.

23        Mr. Lagarde, you understand that today you

24 were asked to give binding testimony on behalf of the

25 company?

**1    A. Yes, sir.**

2    Q. On behalf of GLO?

**3    A. Yes, sir.**

4    Q. Okay.  And all the testimony that you've given

5 today, you have given be behalf of GLO; is that fair?

**6    A. Yes, sir.**

7    Q. Okay.  I want to show you your deposition

8 notice.  I'm sure you have a copy there in front of you.

9 You can either look at that or I'm going to pull it up

10 just for ease.

11        MR. SHEPPARD:  Alan, I'm using yours.  It

12 has the objections in there.  So you don't have to

13 submit it yourself.

14        MR. MECHE:  Great.  Yeah, if you don't

15 marking it, it would be easier from your end than mine.

16        MR. SHEPPARD:  Yeah, that's what I'm going

17 to do.

18        MR. MECHE:  Thank you.

19        MR. SHEPPARD:  I believe that's Exhibit 8.

20        THE REPORTER:  Correct.

21        (Exhibit 8 marked.)

22    Q. (BY MR. SHEPPARD) All right.  Subject to the --

23 the objections that were made, you are here to testify

24 on Topics 1 through 20; correct?

**25    A. Yes, sir.**

1    Q. Okay.  Is there anyone else that has superior

2 knowledge to you on those topics?

**3    A. No, sir.**

4    Q. Okay.  I'll probably get back to that as a

5 cleanup, but I think I've covered a lot of it.  So I'm

6 going to pull this down.

7        Okay.  I'm going to pull up the Root Cause

8 Analysis Form.  Are you able to see that on the screen,

9 sir?

**10    A. Yes, sir.**

11    Q. Okay.

12        And actually before I proceed, we took a

13 break a little while ago.  Did you have an opportunity

14 to talk to your lawyer?

**15    A. Yes, sir.**

16    Q. Did you have -- again, without getting into

17 content, did you have a discussion with him?

**18    A. Yes, sir.**

19    Q. How long was that discussion?

**20    A. Five minutes, maybe.**

21    Q. Okay.  Is there anything -- any part of your

22 testimony that you've given today that you would like to

23 change, extend or amend?

**24    A. No, sir.**

25    Q. Okay.  Yeah.  It looks like the proportion of



Page 117

1 the "Data Collection" on the -- for the Root Cause
2 Analysis, the -- Mr. -- Mr. Whittaker looked at the
3 "Incident Reports," the "Medical Reports," the "Risk
4 assessment records" and the "Training records"; correct?
5    **A. Which I'm assuming the risk assessment would**
6 **have been the JSA.**
7    Q. Right. I think it says "JSA verified" in
8 parentheses?
9    **A. Yes, sir.**
10    Q. Okay. It looks like for part of the "Data
11 Collection" for the "People" aspect of it, again,
12 "Witness statements," "Days on hitch," "Hours on watch."
13 Those were the three things collected; correct?
14    **A. Yes, sir.**
15    Q. Okay. What's the importance of collecting
16 information related to the amount of -- the number of
17 days that a person has had on a particular hitch?
18    **A. I actually -- I mean, I guess it's just to see**
19 **how many hours he was up and how many days he had been**
20 **on the hitch.**
21    Q. Okay.
22    **A. You know, it could be if he's getting closer to**
23 **his days off, his mind might have been somewhere else**
24 **or -- or if he was closer to the end of his shift, it**
25 **may have been relevant as well.**

Page 118

1    Q. Okay. Also it looks like for the "Environment"
2 part of the information that's collected is "Weather
3 information," "Workplace information," and it says "Any
4 housekeeping issues involved." Do you see that?
5    **A. Yes, sir.**
6    Q. Okay. It says the wind was
7 "10-KT-300 degrees." What does that mean?
8    **A. Yeah. So the -- the wind was 10 knots. The**
9 **current was 1 knots. 300 degrees, I -- I don't know**
10 **what that one is.**
11    Q. Okay. "Workplace information," it looks like
12 it's saying -- correct me if I'm wrong -- it says
13 "700 hours - Back Deck/GC390." It looks like it is
14 describing the time of day that this took place and
15 maybe where on the vessel and where the vessel was --
16    **A. Yes.**
17    Q. -- when the incident took place?
18    **A. Yes, sir.**
19    Q. Okay. Then it says, "Any housekeeping issues
20 involved," and it says "Deckload of cargo"; correct?
21    **A. Yes, sir.**
22    Q. It's not saying "Offload of cargo"; correct?
23    **A. No. It says "Deckload of cargo."**
24    Q. What does that mean?
25    **A. It's what was on the back deck.**

Page 119

1    Q. Okay. Do you have any idea what the comment
2 that -- that is -- that is meant when someone writes
3 "Deckload of cargo"?
4    **A. So, I guess what he meant was -- or what he's**
5 **saying is what was involved at the time of the -- at the**
6 **time of the incident -- incident.**
7    Q. Okay. Probably need to -- to be sure, though,
8 we need to speak to Mr. Whittaker; right?
9    **A. Yes, sir.**
10    Q. Okay. "Data Collection," they're seeing if the
11 right equipment was used and if the right -- if he had
12 the right PPE, personal protective equipment; correct?
13    **A. Yes, sir.**
14    Q. And there's nothing wrong with Mr. Flora's PPE;
15 correct?
16    **A. No, sir.**
17    Q. Okay. One of the things they added after the
18 incident was a larger stinger; right?
19    **A. That's what they have there, yes.**
20    Q. Okay. I think we've covered the lessons
21 learned.
22      Now, it says "Description of the Incident."
23 Do you see that?
24    **A. Yes, sir.**
25    Q. And it says this description is coming from

Page 120

1 Lester James; correct?
2    **A. Yes.**
3    Q. And Lester James was the captain of the vessel,
4 the master of the vessel at the time of the incident?
5    **A. Yes, sir.**
6    Q. Okay. And it says that the boat went on a --
7 on a wave; correct?
8    **A. Yes, sir, that's what it says.**
9    Q. Okay. Then it says, "The headache ball hit
10 Mark on the hardhat, then his shoulder and then his
11 foot"; correct?
12    **A. Yes, sir.**
13    Q. Okay. Then it says, "The headache ball was
14 caught on the cargo rail when the wave made the ball
15 fall"; correct?
16    **A. That's what it says.**
17    Q. Okay. One thing I noticed on this is there
18 a -- it says that the "Person or equipment involved is
19 the M/V MR. JAKE." Do you know what that is?
20    **A. Where do you see that at?**
21    Q. It says right here, "Person or equipment
22 involved: M/V MR. JAKE."
23    **A. He probably meant to put the MAGGIE A.**
24    Q. Okay. So that's a -- that's an error on this
25 Summary Sheet; correct?



1    A. Yes, sir.

2    Q. Okay. Was the only investigation done the

3  investigation that's contained in the Root Cause

4  Analysis?

5          MR. MECHE: Objection, form.

6    **A. Plus the accident report and the witness**

7  **statements.**

8    Q. (BY MR. SHEPPARD) Okay. Anything else?

9    **A. None that I've seen.**

10   Q. Okay. Is there any that you're aware of?

11   **A. No, sir.**

12   Q. Okay. Following this incident, has GLO taken

13  any -- made any changes to their policies and procedures

14  surrounding the offloading of cargo or the -- the -- the

15  things that people need to do when there is a crane

16  operation taking place onboard?

17   **A. No, sir.**

18   Q. Okay. Would it have been reasonable to have

19  more people working on the MAGGIE A at the time of the

20  incident?

21          MR. MECHE: Objection, form.

22   **A. No, sir, I -- I don't think it would have made**

23  **a --**

24   Q. (BY MR. SHEPPARD) Okay.

25   **A. -- difference.**

1    Q. Okay. Would it have been -- I'm just asking,

2  would it have been -- would it have been reasonable for

3  the MAGGIE A to have more people on the vessel, more

4  deckhands? Would that have been something reasonable

5  for the company to do?

6          MR. MECHE: Objection, form.

7    **A. Honestly, sir, that boat, it -- the Coast Guard**

8  **only makes us have one deckhand on the deck. We had**

9  **two.**

10   Q. (BY MR. SHEPPARD) Okay. Would it have been

11  feasible to have more deckhands on the deck?

12          MR. MECHE: Objection, form.

13   **A. I don't see where it would have been feasible.**

14   Q. (BY MR. SHEPPARD) Okay. Would it have been

15  reasonable to have more than just the captain in the

16  wheelhouse supervising the operation?

17   **A. It's not required by the Coast Guard. No.**

18   Q. Okay. Would it have been feasible to have more

19  than one person in the wheelhouse supervising the

20  operation other than the captain?

21   **A. I don't know that it would have any bearing on**

22  **it.**

23   Q. Would it have been something that the company

24  could have done?

25   **A. Honestly, no, I don't think so. I mean, we'd**

1  have to hire more people. There's a lot involved in

2  that, sir.

3    Q. Okay. Would you agree that safety should be

4  the number one priority at GLO?

5    **A. Yes, sir.**

6    Q. Would you agree with me that the responsibility

7  for implementing a complete safety program is vested in

8  the company?

9    **A. Yes, sir.**

10   Q. And would -- as the operations manager, is that

11  your responsibility to implement a complete safety

12  program and follow it?

13   **A. Yes, sir. And I think we do that.**

14   Q. Okay. Would you agree that safe means

15  eliminating all unnecessary and hazardous exposures?

16   **A. Yes, sir.**

17   Q. And would you agree with me that all accidents

18  must be fully investigated?

19   **A. Yes, sir.**

20   Q. Would you agree with me that working on vessels

21  like the -- like the MAGGIE A can be dangerous work?

22   **A. Yes, sir.**

23   Q. And you need to make sure that there are enough

24  people out there to do the work; right?

25   **A. Yes, sir.**

1    Q. And, you know, GLO shouldn't rush its workers

2  on any particular job; right?

3    **A. No, sir. We don't.**

4    Q. Okay. And GLO shouldn't prioritize money over

5  safety, should they?

6    **A. No, sir.**

7    Q. And would you agree with me that workers of GLO

8  have been seriously injured while working for the

9  company?

10   **A. What's your definition of "serious"?**

11   Q. An injury requiring hospitalization.

12   **A. Yes.**

13   Q. Does it happen often, you know, monthly,

14  weekly, yearly?

15   **A. No, sir. I'm -- I'm trying to think of the**

16  **last one, and I -- I can't.**

17   Q. Okay. It's important to -- let's see, I think

18  I had that one.

19          GLO workers have the right to expect a safe

20  place to work; right?

21   **A. Yes, sir.**

22   Q. And GLO workers have the right to expect that

23  the company will assign enough crew members for the work

24  that is being done by a vessel; correct?

25   **A. Yes, sir.**



1    Q.  GLO workers have the right to expect that
2  masters will watch out for hazards while an operation is
3  going on; correct?
4    **A.  Yes, sir.  Everybody has that responsibility.**
5    Q.  Okay.  GLO workers have the right to expect GLO
6  will not create a policy that would be unsafe; correct?
7    **A.  Correct.**
8    Q.  And certainly, you know, GLO workers aren't
9  going to do something that goes against maritime injury
10  standards; correct?
11   **A.  No, sir.**
12   Q.  Going back to the Root Cause Analysis.  Is it
13  fair to say since there's no lessons learned documented
14  that there's no lessons learned forwarded to other crew
15  members or employees of GLO?
16        MR. MECHE:  Objection, form.
17   **A.  No, I don't think that's accurate, I mean...**
18   Q.  (BY MR. SHEPPARD) Are there any -- there are no
19  lessons learned documented on the Root Cause Analysis
20  Form completed by Randy Whittaker; correct?
21   **A.  Right.**
22   Q.  And if that's the truth -- if that's the case,
23  then what lessons were -- what lessons learned were
24  forwarded to other GLO employees and crew members?
25   **A.  It's not noted there.  I don't know.  I'm not**

1  **saying that there wasn't none sent out, but there's none**
2  **noted there.**
3    Q.  Okay.  What three important lessons did GLO --
4  GLO learn as a result of this incident?
5        MR. MECHE:  Objection, form.
6    **A.  You're asking me what three lessons we learned?**
7    Q.  (BY MR. SHEPPARD) Yes, sir.
8    **A.  Okay.  A stop work should have been called.  We**
9  **should have allowed one task to finish before attempting**
10  **to do a second.  And we should have possibly recentered**
11  **the headache ball over the load as opposed to the cargo**
12  **rail.**
13   Q.  Okay.  And at least two of those things that
14  you're saying that you learned from it, those weren't
15  contributing factors contained on the Root Cause
16  Analysis; correct?
17   **A.  Which was taken on the front side of things.**
18  **Yes.**
19   Q.  Okay.  Did GLO require anyone to appear for
20  additional training to make sure something like this
21  never happens again?
22   **A.  Nothing additional.  We -- all of our guys are**
23  **trained.**
24   Q.  Okay.  Have any of my questions in your opinion
25  been tricky or manipulative?  Because if they have been,

1  I want to go back and work them out so that they're not.
2    **A.  No, sir.**
3    Q.  Okay.  Have you been --
4    **A.  It's been consistent.**
5    Q.  Sorry, go ahead.
6    **A.  Consistent.**
7    Q.  Consistent?
8    **A.  Yes, sir.**
9        MR. MECHE:  It's a compliment, Daniel.
10       MR. SHEPPARD:  Okay.  I just don't know
11  what it means.
12       **THE WITNESS:  You don't want me to -- you**
13  **don't want me to clarify that.**
14   Q.  (BY MR. SHEPPARD) Have you been given a full
15  and fair opportunity to answer all the questions here
16  today?
17   **A.  Yes, sir.**
18   Q.  Okay.  Did I make you feel stressed at any
19  point in the deposition?
20   **A.  I'm always stressed.**
21   Q.  Okay.  But definitely not by me; right?
22   **A.  No.  You just made it a little worse but not**
23  **too bad.**
24   Q.  I apologize.
25       Did I cut you off whenever you were trying

1  to answer a question?
2    **A.  No, sir.  You were very polite.**
3    Q.  Okay.  And you were given all the time you
4  needed to take breaks when you wanted to?
5    **A.  Yes, sir.**
6    Q.  I know I've asked you this a few different
7  times, but I just want to make sure that I've got it all
8  buttoned up.  Is there any question that you didn't
9  answer fully that you want to expand on?
10   **A.  No, sir.**
11   Q.  Okay.
12       MR. SHEPPARD:  I can pass the witness.
13       MR. DAVIS:  All right.  Can you guys hear
14  me okay?
15       **THE WITNESS:  Yes.**
16       MR. SHEPPARD:  Yep.
17       MR. DAVIS:  All right.  Give me one second.
18  I've got to switch headphones because during Daniel's
19  closing there I was getting the alert that my batteries
20  are dying on this current set.  It will just take me a
21  minute.
22       I'm guessing you guys can hear me?
23       **THE WITNESS:  Yes, sir.**
24       MR. SHEPPARD:  Yep.
25       MR. DAVIS:  All right.  I'm ready to



1 proceed.

2          EXAMINATION

3 QUESTIONS BY MR. JOHN G.H. DAVIS:

4     Q. Mr. Lagarde, my name is John Davis. And I'm an

5 attorney, and I represent Grande Isle Shipyards. Okay?

6     **A. Yes.**

7     Q. Our -- my -- my company is another company

8 that's been sued by Mr. Flora, and I just have a few

9 follow-up questions.

10          What is -- is it correct that you don't

11 know whether or not Grand Isle Shipyards was involved in

12 loading these particular cargo boxes?

13    **A. That's correct, sir, I -- I don't know.**

14    Q. And as I understand it, if -- if Grand Isle

15 Shipyards had done it, it was your testimony that there

16 would not be some sort of paper trail or payment trail

17 that could prove that up; is that true?

18    **A. None that I could provide that I know of.**

19    Q. Okay. Is there someone at the company that

20 would be -- that's in a better position to know that

21 than you?

22    **A. No, sir. I mean, I --**

23    Q. Okay.

24    **A. The only -- the only thing I'm referring to is**

25 **maybe my captain can tell me if his riggers rigged that**

1 **night at the dock or if the -- the dockhands did it.**

2 **I -- maybe the captain can tell us that. I don't know.**

3     Q. And it's my understanding -- or at least it's

4 claimed by the Plaintiff in this lawsuit, Mr. Flora --

5 that some of these cargo boxes were pre-slung. Do you

6 know what that means?

7     **A. Yes, sir. Most -- almost all lifts come**

8 **pre-slung.**

9     Q. I apologize. Let me -- I didn't realize I

10 wasn't in connection with you there.

11          So can you explain briefly to the ladies

12 and gentlemen of the jury what -- what it means when a

13 box or cargo is pre-slung?

14    **A. Okay. So when it's loaded onto the boat, it's**

15 **already -- it already has its lifting mechanisms.**

16    Q. Okay. And so as I understand it -- correct me

17 if I'm wrong, you don't have an agree with me --

18 essentially what you have is four lines that connect to

19 a ring, and that's what's picked up by the crane?

20    **A. So I guess nec -- it doesn't necessarily have**

21 **four lines, but however they deem that is the safest to**

22 **rig the pre-slung someone else makes that decision.**

23 **That's beyond our scope. But we don't --**

24    Q. I'm sorry, I couldn't -- I had a problem

25 hearing the last part of your answer there.

1     **A. So --**

2     Q. Could you repeat that?

3     **A. Can you repeat your question again?**

4     Q. Yeah. So -- so that the jury understands what

5 pre-slung means, there's -- there's -- it's true, is it

6 not, that there are four lines, two lines that are then

7 connected to a ring and then a crane can pick that up

8 kind of like you'd pick up a -- a grocery bag?

9     **A. Yes, sir. In a lot of cases, that's how it is.**

10    Q. Okay. And is it your test -- it's your

11 testimony that when all those boxes are loaded from the

12 dock to the back deck all of those are pre-slung;

13 correct?

14    **A. I can tell you that we didn't sling them, the**

15 **boat.**

16    Q. Okay.

17    **A. So, yes --**

18    Q. And --

19    **A. -- someone else --**

20    Q. -- they have to be slung -- I'm sorry. I'm

21 talking over you because there's a delay. Go ahead.

22    **A. Yes, sir. Someone else besides my crew slung**

23 **these boxes, or any lift, for that matter.**

24    Q. Okay. I thought -- was it your testimony

25 earlier that you didn't know who was involved in the

1 actual rigging, that sometimes it is your crew and

2 sometimes it can be the folks working on the dock?

3     **A. Yes, sir. At the dock --**

4     Q. Okay.

5     **A. -- it could be -- it could be either/or or**

6 **both.**

7     Q. And would rigging include pre-slinging?

8     **A. Not with my side.**

9     Q. Okay. And that's what -- that's what I was

10 trying to figure out when the used the term "rigging."

11          With respect to this particular incident,

12 did Mr. Flora continue to work after the accident?

13    **A. Yes, sir.**

14    Q. And do you recall or do you know how many days

15 he worked after the accident in connection with his

16 particular stint or shift?

17    **A. So to my knowledge he completed his hitch.**

18    Q. Okay.

19    **A. Yes, sir.**

20    Q. And do you -- and do you know if he returned to

21 begin another hitch with you-all?

22    **A. Yes, sir.**

23    Q. And what's the answer to that question?

24    **A. So I'm a little unclear on that one because I**

25 **think he -- he -- we found him a captain spot, I think**



1 at that point. And before he went home -- well, he had
2 to -- he had to go all the way to Houston, and I think
3 he had a few days he wanted off before going on to the
4 next as a captain. I think he may have requested to go
5 see the doctor before he went home. But, again, same
6 results; I mean, he got a return to work.
7 Q. The -- the incident, as you understand it, did
8 it have anything to do with how the boxes were slung?
9 **A. None to my knowledge.**
10 Q. And what I want to -- I'm going to share my
11 screen with you as soon as I can figure out how. Pull
12 up the proper document.
13 Okay. I have a pretty big monitor. Can
14 you see that?
15 **A. Somewhat, yes, sir.**
16 Q. Okay. Can you see the full page even if you
17 can't read it?
18 **A. Yeah. It's a little blurry. I apologize. I'm**
19 **just not --**
20 Q. Okay. No, that's -- let's see if we can get it
21 a little bit better. Can you see it now?
22 **A. I see -- I guess I can probably -- yeah,**
23 **that's -- I mean, the whole page --**
24 Q. Let me -- I'm going to --
25 **A. Go ahead.**

1 Q. I'm going to highlight a couple -- a couple
2 portions, and just let me know if they're legible to you
3 so that we can discuss them.
4 **A. Yes, sir, I see that one.**
5 Q. Okay. This is -- I don't know that it's been
6 marked as an exhibit. It's LLOG Exploration. Can you
7 tell us who that is?
8 **A. That's -- that's the customer we were working**
9 **for.**
10 Q. Okay. And the title of this document is what?
11 **A. "Incident Reporting Program."**
12 Q. And then if we go -- this is -- for the record,
13 it's GLO 00266. And if we go to the next page, it has
14 "Instructions." Do you see that?
15 **A. Yes, sir.**
16 Q. All right. And then if we go to the next page,
17 which is the one I want to discuss with you, what is the
18 title of this page?
19 **A. "Supervisor's First Report of Incident**
20 **Personnel Illness Slash -- Personal Injury/Illness**
21 **Report."**
22 Q. Okay. And is this something that you-all fill
23 out, or is this something that -- in other words, is it
24 something LLOG requires you to fill out, or is it
25 something they fill out and provide you with a copy of?

1 **A. This is -- this is something they fill out.**
2 Q. All right. And do you know where they obtain
3 the information that's contained in it?
4 **A. They could have talked to my guys on the boat.**
5 **I mean, that's --**
6 Q. All right. And if we -- if we look down at the
7 bottom here -- let me know if you can't see it -- it
8 says "Person filling out report," and it says "Scott
9 Sepulvado." Do you see that? S-E-P-U-L-V-A-D-O.
10 **A. I do, sir.**
11 Q. Do you know him?
12 **A. No, sir.**
13 Q. Okay. Do you know Wilson Walley, which it
14 indicates is the LLOG company man?
15 **A. No, sir.**
16 Q. All right. So I want to talk to you about the
17 description here. We'll go to the part, it -- it reads
18 "Describe Worker Activity Prior to the Time of the
19 Incident," and it says, "The crane operator sent the
20 fast line down with tag lines to the M/V MAGGIE A in
21 order to offload the grocery box." What are tag lines?
22 **A. Tag lines are generally put on the bottom of**
23 **the -- the cargo being lifted so that the riggers can**
24 **help guide, help guide the load from coming up or --**
25 **going up or down.**

1 Q. All right. I'm putting myself in the -- in the
2 jury box, and I still don't know what a tag line is.
3 I -- I kind of get a sense from your answer of what it
4 might help do, but I don't know what it is. Is it an
5 actual line of wire?
6 **A. Generally they're made of rope.**
7 Q. Okay. And are they looped? What do they look
8 like?
9 **A. Sir, I couldn't tell you that.**
10 Q. Okay.
11 **A. What do you mean "looped"?**
12 Q. And --
13 **A. What do you mean "looped"?**
14 Q. Well, in other words, are they looped on the
15 end to connect to something?
16 **A. They connect to the bottom of -- generally the**
17 **bottom of the cargo. And if --**
18 Q. How do they do that? How is that connection
19 done? That's what I'm getting at.
20 **A. Generally there's some -- sometimes most boxes**
21 **have places to tie tag lines or attach tag lines.**
22 Q. Okay. Well, do they have some sort of
23 connection on the end of them? I mean, they're not just
24 loop -- loop -- loose lines hanging down; right?
25 **A. Some of them are just tied.**



1    Q.   Okay.  And then if we look at the "Incident
2  Description," he says, "The crane operator stated that
3  the deckhands had removed the tag lines," I want to stop
4  right there.  What is -- what is -- why would the
5  deckhands be removing the tag lines in this process?
6    A.   Wait.  Where -- where are you at, John?
7    Q.   Sure.  If you look -- we're looking at the same
8  exhibit.  We just went over "Describe Worker Activity
9  Prior to Time of the Incident," and now I'm looking at
10  "Incident Description (how the injury/illness person
11  described this incident)."
12    A.   I -- I don't know why -- I don't know why they
13  would have removed them.  But, I mean, it's not
14  something that's -- that's eye grabbing for me.  Look,
15  on a previous load, they -- it may have been short a tag
16  line.  So they might have taken that one while the --
17  the rig went -- went and got some more.  And they --
18  they tied it to this other lift that they got -- had to
19  get off first.  Maybe they took it off because it -- it
20  was in the way.  I -- I don't know.  I mean, you'd have
21  to ask the deckhand --
22    Q.   Well --
23    A.   -- there.  It's -- it's really not eye grabbing
24  for me.
25    Q.   Well, right.  It may not be eye grabbing to

1  you, but to a jury that doesn't do this stuff and has
2  never been around it, what I'm trying to do is to get
3  you as someone who's in the industry who does this type
4  of work to give us a little more information so that the
5  jury can understand it.  Okay?
6    A.   Yes, sir, I understand.
7    Q.   All right.  So that first line says, "The crane
8  operator stated that the deckhands had removed the tag
9  lines and were in the proc" -- let me start over.
10        "The crane operator stated that the
11  deckhands had removed the tag lines and were in the
12  process of attaching same and hooking the stinger to the
13  grocery box."  Do you see that line?
14    A.   Yes, sir.
15    Q.   Okay.  It looks like the deckhands removed
16  these tag lines, and then were in -- it says "in the
17  process of attaching same."  Do you know where they get
18  attached once they're removed?
19    A.   Where they get attached?
20    Q.   Yeah.  Read the sentence.
21    A.   Well, where they get reattached?
22    Q.   Do they get -- I don't know.  I don't know -- I
23  don't know if they get attached.  I don't know if they
24  get reattached.  I'm trying -- trying to understand what
25  they were doing at the moment the incident occurred.

1  And all I've got aside from Mr. Flora's testimony is
2  I've got some incident reports.  And one of the incident
3  reports, which was filled out by the customer, says that
4  the deckhands had removed the tag lines.  You and I
5  talked about what a tag line does.  And it -- then it
6  says that they "had removed them and were in the process
7  of attaching same" -- it's like a lawyer wrote this,
8  right -- "they were in the process of attaching same."
9  Do you know after -- after they come down and they're
10  being used to help, I don't know, guide connection,
11  after they're removed what are they attached to?
12    A.   Man, I apologize, but I don't --
13        MR. SHEPPARD:  Objection, form.
14    A.   -- follow you, brother.  I -- I mean, look,
15  if -- so if the tag lines weren't there, they might have
16  taken them off again to use them on another lift.  Maybe
17  they were in their way.  They didn't want another lift
18  to land on them.  It's not uncommon for them to take
19  them off and use them somewhere else or whatever.  But
20  they would have reattached --
21    Q.   (BY MR. DAVIS) Okay.
22    A.   -- them before it went up so that when he does
23  lift it, they have -- they have -- the riggers have
24  something to hold onto besides touching the -- the lift
25  itself so that they can possibly, possibly help the box

1  from maybe hitting the side or hitting another --
2  another box.  Same thing when it's coming down, sir.
3  That tag line is --
4    Q.   Well, I --
5    A.   That's -- that's the first thing that the --
6  that the rigger is going to try to reach for.  You know,
7  instead of putting his hands on the -- on the box itself
8  or the lift, he's going to try to use that tag line
9  within his means, because, I mean, he's not going to
10  beat the crane.  So he -- he's going to have to guide
11  that crane as well.  But -- but, again, that the tag
12  line is used to help guide the -- load, sir.
13    Q.   Right.  Well, so -- so -- correct me if I'm
14  wrong.  If we look at the activity above, which says
15  "The crane operator sent the fast line down with the tag
16  lines" --
17    A.   Yes, sir.
18    Q.   -- the way I read this next sentence is the
19  fast line comes down, it's got tag lines attached.  And
20  now they've removed the tag lines from the fast line,
21  and then they're in the process of attaching it to the
22  actual cargo?
23    A.   Correct.  To the bottom side.
24    Q.   Okay.  All right.  Is that how you read that?
25    A.   Yes, sir.

1      MR. SHEPPARD:  Object to form.

2    Q.  (BY MR. DAVIS)  Okay.  And then it says the

3  hooking -- "and hooking the stinger to the grocery box."

4  Explain to the ladies and gentlemen of the jury what the

5  stinger is.

6    **A.  So the stinger, it would have been off of**

7  **the -- off of the -- coming off of the block of the --**

8  **of the -- of the crane; and that stinger, they would**

9  **have been trying to hook the D-ring from the actual**

10  **cargo box.  They were going to try to hook that onto the**

11  **hook of the stinger.**

12    Q.  Okay.  And that D-ring is connected to the

13  sling?

14    **A.  That D-ring is connected to the slings of the**

15  **cargo box, correct.**

16    Q.  Got it.

17      So -- so that the jury understands then,

18  you've got -- now you've got this line that's come down.

19  It's got the stinger on the end.  That's the part that's

20  going to connect to what, you know, anecdotically we

21  described as the shopping bag handles earlier so they

22  can lift the cargo up; correct?

23    **A.  Yes, sir.**

24    Q.  All right.  And it says, "During this time

25  there was a heave in the boat that caused the headache

1  ball for the fast line to catch onto and lift with the

2  grocery box."  Can -- can you describe to the ladies and

3  gentlemen of the jury what the headache ball is on the

4  fast line as compared to the stinger?

5    **A.  So, I mean, look, I'm not a -- I'm not the**

6  **crane guy or anything like that, but I'll give you my**

7  **opinion of it.**

8    Q.  Okay.

9    **A.  The -- the headache ball is -- is -- is before**

10  **the stinger, that the stinger hangs below the headache**

11  **ball.  And there's a -- there's a hooking mechanism at**

12  **the bottom of the stinger that the D-ring hooks onto**

13  **from the cargo slings?**

14    Q.  Got it.  And so if -- if the headache ball for

15  the fast line catches onto the grocery box, does that

16  have anything to do with the sling?

17    **A.  Not in my opinion.  I mean, no.  It sounds like**

18  **the -- it could have been that the -- you know, there**

19  **was miscommunication on when -- when stopping the -- the**

20  **lower from coming down -- the ball from coming down a**

21  **little bit too much or -- or what.  I don't know.  I**

22  **mean, I didn't --**

23    Q.  Does -- can you tell us after having looked at

24  the description provided by LLOG, as well as the

25  incident report -- and we can look at that if you want.

1  Let me see if I've got it over here.  Don't get dizzy.

2      The -- I believe you went over this with

3  Mr. Flora's attorney earlier.  Would it be a fair

4  summary of this incident that essentially what happened

5  based upon these reports is that Mr. Flora's job out

6  there was to connect the stinger to -- to the D-ring

7  that's a part of the sling that's connected to the

8  cargo, and as he was making that connection there was a

9  swell or a wave that brought the vessel higher, which

10  then resulted in essentially the headache ball coming

11  down further than was intended, that it caught part of

12  the cargo and then as it came up it -- it bumped into

13  Mr. Flora?

14    **A.  That's not in the initial --**

15      MR. SHEPPARD:  Objection, form.  Vague.

16    **A.  It's not in the initial reporting.  The initial**

17  **reporting, I don't think it mentioned anything about**

18  **the -- the wave in his report.  I mean --**

19    Q.  (BY MR. DAVIS)  Which report are you referring

20  to?

21    **A.  His incident report, his witness statement, the**

22  **initial one.  But, I mean, I don't know.  I mean, I --**

23  **did he -- was he asking for slack?  Maybe he asked for**

24  **too much slack.  Did the crane operator give --**

25    Q.  Well, it --

1    **A.  -- him too much slack?**

2      MR. SHEPPARD:  Object as --

3    Q.  (BY MR. DAVIS)  And what --

4      MR. SHEPPARD:  -- nonresponsive.

5    Q.  (BY MR. DAVIS)  Yeah.  What -- what I'm trying

6  to figure out is we've got a description of the

7  accident.  And -- and correct me if I'm -- if I'm wrong

8  or I'm misreading this, but what's described to me is

9  that you've got a wave or a swell presumptively that

10  raises the boat; right?

11    **A.  Yes.**

12    Q.  Which means that brings the -- does that bring

13  the headache ball closer to Mr. Flora, or does -- does

14  everything rise and fall with the boat as well?

15    **A.  Okay.  So, yeah, if -- if it were sitting on**

16  **the cargo rail or the -- or the box, it could have came**

17  **falling down.  Now, what caused it to fall, I don't**

18  **know.**

19    Q.  Okay.  Did --

20    **A.  But, sir, I'll say this, if it were sitting on**

21  **the cargo box or the cargo rail, there was**

22  **miscommunication well before that.**

23    Q.  Well, the crane that's being operated --

24      MR. SHEPPARD:  Objection, nonresponsive.

25    Q.  (BY MR. DAVIS)  Yeah.  And I want to be clear

1 about this. The -- the process here was cargo was
2 loaded onto the vessel. The vessel moved to another
3 area. And then the cargo was in the process of being
4 offloaded; correct?
5  **A. Yes, sir.**
6  Q. Okay. And the crane that was doing the
7 offloading was not located on the vessel but was located
8 on another deck; correct?
9  **A. Yes, sir.**
10  Q. Dock. Excuse me. I shouldn't say deck.
11  On -- on another dock; correct?
12  **A. No, sir, not a dock. They were offshore.**
13  Q. Okay. It was a deck, then.
14  But the -- the point being that if -- if
15 the -- if the -- the crane that is actually picking up
16 the cargo that was on your-all's also vessel doesn't
17 rise and fall with your-all's vessel; correct? It -- it
18 rises and falls with its own -- its own vessel or
19 platform; fair?
20  **A. The boat --**
21  MR. SHEPPARD: Object to form.
22  **A. -- does go up and down, yes.**
23  MR. SHEPPARD: Vague.
24  **A. And if the boat --**
25  Q. (BY MR. DAVIS) But your -- the -- the crane

1 lifting your cargo isn't on your boat; correct?
2  **A. No, sir.**
3  Q. Okay. And so if your boat is going up and down
4 that can affect the proximity of the headache ball to
5 someone like Mr. Flora if he's near it and on your boat;
6 correct?
7  **A. Yes, sir.**
8  Q. Okay.
9  MR. DAVIS: All right. That's all I have
10 for you, sir.
11  **THE WITNESS: Thank you.**
12  MR. MECHE: I've got a few questions for
13 the witness.
14  EXAMINATION
15 QUESTIONS BY MR. ALAN J. MECHE:
16  Q. Mr. Lagarde, if I understand your earlier
17 testimony to Captain Flora's lawyer, the con -- the
18 investigation that was conducted offshore by the crew
19 consisted -- the crew of the MAGGIE A, excuse me,
20 consisted of an incident report that was completed by
21 Captain Lester James; correct?
22  **A. Yes, sir.**
23  Q. And a witness statement that was completed by
24 Captain Flora?
25  **A. Yes, sir.**

1  Q. And a witness statement --
2  MR. SHEPPARD: Objection, form.
3 Misleading.
4  Q. (BY MR. MECHE) And a witness statement that was
5 completed by Mr. Bruce Bolt?
6  **A. Yes, sir.**
7  Q. Okay. Were any other incident reports or
8 witness statements collected on the boat from the Gulf
9 Logistics Operating crew?
10  **A. None that I'm aware of.**
11  Q. So these -- these three documents -- the
12 incident report, the two witness statements -- that was
13 the basis of the initial investigation for GLO?
14  **A. Yes, sir.**
15  Q. Okay. Now, those documents were completed --
16 well, I'll just ask you: When were those -- those
17 documents completed?
18  **A. 5/25/17, 5/25/17 and 5/25/17.**
19  Q. Okay. And I think you testified earlier that
20 according to Captain James' report at the specific
21 moment of the incident he had turned his attention to
22 the DP screen; correct?
23  **A. Yes, sir.**
24  Q. And he did not see the actual incident occur?
25  **A. Yes, sir.**

1  Q. All right. Where would Captain James get the
2 information about what happened that he didn't see with
3 his own eyes?
4  **A. From the people that were on the deck, Flora**
5  **and Bolt.**
6  Q. Okay. So for that information he didn't see it
7 with his own eyes, he's getting his information from
8 Captain Flora and Bruce Bolt?
9  **A. Yes, sir.**
10  Q. All right. Earlier -- and I believe --
11  MR. MECHE: Guys, did we mark the Root
12 Cause Analysis?
13  MR. SHEPPARD: Yes.
14  THE REPORTER: Exhibit 4.
15  Q. (BY MR. MECHE) All right. Exhibit 4 was the
16 Root Cause Analysis. Can you take a look at when
17 Randy Whittaker completed that report?
18  **A. May 27, '17.**
19  Q. Okay. Do you know whether Randy Whittaker had
20 anything to base his report on other than the
21 investigative reports that we just described for
22 Gulf Logistics?
23  **A. No, sir.**
24  Q. All right. If Mark Flora had factual
25 information about what happened to him that he did not



1 provide Gulf Logistics, would that Root Cause Analysis
2 be complete?
**3    A. No.**
4    Q. Would it be accurate?
5        MR. SHEPPARD: Objection, form. Vague.
**6    A. No.**
7    Q. (BY MR. MECHE) All right. I want you to
8 assume, Mr. Lagarde -- you don't have to agree with
9 me -- but I want you to assume that Mark Flora testified
10 that before the incident occurred he felt that the
11 headache ball was too close to him. I want you to
12 assume that. Was that information provided in his
13 witness statement?
**14    A. No.**
15    Q. Do you know whether or not he provided that
16 information to Randy Whittaker?
**17    A. I don't know that he did.**
18    Q. If he didn't provide that information to be
19 included in the analysis for the root cause, would the
20 Root Cause Analysis be complete in your opinion?
**21    A. No, sir.**
22    Q. All right. I want you to assume that
23 Mark Flora testified that a heaving of the boat caused
24 by a wave was not the cause of his incident, that he
25 identified a short stinger and he identified the

1 crashing of the headache ball and cables that happened
2 in a split second. I want you to assume that that's
3 what he testified to. Did he provide that information
4 in his witness statement?
5        MR. SHEPPARD: Object to form.
6 Mischaracterizes --
**7    A. No.**
8        MR. SHEPPARD: -- the evidence.
9    Q. (BY MR. MECHE) Did he provide that information
10 to Gulf Logistics Operating or Randy Whittaker in
11 advance of the Root Cause --
12        MR. SHEPPARD: Same --
13    Q. (BY MR. MECHE) -- Analysis report being done?
**14    A. No, sir.**
15        MR. SHEPPARD: Same objection.
16    Q. (BY MR. MECHE) If he had those factual pieces
17 of information and did not provide that to the company,
18 is it your -- what is your opinion about whether or not
19 the Root Cause Analysis is complete or accurate?
**20    A. It wouldn't --**
21        MR. SHEPPARD: Object to form. Asked and
22 answered.
23    Q. (BY MR. MECHE) I'm sorry. Go ahead.
**24    A. It wouldn't have been complete.**
25    Q. Those things, those factual details that

1 Mark Flora provided to this Court and this jury in his
2 deposition, if those pieces of information had not been
3 provided to Gulf Logistics, how would you have known?
**4    A. I wouldn't have.**
5    Q. Now, when you hired Mark Flora, he wasn't just
6 some deckhand, was he?
**7    A. So I didn't do the actual hiring. But, no,**
**8 I -- I -- I did know that we were hiring a 1,600-ton**
**9 captain, and he was going to come on as a -- as a**
**10 deckhand waiting on a captain position. And I said,**
**11 "Wow." I said, "That doesn't happen too often" -- like**
**12 I didn't ever remember that happening -- "but I welcome**
**13 it. That's an experienced guy."**
14    Q. What was going on in the offshore economy that
15 would cause a 1,600-ton master to take a deckhand
16 position?
**17    A. So there was a downturn --**
18        MR. SHEPPARD: Object to form.
19 Speculation.
**20    A. There was a downturn. And he wasn't the only**
**21 captain that we hired in a deckhand position. He was**
**22 the only 1,600-ton captain that I can remember.**
23    Q. (BY MR. MECHE) And -- and what you do, is that
24 kind of the top of the heap, so to speak, in terms of
25 the captains?

**1    A. That's a big license, it really is.**
2    Q. But he wanted to take that deckhand position
3 why?
**4    A. He -- he wanted to work.**
5    Q. Was there some sort of an endorsement that he
6 was looking for?
**7    A. So if -- if memory serves me right, I think he**
**8 was trying to get on one the DP2 boats so that he can**
**9 get that sea time so he can apply for that.**
10    Q. Okay. And I think -- I think it was Mr. Davis
11 who asked you some questions about subsequent hitches
12 that Captain Flora worked for Gulf Logistics after the
13 incident that we're here to talk about. Remember those
14 questions?
**15    A. Yes.**
16    Q. In fact, he did get promoted to a captain
17 position after this incident occurred; true?
**18    A. Yes, sir.**
19    Q. What boat did he go to work on?
**20    A. He went on -- on the MS. ELISSA.**
21    Q. How long did he work on that boat?
**22    A. I think he made his full hitch.**
23    Q. And then what happened to him after that?
**24    A. I think he chose to -- he -- he found other**
**25 employment. If memory serves me right, I think that he**



Page 153

1  wanted to go and do some hurricane relief cleanup,
2  maybe, or -- or something.  I don't remember exactly
3  what they had said.
4      Q.  We were talking a few moments ago about the
5  Root Cause Analysis and your opinions that that document
6  can't be complete if all of the factual information that
7  Mark Flora has provided via testimony was never provided
8  to the company.  Do you remember that testimony?
9      A.  Yes, sir.
10     Q.  Okay.  Is that why the company suggests that
11  captains don't try to assign blame on the day of the
12  incident, because they may not have all the information
13  available?
14     A.  Right.
15         MR. SHEPPARD:  Object to form.  Asked --
16     A.  They --
17         MR. SHEPPARD:  -- and answered.
18     A.  They may not have all the facts.
19     Q.  (BY MR. MECHE)  And clearly in this situation,
20  Captain Lester James didn't see the incident; true?
21     A.  True.
22     Q.  And he's limited to what he was told by others?
23     A.  Correct.
24     Q.  Now, moving around a little bit.  There was --
25  I don't recall if we marked the -- the cargo manifest in

Page 154

1  this case.  But I think you were shown the cargo
2  manifest by Mr. Sheppard.  Do you recall that?
3      A.  Yes, sir.
4      Q.  Tell the Court and the jury how is it that that
5  cargo manifest is used with respect to Gulf Logistics
6  and whether or not you guys keep a copy of that.
7      A.  So the majority of times the way it's supposed
8  to happen is that we'll receive at the dock -- we'll --
9  before the boat is loaded, we'll take a look at the
10  manifest, the -- the dispatcher and them will discuss
11  load-out and -- and things of that nature.  Generally
12  they're given -- they're given a copy to bring offshore.
13  This is all done by email a lot of times, too.  So they
14  may not get a hard copy.  They may -- they may send it
15  by email.  But the answer to your question is, yeah, my
16  guys look at that generally to see exactly what's going
17  to be coming on the boat --
18     Q.  If --
19     A.  -- things of that nature?
20     Q.  If Gulf Logistics is provided with a copy of
21  the cargo manifest at the dock where the boat is loaded,
22  do they deliver that to the either platform drillship
23  where they're working?
24     A.  If -- if they're given one.  Generally -- I
25  mean, generally they have to have one.  They're supposed

Page 155

1  to have one when they're traveling with it.  And back in
2  the day, they used to have to send it back up.  But now
3  a lot of times they'll email that; you know, the dock
4  will email it to the -- to the -- to the location going
5  offshore.
6      Q.  Okay.
7      A.  And we -- I mean, look, some -- some boats may
8  keep it, you know.  But it's cumbersome.  It's a lot,
9  and we don't keep it.
10     Q.  All right.  We've had a lot of testimony about
11  what information Gulf Logistics has or doesn't have
12  regarding who may have loaded the boat.  I want to make
13  sure that that's clear on the record.
14         Am I to understand your testimony is that
15  there are times where riggers who are part of the crew
16  of the MAGGIE A may assist in loading the boat?
17     A.  Yes, sir.
18     Q.  Okay.  But they do that on the vessel.  Never
19  dockside; is that true?
20     A.  No, sir, we -- we don't work on the dockside.
21     Q.  Okay.  You don't work on the dockside.
22         And with regard to whoever is on the
23  dockside loading the boat, you don't have any
24  information one way or the other as to what company did
25  that in this case?

Page 156

1      A.  No, sir.
2      Q.  Okay.  Now, here's my question:  Do you know
3  whether the folks loading the boat are the same folks
4  that employ the crane operator on the dock?
5      A.  I -- I don't know that.
6      Q.  That's not information you provide?
7      A.  No, sir.
8      Q.  The folks on the dock and the folks that
9  operate the crane, those are not employed by
10  Gulf Logistics Operating?
11     A.  No, sir.
12     Q.  In fact, you don't contractually make
13  arrangements for those people, do you?
14     A.  None.
15     Q.  Do you know who does?
16     A.  I'm assuming the LLOGs of the world have
17  contracts with the dock itself.
18     Q.  Okay.  So you believe that -- that whoever was
19  responsible for loading and -- loading the boat or
20  operating the crane that is the subject of what we're
21  here to talk about that would have been made --
22  arrangements would have been made through your customer,
23  LLOG?
24     A.  I would assume that, yes.
25     Q.  It's outside of Gulf Logistics' field?



1    A.  Yes.

2    Q.  All right.  Lester James, Captain Lester James

3  that's been talked about in this deposition, is he still

4  employed by the company?

5    A.  Yes, sir.

6    Q.  Has he been employed by the company since this

7  incident occurred, or did he have a break at any point?

8    A.  No, I don't think he's had any break.

9    Q.  Okay.  So he's been there the whole time?

10    A.  Yes, sir.

11    Q.  How -- how big a boat, if you can give us a

12  rough estimate of how long this boat is.  Can you tell

13  us?

14    A.  205 foot.

15    Q.  Is there -- based on your knowledge of either

16  company policy, or any policy, is there any prohibition

17  to operating a 205-foot vessel in 6- to 7-foot swell?

18    A.  I -- again, I don't -- I don't put numbers --

19        MR. SHEPPARD:  Object to form.

20  Speculation.

21    A.  I don't put a number on seas.  But through my

22  experience, when they say 6 or 7 foot, that's -- it's

23  not that bad.

24    Q.  (BY MR. MECHE) Did you know, Mr. Lagarde, that

25  there were several lifts that were done before the one

1  where Captain Flora was -- was injured?  Did you know

2  that?

3    A.  As I understand now, yes.

4    Q.  If -- if there was any weather conditions --

5  seas, wind, current or anything else -- that

6  Captain Flora felt uncomfortable with, what was he

7  supposed to do?

8    A.  Call stop work authority.

9    Q.  Okay.  Does he have the right to do that?

10    A.  Yes, sir.

11    Q.  Does he have the obligation to do --

12        MR. SHEPPARD:  Object to form --

13    A.  Yes.

14        MR. SHEPPARD:  -- asked and answer.

15    A.  So does everyone onboard.

16    Q.  (BY MR. MECHE) Everybody does; right?

17    A.  Yes.

18    Q.  When Gulf Logistics hired Captain Flora and

19  allowed him to work in a deckhand position until a -- a

20  captain's position came open, did you -- did you require

21  him to set his license and his training aside, or was he

22  required to use the training and license that he had in

23  doing his daily duties?

24    A.  Oh, no.  Not set it side.  We welcomed the

25  experience.

1    Q.  You were asked some questions about the

2  pre-slinging of cargo.  Is that ever the job of

3  Gulf Logistics operating crew members to pre-sling any

4  cargo?

5    A.  No, sir.  So I'll say this.  Now, if -- if --

6  if for some reason my riggers notice that there's a

7  stinger -- I mean, one of the cables, the slings are

8  bad, then they call the rig and they call the dock and

9  let them know that.  And nine times out of ten, the rig

10  will send somebody down and rehook or the dock will do

11  the sling.

12    Q.  In fact, before the MAGGIE A leaves the dock,

13  are the riggers onboard the boat required to do a visual

14  inspection of the cargo and the rigging that's loaded?

15    A.  Yeah.  So that's part of the -- their

16  post-voyage, that's one of the things that the crew

17  should do, is walk around the boat and make sure that

18  everything is secure.

19    Q.  You mean pre-voyage?

20    A.  Yes.

21    Q.  Okay.  All right.

22    A.  Did I say post?

23    Q.  You said post.

24    A.  I'm just looking toward the end, I guess, huh.

25    Q.  But you meant before -- before the boat leaves

1  the dock --

2    A.  Yes.

3    Q.  -- right?

4    A.  Yes.

5    Q.  If Captain Flora, when -- when the boat -- the

6  MAGGIE A arrives at the drillship, if he observes that a

7  piece of cargo has shifted to a point where he believed

8  it would be unsafe to deal with it, what is he supposed

9  to do?

10    A.  Stop the job.

11    Q.  Earlier you were asked some questions at the

12  beginning of the deposition to give your opinion about

13  what three causes of the incident were, and at the end

14  of the deposition you were asked to give three lessons

15  that were learned about this incident.

16    A.  Yes.

17    Q.  If Mark Flora had provided the factual details

18  about this accident that he did in his deposition to

19  Gulf Logistics when the incident happened, would you

20  have that information at the front end instead of the

21  back end?

22    A.  Yes.

23        MR. SHEPPARD:  Object to form.  Confusing.

24    Q.  (BY MR. MECHE) When we were talking about the

25  SEMS manual earlier and you -- you mentioned that some



1 of the information in the SEMS manual applies to -- did
2 you say ISM code?
3   **A. Yes.**
4   Q. Okay. This particular vessel doesn't fall
5 under the ISM code?
6   **A. No, sir.**
7   Q. Do you have a separate SEMS manual for every
8 class of vessel that you have?
9   **A. No, sir.**
10   Q. You've got one SEMS manual. And -- and if it
11 is ISM code, then that would apply to that vessel;
12 right?
13   **A. Apply to that vessel.**
14   Q. This --
15      THE REPORTER: Keep your voice up,
16 Mr. Lagarde.
17      **THE WITNESS: I'm sorry?**
18      THE REPORTER: Keep your voice up a little
19 bit, Mr. Lagarde.
20      **THE WITNESS: I'm sorry. I'm getting a**
21 **little tired.**
22      THE REPORTER: Thank you.
23      MR. MECHE: All right. I'm going to pass
24 the witness. We'll reserve the rest of ours until the
25 time of trial, unless you guys have some more.

1      MR. SHEPPARD: I've got a couple
2 follow-ups.
3      FURTHER EXAMINATION
4 QUESTIONS BY MR. DANIEL J. SHEPPARD:
5   Q. Just pick up where you left off there. You
6 said the -- the SEMS manual applies to all the
7 vessels in the fleet, but some of the provisions apply
8 to the GIS and some of prov -- some provisions don't.
9 Is that your testimony?
10   **A. GIS?**
11   Q. Sorry, I may -- I used the wrong acronym. I'm
12 sorry. It's floating through my head.
13      MR. DAVIS: Objection, form.
14   Q. (BY MR. SHEPPARD) Sorry. You just testified
15 that some of the provisions applied to some of the
16 vessels, other provisions don't; is that correct?
17   **A. So I don't require the MAGGIE A to do the**
18 **end-of-the-year review report. That's not saying that**
19 **they don't. That's not saying that they didn't or**
20 **don't, but it's not something that would be audited on**
21 **my end, no.**
22   Q. Okay. And, again, the manual doesn't
23 distinguish between two classes of vessels. It says
24 each vessel shall do it; correct?
25   **A. No, sir, it does not.**

1   Q. Okay. Sorry, I asked a bad a question with a
2 negative.
3      The SEMS manual does not provide a
4 distinction between one vessel or another. It says each
5 vessel must complete certain reports; correct?
6   **A. That's correct.**
7   Q. Okay. Do you have any information about which
8 riggers actually did the rigging of the Conex box in
9 question?
10   **A. Where at, sir?**
11   Q. You said that -- that the riggers were
12 responsible for performing an inspection before the
13 vessel left the dock; correct?
14   **A. Correct.**
15   Q. Which riggers did the inspection?
16   **A. Riggers/deckhands, my guys, before -- before**
17 **leaving the dock, the crew, they would have walked**
18 **around, made sure that everything was secure, among --**
19   Q. Okay.
20   **A. -- quite a few other things as well. But that**
21 **is part of their -- you know, just walk around, make**
22 **sure everything is good.**
23   Q. Okay. When it's at the dock, do you have two
24 of the deckhands on, two of the deckhands off, or how
25 does that work?

1   **A. Wait. I don't know if I'm following you there.**
2 **Two of the deckhands on, two -- this --**
3   Q. So for the -- for the particular journey we're
4 talking about, there were four deckhands that were
5 available to perform work aboard the vessel; correct?
6   **A. Yes, sir.**
7   Q. While the vessel was at dock, are you saying
8 that all four deckhands were working at the same time,
9 or were two deckhands working and two deckhands weren't?
10   **A. No. Two deckhands would have been sleeping, I**
11 **would assume.**
12   Q. Okay. Do you know which deckhands performed
13 the initial inspection of the cargo as it was leaving
14 the dock?
15   **A. No. No, sir, I don't.**
16   Q. Okay.
17   **A. It looks --**
18   Q. So it could have been --
19   **A. It could have been the captain that did the**
20 **walk-around.**
21   Q. Okay. Understood.
22      There's some questions about whether or not
23 you had all the information you needed in order to
24 complete the risk assessment. Is -- is GLO contesting
25 that there was a swell that caused the headache ball to



1 fall on Mr. Flora?

**2    A. No.**

3    Q. Okay. Because that information is also

4 contained in the witness statements from LLOG; correct?

**5    A. I guess I read that. I don't remember.**

6    Q. Okay. What other information do you need --

7 did you need from Mr. Flora in order for that report to

8 be complete?

9        MR. MECHE: Objection, form.

**10    A. Just some other items that were listed in his**

**11 summary that I read that wasn't in the -- in the initial**

**12 investigation.**

13    Q. (BY MR. SHEPPARD) Could you be specific and let

14 me know what those things were that needed to be part of

15 the initial investigation?

**16    A. If I remember right, in his -- in his incident**

**17 report, I don't think he mentions anything about the --**

**18 a swell. He didn't mention anything about the stinger**

**19 being too short.**

20    Q. Okay. You're aware that on the Root Cause

21 Analysis it says that a larger stinger was added after

22 the incident; correct?

**23    A. That was done on -- what -- what date did I say**

**24 that was done?**

25    Q. On the 27th of May, 2017.

**1    A. Correct.**

2    Q. Okay. So the -- the information needed to make

3 that assessment was provided to Mr. Whittaker before he

4 wrote his report; correct?

**5    A. Yeah, he wrote his --**

6    Q. Okay.

**7    A. -- initial report.**

8    Q. Okay. What other information did you require

9 from Mr. Flora to -- in order for this report to be

10 complete?

**11    A. I'd have to look at the summary again.**

12    Q. You're welcome to take your time and look at

13 the summary if you want. If it's work product --

14        MR. MECHE: Yeah. We -- we don't have it

15 down here.

16    Q. (BY MR. SHEPPARD) -- I'm not going to -- I'm

17 not going to ask for it.

18        MR. MECHE: We don't have the summary down

19 here, and I'm not shutting down the deposition so that

20 he can read Flora's deposition.

21        MR. SHEPPARD: I thought it was a summary

22 that was written. If -- if -- I want to make sure we're

23 covering all the bases here, and I just need to --

24        MR. MECHE: Okay. What's your question?

25        MR. SHEPPARD: Yeah. Sure.

1    Q. (BY MR. SHEPPARD) I don't if this is a long

2 summary or a short summary. If it's something that

3 you're able to read, you're welcome to do so. Take the

4 opportunity if you want. Would you like an opportunity

5 to read Mr. Flora's summary?

**6    A. No, sir.**

7    Q. Okay. You also said that it doesn't say in

8 Mr. Flora's statement that the -- the vessel went up on

9 a -- that it heaved and it went up on a swell or a wave;

10 right?

**11    A. That the -- that the -- the incident report**

**12 didn't say that?**

13    Q. Correct.

**14    A. I'm pretty sure it did.**

15    Q. It -- it did say that -- Mr. Flora's did say

16 the vessel heaved?

17        MR. MECHE: Daniel, I'm confused. Are you

18 talking about Flora's statement or the incident report?

19        MR. SHEPPARD: So I'll back up a little bit

20 here.

21        MR. MECHE: Thank you.

22    Q. (BY MR. SHEPPARD) You said that one of the --

23 there -- there's a lot of the things that you wanted --

24 that were in Mr. Flora's deposition that -- that needed

25 to be part of this information provided to GLO in order

1 for them to write a Root Cause Analysis. And I want to

2 make sure that we discuss what other information that

3 the company says it needed to perform that task.

4        With that line -- with that line of

5 thought, is there any information that you can think of

6 that the company needed in order to finalize the Root

7 Cause Analysis Form?

**8    A. So --**

9        MR. MECHE: Objection, form.

**10    A. I mean, we talked about the -- there was**

**11 some -- some discussion. He said that he felt as though**

**12 the headache ball was close to him. Well, that's --**

**13 that's -- that's a sign right there. If it's too close,**

**14 he should have asked the guy to pick it back up.**

**15 That's -- that's -- that's -- I mean, I think that's**

**16 probably something that we didn't know in the front**

**17 side. If he thought it was too close to him, he should**

**18 have said something and he should have stopped the job.**

19    Q. (BY MR. SHEPPARD) Okay. Anything else you can

20 think of?

**21    A. I just thought I had read where he said in his**

**22 testimony, is that the headache ball just came falling**

**23 down; like it had so much slack in it, that it fell. I**

**24 don't know that he said anything about a wave causing it**

**25 to come down.**



Page 169

1    Q.  Okay.

**2    A.  That wasn't his testimony, I think.**

3    Q.  Do you understand that -- Lester James, he
4  mentions the wave, doesn't he?

**5    A.  He must have heard that from Flora or Bolt.**

6    Q.  Okay.  And that information was provided to
7  Mr. Whittaker before he wrote his report, wasn't it?

**8    A.  Okay.**

9    Q.  Okay.  What's the -- what -- what's the purpose
10  of the stinger?  What do you use that for?

**11    A.  That's the portion that the cargo is hooked up**
**12  to.**

13    Q.  Okay.  And it's a -- there's -- you have
14  stingers that are small size, medium size and large
15  size; correct?

**16    A.  So that's -- that's going to be above me on the**
**17  stinger side.  But it's my understanding, sir, yeah,**
**18  that there -- there are different sizes.**

19    Q.  Okay.  And a larger stinger wouldn't mean that
20  it's like a thicker stinger.  It would mean that it has
21  more -- more cable.  So it has -- instead of being
22  2 foot long, maybe it's 4 foot long.  Does that make
23  sense?

**24    A.  That could be -- that could be an example.**

25    Q.  Okay.  So if -- if one of the things that

Page 170

1  Mr. -- that's in this report here says that a larger
2  stinger is needed after the incident, wouldn't that be
3  indicative of maybe the headache ball is a little too
4  close to Mr. Flora and a larger stinger would be
5  necessary?

**6    A.  So, I mean, that would have been an assumption,**
**7  I guess, you're saying.  But, I mean, I don't know that**
**8  he said that is what I'm saying, sir.**

9    Q.  Okay.  Well, what I'm saying is as part of the
10  report one of the things that is indicated in there is
11  that a larger stinger would be needed.  And if that's --
12  if that's being -- if that's needed because to put some
13  distance between Mr. Flora and the headache ball, then
14  that would be information that was provided to GLO
15  before Mr. Whittaker wrote his report; correct?

**16    A.  Yeah.  I mean, the thing about it is that he**
**17  got that information from Flora more than likely.  And**
**18  if Flora felt that, he could have stopped the job and**
**19  sent it back up.**

20    Q.  Okay.

**21    A.  And he actually used that stinger for other**
**22  lifts, as I understand it.**

23    Q.  One other thing you've testified to is you
24  think LLOG have made arrangements with the folks at the
25  dock who performed the initial loading of the cargo on

Page 171

1  the MAGGIE A; is that correct?

**2    A.  That's an assumption on my part, that the**
**3  contract between the dock is between the dock and the --**
**4  and the oil company, yeah.**

5    Q.  Okay.

6        MR. SHEPPARD:  I can pass the witness.

7        MR. MECHE:  John, do you have anything
8  else?  John, are you with us?

9        MR. DAVIS:  I am.  Sorry, my mute was like
10  four screens back.

11        No, I don't have any furth -- further
12  questions at this time.

13        MR. MECHE:  All right.  The only thing I
14  have, Daniel, is did we mark the Gulf Logistics
15  Operating incident report and the witness statements of
16  Flora and Bolt.

17        MR. SHEPPARD:  Let's go ahead and mark them
18  as the next one.  I think that puts us at 10.

19        THE REPORTER:  9.  I have it at 9.

20        MR. MECHE:  Yeah.  Let's go ahead and mark
21  that in globo.  It's a -- it's a three-page incident
22  report -- actually, excuse me, it's a four-page, because
23  the JSA is attached to it.  A four-page incident report,
24  a one-page witness report of Mark Flora and a one-page
25  witness report of Bruce Bolt, we'll mark that in globo

Page 172

1  as Exhibit Number 9.

2        MR. SHEPPARD:  Just to be clear, I thought
3  Exhibit 9 was the LLOG incident reporting program?

4        THE REPORTER:  Was that presented by
5  Mr. Davis, because he didn't indicate for it to be
6  marked?

7        MR. SHEPPARD:  Okay.  I thought -- I wrote
8  it down as a marked.  Sorry.

9        MR. MECHE:  John, did you mark that?

10        MR. DAVIS:  Which one, the LLOG -- the LLOG
11  incident, I did not mark it.

12        MR. MECHE:  Okay.  So Exhibit Number 9
13  in globo will be those documents that I just described
14  on the record.

15        (Exhibit 9 marked.)

16        MR. MECHE:  Ralph, you have the -- the
17  right but not the obligation to read and sign your
18  deposition or you can waive that right.  What would you
19  like to do?

**20        THE WITNESS:  I'll waive it.**

21        MR. MECHE:  He's going to waive his right.

22        MR. SHEPPARD:  Okay.  And I'd like to make
23  just Exhibit 10 to be that LLOG incident reporting
24  program.

25        (Exhibit 10 marked.)



1        MR. MECHE:  All right.  Daniel, just very

2   quickly, are you -- are you going to be in the office

3   tomorrow, we can call and discuss those issues?  I kind

4   of went later than I thought we were going to be.

5        MR. SHEPPARD:  Yeah, I'll be around.  And

6   if you -- let's go -- are we done with this?  Let's go

7   off the record.

8        MR. MECHE:  I thought we were off the

9   record.  Sorry.

10        MR. SHEPPARD:  Are we off the record?

11        THE REPORTER:  I'm waiting on the

12   videographer.

13        MR. SHEPPARD:  Okay.

14        THE REPORTER:  Harshal are you there?

15        MR. SHEPPARD:  I see it's messing with your

16   audio.  If you can maybe type a message or something.

17        THE REPORTER:  Yeah.  We're off the record

18   at 3:19 p.m.

19

20          (Signature waived.)

21

22

23

24

25

1   within 30 days from date of receipt of the transcript.

2   If returned, the attached Changes and Signature Page

3   contains any changes and the reasons therefor:

4        _X__ was not requested by the deponent or a

5   party before the completion of the deposition.

6        I further certify that I am neither attorney

7   nor counsel for, related to, nor employed by any of the

8   parties to the action in which this testimony was taken.

9   Further, I am not a relative or employee of any attorney

10   of record in this cause, nor am I financially or

11   otherwise interested in the outcome of the action.

12        Subscribed and sworn to on this 31st day of

13   March, 2021.

14

15

16

17   _____

     DEBBIE BOOTHE, CSR

18   Texas CSR 4708

     Expiration Date:  7-31-21

19   Lexitas

     Firm Registration No. 95

20   13101 Northwest Freeway, Suite 210

     Houston, Texas  77040

21   888-893-3767

22

     JOB NO. 2021-783563

23

24

25

1        IN THE UNITED STATES DISTRICT COURT

        FOR THE SOUTHERN DISTRICT OF TEXAS

2              HOUSTON DIVISION

3

   MARK FLORA,                    *

4                                 *

        Plaintiff,                *

5                                 *

   VS.                            * CIVIL ACTION NO.

6                                 * 4:19-CV-2328

   TRANSOCEAN DRILLING (USA), INC. *

7   ET AL                         *

                                  *

8        Defendants.              *

9

10           REPORTER'S CERTIFICATION

         ORAL VIDEOTAPED DEPOSITION OF

11             RALPH LAGARDE, JR.

          CORPORATE REPRESENTATIVE FOR

12       GULF LOGISTICS OPERATING, LLC

             (Reported Remotely)

13

14        I, Debbie Boothe, Certified Shorthand Reporter

15   in and for the State of Texas, hereby certify to the

16   following:

17        That the witness, RALPH LAGARDE, JR.,

18   CORPORATE REPRESENTATIVE FOR GULF LOGISTICS OPERATING,

19   LLC, was duly sworn by the officer and that the

20   transcript of the oral deposition is a true record of

21   the testimony given by the witness;

22        I further certify that pursuant to FRCP Rule

23   30(f)(1) that the signature of the deponent:

24        _____ was requested by the deponent or a party

25   before the completion of the deposition and returned

LEXITAS

## Exhibits

**Lagarde 001**  4:7 33:5,7

**Lagarde 002**  4:9 43:9,19, 20

**Lagarde 003**  4:14 58:3,4

**Lagarde 004**  4:20 69:11, 12 148:14,15

**Lagarde 005**  5:3 90:2,3

**Lagarde 006**  5:9 97:10,11

**Lagarde 007**  5:15 98:24 99:1 106:23,25

**Lagarde 008**  5:20 115:19, 21

**Lagarde 009**  6:3 172:1,3, 12,15

**Lagarde 010**  6:6 172:23, 25

## (

**(337)**  2:11

**(713)**  2:5,16

## 0

**00266**  6:7 134:13

**00272**  6:7

**00317**  4:19 5:14

**00319**  4:19 5:14

**00321**  5:19

**00329**  5:19

**00339**  4:13

**00340**  4:13

**00408**  5:8

**00410**  5:8

**00444**  4:23

**00446**  4:23

**0lifts**  33:10,22

## 1

**1**  4:7,18 5:13,18 7:3 33:5,7 47:15 64:7 115:24 118:9

**1,600-ton**  41:7 151:8,15, 22

**10**  6:6 66:14 118:8 171:18 172:23,25

**10-KT-300**  118:7

**100**  2:4 7:17 11:6 30:14

**100-ton**  55:24

**115**  5:23

**1177**  2:15 7:19

**11:10**  1:18 3:7 7:2

**12**  99:11

**129**  3:10

**12:03**  3:7 47:15,16

**12:13**  3:8 47:16,18

**146**  3:12

**15**  66:14

**162**  3:14

**17**  1:11 7:2 148:18

**172**  6:5,7

**174**  3:16

**17th**  1:17

**18**  27:24 28:9

**19**  34:6

**1:45**  3:8 114:17,18

## 2

**2**  3:5 4:9 5:7 43:9,19,20 47:18 114:17 169:22

**2.1**  102:13

**2.9**  43:25

**20**  27:24 66:14 68:6 70:5 74:19 115:24

**2000**  2:10 7:23

**2017**  19:11 30:3,15 34:6 35:3 63:23 107:12 112:21 165:25

**2021**  1:11,17 7:2 16:4

**205**  157:14

**205-foot**  157:17

**24th**  30:3

**25**  35:3

**257**  4:8 17:4 30:2 33:5

**259**  17:4 34:5

**25th**  34:6

**261**  36:10

**264**  4:8 17:4 33:6

**26th**  36:10

**27**  63:23 148:18

**27th**  165:25

**2:05**  3:9 114:18,20

**2:25**  3:9,11

**2:47**  3:11,13

## 3

**3**  4:12,14,18 58:3,4 69:14 114:20

**30**  15:2

**300**  118:9

**317**  58:2

**318**  58:2

**319**  58:2

**321**  98:25 101:23 102:14 106:23,24



**324**  101:13 102:3 104:3

**329**  102:3 106:24

**3291-1000**  2:11

**33**  4:8

**337 291-1200**  2:11

**339**  43:17,19

**340**  43:9,12,18,19

**35**  28:16

**36th**  1:23

**3:05**  3:13,15

**3:19**  1:18 3:15 173:18

**3lifts**  33:10,21

---

**4**

**4**  4:12,20 5:7 69:11,12
148:14,15 169:22

**400**  2:10

**407**  97:9 98:15

**408**  89:14,24 90:1

**409**  90:1 91:24 92:1

**410**  90:1

**43**  4:13

**445**  69:9

**4708**  7:9

**4:19-CV-2328**  1:5

---

**5**

**5**  5:3 34:7 58:8 90:2,3

**5.0**  4:18 5:13

**5.1**  5:18 102:13

**5/24/17**  4:7

**5/25/17**  6:4 147:18

**5/27/17**  4:22

**5151**  7:17

**52-week**  100:4 102:8

**53**  28:14

**58**  4:19

**5th**  16:4

---

**6**

**6**  5:9 37:8,9 67:6 85:21
97:10,11 157:22

**6-**  69:20 70:15 71:2,6,10
77:25 85:13,19 86:1
157:17

**6.2**  4:12

**629-5027**  2:16

**69**  4:23

---

**7**

**7**  5:15 67:6 85:21 98:24
99:1 106:23,25 157:22

**7-foot**  69:20 70:15 71:2,6,
10 77:25 85:14,19 86:1
157:17

**700**  118:13

**70508**  2:10 7:24

**713 489-1206**  2:5

**713 629-1580**  2:16

**77027**  2:15 7:20

**77056**  7:17

**77098**  2:5

---

**8**

**8**  3:6 5:20 115:19,21

**893-8370**  2:5

---

**9**

**9**  5:18 6:3 171:19 172:1,3,
12,15

**9.2**  5:7

**90**  5:8

**97**  5:14

**99**  5:19

**9:30**  35:11

---

**A**

**a.m.**  1:18 3:7 7:2

**aboard**  18:16 34:18 35:3,
16,23,24 50:24 76:2 99:7
164:5

**above-styled**  1:16

**Absolutely**  10:4 80:19

**abundance**  15:21

**accessible**  104:19

**accident**  21:6 23:11 73:6
89:7,16 95:7 101:3
103:22 107:6 121:6
132:12,15 144:7 160:18

**accidents**  108:4 109:21
123:17

**accordance**  40:10

**accounts**  95:8

**accuracy**  65:24

**accurate**  95:8 125:17
149:4 150:19

**acknowledge**  43:2 45:20

**acronym**  162:11

**acting**  59:22

**action**  1:5 5:6 43:24 90:6
91:15 95:19,24 96:15

**actions**  91:4,8 92:8 99:17,

20 104:7 108:5 109:22

**activities** 59:7

**activity** 34:8 135:18 137:8 140:14

**actual** 132:1 136:5 140:22 141:9 147:24 151:7

**add** 64:4

**added** 119:17 165:21

**addition** 8:14 14:10 15:13

**additional** 34:20 35:12 64:1 126:20,22

**advance** 150:11

**adversely** 61:24

**advised** 76:14

**affect** 78:12 146:4

**affected** 61:24

**affecting** 76:19

**agenda** 108:3

**agree** 10:19 36:20 37:1,4 45:12 75:22 78:23 79:10 82:9 123:3,6,14,17,20 124:7 130:17 149:8

**agreement** 59:8

**ahead** 11:5 13:19,21 18:24 75:15 110:12 127:5 131:21 133:25 150:23 171:17,20

**air** 74:19

**Alan** 2:9 3:12 7:21 43:9 115:11 146:15

**Alanmeche@allengooch. com** 2:11

**alert** 128:19

**Allen** 2:9

**allowed** 126:9 158:19

**aloud** 58:10

**amend** 116:23

**amendments** 108:6

**amount** 36:7,8 117:16

**amounts** 66:10

**analysis** 4:21 15:3 24:5, 10 62:23,25 69:11 76:24 77:21 89:18 116:8 117:2 121:4 125:12,19 126:16 148:12,16 149:1,19,20 150:13,19 153:5 165:21 168:1,7

**and/or** 72:16 75:7

**anecdotically** 141:20

**annual** 102:16 103:11,16 105:24

**annually** 105:3

**answers** 9:12 47:25

**anymore** 26:24

**anyone's** 113:23

**anytime** 85:7

**apologize** 127:24 130:9 133:18 139:12

**apparently** 46:14 72:13

**appearances** 3:5 7:12

**applied** 90:7 162:15

**applies** 102:22,25 161:1 162:6

**apply** 152:9 161:11,13 162:7

**applying** 103:10,11

**approaching** 76:15

**appropriately** 52:11

**area** 30:8 33:9 145:3

**arrangements** 156:13,22 170:24

**arrives** 160:6

**articulate** 65:8

**aspect** 117:11

**assess** 96:24 97:14 98:2

**assessment** 117:4,5 164:24 166:3

**assign** 124:23 153:11

**assigned** 18:8,10

**assist** 31:20 155:16

**assistance** 73:1,16

**assume** 16:17 71:9 149:8, 9,12,22 150:2 156:24 164:11

**assuming** 16:23 46:6 65:4,10 67:5 83:3 89:10 93:14 100:16 117:5 156:16

**assumption** 170:6 171:2

**attach** 72:3 136:21

**attached** 1:25 138:18,19, 23 139:11 140:19 171:23

**attaching** 138:12,17 139:7,8 140:21

**attempting** 126:9

**attention** 147:21

**attorney** 16:12 54:20 71:17 83:22 129:5 143:3

**attorney-client** 83:12,15, 20

**attorneys** 17:16

**audio** 58:15 89:1,4 173:16

**audited** 162:20

**Authorities** 4:17 5:12 58:10

**authority** 23:17 58:11,13, 15 59:5,9 60:13,17,18 61:2,11,17 67:14,20 70:1 84:14 85:3,20 86:1 158:8



**authorized** 57:6

**aware** 15:22 35:15 41:15
42:11 47:7 54:12 62:12
73:3,4,20 89:2,5 101:6
111:6,7 121:10 147:10
165:20

**awhile** 111:21

### B

**back** 9:8 19:11 20:18 25:5
27:22 37:10 45:1 47:17,
20 48:13 49:14 80:16
89:25 110:19 113:7,15
114:3,9,19 116:4 118:13,
25 125:12 127:1 131:12
155:1,2 160:21 167:19
168:14 170:19 171:10

**bad** 127:23 157:23 159:8
163:1

**bag** 131:8 141:21

**ball** 23:19,20 72:13,15,19,
25 73:4,21 74:2,12 75:2,7
79:17 120:9,13,14 126:11
142:1,3,9,11,14,20
143:10 144:13 146:4
149:11 150:1 164:25
168:12,22 170:3,13

**ballpark** 11:9 28:7 113:24

**balls** 79:12

**Barry** 19:23,25 20:2,8,15,
22 22:13

**base** 29:19 148:20

**based** 143:5 157:15

**bases** 166:23

**Basically** 14:20

**basing** 81:16 82:21

**basis** 105:24 147:13

**Bate** 6:5

**bates** 4:8,13,19,23 5:8,14,

19,23 6:7 98:13 102:14

**bathroom** 10:17 42:17
47:23

**batteries** 128:19

**bear** 72:7 78:19

**bearing** 25:12 76:17
122:21

**beat** 9:14,19 10:9 140:10

**beds** 54:23,25 55:1

**begin** 132:21

**beginning** 7:3 44:3 75:20
89:22 160:12

**behalf** 9:1 11:18 114:24
115:2,5

**believed** 160:7

**benefit** 95:19 96:13

**big** 10:24 53:4 64:15,24
65:6,19 78:11 87:18
133:13 152:1 157:11

**bigger** 55:25

**binded** 49:22

**binding** 114:24

**bit** 35:11 72:23 86:6 87:4
133:21 142:21 153:24
161:19 167:19

**blame** 96:25 97:14,19
98:3 153:11

**blanks** 36:18,21

**block** 141:7

**blue** 58:12 59:14 99:3

**blurry** 133:18

**boat** 16:23 17:8,9,14
18:13 19:11,14 20:4,5,17
25:11 27:14 31:20 36:1
37:15 39:3,5 46:5 49:18,
20 50:4,8 51:17,21 52:3
55:18 57:22 64:19 66:2,
18 68:17 70:23 71:10

76:20 78:14 81:8,13 85:3,
4 87:1 92:16 100:20
120:6 122:7 130:14
131:15 135:4 141:25
144:10,14 145:20,24
146:1,3,5 147:8 149:23
152:19,21 154:9,17,21
155:12,16,23 156:3,19
157:11,12 159:13,17,25
160:5

**boats** 48:6 55:11 152:8
155:7

**Bolt** 16:3 21:16 22:19,22
23:5 147:5 148:5,8 169:5
171:16,25

**Boothe** 1:18 7:9

**bottom** 135:7,22 136:16,
17 140:23 142:12

**box** 22:3 39:21 53:17
72:13,16,17 73:5,7,22
74:3,14,20 75:2 130:13
135:21 136:2 138:13
139:25 140:2,7 141:3,10,
15 142:2,15 144:16,21
163:8

**boxes** 34:9 38:6,10 39:12
48:4 52:16 53:14 54:7
78:24 89:21 129:12 130:5
131:11,23 133:8 136:20

**brace** 71:3

**brand** 19:10

**brand-new** 19:10,13

**break** 10:15,19 42:18
47:10,20 86:6,23 87:11
113:10,17 114:11 116:13
157:7,8

**breaks** 128:4

**briefly** 47:23 130:11

**bring** 15:12 35:5 37:25
144:12 154:12

**brings** 144:12



**broad** 86:17 100:22

**broke** 9:6

**brother** 139:14

**brought** 37:24 143:9

**Brown** 2:14

**Bruce** 16:3 21:16,22 22:1, 19 23:5 72:23 73:1,14 75:6 147:5 148:8 171:25

**bul** 75:11

**bulwarks** 68:11 72:16,17 73:5,22 74:3,13,20 75:2, 11

**bumped** 143:12

**bunch** 112:5

**bunk** 35:17 54:23

**bunks** 55:2

**business** 64:22

**buttoned** 128:8

---

**C**

**cable** 169:21

**cables** 150:1 159:7

**call** 8:8 60:13 61:16 84:13 85:15,20,25 100:19 158:8 159:8 173:3

**called** 23:17 71:12 85:3,7 126:8

**calling** 20:13

**camera** 29:24

**captain** 17:20 19:21,22 20:3 21:2,18 22:13,17 23:24 25:2 27:6 29:16 33:24 38:12,14,18 39:1 42:8 57:9,14 64:15 65:16 68:2 70:4,12,14,20,25 74:10 76:19 77:10 80:25 81:19,21 82:6,9,13,25 83:9 84:15 85:4,8,11,20,

25 120:3 122:15,20 129:25 130:2 132:25 133:4 146:17,21,24 147:20 148:1,8 151:9,10, 21,22 152:12,16 153:20 157:2 158:1,6,18 160:5 164:19

**captain's** 158:20

**captains** 35:22 50:9,13,24 55:4 151:25 153:11

**cargo** 28:21 29:2,5,13 35:5 38:22,24 39:5 73:5, 22 74:3,13,21 118:20,22, 23 119:3 120:14 121:14 126:11 129:12 130:5,13 135:23 136:17 140:22 141:10,15,22 142:13 143:8,12 144:16,21 145:1,3,16 146:1 153:25 154:1,5,21 159:2,4,14 160:7 164:13 169:11 170:25

**carried** 36:16

**carry** 36:9

**carrying** 34:17

**case** 8:15,18 12:3,5,18,24 13:2 14:14 17:17 20:25 21:7 22:5,15 38:17 53:25 57:8 64:10 101:7 125:22 154:1 155:25

**cases** 8:19,20,23 11:10, 14,23,24,25 12:7,10 57:5 99:21 131:9

**casualty** 97:1,15

**catch** 142:1

**catches** 142:15

**categories** 8:23

**caught** 73:5,21,25 74:2,7, 13,17 75:2,17 120:14 143:11

**caused** 141:25 144:17

149:23 164:25

**causing** 168:24

**caution** 15:21

**center** 23:21 75:10,12

**centered** 75:11

**centimeter** 53:2

**certifica** 103:7

**Certificate** 3:16

**certification** 102:7 103:7

**certified** 50:11 72:5 102:5

**chance** 39:13 52:22

**change** 48:1 116:23

**changed** 63:13

**Chapter** 102:13

**charge** 56:17,20 63:5

**check** 25:14 27:13 52:4 82:4 108:23

**checked** 89:21

**checking** 81:25

**checklist** 87:2 89:10

**choosing** 105:2

**chose** 152:24

**Civil** 1:5,23

**claimed** 130:4

**clarify** 15:24 127:13

**class** 161:8

**classes** 162:23

**cleaning** 42:11 46:1

**cleanup** 116:5 153:1

**clear** 9:4,5 12:14 144:25 155:13 172:2

**close** 14:9 149:11 168:12, 13,17 170:4

**closer** 117:22,24 144:13

LEXITAS

**closing** 128:19

**clues** 93:1

**Coast** 36:8 122:7,17

**code** 161:2,5,11

**collected** 117:13 118:2 147:8

**collecting** 117:15

**Collection** 117:1,11 119:10

**comfortable** 66:3

**command** 24:3

**comment** 42:4 119:1

**comments** 93:2

**commit** 62:22

**committed** 42:12

**communicating** 24:1 80:6

**communication** 13:23 42:24 45:17,25 48:15,17 49:18 76:14 82:10,14,20 83:1,3,10 84:3,6,8 86:18

**communications** 83:13, 15,21

**comp** 62:25

**companies** 15:23

**company** 22:17,19,24 23:5 26:21 31:11 37:21 78:19 95:11 96:18,19 97:3,13 98:2 102:15 105:1,7,14,17 106:2,15 107:2 108:1,17,19 114:25 122:5,23 123:8 124:9,23 129:7,19 135:14 150:17 153:8,10 155:24 157:4,6, 16 168:3,6 171:4

**company's** 105:20,22

**compared** 142:4

**complete** 29:1 62:22 70:10 90:12 95:8 100:2 104:9 105:9 106:3 123:7,

11 149:2,20 150:19,24 153:6 163:5 164:24 165:8 166:10

**completed** 33:16 63:1 76:24 91:2 101:22 104:21,23 105:3,14,23 125:20 132:17 146:20,23 147:5,15,17 148:17

**completely** 51:6

**completing** 88:4 96:25 97:14 98:3

**compliment** 127:9

**computer** 113:7

**con** 111:16 146:17

**concern** 88:14

**concerns** 100:11

**condition** 57:20 59:16 60:8 95:15

**conditions** 59:7 67:4,14 68:19 69:3,18 70:2,6,13, 23 76:25 77:13,22,23 78:13 80:16 95:12,13 158:4

**conduct** 4:11 58:17 59:11 88:11,20

**conducted** 7:6 146:18

**conducting** 26:7

**Conex** 22:2 38:6,10 39:21 48:4 52:15 53:14,17 54:7 74:3,14,20 78:24 163:8

**Confer** 93:23

**conference** 95:4

**confused** 167:17

**Confusing** 160:23

**connect** 130:18 136:15,16 141:20 143:6

**connected** 131:7 141:12, 14 143:7

**connection** 130:10 132:15 136:18,23 139:10 143:8

**consent** 8:15

**consideration** 39:4,7

**Considerations** 96:23

**consisted** 146:19,20

**consistent** 127:4,6,7

**constant** 76:13 82:25 83:10 84:8

**contact** 22:21 23:2,7 72:19

**contained** 22:9 24:5 47:5 63:19 88:13 121:3 126:15 135:3 165:4

**content** 12:15 14:17 47:21 116:17

**contesting** 164:24

**context** 43:19

**continually** 47:1

**continue** 132:12

**continued** 5:1 6:1 46:11

**continues** 43:1 45:19

**contract** 31:6,11 171:3

**contracts** 156:17

**contractual** 59:8

**contractually** 31:12 156:12

**contributing** 24:13 63:8, 18,22 64:7 67:10 69:13, 19 72:19 77:23,24 82:19 84:24 126:15

**controlled** 39:16

**controls** 39:16

**conversation** 13:14 14:18 86:24,25 111:12,13,14,16 112:21



**conversations** 13:25 93:1 111:11,19,23

**coordinating** 26:16

**cop** 84:13

**copies** 104:14

**copy** 28:22 29:13,17 44:10,22 46:8 102:16 115:8 134:25 154:6,12, 14,20

**corner** 33:8

**corporate** 1:10,14 7:5 8:2

**correct** 19:12 24:11,15 33:16 37:2 38:7 39:17 43:2 45:20 46:2,13,19,25 51:10 52:18 56:11,15,22, 25 57:17,21 59:17,20,23 60:2,4,10,16,19,23 61:24 62:14,17,19 63:10 66:7 67:10,15,23 68:3,8,12 69:3 74:14 75:3 77:3 78:20 80:13,18,23 84:11, 19 85:9,14,20 86:2 87:19 88:2,5,9,11,20 90:12,17, 24 91:2,6,9,11 92:10,13, 22,24 93:11 95:9 96:14, 18 98:6,21 99:15,17,20, 23 100:4,8,11,14,25 101:4 102:23 103:1,12,23 104:4,9,10,11,15,19 105:3,9 107:3,7 108:7,22 115:20,24 117:4,13 118:12,20,22 119:12,15 120:1,7,11,15,25 124:24 125:3,6,7,10,20 126:16 129:10,13 130:16 131:13 140:13,23 141:15,22 144:7 145:4,8,11,17 146:1,6,21 147:22 153:23 162:16,24 163:5,6,13,14 164:5 165:4,22 166:1,4 167:13 169:15 170:15 171:1

**corrected** 54:4 90:9 95:12,14

**corrective** 5:6 90:5,6 95:19,24 96:15 99:17,20 104:6 108:5 109:22

**correctly** 41:22 92:4 93:3 97:4,6

**cost** 26:18

**Counsel** 7:12

**counseling** 43:1 45:19

**couple** 10:23 13:13 72:16 134:1 162:1

**Court** 1:1 151:1 154:4

**cover** 56:2,6

**covered** 98:14 116:5 119:20

**covering** 166:23

**covers** 56:3

**COVID-19** 1:24

**crane** 23:22 24:2 31:23 32:1,7,17 38:5,9,25 48:12,16,18 49:9 73:12 75:7 78:24 80:7,13,18 82:11,14 83:4 84:4 121:15 130:19 131:7 135:19 137:2 138:7,10 140:10,11,15 141:8 142:6 143:24 144:23 145:6,15, 25 156:4,9,20

**cranes** 38:8 79:12

**crashing** 150:1

**create** 125:6

**creating** 96:6

**crew** 27:8,16 28:7 30:19 34:20 35:5 48:15 49:25 50:21 51:18,20 52:2,3 54:13,17,23 55:5 56:14, 21 57:1,3 60:23 61:23 64:25 66:2,3 88:20 99:24 100:3,14 124:23 125:14, 24 131:22 132:1 146:18, 19 147:9 155:15 159:3,16

163:17

**crews** 94:3

**CSR** 1:18 7:9

**cumbersome** 155:8

**current** 66:18 118:9 128:20 158:5

**customer** 19:11 27:14 33:13 37:24 38:2 97:23 134:8 139:3 156:22

**customer's** 35:4

**cut** 44:7,22 127:25

**cutting** 29:9 39:12

## D

**D-RING** 72:4,14,18 73:2, 10,21 141:9,12,14 142:12 143:6

**daily** 25:19 108:13,20 109:10,16,17,20 110:21 112:3,11 113:1 158:23

**dangerous** 123:21

**Daniel** 2:3 3:6,14 7:15 8:5 13:1 14:25 15:16 23:4 29:8 42:16 44:9 62:1 77:15 83:12 91:17 98:13 101:8 109:12 113:24 114:8 127:9 162:4 167:17 171:14 173:1

**Daniel's** 128:18

**Data** 117:1,10 119:10

**date** 4:7 28:8 165:23

**Davis** 2:14 3:10 7:18 31:18 32:4,10,13,23 52:8, 13 58:25 79:7 114:6,14 128:13,17,25 129:3,4 139:21 141:2 143:19 144:3,5,25 145:25 146:9 152:10 162:13 171:9 172:5,10



**day** 26:12 34:19 39:25
57:23 109:6 111:9,11
112:16 118:14 153:11
155:2

**day-to-day** 26:1,6 56:19

**days** 14:23 18:1 26:11
110:14 117:12,17,19,23
132:14 133:3

**deal** 42:2 160:8

**dealt** 11:21

**Debbie** 1:18 7:9 58:20

**decide** 114:10

**decision** 38:10,14 39:1
40:5 103:3,15,17 105:8
130:22

**decisions** 59:6

**deck** 31:20 37:10 38:15
40:6 48:13 49:14 64:21
68:6,10,12 70:8 71:8
74:11,20 76:10 79:4 80:4,
12,18 118:25 122:8,11
131:12 145:8,10,13 148:4

**Deck/gc390** 118:13

**deckhand** 27:4 57:6,10
83:1,10 84:3 122:8
137:21 151:6,10,15,21
152:2 158:19

**deckhands** 35:22 50:9,13
55:4 71:1 122:4,11 137:3,
5 138:8,11,15 139:4
163:24 164:2,4,8,9,10,12

**Deckload** 118:20,23 119:3

**decks** 70:9

**decree** 8:15

**deem** 130:21

**DEFENDANT** 2:7,13

**Defendants** 1:7

**definition** 27:3 124:10

**degrees** 86:12 87:10
118:7,9

**delay** 131:21

**deliver** 154:22

**demonstrating** 45:25

**denote** 4:3

**density** 51:5

**department** 26:3,4,15,16,
17 107:18

**depends** 26:12 49:13
66:17

**deposed** 8:11

**deposition** 1:9,13 5:22
7:4,10 8:19 9:1 10:13,22
13:6,12 14:12,15 15:3
33:5 40:19 41:1 71:13
115:7 127:19 151:2 157:3
160:12,14,18 166:19,20
167:24 172:18

**depositions** 9:10

**describe** 135:18 137:8
142:2

**describing** 118:14

**description** 4:6 5:2 6:2
119:22,25 135:17 137:2,
10 142:24 144:6

**detail** 36:21

**detailed** 36:18

**details** 11:25 150:25
160:17

**determination** 62:17

**determine** 70:6 90:5
99:22 100:7,10,24 105:20

**determined** 67:12 76:25
90:7

**determining** 95:23

**dictated** 80:11

**difference** 71:11 121:25

**differently** 46:4

**difficulty** 58:14

**dig** 98:19 99:13 102:9

**directly** 101:9

**dirty** 41:23

**disagree** 79:25 81:6 84:23

**Disaster** 1:24

**disciplinary** 41:18,20
43:5,24

**Discipline** 4:11

**discover** 15:4

**discovered** 15:15

**discovery** 14:12 16:10,15,
16

**discuss** 96:24 97:14 98:2
134:3,17 154:10 168:2
173:3

**discussed** 107:10 108:11
111:1

**discussion** 40:3 111:2
112:25 116:17,19 168:11

**discussions** 12:16 40:18
112:10

**dishes** 41:23 42:11 46:2,
15

**dispatcher** 154:10

**disre** 46:11

**disregard** 43:2 45:19
46:11

**disregarding** 46:18

**distance** 170:13

**distinction** 163:4

**distinguish** 162:23

**DISTRICT** 1:1

**DIVISION** 1:2

**dizzy** 143:1



**dock** 30:5,7,12 31:13,15, 17,24 32:7 37:23 48:13 49:17 50:4,21 51:17,18, 20 52:2 130:1 131:12 132:2,3 145:10,11,12 154:8,21 155:3 156:4,8, 17 159:8,10,12 160:1 163:13,17,23 164:7,14 170:25 171:3

**dockhands** 130:1

**docks** 27:21 30:8

**dockside** 155:19,20,21,23

**doctor** 111:14,15,16 112:8 133:5

**document** 4:4 15:2,4,7 16:4,5,8,20 17:7 29:7 45:7,11 107:15,23 108:11 109:9,20 133:12 134:10 153:5

**documentation** 109:10 110:20

**documented** 93:22 94:21 104:2 107:14,25 108:21 109:1,3,23 110:3,24 125:13,19

**documenting** 93:15

**documents** 14:11,18,23, 25 15:19 16:10 28:19 47:6 84:1 87:8 95:3 107:1 147:11,15,17 172:13

**downstairs** 85:5

**downturn** 151:17,20

**DP** 81:25 87:1 147:22

**DP2** 152:8

**drawn** 31:12

**DRILLING** 1:6

**drillship** 86:11,22 87:1,3, 4,10 154:22 160:6

**drug** 88:7,11,13,15 89:23

**dsheppard@ morrowsheppard.com** 2:6

**due** 67:13 103:8

**duly** 1:16

**duties** 56:4 74:4 158:23

**dying** 128:20

**dynamic** 82:2,4

---

### E

**earlier** 34:10 59:13 114:21 131:25 141:21 143:3 146:16 147:19 148:10 160:11,25

**ease** 115:10

**easier** 36:15 115:15

**easily** 104:19

**easy** 107:17

**economical** 57:16

**economy** 151:14

**effect** 46:13

**effective** 91:5,9 92:3,6,9 96:17 99:23

**effectiveness** 104:11

**effort** 79:1

**either/or** 72:18 132:5

**elaborate** 12:4

**electronic** 17:10,11,13,15

**elements** 80:12

**elevated** 68:5,10 70:1 74:19

**eliminating** 123:15

**ELISSA** 152:20

**email** 42:24 45:17 100:19 154:13,15 155:3,4

**emails** 13:22

**Emergency** 1:23

**employ** 156:4

**employed** 23:5 156:9 157:4,6

**employee** 42:25 45:13,18 47:2 63:3

**employees** 50:3,6,7 51:10 125:15,24

**employment** 8:14 152:25

**Encourage** 93:8

**end** 39:25 57:23 60:10 98:14 103:8 106:24 115:15 117:24 136:15,23 141:19 159:24 160:13,20, 21 162:21

**end-of-the-year** 162:18

**Ending** 47:15 114:17

**endorsement** 152:5

**ends** 102:1

**engine** 55:6

**ensure** 31:9 100:2 104:17

**entails** 25:22

**entire** 70:10 74:19 98:20 99:11

**entirety** 71:14 84:4

**Environment** 118:1

**environmental** 4:10,15 5:4,10,16 60:1 99:7

**equipment** 119:11,12 120:18,21

**error** 120:24

**essentially** 130:18 143:4, 10

**estimate** 14:1 114:10 157:12

**ethic** 41:2

**event** 51:3



**eventually** 28:3

**evidence** 47:4 53:21 54:9 70:18 73:3,19 82:24 83:7 86:10,20 150:8

**exact** 4:3 28:8

**Examination** 3:6,10,12,14 8:4 129:2 146:14 162:3

**exceed** 99:8

**exclude** 83:20

**excluding** 22:13 83:12

**excuse** 145:10 146:19 171:22

**exhibit** 4:5,7,9,14,20 5:1, 3,9,15,20 6:1,3,6 33:5,7 43:9,19,20 58:3,4 69:11, 12 90:2,3 97:10,11 98:24 99:1 106:23,25 115:19,21 134:6 137:8 148:14,15 172:1,3,12,15,23,25

**exhibited** 46:1

**exhibits** 4:1

**expand** 9:13 128:9

**expect** 71:5 124:19,22 125:1,5

**expectations** 45:13

**experience** 95:20 157:22 158:25

**experienced** 41:8 151:13

**experiencing** 113:5

**explain** 33:10 130:11 141:4

**Exploration** 134:6

**exposures** 123:15

**extend** 48:1 116:23

**extent** 111:18

**eye** 137:14,23,25

**eyes** 148:3,7

---

**F**

**facility** 30:7

**Facsimile** 2:5,11,16

**fact** 41:6 112:7 152:16 156:12 159:12

**factor** 64:7 67:10 68:16,19 69:14,19 72:20 76:25 77:14,23,24 82:19 84:24

**factors** 24:13 63:8,18,22 64:1 126:15

**facts** 92:22 97:18,19 98:9 153:18

**factual** 148:24 150:16,25 153:6 160:17

**fair** 10:12,13,14 57:18 76:23 78:9 99:12 105:22 115:5 125:13 127:15 143:3 145:19

**fall** 112:3 120:15 144:14, 17 145:17 161:4 165:1

**falling** 144:17 168:22

**falls** 145:18

**familiar** 9:9 71:22 72:2

**fast** 135:20 140:15,19,20 142:1,4,15

**favor** 23:9

**feasible** 122:11,13,18

**Federal** 1:22

**feel** 127:18

**feels** 61:10

**feet** 65:8,13,21,22 68:6 70:5 74:19

**Felipe** 2:4 7:17

**fell** 168:23

**felt** 149:10 158:6 168:11 170:18

---

**field** 156:25

**fighting** 73:9

**figure** 30:21 52:25 101:25 132:10 133:11 144:6

**file** 14:14 15:8,10 16:11 41:17 42:7 47:6 89:12 100:2 102:16 104:18,19

**filed** 12:11

**files** 22:25

**fill** 102:6 134:22,24,25 135:1

**filled** 139:3

**filling** 135:8

**finalize** 168:6

**finally** 46:7

**find** 87:15

**fine** 8:10 70:24 81:13,15 85:3 113:18 114:13

**finish** 13:19,21 72:24 126:9

**five-minute** 42:17 113:17

**fleet** 102:4 162:7

**floating** 162:12

**Floor** 2:15 7:20

**Flora** 1:3 12:5 18:7,10,16 20:9,16,23 40:13,20 41:12,16 42:12,20 45:25 46:10,18 47:5 54:8,10 62:21 67:5 71:23 73:4,20 74:21 75:23 76:14 82:17 83:1,4,9 84:2,19 85:2 87:14 107:11 110:23 112:8,10,25 129:8 130:4 132:12 143:13 144:13 146:5,24 148:4,8,24 149:9,23 151:1,5 152:12 153:7 158:1,6,18 160:5, 17 165:1,7 166:9 169:5 170:4,13,17,18 171:16,24



**Flora's** 17:17 18:4 41:1
57:8 71:13 86:4 88:15
111:3 119:14 139:1
143:3,5 146:17 166:20
167:5,8,15,18,24

**focus** 54:7

**folks** 12:7 31:25 40:18
50:12 55:5 79:4 104:14
110:16 132:2 156:3,8
170:24

**follow** 91:19 95:11 102:18
103:4 105:2,8 123:12
139:14

**follow-up** 129:9

**follow-ups** 162:2

**food** 113:22

**foot** 53:2 66:14 67:6
120:11 157:14,22 169:22

**footage** 36:6

**form** 4:21 12:1,25 13:8
15:3 17:18 18:17 19:18
23:13 24:14 30:10 31:18
32:4,10,13,23 36:23 37:3
39:18,24 40:8,21 41:18,
20 50:1,14 51:11 52:8,13
60:11,24 61:9,25 64:3,12
65:18,25 66:11 67:2,17,
24 69:1,4,5,6,25 73:23
74:6,15,23 76:4 77:2,21
78:2,10,21 79:7,8,24
81:5,12,22 82:18 83:11,
17 84:12,20 86:8 90:14,
15 101:21,24 102:6,8
103:24 104:2,21,22,23
105:2,4,9,10,12,14,25
106:6 109:25 111:4,25
112:12 116:8 121:5,21
122:6,12 125:16,20 126:5
139:13 141:1 143:15
145:21 147:2 149:5
150:5,21 151:18 153:15
157:19 158:12 160:23
162:13 165:9 168:7,9

**forms** 101:10 105:24

**forward** 9:7

**forwarded** 125:14,24

**found** 90:8 92:3,5 96:17,
22 132:25 152:24

**four-page** 171:22,23

**Fourchon** 29:19 30:5,9,12

**fourth** 36:11

**framing** 53:11

**front** 107:18 111:5 115:8
126:17 160:20 168:16

**full** 19:13 72:11 127:14
133:16 152:22

**fully** 10:7 123:18 128:9

**furth** 171:11

**fussing** 112:22

**future** 98:5

## G

**G.H.** 2:14 3:10 129:3

**gather** 18:12

**gathered** 62:20 77:5

**gathering** 68:20,22

**gave** 88:14

**general** 25:15,16,17 26:2
48:9 49:7 54:22 72:6
107:20 109:9

**generally** 9:9 26:23 31:13,
14 48:3,7 53:20 80:6
135:22 136:6,16,20
154:11,16,24,25

**gentlemen** 130:12 141:4
142:3

**get all** 58:21

**giant** 64:24 65:2,7,12,15,
17 66:10

**GIS** 30:12,15,17,22,25
31:1,2 32:2,14 162:8,10

**GIS's** 32:7

**gist** 38:1

**give** 27:24 43:11 48:9
72:6 86:6,22 87:10 97:19
101:11 114:10,24 128:17
138:4 142:6 143:24
157:11 160:12,14

**giving** 95:8

**glitch** 59:3

**GLO** 4:13,19 5:8,14,19 6:7
9:2 11:18 21:9,11 25:15,
25 27:23,25 29:6,12 31:2
32:16 33:5,15 35:6 42:13,
24 43:9,19 45:16 47:6
48:5,15 49:11 50:23 51:2,
9 53:21 55:14 58:2 62:17,
22 63:3,5,8,23 64:1 68:19
69:9 76:1 77:13,22 88:14
89:14 91:4,8,24 92:1,8
93:7 95:3,24 96:24 97:9
98:8,10,15,25 101:13,23
102:18 103:21 104:3
109:19 115:2,5 121:12
123:4 124:1,4,7,19,22
125:1,5,8,15,24 126:3,4,
19 134:13 147:13 164:24
167:25 170:14

**GLO's** 31:8 45:22 46:24
48:15 49:10 52:5 56:10
58:8 60:1 98:4

**GLO-LLOG** 4:23

**GLO/LLOG** 4:8 17:4 30:2
34:5 36:10

**globo** 171:21,25 172:13

**God** 36:5

**Gooch** 2:9

**good** 7:1 42:16 51:7,25
78:14 163:22

**grabbing** 137:14,23,25



**Grand** 2:13 7:18 37:23 129:11,14

**Grande** 129:5

**Great** 115:14

**grocery** 38:6 39:11 131:8 135:21 138:13 141:3 142:2,15

**Growing** 27:20

**guarantee** 113:2

**Guard** 122:7,17

**Guard-regulated** 36:8

**guess** 28:17 45:12 56:5 80:24 105:1 108:10 117:18 119:4 130:20 133:22 159:24 165:5 170:7

**guessing** 112:18,20 128:22

**guide** 135:24 139:10 140:10,12

**guidelines** 38:2,4

**Gulf** 1:10,14 2:7 4:9,14,20 5:3,9,15,20 6:3 7:6,22 8:3,20 9:2 15:18,20 16:2, 13 30:24 50:3,6,7 147:8 148:22 149:1 150:10 151:3 152:12 154:5,20 155:11 156:10,25 158:18 159:3 160:19 171:14

**guy** 41:7 63:7 92:16 110:3 142:6 151:13 168:14

**guys** 18:6 31:20 49:15,20 50:8 51:15,23 64:17,20 65:16 70:8,9,15 71:12 76:21 80:2,4,6 113:17 126:22 128:13,22 135:4 148:11 154:6,16 161:25 163:16

## H

**hand** 56:23 84:6

**handful** 10:24 11:23

**handfuls** 10:23 11:24

**handles** 141:21

**handling** 85:4

**hands** 49:17 140:7

**hanging** 136:24

**hangs** 142:10

**happen** 52:23 69:23 87:16 108:13 124:13 151:11 154:8

**happened** 11:14,15 67:13 72:9 75:24 81:11 83:3 86:14 87:15 112:14 143:4 148:2,25 150:1 152:23 160:19

**happening** 25:4 44:20 48:14 76:3,7,11,16,22 78:7 80:12,13,17 81:2,8 95:5 151:12

**hard** 15:8 44:9 46:8 154:14

**hardhat** 120:10

**Harshal** 2:19 173:14

**hate** 42:4

**hazardous** 123:15

**hazards** 125:2

**He'll** 57:14

**head** 63:7 162:12

**headache** 23:19,20 72:15, 25 73:4,7,21 74:2,12 75:1 79:12,17 120:9,13 126:11 141:25 142:3,9,10,14 143:10 144:13 146:4 149:11 150:1 164:25 168:12,22 170:3,13

**headphones** 128:18

**heap** 151:24

**hear** 29:9,10 82:23 88:17 128:13,22

**heard** 58:24 169:5

**hearing** 130:25

**heave** 141:25

**heaved** 167:9,16

**heaving** 149:23

**held** 100:8

**helped** 73:2

**helpful** 54:5

**helping** 26:13 51:24 62:8

**hereto** 1:25

**Hey** 64:16,17 65:16 70:15 71:12

**hiding** 97:24

**high** 58:16 59:10

**higher** 143:9

**highlight** 134:1

**highlighted** 44:2 58:11 59:14 91:24 99:3

**hire** 55:11,14,19 123:1

**hired** 29:14 151:5,21 158:18

**hiring** 151:7,8

**hit** 72:15 73:7 79:17 81:25 120:9

**hitch** 117:12,17,20 132:17,21 152:22

**hitches** 152:11

**hitting** 140:1

**hold** 57:10 83:11 139:24

**holding** 64:20 70:24 72:14,18,22 78:14 81:13



**holds** 106:15 107:2 108:2

**home** 42:25 45:18 133:1,5

**honest** 29:1 91:13

**honestly** 26:10 96:20 122:7,25

**hook** 72:15,18,22,23 141:9,10,11

**hooked** 169:11

**hooking** 21:23,25 22:2 72:12 73:15,20 138:12 141:3 142:11

**hooks** 142:12

**horizontally** 53:17

**hospitalization** 124:11

**hour** 18:5

**hours** 14:4,5,6,7,8 117:12, 19 118:13

**housekeeping** 114:22 118:4,19

**Houston** 1:2,21 2:5,15 7:11,16,17,20 133:2

**huge** 66:16

**hurricane** 153:1

**hurt** 82:15,17 84:17,19 85:13,19 86:2 87:22

---

**I**

**idea** 32:8 48:9 72:6 93:9 97:13 119:1

**identified** 91:4,8 92:8 149:25

**identify** 99:17,19

**Illness** 134:20

**imagine** 27:16

**implement** 123:11

**implementing** 56:10 60:1 123:7

**importance** 18:15,20 117:15

**important** 98:8,9,10 100:11 124:17 126:3

**improvement** 104:7

**inception** 13:1 19:5

**incident** 4:22 6:4,6 18:13 20:6 21:9,10 62:13 63:9 64:7 69:17,22 70:7 71:24, 25 74:22 75:23 77:3,5,25 86:14 87:13 88:23 89:18 95:9 96:2 104:15,18 107:10,21 110:22 111:3 112:14,25 117:3 118:17 119:6,18,22 120:4 121:12,20 126:4 132:11 133:7 134:11,19 135:19 137:1,9,10,11 138:25 139:2 142:25 143:4,21 146:20 147:7,12,21,24 149:10,24 152:13,17 153:12,20 157:7 160:13, 15,19 165:16,22 167:11, 18 170:2 171:15,21,23 172:3,11,23

**incidents** 96:7,8,11,15 108:5 109:14

**include** 52:10 89:16 95:15 107:6 132:7

**included** 149:19

**includes** 13:22 67:21 88:4 108:3

**including** 108:6

**independent** 112:18,23, 24

**INDEX** 3:1 4:5 5:1 6:1

**indicative** 170:3

**industry** 138:3

**inf** 68:22

**info** 23:7

**information** 18:21,25 20:21,22 22:21 62:20 68:21,23 77:5 84:25 85:1 117:16 118:2,3,11 135:3 138:4 148:2,6,7,25 149:12,16,18 150:3,9,17 151:2 153:6,12 155:11,24 156:6 160:20 161:1 163:7 164:23 165:3,6 166:2,8 167:25 168:2,5 169:6 170:14,17

**infraction** 41:24,25

**infractions** 42:12

**initial** 16:6,11 143:14,16, 22 147:13 164:13 165:11, 15 166:7 170:25

**injured** 12:7 54:8,10 64:11 79:18 92:20 124:8 158:1

**injuries** 8:21,24 11:11,14 108:4 109:21

**injury** 5:5 91:5,9 92:4,6,9 97:1,15 101:3 103:23 107:7 124:11 125:9

**injury/illness** 134:20 137:10

**input** 38:22 39:14 48:25

**inspection** 159:14 163:12, 15 164:13

**instance** 1:15

**Instructions** 134:14

**intended** 143:11

**intends** 66:25

**interested** 93:23 95:4

**interesting** 96:22

**internally** 100:20

**interrupt** 75:16 110:11

**interviews** 88:20

**investigated** 123:18



**investigating** 91:5,9 92:4,
6,9

**investigation** 5:6 16:7
87:24 88:1 89:15 121:2,3
146:18 147:13 165:12,15

**investigative** 148:21

**involve** 11:14

**involved** 26:11,19 46:1
64:9 66:18 67:19 75:23
82:10,14 110:9,13,16
111:5 118:4,20 119:5
120:18,22 123:1 129:11
131:25

**involving** 47:5 79:12
87:14 107:10 109:21
110:22 111:3 112:10,25

**Isle** 2:13 7:18 37:23 129:5,
11,14

**ISM** 102:5 161:2,5,11

**issue** 26:14 36:24 76:18
85:5

**issues** 118:4,19 173:3

**item** 36:11

**items** 165:10

———————

**J**

**JAKE** 120:19,22

**James** 19:22,23 21:2
22:13,17 34:2 38:18 42:8
120:1,3 146:21 148:1
153:20 157:2 169:3

**James'** 147:20

**jdavis@brownsims.com**
2:16

**jeopar** 97:21

**jeopardize** 97:3 98:4

**job** 17:15 25:22 35:5 38:1
50:2 61:11,15,16,20
64:20,21 73:12 78:15,18

85:4 124:2 143:5 159:2
160:10 168:18 170:18

**Jody** 34:3 38:19

**John** 2:14 3:10 7:18 114:4
129:3,4 137:6 171:7,8
172:9

**journey** 164:3

**Jr** 1:9,13 3:3 8:1,7

**JSA** 117:6,7 171:23

**jumped** 41:19 114:1

**jury** 130:12 131:4 136:2
138:1,5 141:4,17 142:3
151:1 154:4

———————

**K**

**Kaliste** 2:10 7:23

**kicked** 113:6

**kind** 9:5,7 29:24 46:3 47:2
52:4 53:11 62:4,7,9 72:7,
15 76:20 108:18 110:19
114:1 131:8 136:3 151:24
173:3

**knew** 73:25 74:2,7 75:17

**knots** 118:8,9

**knowledge** 26:2 116:2
132:17 133:9 157:15

———————

**L**

**lack** 83:2

**ladies** 130:11 141:4 142:2

**Lafayette** 1:22 2:10 7:8,23

**Lagarde** 1:9,13 3:3 7:5
8:1,6,7,9,11 47:19 114:23
129:4 146:16 149:8
157:24 161:16,19

**land** 139:18

**large** 36:2 41:24 52:24
169:14

**larger** 119:18 165:21
169:19 170:1,4,11

**lawsuit** 17:17 18:4 24:10
98:5 130:4

**lawyer** 9:14,19 10:16
12:16,18,24 14:15 15:11
47:22 116:14 139:7
146:17

**lawyers** 22:14

**lay** 97:18

**leadership** 58:17 59:11

**learn** 41:1,4,11 126:4

**learned** 4:21 24:14 40:20,
23 90:11,17,22,24
100:14,18 119:21 125:13,
14,19,23 126:6,14 160:15

**leaves** 159:12,25

**leaving** 163:17 164:13

**ledger** 88:5 89:6,17

**Lee** 110:14

**left** 41:23 44:14,15 113:25
162:5 163:13

**legal** 97:3 98:4

**Legalview/zoom** 1:11,20
7:7

**legible** 134:2

**lessens** 90:24

**lessons** 4:21 24:14 90:11,
17,22 100:14 119:20
125:13,14,19,23 126:3,6
160:14

**Lester** 19:22,23 20:14
21:2,18 34:2 38:18 46:5,6
70:20,25 120:1,3 146:21
153:20 157:2 169:3

**letter** 100:19

**level** 26:20

**Lexitas** 2:19



**license** 41:8 55:25 56:1,2, 3 152:1 158:21,22

**lifeboat** 36:11,13,16

**lift** 23:19 40:1 72:25 131:23 137:18 139:16,17, 23,24 140:8 141:22 142:1

**lifted** 135:23

**lifting** 130:15 146:1

**lifts** 33:17 34:6 35:11 37:8,9,10 38:13,15 49:16 130:7 157:25 170:22

**light** 24:9

**limited** 108:4 153:22

**limiting** 62:9

**lines** 21:23 22:2 23:18 71:2 72:11,12,13,24 73:15 130:18,21 131:6 135:20,21,22 136:21,24 137:3,5 138:9,11,16 139:4,15 140:16,19,20

**list** 23:14

**listed** 24:20 34:21 67:9 165:10

**Listen** 93:1

**LLC** 1:10,15 2:8,13 7:6,19, 22 8:3

**LLC's** 5:20

**LLOG** 2:8 6:6 7:23 15:19 19:11 21:9 28:20 30:4,8, 11 36:11 134:6,24 135:14 142:24 156:23 165:4 170:24 172:3,10,23

**LLOGS** 156:16

**LLP** 2:4

**load** 30:25 31:3,9 32:1,24 37:22 38:5 39:9 48:6 49:18 51:20 52:3 126:11 135:24 137:15 140:12

**load-out** 49:8 154:11

**loaded** 31:7,16,17 32:5 48:5 49:11 50:4 51:17 130:14 131:11 145:2 154:9,21 155:12 159:14

**loading** 30:17 31:20 32:18 39:3 49:19 129:12 155:16,23 156:3,19 170:25

**loc** 16:5

**locate** 14:23

**located** 1:21 7:8,13,16 16:5,9 145:7

**location** 37:24 155:4

**log** 4:7 16:19,21 17:5,8 30:2 32:14,17,20,22 33:2, 15,16 37:19 51:2 55:3

**Logistics** 1:10,14 2:7,8 4:9,14,20 5:3,9,15,20 6:3 7:6,22 8:3,20 9:2 15:18, 20 16:2,13 30:24 50:3,6,7 147:9 148:22 149:1 150:10 151:3 152:12 154:5,20 155:11 156:10 158:18 159:3 160:19 171:14

**Logistics'** 156:25

**logs** 16:23 17:9,14 33:14

**long** 13:14 14:1,3 18:7,10, 15,18 19:2,8 27:23 42:20 82:1,4 116:19 152:21 157:12 167:1 169:22

**looked** 117:2 142:23

**loop** 2:15 7:19 136:24

**looped** 136:7,11,13,14

**loose** 136:24

**lost** 83:24

**lot** 26:11 39:4,10,11,12 49:17 63:14 114:4 116:5 123:1 131:9 154:13 155:3,8,10 167:23

**Louisiana** 1:22 2:10 7:9, 24 12:11 30:5,9

**low** 72:10,14

**lower** 23:19 142:20

**lowered** 72:11

**lunch** 113:23 114:11

---

**M**

---

**M/v** 120:19,22 135:20

**machine** 1:19

**made** 21:13,14 36:22 41:15 62:17 63:18 67:4,6 71:11 100:24 103:3,15,17 105:7 111:6,7 115:23 120:14 121:13,22 127:22 136:6 152:22 156:21,22 163:18 170:24

**MAGGIE** 16:20 17:12 18:8,11,16 19:2,9,16 30:17 31:3 32:1 33:3 34:19 35:3,16,17 50:2,25 54:8,10,14,17 57:7 68:5 86:6,21,23 87:10 120:23 121:19 122:3 123:21 135:20 146:19 155:16 159:12 160:6 162:17 171:1

**magnifies** 44:21

**maintain** 51:2 60:22

**maintenance** 26:3,15 27:21

**major** 96:7,8

**majority** 11:12,13 154:7

**make** 9:15 10:13 15:17,22 33:23 38:11 39:1 41:12 49:21,22 51:6,14 52:4 59:6 60:5 62:5,8 69:10 78:5 86:12 87:15 90:1 95:12 97:10 98:24 101:18 105:8,11 106:23,25 123:23 126:20 127:18



128:7 155:12 156:12
159:17 163:21 166:2,22
168:2 169:22 172:22

**makes** 38:14 72:19
104:17 122:8 130:22

**making** 51:25 52:10
106:22 143:8

**man** 40:16 135:14 139:12

**management** 4:10,15 5:4,
10,16,17 26:20 90:11
99:7 101:21 106:3

**manager** 17:19,22 25:15,
16,18 26:13,14 28:5
76:23 77:13,21 96:5
110:15 123:10

**manager/operations**
25:16,17

**manifest** 28:21 29:2,13
35:9 39:14 153:25 154:2,
5,10,21

**manifests** 29:5

**manipulative** 126:25

**manner** 4:2 95:16

**manual** 4:11,16 5:5,11,17
43:6 58:9 91:22 98:18
99:11,23 100:25 102:9,
12,22 103:5,9,21 105:16,
18,19 160:25 161:1,7,10
162:6,22 163:3

**Manuel** 34:3 38:18,19

**March** 1:11,17 7:2 16:4

**maritime** 125:9

**mark** 1:3 20:9,10,11
23:16,23 24:1 33:4 43:8
58:2 72:14 73:24 74:2
75:5,23 81:24 83:4 85:2
120:10 148:11,24 149:9,
23 151:1,5 153:7 160:17
171:14,17,20,24,25
172:9,11

**marked** 30:2 33:7 43:20
58:4 69:12 90:3 97:11
99:1 115:21 134:6 153:25
172:6,8,15,25

**marking** 115:15

**master** 4:7,16 5:11 16:19,
21 17:5 30:2 32:20,22
33:2 39:15,22,25 40:7
48:15,20 49:3,11 52:4
55:3,10,21,24 56:4,9,13,
17,24 57:15,19,24 58:9,
13,16 59:5,10,15,19,25
60:7,10,16 61:21,22 64:8,
10 67:22 71:6 76:10,13
78:6,11,13,17,19 79:5,11,
16,20 81:19 84:3,10 86:5,
11,21 87:9 96:23,24 98:2,
17 99:10,19,22 100:1,6,
13,23 101:2 104:8,14
106:3 120:4 151:15

**master's** 5:17 40:4 55:25
56:2,3 58:11 99:6 101:21

**masters** 55:19 97:13
103:22 105:8 125:2

**mate** 55:8,10,21 56:3

**mate's** 56:1

**material** 31:17

**materials** 14:11 29:14
30:18,25 31:3,7,10,16
32:18 49:10 52:16,17,20
53:5,22 54:7,9 101:6,8

**mates** 55:11,14,23

**matter** 11:20 131:23

**means** 10:9 33:2,10,12
34:14 36:12 42:25 45:18
65:6 68:11 90:8 123:14
127:11 130:6,12 131:5
140:9 144:12

**meant** 114:21 119:2,4
120:23 159:25

**meantime** 72:13

**measure** 69:22

**measurement** 65:25

**measuring** 65:23

**mechanism** 142:11

**mechanisms** 130:15

**Meche** 2:9 3:12 7:21 12:1,
25 13:7,8,11,19 14:1,11,
25 15:16 17:18 18:17
19:18 23:4,13 29:8 30:10
36:23 37:3 39:18,24 40:8,
21 42:16,22 43:11,15
44:7,13,20 45:2 47:11
50:1,14 51:11 60:11,24
61:9,25 62:10 64:3,12
65:18 66:11 67:2,17,24
69:1,4,25 73:23 74:6,15,
23 76:4 77:2,15,19 78:2,
8,10,21 79:8,24 81:5,12,
22 82:18 83:11,16 84:12,
20 86:8 91:14,16,19
98:13,16 101:8,11,14,17
103:24 104:22 105:4,10,
25 106:6 109:25 111:4,25
112:12 113:18,24 114:4,
8,15 115:14,18 121:5,21
122:6,12 125:16 126:5
127:9 146:12,15 147:4
148:11,15 149:7 150:9,
13,16,23 151:23 153:19
157:24 158:16 160:24
161:23 165:9 166:14,18,
24 167:17,21 168:9
171:7,13,20 172:9,12,16,
21 173:1,8

**Medical** 117:3

**medium** 169:14

**meet** 109:13

**meeting** 26:14 27:12
93:20 100:3 107:19,23
108:2 109:3 110:21,22
112:4

**meetings** 26:8 100:7
106:16 107:3,5,15 108:3,



10,22 109:11,15,21
112:11 113:1

**mem** 66:3

**member** 27:8,16 28:7

**members** 48:15 49:25
52:3 55:5 61:23 66:3
100:14 124:23 125:15,24
159:3

**memo** 100:20

**memory** 112:23,24 152:7,
25

**mention** 24:15,22 67:6
165:18

**mentioned** 25:1 71:4
143:17 160:25

**mentions** 165:17 169:4

**merit** 93:2

**message** 173:16

**messing** 173:15

**met** 40:15 45:13

**mind** 47:12 59:3 98:14
114:9 117:23

**mine** 115:15

**minor** 41:25 42:1

**minute** 128:21

**minutes** 15:2 47:11 114:7
116:20

**Mischaracterizes** 105:5
150:6

**miscommunication**
142:19 144:22

**mishear** 94:24

**Misleading** 147:3

**misreading** 144:8

**misses** 109:22

**modify** 48:1

**moment** 138:25 147:21

**moments** 153:4

**money** 26:18 124:4

**monitor** 59:15 133:13

**monitoring** 74:10

**month** 18:12,13 106:16,19

**monthly** 100:13,16 108:21
109:21 110:21 124:13

**months** 99:9,11

**morning** 7:1 28:22

**Morrow** 2:4

**move** 9:7 45:3 52:21 53:7,
8 86:11,22 87:3,10

**moved** 28:4 86:5 145:2

**moving** 52:17 78:24
153:24

**muscle** 73:11

**mute** 171:9

## N

**names** 12:7

**nature** 154:11,19

**navigation** 49:23 56:25
57:1,16 59:20

**nec** 130:20

**necessarily** 4:3 74:16
130:20

**needed** 40:11 49:21 73:1
78:15 108:5 128:4 164:23
165:14 166:2 167:24
168:3,6 170:2,11,12

**negative** 163:2

**night** 49:6 50:19 51:18
130:1

**nonresponsive** 41:10
61:5,19 73:17 77:8 83:6
85:17 109:18 144:4,24

**norm** 65:6,10,19

**note** 4:1 29:21

**noted** 64:6 77:4 90:25
125:25 126:2

**notes** 15:10

**noth** 41:18

**notice** 5:21 14:15 115:8
159:6

**noticed** 71:6 120:17

**notices** 61:21 64:8

**number** 4:6 5:2 6:2 7:9
64:7 65:7 66:10 69:14
98:13 102:14 117:16
123:4 157:21 172:1,12

**numbered** 1:17

**numbers** 5:23 6:5 66:13
157:18

## O

**object** 19:18 32:10 41:9
61:4,19 73:17 75:14,19
77:7 78:8 83:5 85:17
109:18 141:1 144:2
145:21 150:5,21 151:18
153:15 157:19 158:12
160:23

**objection** 9:15,20 12:1,25
13:8 17:18 18:17 23:13
30:10 31:18 32:4,10,13,
23 36:23 37:3 39:18,24
40:8,21 50:1,14 51:11
52:8,13 60:11,24 61:9,25
62:5,11 64:3,12 65:18
66:11 67:2,17,24 69:1,4,
25 73:23 74:6,15,23 76:4
77:2 78:2,10,21 79:7,8,24
81:5,12,22 82:18 83:11,
17 84:12,20 86:8 103:24
104:22 105:4,10,25 106:2
109:25 111:4,25 112:12
121:5,21 122:6,12 125:16



126:5 139:13 143:15 144:24 147:2 149:5 150:15 162:13 165:9 168:9

**objections** 5:21 115:12,23

**obligation** 158:11 172:17

**observes** 160:6

**obtain** 135:2

**occur** 147:24

**occurred** 18:14 138:25 149:10 152:17 157:7

**occurrence** 93:9 109:17

**offhand** 12:9

**office** 15:9 17:25 42:25 45:18 46:8 47:3 97:17 107:18 108:2 173:2

**officer** 59:23

**offices** 7:19

**offload** 118:22 135:21

**offloaded** 145:4

**offloading** 121:14 145:7

**offshore** 27:17,18 92:16 145:12 146:18 151:14 154:12 155:5

**oil** 171:4

**onboard** 35:6 49:10 51:16 54:8,10 56:10,15,21 58:17 59:12 60:2,6,12,18 100:3 121:16 158:15 159:13

**one-page** 171:24

**op** 84:10

**open** 33:6 158:20

**operate** 38:5 66:4,17 67:19 68:17 85:6 156:9

**operated** 144:23

**operating** 1:10,14 2:7 4:9, 14,20 5:3,9,15,20 6:3 7:6,

22 8:3 16:3 78:13,14 81:9,15 147:9 150:10 156:10,20 157:17 159:3 171:15

**operation** 32:18 48:21 49:4,9 60:10 61:7,8 71:7 76:10 79:20,22 80:11 81:20 82:11,15 84:4,11, 16 121:16 122:16,20 125:2

**operational** 28:4 108:7

**operations** 25:19 26:2,6 27:2 58:9 61:23 64:10 78:24 79:11 86:14 96:5 100:11 106:16 107:3,6,9 110:17 123:10

**operator** 23:22 24:2 38:9, 25 48:16,18 73:12 75:7 80:7 83:4 135:19 137:2 138:8,10 140:15 143:24 156:4

**opinion** 42:1 126:24 142:7,17 149:20 150:18 160:12

**opinions** 153:5

**opportunity** 12:17 47:21 116:13 127:15 167:4

**opposed** 126:11

**Oral** 1:8,13 5:22

**order** 1:23 64:10 72:3 135:21 164:23 165:7 166:9 167:25 168:6

**orders** 35:4

**out.'** 65:17

**outcome** 111:20 112:9

**overhead** 97:2

**overheard** 97:20

**override** 39:22

**OVERRIDING** 58:13 59:5

**oversee** 25:19 26:1

**overseeing** 26:5

**owner** 31:17

## P

**p.m.** 1:18 3:7,8,9,11,13,15 47:15,16,18 114:17,18,20 173:18

**Pages** 4:12,18 5:7,18

**paid** 30:25 31:1

**paper** 103:20 129:16

**par** 52:5

**paragraph** 44:3 92:2 102:13

**parentheses** 117:8

**part** 29:13,14 35:5 38:12 57:2 78:4 79:4,6,9 80:9, 11 96:6 99:24 102:12 112:10 116:21 117:10 118:2 130:25 135:17 141:19 143:7,11 155:15 159:15 163:21 165:14 167:25 170:9 171:2

**parts** 80:9

**pass** 128:12 161:23 171:6

**passage** 43:7

**passenger** 35:25 36:3,4

**passenger's** 35:25

**passengers** 34:7,13,17, 18,24 35:2,11,13,22,23

**past** 14:23

**Paul** 21:23

**pause** 10:9 58:20,25 62:5

**pay** 31:2,5

**payment** 129:16

**PC** 2:14



**people** 32:14,15 35:6 36:8 53:5 64:11 66:14 68:17 76:2 117:11 121:15,19 122:3 123:1,24 148:4 156:13

**percent** 11:6 30:14

**percentage** 11:11

**perform** 56:4 88:1 103:16 164:5 168:3

**performed** 30:17 95:16 99:7 164:12 170:25

**performing** 74:4 163:12

**period** 100:4

**periods** 99:8

**person** 8:22 31:9 33:24 41:13 68:18 84:17 92:21 110:9,13 117:17 120:18, 21 122:19 135:8 137:10

**personal** 11:11 58:16 59:11 119:12 134:20

**personally** 22:9 40:13 66:6 71:22 96:1 103:14

**personnel** 26:2,13 28:3 41:17 47:5 49:24 110:14, 17 134:20

**persons** 87:7 93:23 95:4

**phone** 20:13,14 100:19

**pick** 40:17 73:12 131:7,8 162:5 168:14

**picked** 75:12 130:19

**picking** 145:15

**piece** 160:7

**pieces** 150:16 151:2

**place** 23:12 38:25 48:21 49:9 71:8 74:11 81:21 82:11 86:24 118:14,17 121:16 124:20

**places** 136:21

**Plaintiff** 1:4,16 2:2 7:16 130:4

**Plaintiff's** 5:21

**platform** 78:25 145:19 154:22

**play** 76:25 77:14

**point** 9:23 42:17 43:7 48:19 49:16 60:13 64:22 67:22 68:1,21 70:6 73:2, 13 74:12 75:6,13 77:12 112:20 127:19 133:1 145:14 157:7 160:7

**policies** 56:10 60:1 105:20 121:13

**policy** 45:22 46:24 97:13 98:8,10 102:18,22 105:14,17,23 106:3,7 109:19 125:6 157:16

**polite** 128:2

**pollution** 59:7

**pop** 43:13

**port** 53:18

**portion** 10:3 91:25 113:8 169:11

**portions** 71:16 134:2

**position** 55:8 86:5,22 97:3 129:20 151:10,16,21 152:2,17 158:19,20

**positioning** 82:2,5

**positions** 98:4

**possibly** 95:17 106:12 126:10 139:25

**post** 89:16 159:22,23

**post-incident** 26:7

**post-voyage** 159:16

**postaccident** 88:4 89:6

**PPE** 119:12,14

**practical** 88:1

**pre** 87:1,2

**pre-approach** 87:2

**pre-sling** 159:3

**pre-slinging** 132:7 159:2

**pre-slung** 130:5,8,13,22 131:5,12

**pre-voyage** 159:19

**precisely** 36:21

**preparation** 13:3,5,12 14:12

**prepared** 12:4 40:19 63:23

**preparing** 26:15 40:25

**present** 15:12

**presented** 172:4

**presumptively** 144:9

**pretty** 18:1 22:7 64:21 68:13 97:7 133:13 167:14

**prevent** 52:17 64:11 76:24 95:5

**preventative** 69:21

**prevented** 23:11 25:2 75:25 76:2,6,10,15

**preventing** 93:9

**prevention** 107:6,7

**preventions** 59:7

**prevents** 53:16

**previous** 137:15

**prior** 15:2 86:13 135:18 137:9

**prioritize** 124:4

**priority** 123:4

**prob** 89:20

**probable** 68:23 69:2,16 77:24

**problem** 11:8 47:1,2 76:5



130:24

**problems** 41:15 43:2 45:20 46:1,11 47:5 88:18

**proc** 138:9

**Procedure** 1:23

**procedures** 108:6,7 109:22 121:13

**proceed** 116:12 129:1

**process** 48:4 72:12 137:5 138:12,17 139:6,8 140:21 145:1,3

**processes** 31:8

**produced** 1:15 15:2,9,14, 20,21 16:4 24:6 28:20 101:7

**product** 166:13

**professional** 58:17 59:11

**program** 6:6 123:7,12 134:11 172:3,24

**prohibition** 157:16

**promoted** 152:16

**proper** 133:12

**properly** 52:21

**proportion** 116:25

**protective** 119:12

**prov** 162:8

**prove** 129:17

**provide** 23:6 25:23 45:17 58:17 59:11 129:18 134:25 149:1,18 150:3,9, 17 156:6 163:3

**provided** 8:25 14:20,22 28:25 29:6,12 142:24 149:12,15 151:1,3 153:7 154:20 160:17 166:3 167:25 169:6 170:14

**provisions** 1:24 162:7,8, 15,16

**proximity** 146:4

**publicize** 95:19 96:14

**publicized** 95:20,24 96:2

**pull** 16:24 31:15 54:15,19 58:2 73:9 89:14,25 101:22 115:9 116:6,7 133:11

**pulled** 30:1 73:11

**pulling** 33:2 104:3

**purchasing** 26:4,17

**purpose** 35:2 169:9

**purposes** 54:6

**pursuant** 1:22

**put** 9:19 32:21 33:9 37:15 38:10 39:20,22 49:1,19 64:2 90:17 101:14 120:23 135:22 157:18,21 170:12

**puts** 48:13 171:18

**putting** 39:21 71:1 136:1 140:7

## Q

**quantify** 62:1 65:12,20 66:9

**quarter** 35:25 36:1,4 108:1

**quarterly** 108:3,10,21 109:11,20 110:21 112:3, 11 113:1

**quarters** 35:16 54:14,18, 23

**ques** 77:6

**question** 8:17 9:5,14,18 10:1,8,18 12:3,15 13:4 18:20 19:1 21:19,20 28:18 49:2 53:11 54:3,6, 22 64:23 65:14 72:8 73:19 83:18,23 85:23 91:21 92:7 105:6 106:1

128:1,8 131:3 132:23 154:15 156:2 163:1,9 166:24

**questions** 8:5 40:13 42:20 110:20 126:24 127:15 129:3,9 146:12,15 152:11,14 159:1 160:11 162:4 164:22 171:12

**quick** 89:15

**quickly** 173:2

**quotations** 4:1

**quote** 4:3

## R

**radio** 84:6

**radioed** 71:1 76:21

**rail** 73:5,22 74:3,13,21 75:2 120:14 126:12 144:16,21

**raises** 144:10

**Ralph** 1:9,13 3:3 7:5 8:1,7 172:16

**Randy** 16:12 17:23 63:1,3, 7 95:25 106:12 109:4 110:4 125:20 148:17,19 149:16 150:10

**rapidly** 88:1

**reach** 140:6

**read** 4:2 29:2 45:8 46:3 58:10,23 62:15 71:13,16, 19,20 72:16 73:6 81:18 91:22 92:4 93:3 96:16 97:4,6 99:5 133:17 138:20 140:18,24 165:5, 11 166:20 167:3,5 168:21 172:17

**reading** 45:5,7,8,11 59:4 87:12 91:16,20 101:9

**reads** 135:17



**ready** 64:17 128:25

**real** 89:14

**realize** 130:9

**reason** 10:16 24:22,25 36:17 55:14 89:13 90:16 159:6

**reasonable** 121:18 122:2, 4,15

**reasons** 80:20 84:13 98:1

**reattached** 138:21,24 139:20

**recall** 11:17,25 13:11,14 63:24 77:20,25 87:12 96:1 111:2,10,12,22 112:10,16,17 132:14 153:25 154:2

**receive** 29:17 154:8

**received** 15:19 43:1 45:19 46:12

**recenter** 23:22 72:24

**recentered** 126:10

**recess** 47:16 114:18

**recollection** 11:20 112:18

**recommends** 93:8

**record** 1:25 4:3 7:3,13 17:3 47:14,18 88:20 106:21 113:12,15,20 114:9,16,20 134:12 155:13 172:14 173:7,9, 10,17

**recorded** 88:22 89:1

**records** 17:13 35:7 37:18 117:4

**reduce** 58:15 59:9

**referring** 16:20 43:5,6 129:24 143:19

**reflected** 4:2

**reflecting** 108:8

**regard** 155:22

**rehook** 159:10

**related** 8:21 11:11 117:16

**relevant** 117:25

**relief** 153:1

**remain** 82:13

**remark** 33:23

**remarks** 33:9 34:7 36:18, 22 37:2,7

**remember** 8:24 11:7,19 12:6,10 19:12 22:9,16 31:6 41:20,22 71:21 77:14 107:13 151:12,22 152:13 153:2,8 165:5,16

**remembered** 20:9 22:5,6

**remembers** 20:18 21:22 77:17,19

**remind** 54:13

**reminded** 41:6

**remotely** 1:11,20 7:7,10

**removed** 137:3,13 138:8, 11,15,18 139:4,6,11 140:20

**removing** 137:5

**repair** 26:17

**repeat** 131:2,3

**replies** 102:25

**report** 6:4 16:3 21:4,5,6 22:7,10 43:5 47:2 63:11, 19,23 64:2 67:7 73:6 89:7 95:8 96:25 97:15,16,20 98:3 103:8 104:15 121:6 134:19,21 135:8 142:25 143:18,19,21 146:20 147:12,20 148:17,20 150:13 162:18 165:7,17 166:4,7,9 167:11,18 169:7 170:1,10,15 171:15,22,23,24,25

**reported** 1:11,19 46:21, 24,25

**REPORTER** 7:4 58:23 115:20 148:14 161:15,18, 22 171:19 172:4 173:11, 14,17

**Reporter's** 3:16 4:1

**reporting** 5:5 6:6 7:10 134:11 143:16,17 172:3, 23

**reports** 21:7,9,10,12,13 26:7 89:18 97:2,22 100:3 101:3 103:23 104:18 107:21 117:3 139:2,3 143:5 147:7 148:21 163:5

**reposition** 73:13

**represent** 129:5

**representative** 1:10,14 7:5 8:2

**representing** 7:21 15:18, 23

**repurpose** 106:22

**requested** 133:4

**requests** 16:10,16

**require** 102:6 103:4,6,10, 15 126:19 158:20 162:17 166:8

**required** 36:19 42:25 98:17 99:10,19,22 100:1, 7 103:22 104:7,8 122:17 158:22 159:13

**requirements** 52:6

**requires** 79:1 102:7 104:13 134:24

**requiring** 124:11

**research** 66:22

**reserve** 161:24

**residence** 1:20 7:11



**respect** 59:6 132:11 154:5

**responses** 14:12 16:15

**responsibilities** 4:17 5:12 58:9 59:15 60:4,15

**responsibility** 28:3 40:5 56:16 57:22 58:14 59:6 60:5,19,20 61:7,13 78:19 123:6,11 125:4

**responsible** 25:24 56:9, 13,24 57:15,19,25 59:25 60:7 156:19 163:12

**responsive** 16:10

**rest** 161:24

**result** 126:4

**resulted** 143:10

**results** 133:6

**return** 133:6

**returned** 102:15 132:20

**reusing** 106:25

**review** 5:18 33:13 86:4,9 90:11 98:18,20,22 99:6, 10,15 100:13 101:3,21 102:14,16 103:8,11,16,22 106:4 108:4 162:18

**reviewed** 14:11,14,19 21:4 82:25 83:8 84:1 87:8 107:22

**reviewing** 26:7 77:20 78:1 102:11

**revisions** 108:6

**rig** 130:22 137:17 159:8,9

**rigged** 129:25

**rigger** 50:11 72:5 140:6

**rigger-certified** 51:16

**riggers** 49:14,20,24 85:5 129:25 135:23 139:23 155:15 159:6,13 163:8, 11,15

**Riggers/deckhands** 163:16

**rigging** 31:21 48:18 49:14 50:12,16,18,25 51:8,9 72:1 80:4 132:1,7,10 159:14 163:8

**ring** 130:19 131:7

**rise** 144:14 145:17

**rises** 145:18

**risk** 117:3,5 164:24

**Road** 2:10 7:23

**rock** 61:22 64:9

**rocking** 60:9 61:8,10 84:11,16

**rogue** 66:19,20,23

**role** 26:9 28:1

**room** 40:16 55:2,6

**rooms** 35:18

**root** 4:20 15:3 24:5,10 62:13,16,23,25 69:10 76:24 77:4,21 84:25 89:8, 18,22 116:7 117:1 121:3 125:12,19 126:15 148:11, 16 149:1,19,20 150:11,19 153:5 165:20 168:1,6

**rope** 23:20 136:6

**rough** 52:19 61:10,14 66:5,15 67:19 85:2 157:12

**routine** 33:20

**routinely** 42:6

**rude** 29:23

**ruin** 113:23

**rules** 1:22 9:9 42:3,23 45:16 105:1,8

**run** 31:23 32:1 38:8 55:10, 11,21

**running** 55:23

**rush** 124:1

---

## S

**S-E-P-U-L-V-A-D-O** 135:9

**safe** 16:12 56:25 57:1,16 123:14 124:19

**safer** 86:12

**safest** 130:21

**safety** 4:10,15 5:4,10,16 16:13 17:19,22 26:3,8,14 28:2 52:5 56:10 59:6,22 60:1,22 63:5,7 68:18 76:23 77:12,21 93:20 99:6,15 100:3,7 107:6,9 108:2 109:11,15 110:3,17 123:3,7,11 124:5

**sales** 26:16

**Saloom** 2:10 7:23

**SAMM** 4:7 16:19 17:5 30:2

**San** 2:4 7:17

**scene** 92:12

**scope** 130:23

**Scott** 135:8

**screen** 16:25 17:1 43:14, 22 44:8,19 45:4 58:6 81:25 82:5 88:7,11,14,15 89:14,23 90:19 101:15 116:8 133:11 147:22

**screens** 29:23 171:10

**sea** 66:7 67:4,14 68:16,19 69:3,18 70:1,6,10,12,22 71:7 76:25 77:13,22,23 78:13 80:16,23 81:2,8 86:7 152:9

**Seabulk** 20:18

**Seadrill** 29:15 30:18 34:24

**seaman** 41:8

**searched** 16:9



**searching** 20:24

**seas** 25:3 64:19 66:3 68:15 76:19 86:23 87:11 157:21 158:5

**seat** 36:3

**seating** 36:5,7

**section** 4:12,18 5:7,13,18 34:7 43:25 44:2 58:8 59:4 102:13 106:24

**secure** 159:18 163:18

**secured** 53:19

**securing** 51:24

**security** 59:23

**seek** 20:22

**sees** 64:15,23 65:1

**semi-prepared** 12:5

**SEMS** 43:6 91:22 98:18 99:23 100:25 103:5 160:25 161:1,7,10 162:6 163:3

**send** 54:20 104:14 154:14 155:2 159:10

**sense** 29:4 136:3 169:23

**sentence** 92:2 138:20 140:18

**separate** 15:23 55:8 90:14 161:7

**Sepulvado** 135:9

**serves** 152:7,25

**service** 19:3,9

**set** 58:16 59:10 86:18 87:1 128:20 158:21,24

**Shah** 2:19

**share** 93:8 133:10

**Sheet** 4:22 120:25

**sheets** 35:20 54:15

**Sheppard** 2:3,4 3:6,14 7:15 8:5 12:6 13:3,5,10, 21 15:1 16:1,2 17:21 18:19 19:20 23:8,9,15 29:11,12,22 30:1,13,16 31:22 32:6,12,16,25 33:8 37:1,6 39:20 40:2,12,24 41:9,11 42:19,23 43:8,13, 16,21 44:11,17,24 45:3 47:9,13,19 50:5,17 51:13 52:9,14 58:1,5,20 59:1,2 60:14 61:3,4,6,12,19,21 62:3,4,12 64:5 65:1,20 66:20 67:9,21 68:2 69:2, 7,10,13 70:3 73:17,18 74:1,9,18,25 75:14,15,19, 22 76:6 77:3,7,9,17,20 78:4,9,17,23 79:10 80:1 81:10,14 82:1,21 83:5,7, 14,19 84:15,22 85:8,17, 18 86:10 89:25 90:4 91:20 97:9,12 98:15,17, 24 99:2 99:9,13,16,18, 20 104:1,25 105:7,13 106:2,8,21 107:2 109:18, 19 110:2 111:7 112:2,17 113:5,13,16,19,21 114:1, 13,21 115:11,16,19,22 121:8,24 122:10,14 125:18 126:7 127:10,14 128:12,16,24 139:13 141:1 143:15 144:2,4,24 145:21,23 147:2 148:13 149:5 150:5,8,12,15,21 151:18 153:15,17 154:2 157:19 158:12,14 160:23 162:1,4,14 165:13 166:16,21,25 167:1,19,22 168:19 171:6,17 172:2,7, 22 173:5,10,13,15

**shift** 44:13,15 52:21,23, 24,25 53:1,2,18 56:7 117:24 132:16

**shifted** 53:22 54:10 160:7

**shifting** 44:21 52:17 53:16

**ship** 104:19

**Shipyard** 2:13 7:19 37:23

**Shipyards** 129:5,11,15

**shopping** 141:21

**shore-based** 108:2

**shoreside** 49:24 104:14

**short** 42:17 113:10 137:15 149:25 165:19 167:2

**shorthand** 1:20

**shoulder** 120:10

**show** 16:24 44:9,22 87:9 89:22 90:19 95:3 115:7

**showed** 34:9

**showing** 27:14 74:2 94:8

**shown** 154:1

**shows** 30:4 55:4

**shutting** 166:19

**side** 28:4 53:20 111:5 126:17 132:8 140:1,23 158:24 168:17 169:17

**sign** 168:13 172:17

**signal** 24:2

**signals** 84:6

**signature** 173:20

**signed** 35:8 100:3

**significant** 66:15

**similar** 93:9

**simple** 100:19

**Sims** 2:14

**single** 105:23

**sink** 41:23

**sir** 8:10,13 9:3,11,21,25 10:10,20 11:22 12:19 13:16 16:17,22 17:1,2,6, 19,20 19:4 20:7,24 21:11 22:11,18 23:1,15 24:12,



18 25:5,7 26:1,11,19,22,
25 27:5,7,9,14,17 29:20
30:6 31:4,19 32:9,11
33:11 34:1,4,9,11,12,15,
23 35:8 36:25 38:8,16
41:3,14 42:14 43:22 44:1
45:4,15 48:2 50:20 51:1,4
52:19 53:10,23 54:1,2
55:2,7 56:6,12 58:6 59:3,
18,21,24 60:21 61:1,13
62:3,22,24 63:2,4,6,16
65:10,11 66:8 67:19 68:4,
9,18,21,25 69:14 70:17
71:4,9,15 74:24 76:8,12
79:2,9,19 81:6,16 82:3,8,
12,16 83:7 84:14,18,21
85:10,12 86:3 87:6,12,17
88:3,6,16,21,24 89:5,20
90:13,18,20,21,23 92:23
93:4,6,12,25 96:3,7,10,20
98:7 99:4,16,18,21,24
100:5,9,12,15 102:9,17,
20,24 103:2 104:12,16,20
105:21 106:14,17 107:4,
8,12,21 108:8,24 110:5,
12,18 112:1,5 115:1,3,6,
25 116:3,9,10,15,18,24
117:9,14 118:5,18,21
119:9,13,16,24 120:5,8,
12 121:1,11,17,22 122:7
123:2,5,9,13,16,19,22,25
124:3,6,15,21,25 125:4,
11 126:7 127:2,8,17
128:2,5,10,23 129:13,22
130:7 131:9,22 132:3,13,
19,22 133:15 134:4,15
135:10,12,15 136:9
138:6,14 140:2,12,17,25
141:23 144:20 145:5,9,12
146:2,7,10,22,25 147:6,
14,23,25 148:9,23 149:21
150:14 152:18 153:9
154:3 155:17,20 156:1,7,
11 157:5,10 158:10 159:5
161:6,9 162:25 163:10
164:6,15 167:6 169:17
170:8

sit 39:5

sitting 66:10 70:4 75:8,10
108:25 144:15,20

situation 153:19

size 169:14,15

sizes 169:18

slack 143:23,24 144:1
168:23

Slash 134:20

sleep 35:24

sleeping 35:16 56:5
164:10

sling 131:14 141:13
142:16 143:7 159:11

slings 141:14 142:13
159:7

slung 131:20,22 133:8

small 52:25 53:4 87:19
108:15,17 169:14

solutions 93:24 95:5

somebody's 31:15

sort 8:18 13:23 26:8 27:19
31:8 46:1 51:2 129:16
136:22 152:5

sounds 23:20,21 142:17

South 2:15 7:19

SOUTHERN 1:1

speak 12:18 17:24 18:3
47:21 94:20 119:8 151:24

speaking 13:11 14:10
22:12 62:6

spec 35:20 54:15

specific 12:3 25:21 26:10
30:7 40:22 48:24 49:6
53:25 63:21 106:25
147:20 165:13

specifically 21:14 60:15

spectrum 8:22

Speculation 74:23 151:19
157:20

split 150:2

spoke 12:20 14:16 15:11
17:19,20 19:21 21:1

spoken 12:23 13:6 14:2
17:17 22:14 84:2 87:8
95:2

spot 132:25

square 36:6

stability 57:20 59:16 60:8

standard 39:10,13 58:16
59:10

standards 125:10

standing 48:21 59:20

starboard 53:18

start 43:17 97:17 138:9

started 27:25

starting 47:18 86:13
114:20

state 1:19,24 7:12 8:6
97:18

stated 1:24 59:8 77:13
84:2 137:2 138:8,10

statement 21:15 43:4 78:9
99:12 143:21 146:23
147:1,4 149:13 150:4
167:8,18

statements 15:14 88:20,
22,25 97:1,20 117:12
121:7 147:8,12 165:4
171:15

STATES 1:1

stay 57:14

steady 64:18

steer 57:3,7

**step** 57:9

**steps** 89:16

**stinger** 72:4 73:20 119:18
138:12 141:3,5,6,8,11,19
142:4,10,12 143:6 149:25
159:7 165:18,21 169:10,
17,19,20 170:2,4,11,21

**stingers** 169:14

**stint** 19:6,7 132:16

**stop** 10:2,6 23:17 25:3
60:13,17 61:7,11,16,17,
20,23 64:10 67:14,20
69:24 70:1 73:12 78:15
84:10,13,16 85:3,7,20,25
126:8 137:3 158:8 160:10

**stopped** 78:7,16,18
168:18 170:18

**stopping** 42:17 142:19

**Street** 2:4 7:17

**Stress** 92:21

**stressed** 127:18,20

**strike** 35:1 80:10 105:18
110:10

**stuff** 33:18,20 83:22
104:24 107:21 108:18
112:6 113:6 114:5 138:1

**subject** 115:22 156:20

**submit** 115:13

**submitted** 16:11 46:8,14

**subpoenaed** 97:2,21

**subsequent** 152:11

**sued** 129:8

**suffered** 8:22

**suggestion** 18:24

**suggestions** 104:7

**suggests** 90:5 153:10

**Suite** 2:4,10 7:17

**summary** 4:22 71:17,20
120:25 143:4 165:11
166:11,13,18,21 167:2,5

**superior** 116:1

**supervising** 49:12
122:16,19

**supervisor** 45:14 46:5

**Supervisor's** 134:19

**supplied** 71:17

**supposed** 49:8 59:19 91:1
97:16 100:13 101:21
154:7,25 158:7 160:8

**surrounding** 121:14

**swear** 7:13

**swell** 24:15 25:6 61:21
62:2,13 63:9 64:6,8,9,14,
15 65:3,9,12,15,17 66:10,
21,25 69:20 70:15 71:2,6,
10 77:10,25 78:6,11
85:14,19 86:1 143:9
144:9 157:17 164:25
165:18 167:9

**swells** 67:8 76:15

**switch** 128:18

**sworn** 1:16

**System** 4:11,16 5:5,11,17
99:7

---

**T**

---

**table** 10:18

**tag** 21:23 22:2 23:18 71:2
72:11,12,24 73:15
135:20,21,22 136:2,21
137:3,5,15 138:8,11,16
139:4,5,15 140:3,8,11,15,
19,20

**takes** 38:12 48:12 99:24

**taking** 21:23 23:12 39:3
48:21 49:9 71:7 74:11

81:20 82:11 121:16

**talk** 9:23 10:16 18:6 21:2
42:8 64:6 70:20,25 84:9
92:20,21 94:3,13 108:18
109:14,16 116:14 135:16
152:13 156:21

**talked** 13:2 18:7 59:13
70:22 83:8,22 95:6 99:18
107:22 112:15 113:2
135:4 139:5 157:3 168:10

**talking** 19:5 20:8,24 53:25
62:2 64:9,14 67:3,5,8
83:14,21 89:7 101:24
107:19 108:9 109:6
131:21 153:4 160:24
164:4 167:18

**task** 126:9 168:3

**team** 79:1,4,6,9

**technical** 58:14 59:3
113:6

**telling** 22:4 26:17 51:15,
19 53:8

**tells** 96:24

**ten** 10:25 11:1,10 54:25
97:22 159:9

**Tenth** 2:15 7:20

**term** 66:24 132:10

**terms** 13:25 107:9 151:24

**test** 63:14 131:10

**testified** 8:23 11:24 12:8
80:21 147:19 149:9,23
150:3 162:14 170:23

**testify** 115:23

**testifying** 11:18 77:15

**testimony** 9:1 58:22 63:15
70:4 71:13,19 73:8 78:5
86:4 87:7 105:5 114:24
115:4 116:22 129:15
131:11,24 139:1 146:17
153:7,8 155:10,14 162:9



168:22 169:2

**Texas** 1:1,19,21 2:5,15
7:11,16,17,20 12:12

**text** 99:2

**thicker** 169:20

**thing** 24:20 43:18 44:15
66:19,21 88:19 96:22
98:21 100:1 114:22
120:17 129:24 140:2,5
170:16,23 171:13

**things** 10:11 14:15 23:10,
14,23 24:4,8 25:1,7,13,23
26:12 39:4,6,11,16,19
49:1,18 51:24 53:6 59:19
62:6 66:17 67:13 68:23
72:4,17 79:15,21 80:8,17,
25 81:17,20,21,23 87:14,
25 88:10 90:4,10 92:12
93:7 95:18 96:23 99:14
100:23 101:2 104:8
117:13 119:17 121:15
126:13,17 150:25 154:11,
19 159:16 163:20 165:14
167:23 169:25 170:10

**things/general** 28:4

**thinking** 39:8 46:4

**thinks** 40:11 61:14

**thought** 15:9 25:7,8 67:18
71:10 76:19 77:10 78:12,
14 82:20 83:24 85:6
94:23 131:24 166:21
168:5,17,21 172:2,7
173:4,8

**three-page** 171:21

**tie** 53:5,6,15 136:21

**tied** 52:11,16,21 53:14
136:25 137:18

**time** 7:2 8:25 10:15 11:17
13:11 16:15 18:5 20:5
28:6 30:15 50:2 51:19
55:17 61:17 63:12 67:18
70:7 71:23,25 74:21

76:18 85:1 91:3 94:4
95:10 102:5 111:15,17
118:14 119:5,6 120:4
121:19 128:3 135:18
137:9 141:24 152:9 157:9
161:25 164:8 166:12
171:12

**times** 10:22 11:1 12:23
13:2,6,9,24 46:7 49:17
56:25 57:17,20 59:16
60:8 97:22 128:7 154:7,
13 155:3,15 159:9

**tired** 161:21

**title** 100:17 134:10,18

**titled** 17:5

**today** 7:1 12:4 14:13
15:12 24:6 48:1 66:10
70:4 94:9 108:25 110:13
114:23 115:5 116:22
127:16

**told** 21:24 23:22 25:8 44:5
45:14 67:11 74:17 84:5,7
111:20 112:13,20 153:22

**tomorrow** 173:3

**top** 75:11 89:8 96:16
151:24

**topic** 109:16

**topics** 99:15 100:10
102:10 107:5 108:11
115:24 116:2

**touching** 139:24

**track** 33:19

**trail** 129:16

**train** 83:24

**trained** 126:23

**training** 99:25 102:8
117:4 126:20 158:21,22

**transit** 52:18 53:22 54:11

**TRANSOCEAN** 1:6

**transport** 29:14

**transported** 30:18 35:24

**transporting** 52:15

**traveling** 155:1

**treatment** 112:8,9

**trial** 161:25

**trick** 69:8

**tricky** 126:25

**trip** 19:16,19

**trips** 19:17

**truck** 48:13 53:9

**trucks** 53:6

**true** 43:4 87:18,21 103:13
106:15 129:17 131:5
152:17 153:20,21 155:19

**truth** 10:12 125:22

**truthful** 41:13

**tugboats** 27:20,21

**turned** 106:9,11 147:21

**twelve** 99:8

**type** 75:23 138:3 173:16

**typically** 31:17 32:21

## U

**Uh-huh** 31:22 50:10 80:5

**ultimately** 25:24 39:1,15
40:4,5 56:9 57:15

**un-normal** 86:25

**unable** 66:9

**uncle** 20:20

**unclear** 132:24

**uncomfortable** 158:6

**uncommon** 24:24 87:5
139:18



**understand** 8:17 9:2 10:2, 3,5,7 15:17 25:22 33:1 46:23 51:6 53:11 62:3 66:25 68:18,24 72:10 80:14 109:8 114:23 129:14 130:16 133:7 138:5,6,24 146:16 155:14 158:3 169:3 170:22

**understanding** 30:11 72:8 130:3 169:17

**understands** 131:4 141:17

**understood** 81:23 164:21

**UNITED** 1:1

**unloading** 32:24

**unnecessary** 123:15

**unsafe** 41:5 125:6 160:8

**unsafely** 42:3

**Unsolicited** 93:2

**upstairs** 54:18

**USA** 1:6

**usual** 64:22

---

**V**

**vague** 62:11 143:15 145:23 149:5

**vantage** 67:22,25 68:1 70:6 74:12 75:6

**varies** 27:14

**verbal** 43:1 45:19 46:12 96:25 97:1,14,19 98:3

**verbally** 94:3

**verbatim** 58:23

**verified** 90:7 117:7

**verify** 23:4 90:9

**verse** 101:12

**versus** 26:18

**vertically** 53:16

**vessel** 4:16 5:11 24:14 28:7 30:4,25 31:10,16 38:7 39:16,21,22 51:9 52:3,15 55:24 56:11,14, 15,21,25 57:3,16,20,23 58:9,18 59:12,16,25 60:8, 9,23 61:7,22 63:9 64:8 67:22 68:2 76:2 78:12,25 84:11,16 86:6 87:9 99:8 100:2,11 102:15,21 103:1,12,16 104:18 105:9,15,23 106:4 118:15 120:3,4 122:3 124:24 143:9 145:2,7,16,17,18 155:18 157:17 161:4,8, 11,13 162:24 163:4,5,13 164:5,7 167:8,16

**vessel's** 59:22

**vessels** 11:15,16 26:24,25 27:10,16,19 31:8 32:18 35:6 40:6 48:5 49:10,11 55:9 102:4,19,23 103:4, 10 123:20 162:7,16,23

**vested** 123:7

**video** 44:8 113:11

**view** 70:10

**visit** 111:20

**visual** 159:13

**voice** 161:15,18

---

**W**

**Wade** 110:14

**wait** 64:16 137:6 164:1

**waited** 23:18

**waiting** 151:10 173:11

**waive** 172:18,20,21

**waived** 173:20

**wakes** 66:18

**walk** 48:4 159:17 163:21

**walk-around** 49:22 164:20

**walked** 40:16 163:17

**Walley** 135:13

**wanted** 18:21,25 25:14 37:24 38:25 128:4 133:3 152:2,4 153:1 167:23

**warned** 46:7

**warning** 46:12

**watch** 48:21 49:8 57:14 59:20 65:17 70:16 79:13, 20,22 81:2 117:12 125:2

**watches** 79:15

**watching** 25:2 48:20 49:3 76:10 79:11

**water** 47:24

**wave** 64:14,15,24 65:2,8 66:19,20 120:7,14 143:9, 18 144:9 149:24 167:9 168:24 169:4

**waves** 64:14 65:23

**ways** 31:19 53:15

**weather** 52:19 118:2 158:4

**Wednesday** 7:2

**week** 15:14 18:2 98:19 102:9,11 107:3,20 109:15 111:10,11

**weekly** 98:22 100:2 108:14,20 109:11,16,20 112:3,11 113:1 124:14

**weeks** 13:13

**weight** 25:11 39:4

**welcomed** 158:24

**well-being** 56:14,20 60:22

**West** 2:15 7:19

LEXITAS

**whatsoever** 32:17 110:22

**wheel** 57:9,10

**wheelhouse** 68:3,5 70:5 74:10 79:5,23 80:21 81:3 122:16,19

**Whew** 111:9

**Whittaker** 16:12 17:23,24 18:3 22:12 63:1,3,7 66:24 67:11,12 90:16 110:4 111:12 117:2 119:8 125:20 148:17,19 149:16 150:10 166:3 169:7 170:15

**wider** 8:22

**Wilson** 135:13

**wind** 66:18 118:6,8 158:5

**winds** 86:7,23 87:11

**wire** 136:5

**witness'** 105:5

**witnessed** 78:6

**witnesses** 92:21

**wondering** 18:18 53:1

**word** 10:5 65:15

**words** 134:23 136:14

**work** 10:2,6 23:17 25:3,25 27:1,3,4,6,8,13,16,19 41:2 52:4 55:5 60:13,17 61:17 67:14,20 70:1,11 71:23 74:11 78:7 84:14 85:3,7,20,25 86:12 95:16 108:17 109:13 123:21,24 124:20,23 126:8 127:1 132:12 133:6 138:4 152:4,19,21 155:20,21 158:8,19 163:25 164:5 166:13

**worked** 20:10,18 27:20,23 28:6 66:6 132:15 152:12

**worker** 41:5 135:18 137:8

**workers** 41:16 124:1,7,19, 22 125:1,5,8

**working** 18:16 30:11 32:7 42:2,13 101:16 121:19 123:20 124:8 132:2 134:8 154:23 164:8,9

**Workplace** 118:3,11

**works** 20:3 44:25 56:5 114:14

**world** 156:16

**worse** 127:22

**Wow** 151:11

**write** 69:6 93:18 168:1

**write-up** 42:10

**writes** 119:2

**written** 17:9,11,13 42:24 45:17,24 46:13,19 77:22 89:3 96:25 97:2,15,20 98:3 166:22

**wrong** 78:18 118:12 119:14 130:17 140:14 144:7 162:11

**wrote** 46:7 139:7 166:4,5 169:7 170:15 172:7

## Y

**year** 11:19 98:18,21 103:8 106:4

**yearly** 124:14

**years** 8:15 27:24 28:16

**yellow** 59:14

**yesterday** 15:5,6,7

**you-all** 37:17 58:21 108:11 113:21,22 132:21 134:22

**younger** 28:12

**your-all's** 101:10 145:16, 17

## Z

**zoom** 36:15 44:11,24 58:14 113:6





**SAMM Master Log**
**For Asset: Maggie A**
**For Customer: LLOG Exploration**

11828 Highway 1
Larose, LA 70373

**Log Date: 05/24/2017**

| From | Start Loc | To | End Loc | Activity Type / Customer | Duration | Remarks |
|------|-----------|-----|---------|--------------------------|----------|---------|
| 00:00 | GC-390 | 03:00 | GC-390 | Underway / LLOG Exploration | 00:03:00 | 3lifts |
| 03:00 | GC-390 | 04:00 | GC-390 | Cargo Operations / LLOG Exploration | 00:01:00 | |
| 04:00 | GC-390 | 09:45 | LLOG Dock - Fourchon, LA | Underway / LLOG Exploration | 00:05:45 | 0lifts |
| 09:45 | LLOG Dock - Fourchon, LA | 24:00 | LLOG Dock - Fourchon, LA | Standing By / LLOG Exploration | 00:14:15 | |
| | | | | **Total:** | 24:00 | |

### Fuel Data (Gallons)

| | |
|---|---|
| Beginning Balance: | 18,800.00 |
| Total Transferred: | 0.00 |
| Off: | 0.00 |
| On: | 0.00 |
| Consumed In Service: | -2,800.00 |
| Adjustments: | 0.00 |
| Ending Balance: | 16,000.00 |

### Lube Oil Data (Gallons)

| | |
|---|---|
| Beginning Balance: | 100.00 |
| Total Transferred: | 0.00 |
| Off: | 0.00 |
| On: | 0.00 |
| Consumed In Service: | 0.00 |
| Adjustments: | 0.00 |
| Ending Balance: | 100.00 |

### Hydraulic Oil Data (Gallons)

| | |
|---|---|
| Beginning Balance: | 0.00 |
| Total Transferred: | 0.00 |
| Off: | 0.00 |
| On: | 0.00 |
| Consumed In Service: | 0.00 |
| Adjustments: | 0.00 |
| Ending Balance: | 0.00 |

### Commodity Transactions

| Time | Transaction | Commodity | Amount | Unit | Ticket # / AFE | Location |
|------|-------------|-----------|--------|------|----------------|----------|
| 16:39 | Consumed in Service | Fuel | -2,800.00 | Gallons | | GC-390 |

### Weather

| 12:00 | | | | | |
|-------|---|---|---|---|---|
| | Seas: | In Port | Winds: | 10-15 Knots | Direction: | NW |
| | Visibility: | Horizon | Currents: | In Port | Direction: | In Port |
| | Conditions: | Good | | | Swells: | In Port |

### Crew Onboard

| Captain | James, Lester | All Day |
|---------|---------------|---------|
| Captain | Manuel, Jody | All Day |
| Deckhand | Bolt, Bruce | All Day |
| Deckhand | Leday, Jermey | All Day |
| Deckhand | Flora, Mark | All Day |
| Deckhand | Leblanc, Dakota | All Day |

### Running Hours

| Engine Name | Hours |
|-------------|-------|
| BT 1 | - |
| BT 2 | - |
| GEN 1 | 24.00 |
| GEN 2 | 1.00 |
| ME 1 | 10.00 |
| ME 2 | 10.00 |
| ME 3 | 10.00 |
| ME 4 | 10.00 |

### Commodity Totals

| Commodity | Amount | Unit |
|-----------|--------|------|



**EXHIBIT**

**001**

exhibitsticker.com

Flora v. Transocean

**GLO/LLOG 00257**

| Gear Oil Data (Gallons) | |
|---|---|
| Beginning Balance: | 0.00 |
| Total Transferred: | 0.00 |
| Off: | 0.00 |
| On: | 0.00 |
| Consumed In Service: | 0.00 |
| Adjustments: | 0.00 |
| Ending Balance: | 0.00 |



**Captain's Signature**
**For the Maggie A**
**Log Date: 5/24/2017**

Flora v. Transocean

**GLO/LLOG 00258**



**SAMM Master Log**
**For Asset: Maggie A**
**For Customer: LLOG Exploration**

**Log Date: 05/25/2017**

| From | Start Loc | To | End Loc | Activity Type / Customer | Duration | Remarks |
|------|-----------|-----|---------|--------------------------|----------|---------|
| 00:00 | LLOG Dock - Fourchon, LA | 00:30 | LLOG Dock - Fourchon, LA | Standing By / LLOG Exploration | 00:00:30 | |
| 00:30 | LLOG Dock - Fourchon, LA | 06:00 | GC-390 | Underway / LLOG Exploration | 00:05:30 | w 19lifts and 5 passengers |
| 06:00 | GC-390 | 09:30 | GC-390 | Cargo Operations / LLOG Exploration | 00:03:30 | |
| 09:30 | GC-390 | 14:30 | LLOG Dock - Fourchon, LA | Underway / LLOG Exploration | 00:05:00 | w2lifts and 5 passengers |
| 14:30 | LLOG Dock - Fourchon, LA | 24:00 | LLOG Dock - Fourchon, LA | Standing By / LLOG Exploration | 00:09:30 | |
| | | | | Total: | 24:00 | |

## Fuel Data (Gallons)

| | |
|---|---|
| Beginning Balance: | 16,000.00 |
| Total Transferred: | 20,500.00 |
| Off: | 0.00 |
| On: | 20,500.00 |
| Consumed In Service: | -3,200.00 |
| Adjustments: | 0.00 |
| Ending Balance: | 33,300.00 |

## Commodity Transactions

| Time | Transaction | Commodity | Amount | Unit | Ticket # / AFE | Location |
|------|-------------|-----------|--------|------|----------------|----------|
| 17:47 | On Load | Fuel | 20,500.00 | Gallons | 24467 / N/A | Stone Fuel |
| 17:48 | Consumed in Service | Fuel | -2,800.00 | Gallons | | GC-390 |
| 20:25 | Consumed in Service | Fuel | -400.00 | Gallons | | LLOG Dock |

### Weather

| 17:00 | Seas: | In Port | Winds: | 5-10 Knots | Direction: | SW |
|-------|-------|---------|--------|-----------|------------|-----|
| | Visibility: | Horizon | Currents: | In Port | Direction: | In Port |
| | Conditions: | Good | | | Swells: | In Port |

## Lube Oil Data (Gallons)

| | |
|---|---|
| Beginning Balance: | 100.00 |
| Total Transferred: | 0.00 |
| Off: | 0.00 |
| On: | 0.00 |
| Consumed In Service: | 0.00 |
| Adjustments: | 0.00 |
| Ending Balance: | 100.00 |

### Crew Onboard

| Captain | James, Lester | All Day |
|---------|---------------|---------|
| Captain | Manuel, Jody | All Day |
| Deckhand | Bolt, Bruce | All Day |
| Deckhand | Leday, Jermey | All Day |
| Deckhand | Flora, Mark | All Day |
| Deckhand | Leblanc, Dakota | All Day |

## Running Hours

| Engine Name | Hours |
|-------------|-------|
| BT 1 | - |
| BT 2 | - |
| GEN 1 | 4.00 |
| GEN 2 | 24.00 |
| ME 1 | 14.00 |
| ME 2 | 14.00 |
| ME 3 | 14.00 |
| ME 4 | 14.00 |

### Commodity Totals

| Commodity | Amount | Unit |
|-----------|--------|------|

## Hydraulic Oil Data (Gallons)

| | |
|---|---|
| Beginning Balance: | 0.00 |
| Total Transferred: | 0.00 |
| Off: | 0.00 |
| On: | 0.00 |
| Consumed In Service: | 0.00 |
| Adjustments: | 0.00 |
| Ending Balance: | 0.00 |

Flora v. Transocean

| Gear Oil Data (Gallons) | |
|---|---|
| Beginning Balance: | 0.00 |
| Total Transferred: | 0.00 |
| Off: | 0.00 |
| On: | 0.00 |
| Consumed In Service: | 0.00 |
| Adjustments: | 0.00 |
| Ending Balance: | 0.00 |

**Captain's Signature**
**For the Maggie A**
**Log Date: 5/25/2017**

Flora v. Transocean



**Log Date: 05/26/2017**

| From | Start Loc | To | End Loc | Activity Type / Customer | Duration | Remarks |
|------|-----------|-----|---------|--------------------------|----------|---------|
| 00:00 | LLOG Dock - Fourchon, LA | 07:45 | LLOG Dock - Fourchon, LA | Standing By / LLOG Exploration | 00:07:45 | |
| 07:45 | LLOG Dock - Fourchon, LA | 12:45 | GC-390 | Underway / LLOG Exploration | 00:05:00 | w 6 lifts |
| 12:45 | GC-390 | 14:15 | GC-390 | Cargo Operations / LLOG Exploration | 00:01:30 | |
| 14:15 | GC-390 | 19:15 | LLOG Dock - Fourchon, LA | Underway / LLOG Exploration | 00:05:00 | lite boat |
| 19:15 | LLOG Dock - Fourchon, LA | 24:00 | LLOG Dock - Fourchon, LA | Standing By / LLOG Exploration | 00:04:45 | |
| | | | | Total: | 24:00 | |

### Fuel Data (Gallons)

| | |
|---|---|
| Beginning Balance: | 33,300.00 |
| Total Transferred: | 0.00 |
| Off: | 0.00 |
| On: | 0.00 |
| Consumed In Service: | -3,200.00 |
| Adjustments: | 0.00 |
| Ending Balance: | 30,100.00 |

### Lube Oil Data (Gallons)

| | |
|---|---|
| Beginning Balance: | 100.00 |
| Total Transferred: | 0.00 |
| Off: | 0.00 |
| On: | 0.00 |
| Consumed In Service: | 0.00 |
| Adjustments: | 0.00 |
| Ending Balance: | 100.00 |

### Hydraulic Oil Data (Gallons)

| | |
|---|---|
| Beginning Balance: | 0.00 |
| Total Transferred: | 0.00 |
| Off: | 0.00 |
| On: | 0.00 |
| Consumed In Service: | 0.00 |
| Adjustments: | 0.00 |
| Ending Balance: | 0.00 |

### Commodity Transactions

| Time | Transaction | Commodity | Amount | Unit | Ticket # / AFE | Location |
|------|-------------|-----------|--------|------|----------------|----------|
| 20:26 | Consumed in Service | Fuel | -3,200.00 | Gallons | | GC-390 |

### Weather

| | | | | | |
|---|---|---|---|---|---|
| **20:00** | **Seas:** In Port | **Winds:** 5-10 Knots | **Direction:** SE | | |
| | **Visibility:** Horizon | **Currents:** In Port | **Direction:** In Port | | |
| | **Conditions:** Good | | **Swells:** In Port | | |

### Crew Onboard

| | | |
|---|---|---|
| Captain | James, Lester | All Day |
| Captain | Manuel, Jody | All Day |
| Deckhand | Bolt, Bruce | All Day |
| Deckhand | Leday, Jermey | All Day |
| Deckhand | Flora, Mark | To 07:15 |
| Deckhand | Leblanc, Dakota | All Day |
| Deckhand | Smith, Jalklye | Fm 07:15 To 19:00 |
| Deckhand | Flora, Mark | Fm 19:00 |

### Running Hours

| Engine Name | Hours |
|-------------|-------|
| BT 1 | - |
| BT 2 | - |
| GEN 1 | 24.00 |
| GEN 2 | 2.00 |
| ME 1 | 12.00 |
| ME 2 | 12.00 |
| ME 3 | 12.00 |
| ME 4 | 12.00 |

### Commodity Totals

| Commodity | Amount | Unit |
|-----------|--------|------|

Flora v. Transocean

| Gear Oil Data (Gallons) | |
|---|---|
| Beginning Balance: | 0.00 |
| Total Transferred: | 0.00 |
| Off: | 0.00 |
| On: | 0.00 |
| Consumed In Service: | 0.00 |
| Adjustments: | 0.00 |
| Ending Balance: | 0.00 |

**Captain's Signature**
**For the Maggie A**
**Log Date: 5/26/2017**

Flora v. Transocean



**SAMM Master Log**
**For Asset: Maggie A**
**For Customer: LLOG Exploration**

11828 Highway 1
Larose, LA 70373

**Log Date: 05/27/2017**

| From | Start Loc | To | End Loc | Activity Type / Customer | Duration | Remarks |
|------|-----------|----|---------|--------------------------|----------|---------|
| 00:00 | LLOG Dock - Fourchon, LA | 24:00 | LLOG Dock - Fourchon, LA | Standing By / LLOG Exploration | 01:00:00 | |
| | | | | **Total:** | 24:00 | |

| Fuel Data (Gallons) | | Commodity Transactions | | | | | | |
|---------------------|----------|----------|-------------|-----------|--------|--------|---------------|----------|
| | | **Time** | **Transaction** | **Commodity** | **Amount** | **Unit** | **Ticket # / AFE** | **Location** |
| **Beginning Balance:** | 30,100.00 | 22:53 | Consumed in Service | Fuel | -75.00 | Gallons | | GC-390 |
| **Total Transferred:** | 0.00 | | | | | | | |

| Fuel Data cont. | | Weather | | | | | |
|-----------------|---------|---------|--------|------|------|------|------|
| **Off:** | 0.00 | **12:00** | **Seas:** | In Port | **Winds:** | 10-15 Knots | **Direction:** | SE |
| **On:** | 0.00 | | **Visibility:** | Horizon | **Currents:** | In Port | **Direction:** | In Port |
| **Consumed In Service:** | -75.00 | | **Conditions:** | Good | | | **Swells:** | In Port |
| **Adjustments:** | 0.00 | | | | | | | |
| **Ending Balance:** | 30,025.00 | Crew Onboard | | | | | |

| Lube Oil Data (Gallons) | | Crew Onboard | | | Running Hours | |
|-------------------------|----------|--------------|--------------|---------|---------------|------|
| | | | | | **Engine Name** | **Hours** |
| **Beginning Balance:** | 100.00 | Captain | James, Lester | All Day | BT 1 | - |
| **Total Transferred:** | 0.00 | Captain | Manuel, Jody | All Day | BT 2 | - |
| **Off:** | 0.00 | Deckhand | Bolt, Bruce | All Day | GEN 1 | - |
| **On:** | 0.00 | Deckhand | Leday, Jermey | All Day | GEN 2 | 24.00 |
| **Consumed In Service:** | 0.00 | Deckhand | Leblanc, Dakota | All Day | ME 1 | - |
| **Adjustments:** | 0.00 | Deckhand | Flora, Mark | All Day | ME 2 | - |
| **Ending Balance:** | 100.00 | | | | ME 3 | - |

| Hydraulic Oil Data (Gallons) | | | Commodity Totals | |
|------------------------------|--------|------|------------------|------|
| | | | | ME 4 | - |
| | | | **Commodity** | **Amount** | **Unit** |
| **Beginning Balance:** | 0.00 | | | | |
| **Total Transferred:** | 0.00 | | | | |
| **Off:** | 0.00 | | | | |
| **On:** | 0.00 | | | | |
| **Consumed In Service:** | 0.00 | | | | |
| **Adjustments:** | 0.00 | | | | |
| **Ending Balance:** | 0.00 | | | | |

Flora v. Transocean

6/1/2019 17:32:30 — *Powered by Advanced Logistics, LLC*

**GLO/LLOG 00263**

| Gear Oil Data (Gallons) | |
|---|---|
| Beginning Balance: | 0.00 |
| Total Transferred: | 0.00 |
| Off: | 0.00 |
| On: | 0.00 |
| Consumed In Service: | 0.00 |
| Adjustments: | 0.00 |
| Ending Balance: | 0.00 |

Captain's Signature
For the Maggie A
Log Date: 5/27/2017

Flora v. Transocean

Powered by Advanced Logistics, LLC

**Gulf Logistics Operating, Inc.     Safety and Environmental Management System Manual**

| Title: | Revision Number: | Date Effective: | Section: |
|---|---|---|---|
| **CONDUCT AND DISCIPLINE** | **0** | **September 1, 2012** | **6.2** |
| Prepared By: | Approved By: | | Page: |
| **Operations** | **CA** | | **Page 3 of 4** |

- Pretending to be injured or ill to avoid having to perform assigned duties.

- Neglecting shipboard duties and responsibilities so another shipmate must perform those duties.

- The destruction or tampering of Company, customer or another employee's property at any time.

- Sleeping on watch or sleeping when otherwise on duty.



### 2.8 Violation of Company Policy

Company policy is to maintain a workplace that is safe for all employees, to obey all applicable laws, rules, and regulations. Any employees that refuse to comply with the Company safety and pollution standards, applicable law; rules, regulations or lawful orders are subject to disciplinary action, including termination of employment. One or more of the following can be used to discipline all vessel employees:

- Verbal or written reprimand

- Restriction or confinement to quarters

- Reduction in Rank

- Loss of Safety Incentive Bonus

- Reduction of wages

- Suspension of employment

- Termination of employment

### 2.9 Disciplinary Action

Restriction or confinement to quarters while at sea is the most forceful disciplinary action the Company authorizes the Master. He may only exercise this option if a member of the crew is deemed to be dangerous to him and creates or poses a danger to others on the vessel. In such case, the home office should be notified immediately.

Should the vessel be dockside, the Master should contact the home office immediately (via landline) to arrange for discharge and transportation should a situation dictate these actions.

Most disciplinary actions are to start with a verbal warning should a situation dictate counseling. No employee can know that expectations are not being met, unless told so by their supervisor.

**Gulf Logistics Operating, Inc.**    **Safety and Environmental Management System Manual**

| Title: **CONDUCT AND DISCIPLINE** | Revision Number: **0** | Date Effective: **September 1, 2012** | Section: **6.2** |
|---|---|---|---|
| | Prepared By: **Operations** | Approved By: **CA** | Page: **Page 4 of 4** |

Written communication (e-mail or other means) to the home office is required when an employee has received verbal counseling, but continues to disregard or acknowledge problems. The employee should be allowed to read any disciplinary action communication to shore base management, but does not have to agree or sign it to be valid.

2.10    **Termination and Reduction in Pay**

The Personnel Department and the Operations Department of the Company shall determine and approve the following disciplinary actions:

- Reduction in pay, loss of safety bonus

- Suspension

- Reduction of rank

- Termination of employment

Flora v. Transocean

**GLO    00340**

| Title: **VESSEL MASTER RESPONSIBILITIES AND AUTHORITIES** | Revision Number: **0** | Date Effective: **September 1, 2012** | Section: **5.0** |
|---|---|---|---|
| | Prepared By: **Operations** | Approved By: **CA** | Page: **Page 1 of 4** |

**1.0    Purpose**

To describe the responsibilities and authorities of the vessel Master



EXHIBIT

003

**2.0    Guidelines**

The vessel may have, in addition to the person assigned to that vessel as Master, an additional licensed Captain aboard the vessel.  In the case of more than one licensed Captain aboard the vessel, one will be assigned the duties of Master and the other will be assigned the duties of Mate.  Only one person aboard the vessel may fill the position of Master at any particular time.

**2.1    Master's Authority**

The Master shall have the <u>OVERRIDING AUTHORITY</u> and <u>RESPONSIBILITY</u> to make decisions with respect to safety and pollution prevention conditions or activities.  Nothing stated in any agreement, contractual or otherwise, shall reduce this authority.

The Master will set a high standard of personal, professional conduct to provide leadership onboard the vessel.

**2.2    Master's Responsibility**

In command of the vessel, the Senior Master's responsibilities include:

Safely operating, managing and maintaining the vessel per all instructions contained in this manual and other related documents of this Safety and Environmental Management System.

The safety and well being of the vessel, her crew and all others aboard at any time.

Enforcing the Safety and Environmental policies of the Company while onboard, and administering the Safety and Environmental Management System.

Motivating the crew in regard to compliance with the Policies of the Company and the requirements of the Safety and Environmental Management System.

Issuing all lawful orders in a clear and simple manner.

Verifying compliance with all Federal, State, and Local Laws, and Customer, rules regulations and guidelines.

Verifying compliance with all requirements of the Safety and Environmental Management System.

# Gulf Logistics Operating, Inc.    Safety and Environmental Management System Manual

| Title: | Revision Number: | Date Effective: | Section: |
|---|---|---|---|
| **VESSEL MASTER RESPONSIBILITIES AND AUTHORITIES** | **0** | **September 1, 2012** | **5.0** |
| | Prepared By: | Approved By: | Page: |
| | **Operations** | **CA** | **Page 2 of 4** |

Reviewing the Safety and Environmental Management System and reporting all deficiencies to shore-based management in a timely manner.

Knowing the contents of this manual and ensuring that all members of the crew know and adhere to policies set forth in this manual.

The Safe and Economical navigation of the vessel at all times.

The Oversight with regard to vessel maintenance.

Monitoring the condition of stability of the vessel at all times.

Standing a navigation watch.

Setting the STCW Compliant watch schedule.

Acting as the vessel's safety and security officer.

Maintaining good crew morale and customer relations.

Maintaining and keeping custody of all required original ship's documentation, certificates, records and files.

Ensuring oncoming personnel have all required documents, licenses and endorsements for the job they are assigned.

Ensuring those personnel new to the vessel complete a proper orientation upon arrival.

Keeping and reviewing log books/records for accuracy and completion, maintaining the Masters Handover File.

Ensuring life saving and firefighting equipment are in good working order and inspected at required intervals.

Maintaining the readiness of the entire crew to ensure all personnel are trained and prepared should an emergency situation arise.

Fulfilling any requirements of the charter agreement (not withstanding your OVERRIDING AUTHORITY as previously explained).

**(NOTE:)** The Master in the most secure method will forward any questions or concerns relating to issues of the vessels charter or Charterer, to the home office for resolution.

### 2.3    Implementation Responsibilities

The vessel Master is responsible for implementing the Company's Safety and Environmental Policies onboard. As a result, all personnel should have an adequate understanding of these policies and have read any relevant procedures.

Flora v. Transocean

**GLO    00318**

**Gulf Logistics Operating, Inc.**   **Safety and Environmental Management System Manual**

| Title:<br>**VESSEL MASTER RESPONSIBILITIES AND AUTHORITIES** | Revision Number:<br>**0** | Date Effective:<br>**September 1, 2012** | Section:<br>**5.0** |
|---|---|---|---|
| | Prepared By:<br>**Operations** | Approved By:<br>**CA** | Page:<br>**Page 3 of 4** |

The Safety and Environmental Policies are to be posted in all public areas aboard each vessel.

**2.4**   **Safety Management Compliance**

The Master is responsible for making sure the crew is in compliance with this Safety and Environmental Management System.  Such verification activity includes area inspections, review of logs/records and direct observation of activity.

**2.5**   **Motivation**

The Master may best motivate others to follow the Company's Safety and Environmental Polices by setting a positive example.  The reduction of accidents that result in personnel injury or damage to the environment benefits everyone. He may use the Weekly Safety and Environmental meeting as the venue to provide such guidance and training.

**2.6**   **Management Review of the Safety and Environmental Management System**

The Master is required to review the Safety and Environmental Management System periodically to ensure that the system works as designed. At periods not to exceed 12 months, he is asked to formally review the system using the Master's Management Review form. The Master will take the necessary time to review the system and turn in the annual report in a timely manner. This report will help the home office make any necessary changes that may be needed to the Safety and Environmental Management System while considering any outstanding issues the Master may have.

**2.7**   **Conflict and Shore-Based Support**

Periodically, work-related conflicts arise between the charterer of our vessels (our customers) and vessel officers, over the nature of an activity and how such activity may impact the safety of the vessel and crew, or the environment.

Should such a conflict arise, the Senior Master should consider the following as guidance:

- Reason with the customer's representative, supporting your view with facts (where possible)

- Consider alternative methods or time frames to accomplish the task or job in question.

If unsatisfied, contact the home office for guidance. If Company management

EXHIBIT

004

| Gulf Logistics Operating |  | Root Cause Analysis Form |
|---|---|---|

**DATA COLLECTION (Procedures and Documents)**

Check the applicable boxes and provide comment where necessary. Copies of any applicable documents should be obtained.

| X | ITEM | COMMENT |
|---|---|---|
| X | Incident reports | Received |
| x | Medical reports | |
| | Navigational charts | |
| | Rough log records | |
| | Maintenance records | |
| X | Risk assessment records (JSA verified) | Received |
| X | Training records verified (previous safety meetings, etc.) | Attached to initial email |
| | Vessel orientation form | |
| | Policies & Procedures (what is available? Used?) | |
| | Proper permits? (Hot work, Confined Space, Permit to work, etc) | |
| | MSDS? | |
| | Other | |

**DATA COLLECTION (People)**

The checklist below provides guidance on common people related information that should be retrieved.

| X | ITEM | COMMENT |
|---|---|---|
| X | Witness statements | Received |
| | Drug & Alcohol test(s) | |
| | Relevant physical limitations or health issues | |
| | Relevant medications | |
| | Any similar incidents / near misses? (All Employee's? Vessel?) | |
| X | Days on hitch (injured employee) | 9.5 DAYS |
| X | Hours on watch (injured employee) | 7 HRS. |
| | SSE? | |
| | Other | |

**DATA COLLECTION (Environment)**

The checklist below provides guidance on common environmental related information that should be retrieved.

| X | ITEM | COMMENT |
|---|---|---|
| X | Weather information (sea state, temp, rain, wind) | Wind 10 KT - 300° Current 1KT - 310° |
| X | Workplace information (time of day, location) | 0700 - Back Deck / GC 390 |
| X | Any housekeeping issues involved? | Deckload of Cargo |
| | Any surrounding noises present? | |
| | Light conditions? | |
| | Were toxic gases, dust, or fumes present? | |
| | Other | |

**DATA COLLECTION (Equipment)**

The checklist below provides guidance on common equipment related information that should be retrieved.

| X | ITEM | |
|---|---|---|
| | Inspect equipment for condition | |
| X | Is this the right equipment for the job? | Larger Stinger added after Incident |
| | Qualifications of equipment operators | |
| X | Right PPE for the job? | Fully outfitted. |
| | Operating history | |
| | Other | |

| Gulf Logistics Operating |  | Lessons Learned Form |
|---|---|---|

**Date**          **Vessel**                    **Incident Type**   Personal

### Description of Incident / Accident / Near Miss

As per Captain Lester James - While hooking to cargo, Mark had the his hand on the stinger and the boat went up on a wave. The headache ball hit Mark on the hard hat then the shoulder and then on his foot causing Mark to fall to the deck. Mark got up and went to forward deck area.The headache ball was caught on the cargo rail when the wave made the ball fall.

| 1 | Probable Cause | Headache ball caught on cargo rail |
|---|---|---|
| | Contributing Factor | Vessel went up on a swell. |
| | Preventive Measure | Give all stop signal to crane operator. |

| 2 | Probable Cause | Headache ball hit deckhand on hardhat and shoulder and foot. |
|---|---|---|
| | Contributing Factor | Deckhand in blind spot (between cargo box and port blower box). |
| | Preventive Measure | Deckhand needs to be in visible atrea during Rigging / Cargo Ops. |

| 3 | Probable Cause | Sea Conditions |
|---|---|---|
| | Contributing Factor | 6 to 7 ft swell |
| | Preventive Measure | Use Stop Work Authority is elevated sea conditions |

### Lessons Learned:

**Prepared By**          Randy Whittaker          **Date**          27-May-17

| Gulf Logistics Operating |  | Root Cause Analysis Form |
|---|---|---|

## Incident Summary Sheet

**Incident Type:** Rigging / Cargo Ops          **Classification:** Minor Injury

Vessel Name          Maggie A

Vessel Master     Lester James
Officer on Watch     Lester James

Witnesses
| Name: | Lester James | Company: | Gulf Logistics | Title: | Captain |
|---|---|---|---|---|---|
| Name: | Bruce Bolt | Company: | Gulf Logistics | Title: | Deckhand |
| Name: | Mark Flora | Company: | Gulf Logistics | Title: | Deckhand |

Person or Equipment Involved:          RAM Level Assigned     (include names of all in discussion)

M/V Mr Jake                              2     Randy Whittaker

Description of Incident:
   As per Captain Lester James - While hooking to cargo, Mark had the his hand on the stinger and the boat went up on a
   wave. The headache ball hit Mark on the hard hat then the shoulder and then on his foot causing Mark to fall to the deck.
   Mark got up and went to forward deck area.The headache ball was caught on the cargo rail when the wave made the ball
   fall.

Conditions at Time of Incident:                    Time, Date, & Location of Incident:
   Clear visability, 6 -7 ft swell, 10 kt wind, 1 kt current

                                                      0700 hrs. 5-25-17 GC 390  West Neptune

**Incident Investigation Summary Performed By:**          Randy Whittaker

**Attachments**
   1
   2
   3
   4

**Gulf Logistics Operating, Inc.   Safety and Environmental Management System Manual**

| Title:<br>**INJURY REPORTING, INVESTIGATION & CORRECTIVE ACTION** | Revision Number:<br>**0** | Date Effective:<br>**September 1, 2012** | Section:<br>**9.2** |
|---|---|---|---|
| | Prepared By:<br>**Operations** | Approved By:<br>**CA** | Page:<br>**Page 2 of 5** |

### 2.3    Personal Injury or Illness Reports

Injuries are reported and investigated to allow management to identify and correct the causes of any incident.  The goal of this investigation is to prevent a reoccurrence of the incident.

Illnesses are reported and are further investigated when management considers a further investigation required. Illnesses are not normally subject to the review and corrective action process.

Investigation also provides information required by underwriters, state law, and federal law.

In all injuries or illnesses, the appropriate completed forms along with completed statement forms from <u>all crewmembers</u> need to be forwarded to the office as soon as possible.

<u>All Injuries</u> that are reported to the Master, but were not witnessed, will still require a Personal Injury Report with witness statements. The Statement form should be noted, "Not witnessed" on the form.

All reports to the USCG or Company must be fully completed. The home office relies on these forms from the vessel to complete any additional reports that are required following a serious marine incident.

When a personnel injury is reported the Designated Person conducts an investigation as rapidly as practical.

The Designated Person may require the Master conduct a portion of the investigation.

This investigation may include the following steps.

- Post Accident Ledger
- Drug Screen of vessel crew when required by law or desired by management.
- A Drug Screen of the injured person when required by law or desired by management
- Completion of Form 2692 when required
- Crew interviews conducted and crew statements recorded
- Witness Statements completed
- Post Accident Ledger completed
- Corrective action determined, applied, and verified
- Management Review and Lessons Learned completed

EXHIBIT

005

**Gulf Logistics Operating, Inc.    Safety and Environmental Management System Manual**

| Title:<br>**INJURY REPORTING, INVESTIGATION & CORRECTIVE ACTION** | Revision Number:<br>**0** | Date Effective:<br>**September 1, 2012** | Section:<br>**9.2** |
|---|---|---|---|
| | Prepared By:<br>**Operations** | Approved By:<br>**CA** | Page:<br>**Page 3 of 5** |

## Corrective Action

The Master has the overriding authority and the responsibility to act to stabilize the situation and to correct any situation or condition that could jeopardize life, health, the environment, or company property.

Upon completion of the investigation and review by the Designated Person and the Operations Manager, immediate corrective action may be prescribed. This corrective action is transmitted by memo to the fleet with an acknowledgement receipt.

If no corrective action is required, then at the monthly Safety Meeting management will review the investigative report and determine corrective actions that may be necessary. This corrective action is transmitted to the fleet as "Lessons Learned".

These "Lessons Learned" are then reviewed in the next vessel Safety Meeting. This on board review is documented in the Safety Meeting Form.

## Accident Investigation Method

The goal of an injury investigation is to prevent further injuries through the use of the knowledge derived from the investigation. Additionally, the reports are critical in establishing liability or lack of it under the law.

When an employee is injured at work, the supervisor (in most cases the vessel Master) is responsible for the taking emergency action to have first aid administered, for obtaining medical attention as soon as possible, for protecting other employees and equipment, and investigating the circumstances of the injury. The following have found to be effective when investigating an injury.

- Go to the scene at once.

- Talk with the injured person if at all possible. Talk to witnesses. Stress getting the facts.

- Listen for clues in the conversations around you. Unsolicited comments often have merit.

- Encourage all to share their ideas for preventing a similar occurrence.

- Confer with all interested persons about possible solutions.

- Write you accident report giving complete, accurate accounts of the incident.

- Follow up to make sure that conditions are corrected.

- Publicize corrective action so that all may benefit from the experience.

Flora v. Transocean

**GLO    00409**

**Gulf Logistics Operating, Inc.    Safety and Environmental Management System Manual**

| Title:<br>**INJURY REPORTING,<br>INVESTIGATION &<br>CORRECTIVE ACTION** | Revision Number:<br>**0** | Date Effective:<br>**September 1, 2012** | Section:<br>**9.2** |
|---|---|---|---|
| | Prepared By:<br>**Operations** | Approved By:<br>**CA** | Page:<br>**Page 4 of 5** |

2.6    **Effective Injury Reports**

<u>**All accidents**</u> **must be reported, no matter how minor. Reporting an accident does not make it a Recordable injury!**

In order for the Injury Investigation to be effective it must contain at a minimum the following information:

- What the employee was doing.

- What happened, in detail, complete reports

- What the cause of the incident was.

- What can be done to prevent a similar incident from reoccurrence?

2.7    **Injury Classifications**

This system classifies injuries into three categories, **Lost Time Accidents**, **Recordable**, and **First Aid**. Outlined below is the criteria used to classify these incidences. The following guidelines should be followed for the purposes of record keeping and to determine proper injury classification.

2.8    **First Aid Incidences**

Any time a physician or emergency medical technician must provide basic first aid treatment, which is a considered one-time action with continued observation by the injured party. Any onboard treatment by vessel personnel with band-aids or small bandages will be looked at for seriousness and may be treated as a first aid incident.

2.9    **Recordable Injury**

An injury can become Recordable when the injuries received require more than simple first aid. Accidents will be classified as Recordable when medical treatment situations involve any of the following:

- Loss of consciousness, a positive x-ray that confirms a fracture, or removal of a foreign body imbedded in the eye.

- When skilled medical services of a physician, which prescribes medication or therapy requiring a return visit for the same condition resulting from the accident. (Except for a single dose administered during the first visit)

- When surgery or sutures are applicable to remedy injuries caused by the accident, or admission to the hospital.

| Title:<br>**INJURY REPORTING,<br>INVESTIGATION &<br>CORRECTIVE ACTION** | Revision Number:<br>**0** | Date Effective:<br>**September 1, 2012** | Section:<br>**9.2** |
|---|---|---|---|
| | Prepared By:<br>**Operations** | Approved By:<br>**CA** | Page:<br>**Page 1 of 5** |

**1.0    Purpose**

To describe the process of Injury Reporting, Investigation and Corrective Action



EXHIBIT

006

**2.0    Guidelines**

**2.1    General**

A personal injury is any physical harm, no matter how slight, that occurs on a Company Location.

A personal illness is any sickness or disease or incapacity caused by a medical condition while the person is present on a company location.

Both Illnesses and Injuries are reported by the vessel Master on the Personal Illness or Injury Report

It is the policy of Gulf Logistics Operating, Inc. that all injuries are to be reported and investigated for cause. The cause, as determined by the investigation, is to be corrected.

It is the policy of Gulf Logistics Operating, Inc. that all illnesses are to be reported. Illness is only investigated only when management considers it necessary.

**2.2    Considerations for the Master**

In the event of a serious marine incident or casualty, the Master should consider the following:

Do not discuss a serious injury or casualty with anyone.  A Company representative will arrange all authorized interviews, if and when needed. This applies to all Company employees.

Never discuss or assess blame when completing any verbal or written report of an injury, or casualty. Any verbal statements can be overheard and any written reports can be subpoenaed, which could jeopardize any legal position the Company may have.

In any serious situation fault will be determined by due legal process, if necessary.

Inform the shore base immediately after the situation is stabilized. Give the extent of the injury and the circumstances concerned. Communicate with the shore base by any prudent means.

Flora v. Transocean

**GLO    00407**

| Title:<br>**MASTER'S MANAGEMENT REVIEW** | Revision Number:<br>**0** | Date Effective:<br>**September 1, 2012** | Section:<br>**5.1** |
|---|---|---|---|
| | Prepared By:<br>**Operations** | Approved By:<br>**CA** | Page:<br>**Page 1 of 9** |

**1.0    Purpose**

To describe the Master's Review of the Safety and Environmental Management System

**2.0    Guidelines**

EXHIBIT

007

**2.1    Master's Management Review**

The Master's Review of the Safety and Environmental Management System is performed aboard each vessel at least once at periods not to exceed 12 months. This Review is scheduled by the Designated Person and is completed by the Master on duty at the time of the scheduled review. The completed Review is forwarded to the Designated Person. Company management will review all deficiencies and plan corrective action where deemed necessary.

The Master will use the Management Review form described in this manual to conduct the Review. The form contains complete instructions for performing the Review. Should any additional instructions be necessary they will appear on the acknowledgement letter forwarded from the home office. This form is used by the Document Controller to ensure control of documentation relevant to this Safety and Environmental Management System.

Corrective actions will be assigned to target any areas of concern after the review is completed and turned into the Designated Person.

The Review will be returned to each vessel. The Company will keep a copy of each annual review on file.

Flora v. Transocean

GLO    00321

**Gulf Logistics Operating, Inc.**   **Safety and Environmental Management System Manual**

| Title:<br>**MASTER'S MANAGEMENT REVIEW** | Revision Number:<br>**0** | Date Effective:<br>**September 1, 2012** | Section:<br>**5.1** |
|---|---|---|---|
| | Prepared By:<br>**Operations** | Approved By:<br>**CA** | Page:<br>**Page 2 of 9** |

| 1. Safety and Environmental Meetings: <u>Review Topics</u> |
|---|
| |
| |
| |
| |
| |
| |
| |
| Corrective Actions Required or Suggestions for Improvement |
| |
| |
| |
| |
| Overall effectiveness |
| |
| |

1.   The Master is to review the vessel file of Weekly Safety Meeting Reports and check off the following items:

Y ☐ N ☐   The vessel has a complete file of weekly Safety Meeting Reports onboard, signed by all crew attending. (52 weeks)

Y ☐ N ☐   All required weekly Safety Meetings have been held.

Y ☐ N ☐   The topics used were important to vessel operations and concerns.

Y ☐ N ☐   Monthly Lessons Learned were reviewed with crewmembers.

Y ☐ N ☐   A Job Safety Analysis has been completed for all major operations.

Y ☐ N ☐   Can JSA's be reviewed before beginning an operation?

Y ☐ N ☐   Are Job Safety Analysis completed for critical tasks?

The purpose of this Master's Review of the Weekly Safety Meeting Reports is to make sure that all important topics have been covered that relate to the jobs or tasks the vessel and personnel performs, that JSA's have been completed for all routine and hazardous operations. To ensure the Weekly Safety and Environmental Meeting is serving its purpose as part of the Safety and Accident Prevention Program and Training Record. The Master should describe any support and any changes that need to be made to this part of the Safety and Environmental Management System.

_____

_____

_____

**Gulf Logistics Operating, Inc.**   **Safety and Environmental Management System Manual**

| Title:<br>**MASTER'S MANAGEMENT REVIEW** | Revision Number:<br>**0** | Date Effective:<br>**September 1, 2012** | Section:<br>**5.1** |
|---|---|---|---|
| | Prepared By:<br>**Operations** | Approved By:<br>**CA** | Page:<br>**Page 3 of 9** |

| 2.        Pollution Prevention |
|---|
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| Corrective Actions Required or Suggestions for Improvement |
| |
| |
| |
| |
| |
| |
| Overall effectiveness |
| |
| |
| |

2.        The Master is to review Pollution Prevention and check off the following items.

Y ☐  N ☐        Was Pollution Prevention reviewed weekly as part of each meeting to address various pollution aspects?

Y ☐  N ☐        Are the fuel transfer procedures followed before any transfer?

Y ☐  N ☐        Are the oily waste handling procedures used before any transfer?

Y ☐  N ☐        Are waste management procedures followed as per MARPOL?

Y ☐  N ☐        Is planning part of any transfer before any transfer starts?

Y ☐  N ☐        Has this vessel had any pollution incidents of <u>any type</u>, spills, hazardous materials, or improper waste management incidents, in the previous year?

The purpose of the Master's review of the Pollution Prevention Planning reports is to make sure that all needed topics are covered in the weekly meetings and that pollution prevention planning has been completed for all vessel operations that have the potential for an adverse effect on the environment.  Each vessel's Pollution Prevention Planning and the effectiveness of all contingency plans should be reviewed for effectiveness.  The Master should include an opinion on the effectiveness of the pollution prevention and describe any changes that may need to be made.

Flora v. Transocean

**GLO    00323**

**Gulf Logistics Operating, Inc.**    **Safety and Environmental Management System Manual**

| Title:<br>**MASTER'S MANAGEMENT REVIEW** | Revision Number:<br>**0** | Date Effective:<br>**September 1, 2012** | Section:<br>**5.1** |
|---|---|---|---|
| | Prepared By:<br>**Operations** | Approved By:<br>**CA** | Page:<br>**Page 4 of 9** |

| 3.Review of all Accident/Injury/Near Miss reports: |
|---|
| List Dates and Occurrence (Accident, Injury, Near Miss) |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| Corrective Actions Required or Suggestions for Improvement |
| |
| |
| |
| Overall effectiveness |
| |
| |
| |

The Master is to review the file of Accident/Near Miss/Injury Reports and check off the following items.

Y ☐   N ☐      Does the Vessel have a complete, easily accessible file of Accident/Near Miss and Injury reports?

Y ☐   N ☐      Have these reports generated Job Safety Analysis and Safety Meeting in all appropriate cases?

Y ☐   N ☐      Was each accident report was sent to the Safety Department onshore.

Y ☐   N ☐      Were all Accidents/Injuries/Pollution incidences reported?

The Master should review the Accident, Injury and Near Miss file to determine the success of the Vessel Safety program. Each Accident, Injury or Near Miss Report should generate, at a very minimum, some type of on board corrective actions to prevent recurrence. Should your vessel have a reoccurring problem, note also in the appropriate section. Please describe those Corrective Actions that have been put into place to prevent reoccurrence.

**Gulf Logistics Operating, Inc.**    **Safety and Environmental Management System Manual**

| Title:<br>**MASTER'S MANAGEMENT REVIEW** | Revision Number:<br>**0** | Date Effective:<br>**September 1, 2012** | Section:<br>**5.1** |
| --- | --- | --- | --- |
| | Prepared By:<br>**Operations** | Approved By:<br>**CA** | Page:<br>**Page 5 of 9** |

| 4.     Review all USCG Inspections/ABS Surveys/Boarding |
| --- |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| Corrective Actions Required or Suggestions for Improvement |
| |
| |
| |
| |
| |
| |
| |
| |

The Master is to review any U.S.C.G/ABS Inspection, Survey or Port State Boarding findings to make sure there are no <u>outstanding</u> items that need correction.

Y ☐ N ☐     Does the vessel have any outstanding 835's or USCG work lists?
Y ☐ N ☐     Does the vessel have any outstanding ABS survey findings?
Y ☐ N ☐     Does the vessel have any outstanding Corrective Action Requests?

If the answer to any of the above is yes, the Master should include the planned closure of these items. If additional materials or technical support may be required to close any action item, then the Master should state so in this report and give the details.

Flora v. Transocean

**GLO    00325**

# Gulf Logistics Operating, Inc.    Safety and Environmental Management System Manual

| Title: **MASTER'S MANAGEMENT REVIEW** | Revision Number: **0** | Date Effective: **September 1, 2012** | Section: **5.1** |
|---|---|---|---|
| | Prepared By: **Operations** | Approved By: **CA** | Page: **Page 6 of 9** |

| 5. Review all Internal and External Audit findings and observations |
|---|
| |
| |
| |
| |
| |
| |
| |
| Corrective Actions Required or Suggestions for Improvement |
| |
| |
| |
| |
| |
| Overall effectiveness |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |

The Master is to review all audit reports to ensure that all Nonconformities and Observations have been addressed and corrected.

The Master of each vessel should review the audit findings from any audit either underline internal or external. The Master should describe corrective action plans for closing any outstanding items. Conditions that will prevent the recurrence of any audit deficiencies should also be described. Any needed technical expertise or logistical support that may be required should be requested.

**Gulf Logistics Operating, Inc.**    **Safety and Environmental Management System Manual**

| Title: | Revision Number: | Date Effective: | Section: |
|---|---|---|---|
| **MASTER'S MANAGEMENT REVIEW** | **0** | **September 1, 2012** | **5.1** |
| | Prepared By: | Approved By: | Page: |
| | **Operations** | **CA** | **Page 7 of 9** |

| 6. Have all assigned Corrective Actions been completed and effective? |
|---|
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| Note any ineffective, incomplete, or inappropriate corrective actions and include suggestions for improvement |
| |
| |
| |
| |
| |
| |
| |
| |
| |

The Master is to review any Corrective Actions required by the vessel or any Corrective Actions that have been assigned.

Y ☐ N ☐    Has the vessel requested any Corrective Actions?
Y ☐ N ☐    Has the response to Corrective Action requests has been timely and sufficient?
Y ☐ N ☐    Are all assigned Corrective Actions complete and deemed effective?

The Master of the vessel should describe any outstanding requests for Corrective Action, how long they have been outstanding, and what progress if any has been made toward their implementation. The Master should further describe any improvement in Corrective Action procedures that the Master considers necessary to improve the effectiveness of this Safety and Environmental Management System.

Flora v. Transocean

**GLO    00327**

**Gulf Logistics Operating, Inc.** **Safety and Environmental Management System Manual**

| Title: **MASTER'S MANAGEMENT REVIEW** | Revision Number: **0** | Date Effective: **September 1, 2012** | Section: **5.1** |
|---|---|---|---|
| | Prepared By: **Operations** | Approved By: **CA** | Page: **Page 8 of 9** |

| 7. *(Element to be reviewed will be placed here)* |
|---|
| Review the element of the system assigned above. |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |

The Master is to review the section of the system in detail that has been assigned to the vessel below.

> The element of the system to be reviewed and the details of that element assigned by the Designated Person.
> ( To be assigned annually_____ )

Flora v. Transocean

**GLO    00328**

| Title: **MASTER'S MANAGEMENT REVIEW** | Revision Number: **0** | Date Effective: **September 1, 2012** | Section: **5.1** |
|---|---|---|---|
| | Prepared By: **Operations** | Approved By: **CA** | Page: **Page 9 of 9** |

| 8. Overall Review of Vessel Safety and Environmental Management System |
|---|
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |

The Master shall report on the functioning of the system aboard the vessel, with a particular emphasis on reports of nonconformity, any unfulfilled material needs, corrective action requests, and other matters that the Master considers important to Accident or Pollution Prevention. Please take the required time to complete this review to completely assess the Safety and Environmental Management System onboard your vessel.

EXHIBIT

008

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| MARK FLORA | § | |
| | § | |
| VS. | § | C.A. NO. 4:19-CV-2328 |
| | § | |
| TRANSOCEAN DRILLING (USA), | § | |
| INC., ET AL. | § | |

### GULF LOGISTICS OPERATING, LLC'S OBJECTIONS TO PLAINTIFF'S NOTICE OF ORAL AND VIDEOTAPED DEPOSITION

**NOW COMES**, through undersigned counsel, Defendant, **Gulf Logistics Operating, Inc. ("GLO")**, who serves the following objections to Plaintiff's Notice of Oral and Videotaped Depositions of Gulf Logistics Operating, LLC's Corporate Representative in accordance with the Federal Rules of Civil Procedure, as follows:

### OBJECTIONS TO EXHIBIT A

1.      Your factual contentions as to the cause of the Incident, what happened leading up to and during the Incident, and what happened in response to the Incident.

2.      Policies, procedures, and safety guidelines concerning the navigation and operation of the Maggie A and/or West Neptune.

**RESPONSE:**

Objection: overly broad and lacks the reasonable particularity requirement under the F.R.C.P.

3.      Policies, procedures, and safety guidelines concerning the use or nonuse of communication devices when operating vessels and/or drill ships.

**RESPONSE:**

Objection: overly broad and lacks the reasonable particularity requirement under the F.R.C.P

4. Records reflecting the ownership, purchase, maintenance, repair, and service of the crane, headache ball stringer, and D hook involved in the cargo transfer that injured Plaintiff.

5. Documents reflecting the dimensions and types of cranes, headache balls, stringers, and D hooks available on the Maggie A and/or West Neptune on the day of the Incident.

6. Documents reflecting the types of cranes, headache balls, stringers, and D hooks that Defendant had purchased within 5 years of the Incident.

7. Records reflecting the persons and entities responsible for loading the cargo on the Maggie A that was transported to the West Neptune.

8. Records reflecting the ownership, purchase, maintenance, repair, and service of the equipment used to load the cargo on the Maggie A that was transported to the West Neptune headache ball, stringer, and D hook involved in the cargo transfer that injured Plaintiff.

9. Conditions at the drillship and vessel at the time of the Incident.

10. Dealings and communications with the Plaintiff and/or Defendants concerning the Incident, including but not limited to investigation and root cause analysis.

**RESPONSE:**

Objection: overly broad and lacks the reasonable particularity requirement under the F.R.C.P.

11. Your factual contentions as to Plaintiff's alleged injuries, including but not limited to any factual contentions that Plaintiff was not injured, is faking his injury, and/or that his injury is wholly the result of a pre-existing condition.

**RESPONSE:**

Objection: calls for expert opinion from a witness not qualified to render same.

12. The historical condition and maintenance of the crane, headache ball, stringer, and other equipment involved in transporting the containers between the Maggie A and West Neptune.

13. Complaints regarding the condition and maintenance of the vessels and its equipment, including but not limited to complaints from contractors, and workers.

**RESPONSE:**

Objection: overly broad, not proportionate to the needs of the case and as phrased could include information that is outside the scope of permissible discovery encompassing information that is not relevant nor reasonably calculated to lead to the discovery of admissible evidence. Defendant further objects to the extent that the topic requested lacks the reasonable particularity requirement under the F.R.C.P.

14.    Facts and circumstances regarding other injuries aboard the Maggie A and West Neptune.

**RESPONSE:**

Objection: overly broad, not proportionate to the needs of the case and as phrased could include information that is outside the scope of permissible discovery encompassing information that is not relevant nor reasonably calculated to lead to the discovery of admissible evidence. Defendant further objects to the extent that the topic requested lacks the reasonable particularity requirement under the F.R.C.P.

15.    Who was on the vessels (or supervising the vessels) at the time of the Incident from one month before the Incident and one month following the Incident, what they were doing and did, what they should have been doing, and their job duties and descriptions.

**RESPONSE:**

Objection: overly broad, not proportionate to the needs of the case and as phrased could include information that is outside the scope of permissible discovery encompassing information that is not relevant nor reasonably calculated to lead to the discovery of admissible evidence. Defendant further objects to the extent that the topic requested lacks the reasonable particularity requirement under the F.R.C.P.

16.    Your policies and procedures governing the work going on at the time of the Incident, as well as governing the work being performed on the vessels.

**RESPONSE:**

Objection: overly broad and lacks the reasonable particularity requirement under the F.R.C.P.

17.    Your discovery responses, and interpretation of the documents produced.

**RESPONSE:**

Objection: overly broad and lacks the reasonable particularity requirement under the F.R.C.P.

18.     All agreements, written or otherwise, governing the work at the platform at the time of the Incident.

19.     Your relationship with the other parties to this lawsuit.

20.     The existence or non-existence of documents supporting Your factual contentions.

**RESPONSE:**

Objection: overly broad and lacks the reasonable particularity requirement under the F.R.C.P.  Defendant further objects to the extent Plaintiff seeks to alter the burden of proof that exists by law.


                                        Respectfully submitted:

                                        ALLEN & GOOCH
                                        A LAW CORPORATION

                                        _____
                                        ALAN J. MECHE (SBOT#24025530)
                                        Attorney in Charge
                                        2000 Kaliste Saloom Road, Suite 400
                                        Lafayette, LA  70598-1129
                                        Telephone:  (337) 291-1480
                                        Fax:  (337) 291-1485
                                        Email:  AlanMeche@AllenGooch.com

Of Counsel:

ALLEN & GOOCH
A LAW CORPORATION

Randy Theunissen (SBOT #00795174)
2000 Kaliste Saloom Road, Suite 400
Lafayette, LA  70598-1129
Telephone:  (337) 291-1240
Fax:  (337) 291-1245
Email:  RandyTheunissen@AllenGooch.com
*Attorneys for Defendants, Gulf Logistics Operating, Inc.*
*and Gulf Logistics, LLC*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the above and foregoing instrument has this day been served on all parties through their counsel of record in accordance with the Federal Rules of Civil Procedure:

( )   Hand Delivery        ( )   Prepaid U.S. Mail        ( )   U.S. Mail/CMRRR

(X)   Email                ( )   Facsimile               ( )   Overnight Mail Service

Lafayette, Louisiana, this 16th day of March, 2021.


John D. Sheppard
Daniel Sheppard
MORROW & SHEPPARD, LLP
3701 Kirby Drive, Suite 1000
Houston, TX  77098

Melanie Fordyce
Michael D. Williams
BROWN SIMS
1177 West Loop South
Tenth Floor
Houston, TX  77027

_____
ALAN J. MECHE (SBOT#24025530)

**EXHIBIT**

**009**

**Gulf Logistics Operating, Inc.**



| Vessel Information | | | |
|---|---|---|---|
| Vessel Name: | Maggie A | Customer: | LLOG |
| Master (on board): | L. James | Watch Officer (at time of incident): | L. James |
| Name of other vessel(s) or property involved: | | | |
| Master (of other vessel(s)): | | | |
| Owner(s) of other property(s): | | | |

| Date, Time, Place | | | |
|---|---|---|---|
| Date of Incident: | 5-25-17 | Time: | 0700 |
| Date Reported: | 5-25-17 | Time: | 0715 |
| Offshore or Inland: | Offshore | Location/Block#: | GC-390 |

| Weather Conditions at Time of Incident | | | |
|---|---|---|---|
| Visibility: | Hrozica | Winds (Speed and Direction): | 10 kt/300 |
| Seas: | 6-7 ft swell | Current (Speed and Direction): | 1 kt 310 |

**Description of Incident** (Describe when/what/where the incident happened:)

While Hooking to cargo Mark had stinger in hand and the Boat went up on a wave and the Headache Ball hit Mark in head then shoulder then Foot.

**Personal Data**

| Names of Person(s) Injured | Job Title | Employer | On Duty? | Hours on-duty prior to incident | Nature of Injuries |
|---|---|---|---|---|---|
| Mark Flora | Deckhand | GLO | Yess | 7 | Bruised shoulder |
| | | | | | |
| | | | | | |
| | | | | | |

**Place (x) next to box best describing which type of incident:**

| Injury/Illness: | Vessel: | Third Party: | Pollution: |
|---|---|---|---|

| If injured, treatment given by: | | |
|---|---|---|
| Was injured sent ashore for treatment (yes or no): | | |
| If so, how: | When: | Where to: |

**Signature** (Verifying accuracy of document; invalid without)

| Signature of Person Completing Form: (Verifies accuracy of document) | | Date: | 5-25-17 |
|---|---|---|---|
| Printed Name and Title: | Leyhd James capt | | |

I did not see it I was adjusting D.P. Screen.



# Gulf Logistics Operating, Inc.
## Witness Report

M/V _Maggie A._  Date _5-25-17_

Witness Name _____  Phone Number _____

Address _____

Name of Injured _Mark Flora_  Date of Incident _5-25-17_

Location (on vessel) Accident Took Place _Port Deck, Aft_

Were you injured at the time of the incident? _Yes_

Did you see the Accident/Injury take place?  _X_ YES  _____ NO

If Yes, Explain in Detail What You Observed _Bruce & I were working, rigging a_
_grocery box on the deck to offload. I had the hook & Bruce_
_was attaching the tag lines. He quickly attached the tag lines_
_and was assisting me with the D-Ring & the Headache_ _#5-8 foot stimseo_
_ball (cylinder) got caught on the upper bullwork then freefell._
_It knocked my hardhat off & hit my left shoulder. The hook_
_fell on my Right foot just forward my ankle. I stumbled a few_
_feet to clear the area & rested on deck for a few minutes._

If No, Where were you when the Injury / Accident took place? _____

_____

_____

_____

_Mark Flora_  _____  _5-25-17_
Print Name  Signature  Date

GLO Form 9.1WIT R-0


| Vessel Damage<br>(if applicable, locate the areas of the vessel damaged during this incident) |
|---|

About these on Deck.





| Signature (Verifying accuracy of document; invalid without) | | |
|---|---|---|
| Signature of Person Completing Form:<br>(Verifies accuracy of document) | | Date: 5-25-17 |
| Printed Name and Title: | Lester James | |

GLO Form 9.1IR R-0


| Description of Damage to all Vessel(s), Property, or Environment (If Any)(Describe in detail) |
| --- |
| |

| Crew (on-board at time of incident - include all 3rd party crew members) | | |
| --- | --- | --- |
| (Each name listed is required to complete a Witness Report) | | |
| Name and title: B. Bolt | Employer | GlO |
| Name and title: M. Flora | Employer | GlO |
| Name and title: | Employer | |
| Name and title: | Employer | |
| Name and title: | Employer | |
| Name and title: | Employer | |
| Name and title: | Employer | |
| Name and title: | Employer | |
| Name and title: | Employer | |
| Name and title: | Employer | |
| Name and title: | Employer | |
| Name and title: | Employer | |
| Name and title: | Employer | |
| Name and title: | Employer | |
| Name and title: | Employer | |
| Name and title: | Employer | |
| Name and title: | Employer | |
| Name and title: | Employer | |
| Name and title: | Employer | |

| Signatures (Verifying accuracy of document; invalid without) | | | |
| --- | --- | --- | --- |
| Signature of Person Completing Form:<br>(Verifies accuracy of document) | | Date: | 5-29.17 |
| Printed Name and Title: | Lester Jacure g | Capt | |
| Signature of On-Board Master: | | Date: | |
| Printed Name and Title: | | | |
| Signature of Injured Party: | | Date: | 5-25-17 |
| Printed Name and Title: | Mark Flor | | |



# Incident Reporting Program



EXHIBIT

010

Objective: The purpose of this program is to provide uniform and consistent procedures for the reporting of all incidents. Timely reporting of all incidents ensures that LLOG management is notified and that regulatory reporting requirements are met. Investigations (when required) can be initiated promptly.

Scope: This program applies to all LLOG oil and gas operations including drilling, production, and construction both onshore and offshore. Immediate notification and the initial incident report are a requirements of this program for all operations.

Forward: LLOG must be notified of all incidents. LLOG recognizes that its contractors have safety programs and incident reporting procedures. LLOG, as the operator, has special responsibility for reporting to government agencies on incidents that occur on its properties. The LLOG incident forms may be used for this purpose. This may be in addition to contractor incident reporting forms.

General requirements: All personnel onboard LLOG owned or operated facilities are to report all incidents (injuries, illnesses, near misses, property damage, spills, fires, etc.) to the person-in-charge and their supervisor without delay. Failure to comply with this requirement or falsifying company documents may lead to disciplinary action up and including termination. The supervisor/person in charge is to see that the appropriate incident report is filled out and emailed to the LLOG Operations Manager and the LLOG Safety Department.

Patient Care: For injuries or illnesses patient care is of primary importance. The injury or illness should be assessed on the facility. Transportation, if needed, is to be secured as soon as possible. The employee's company is to be notified any time an employee leaves the facility for medical attention. Depending on the severity of the case, the injured/ill individual may need to be escorted by someone who can look after his/her needs. A representative of the employee's company should meet the individual at the dock, heliport, or hospital and allow the escort to return to the facility.

Agency Notification: A separate excel file "Regulatory Reporting Requirements" details the reporting requirements of MMS and USCG. It contains a guide for the regulatory requirements and forms that can be used to document the oral or written notification. Each department (drilling, production, and construct) has its own regulatory reporting protocol. For drilling, immediate oral notification is the responsibility of the on duty Drilling Foreman; for production and construction oral notification is made by the Production Superintendent. Ensuring that the follow up written report is submitted in the allotted time is the responsibility of the Safety Department.

Investigations: The first duty of operating personnel is to protect the evidence. With due regard to personnel safety, the incident scene should be preserved so that a subsequent investigation can be conducted. The purpose of the investigation is not to find fault, but to review what happened, why it happened, and how it can be prevented. Managmenet system failures should also be included in the report. Information gained from the investigation can be used to update procedures, correct unsafe acts or unsafe conditions with the goal of improving operations. Lessons learned from the investigation can be disseminated to all facilities through safety communiques which will heighten safety awareness and help prevent recurrence of that type of event. The decision to initiate a post accident LLOG investigation will be made by the appropriate operations manager. The manager will select the investigation team. Investigations may be conducted by contractors whose personnel, equipment or facilities were involved in the incident after approval by the LLOG operations manager.

Return to work: Anyone who leaves the facility for medical treatment (injury or illness) and is to return during the hitch or normal work schedule must present a work release prior to returning to the LLOG facility. If the person goes in for medical attention, but does not report back to that facility during the hitch/work schedule, the work release is the responsibility of the employer.

Incident classification: For recordkeeping purposes incidents will be classified as Lost Time, Restricted Work Case, Job Transfer, Other Recordable, First Aid, etc. The classification will be determined by the employer. LLOG will use this information in reports to its management and to report to government agencies.

# Instructions

| *Forms* | *Link* | *Description* |
|---|---|---|
| Injury or Illness | Injury or Illness'!A1 | A report to be used for all injuries and illnesses. This is the Supervisor's First Report of Injury or Illness, if there is to be an investigation, use the Incident Investigation form. |
| Near Miss | Near Miss'!A1 | A near miss report is used for an incident that does not result in injury, property damage, or environmental damage, but which could have caused serious consequences under different circumstances. |
| Property Damage | Property Damage'!A1 | The property damage form is to be used for damage or loss because of fire; explosion; blowout; collision; material lost overboard; crane incident; hurricane, wind, or lightening damage. |
| Investigation | Investigation!A1 | The Incident Investigation form can be used as a tool to investigate any of the above reported incidents. The operations manager or superintendent will determine which incidents need to be investigated and name members of the investigation team. |
| Action Items | Action Items'!A1 | This form is used to document completion of action items that were identified in the investigation. The Action Item form 1) identifies items to be corrected or implemented, 2) names a reponsible person for each item, and 3) indicates the completion date for each item. |

## Using the Forms

| Retrieving Form | Each report is on a separate sheet in this excel file. To retrieve a form you can select the link above or the tab below. |
|---|---|
| Filling in data | The report can be printed and the information hand written, or the information can be typed on the form and the form saved as a separate file. |
| Saving as a file | To save an excel sheet as a separate file: click on 1) edit, 2) move or copy sheet, 3) check create a copy, 4) in "to book" select (new book), 5) save this file with a new name. |
| Signed Copy | The original report must be signed and sent to the LLOG Safety Department. |

## Incident Report Distribution

The Incident Reports will be distributed by email per department guidelines: Drilling will post in the Rig Report Folder; Production will email report to Production Superintendent; and Construction will email reports to the supervising Facility Engineer. The Safety Manager will be copied on all incident reports.

Incident Investigation reports will typically be sent directly to the Department/Project Manager and the Safety Manger.

A copy of the Incident Report will be filed on the facility.

Personnel are not given a copy of the incident report. They can request a copy from LLOG Safety Dept.

The original LLOG incident reports along with copys all contractor generated incident reports will be forwarded to the LLOG Safety Department.

## Agency Notification

See Regulatory Reporting Requirements for Incident Notifications required by Federal Agencies.

MMS has incident reporting requirements. They are both immediate oral and written follow up reports required. The Regulatory Reporting Requirements file has a sheet with the reporting requirements and an oral report form.

The Coast Guard requires that a USCG 2692 be submited for all marine causalties. This form is typically filled out by the vessel or drilling rig. LLOG will be responsible to ensure that a report is filled out and sent to the USCG. Forward a copy of this form with the LLOG Incident Report. Copies of form 2692 and 2692B are on separate sheets in the Regulatory Reporting Requirements file.



# Supervisor's First Report of Incident
# Personnel Injury / Illness Report

| Enter Information is spaces provided, attach additional sheet if necessary | | | | |
|---|---|---|---|---|
| Facility Name | Facility Location | OCS Lease & Well # | Date of Incident | Time of Incident |
| Seadrill West Neptune | GC 390 | OCS-G 35865 | 5/25/17 | 7:00 |

| Injured/Ill Person's Name *(first, middle initial, and last)* | | Date of Birth | Date of Employment |
|---|---|---|---|
| Mark Flora | | NA | NA |

| Person's Address *(Street Address, City, State, and Zip)* | Telephone No. |
|---|---|
| NA | NA |

| Person's Job Title | Employer | Employer Contact | Contact Phone# |
|---|---|---|---|
| Deck hand | Gulf Logistics Operating, Co. | Mark Compeaux | 985-693-3888 |

| Industry Experience | Immediate Supervisor | Days in Current Hitch | Hrs. Worked this Date |
|---|---|---|---|
| | Lester James | 8 | |

| Describe Worker Activity Prior to the Time of the Incident | Operation in Progress |
|---|---|
| The crane operator sent the fast line down with taglines to the M/V Maggie A in order to offload the grocery box. | Indicate: Drilling, Workover, Completion, Production, Transportation or Other<br><br>Drilling |

**Incident Description** *(how the injury/illness person described the incident)*

The crane operator stated that the deck hands had removed the taglines and were in the process of attaching same and hooking the stinger to the grocery box. During this time there was a heave in the boat that caused the headache ball for the fast line to catch onto and lift with the grocery box. Upon the descent of the wave, the headache ball contacted the the deck hand knocking his hard hat off and then contacted his shoulder. He stated the hook of the stinger contacted his foot. Employee stated he does not want to seek medical attention.

| The Injury / Illness Reported | First Aid Treatment, if any |
|---|---|
| Bruised shoulder | Employee was given OTC Advil |

| Weather Conditions at Time of Incident | Wind Direction / Speed | Sea Conditions (ht/direction ) |
|---|---|---|
| Sunny, calm | 293 degrees, 10 knots | 3' |

| Provide Names and Telephone Numbers of Personnel who witnessed the Incident in the Spaces Below | | | |
|---|---|---|---|
| Name | Telephone No. | Name | Telephone No. |
| | | | |
| | | | |

**Was Proper PPE in use?**

| Hard Hat | Steel Toed Shoes | Hearing Protection | Safety Glasses | Goggles | Face Shield | Gloves | Apron | Fall Protection | Other PPE Req'd for Job |
|---|---|---|---|---|---|---|---|---|---|
| X | X | | X | | | X | | | |

Comments:

| Was Employee sent in for Medical Treatment prior to Crew Change? *(yes or no)* | No |
|---|---|
| If yes, where? | |

**Sign-off** *(sign-off to indicate your participation in this initial incident report)*

| | Print Name | Signature | Date |
|---|---|---|---|
| Employee | Mark Flora | | |
| Task Supervisor | Lester James | | |
| Facility Supervisor | Jacques Phaneuf | | |
| Person filling out report | Scott Sepulvado | Wilson Walley (LLOG co man) Flora 5/25/2017 Transocean | |

# GLO 00268

WNE-Inj-5-25-17.xls



# Near Miss Report

*Enter Information is spaces provided, attach additional sheet if necessary*

| Facility Name | Facility Location | OCS Lease & Well # | Date of Incident | Time of Incident |
|---|---|---|---|---|
|  |  |  |  |  |

| Weather Conditions at Time of Incident | Wind Direction / Speed | Sea Conditions (ht/direction ) |
|---|---|---|
|  |  |  |

| Describe Work Activity Prior to the Near Miss | Operation in Progress |
|---|---|
|  | Indicate: Drilling, Workover, Completion, Production, Transportation or Other |

## Incident Description



## Describe Potential for Injury



## List contributing causes including Management System failures



## List Immediate Action/s Taken



If additional corrective actions are required, initiate an *Incident Investigation Action Item List*

## Investigation Team Sign-off *(sign-off to indicate your participation in this initial incident report)*

| Team Member | Title/Position | Signature | Date |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  | Flora v. Transocean |

GLO 00269



# Property Damage Report

*Enter Information is spaces provided, attach additional sheet if necessary*

| Facility Name | Facility Location | OCS Lease & Well # | Date of Incident | Time of Incident |
|---|---|---|---|---|
| | | | | |

| Latitude | Longitude | Facility Supervisor |
|---|---|---|
| 28 deg 41'01.0748 N | 88 deg 10' 31.8170' W | Jack Phaneuf |

### *Type of Loss - check all that apply*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ☐ | Fire | ☐ | Collision | ☐ | Material Overboard | ☐ | Crane Related |
| ☐ | Explosion | ☐ | Well Blowout | ☐ | Hurricane | ☐ | Equipment Failure |
| ☐ | Lightning | ☐ | Windstorm | ☐ | Other (specify) | | |

### *Personnel Safety*

| | | | |
|---|---|---|---|
| Did incident involve injury to personnel? | ☐ Yes | ☐ No | For personnel injury, fill out Supervisor's First Report of Incident. |
| Has facility been secured? | ☐ Yes | ☐ No | |

*Description of damage - List major items lost, damaged or destroyed:*

Marine Debris -

Describe causes of property damage:

Describe any corrective actions taken or recommended:

Estimated cost of loss: (describe as needed)

*If additional corrective actions are required, initiate an Action Item List*

### Witnesses

| Name | Title | Company | Sign Off |
|---|---|---|---|
| | | | |
| | | | |
| | | | Flora v. Transocean |

OLO 00270



# Incident Investigation

*Enter Information is spaces provided, attach additional sheet if necessary*

| Facility Name | Facility Location | Name of Incident | Date of Incident | Time of Incident |
|---|---|---|---|---|
| | | | | |

*Provide detailed explanation of how the injured/ill person described the incident:*

List probable causes of the incident:

List contributing causes including Management System failures:

Recommendations to prevent recurrence of this type of event:

If additional corrective actions are required, initiate an *Incident Investigation Action Item List*

## Investigation Team

| Name | Title | Company | Sign - Off |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | Flora v. Transocean |

GLO 00271



# Incident Investigation Action Items

Enter Information in spaces provided, attach additional sheet if necessary

| Facility Name | Facility Location | Name of Incident | Date of Incident | Time of Incident |
|---|---|---|---|---|
|  |  |  |  |  |

**Action Item 1:**

| Responsible Person |
|---|
|  |
| Date Completed |
|  |
| Sign-off |
|  |

**Action Item 2:**

| Responsible Person |
|---|
|  |
| Date Completed |
|  |
| Sign-off |
|  |

**Action Item 3:**

| Responsible Person |
|---|
|  |
| Date Completed |
|  |
| Sign-off |
|  |

**Action Item 4:**

| Responsible Person |
|---|
|  |
| Date Completed |
|  |
| Sign-off |
|  |

**Action Item 5:**

| Responsible Person |
|---|
|  |
| Date Completed |
|  |
| Sign-off |
|  |

## Final Acknowledgement

| Name | Title | Company | Sign - Off |
|---|---|---|---|
|  |  |  |  |
|  |  |  | Flora v. Transocean |

GLO 00272