Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

* * * * * * * * * * * * * * * *
MARK FLORA
VERSUS            C.A. NO. 4:19-CV
TRANSOCEAN DRILLING
(USA), INC., ET AL
* * * * * * * * * * * * * * * *

    The videoconference deposition of GEORGE E. PLATT, M.D. was taken in the above-entitled cause, pursuant to the following stipulations, before Debbie G. Chaney, Certified Court Reporter, at Lafayette, Louisiana; the Witness appeared at 705 Ferris Street, Green Cove Springs, Florida, on Thursday, September 16, 2021, beginning at 1:24 p.m.

Page 2

1   A P P E A R A N C E S
2   (VIA VIDEOCONFERENCE)
3
    FOR THE PLAINTIFF, MARK FLORA:
4       MR. DANIEL E. SHEPPARD, ATTORNEY AT LAW
        MORROW SHEPPARD
5       3701 Kirby Drive, Suite 1000
        Houston, Texas  77098
6       dsheppard@morrowsheppard.com
7
8   FOR THE DEFENDANTS, GULF LOGISTICS, L.L.C.:
        MR. ALAN J. MECHE, ATTORNEY AT LAW
9       ALLEN & GOOCH
        2000 Kaliste Saloom Road, Suite 400
10      Post Office Drawer 81129
        Lafayette, Louisiana  70598-1129
11      alanmeche@allengooch.com
12
13  FOR THE DEFENDANTS, GRAND ISLE SHIPYARD, LLC:
        MS. ELIZABETH SANDOVAL, ATTORNEY AT LAW
14      BROWN SIMS
        1177 West Loop South, Tenth Floor
15      Houston, Texas  77027-9007
        esandoval@brownsims
16
17
18
    Mr. Bob Laroussini, Videographer
19  Bob Laroussini Productions
    (337) 233-VIDEO (8336)
20  bob@laroussiniproductions.com
21
22
23
24
25

Page 3

                INDEX
                                        Page
 1
 2
 3   Examination By Mr. Meche           6
 4
     Examination By Mr. Sheppard        37
 5
     Re-Examination By Mr. Meche        48
 6
     Examination By Ms. Sandoval        51
 7
     Re-Examination By Mr. Sheppard     53
 8
 9          EXHIBITS
10       Description
11   1   Curriculum Vitae          8
12   2   Medical record           12
13   3   Medication record        27
         14

Page 4

1   S T I P U L A T I O N S
2
3   It is stipulated and agreed by and between
4   counsel for the parties that the deposition of
5   GEORGE E. PLATT, M.D., is hereby taken by counsel
6   for the Defendants, for all purposes, as well as
7   all other purposes pursuant to notice and to the
8   provisions of the appropriate statutes of the
9   Federal Rules of Civil Procedure.
10
11  That the witness waives the right to read and sign
12  the deposition;
13
14  That all formalities of sealing, certifying
15  and filing are waived;
16
17  That all objections, except those as to the
18  form of the question and the responsiveness of
19  the answer, are reserved until such time as this
20  deposition or any part thereof may be used or
21  sought to be used in evidence;
22
23  That, Debbie G. Chaney, Certified Court
24  Reporter officiated in administering the oath to
25  the above-mentioned witness remotely.

1 (Pages 1 to 4)

**Exhibit F**

Page 5

1  VIDEOGRAPHER:
2      We are on the record.  This video
3  deposition is being conducted via remote
4  audio/video conference and is being
5  recorded.
6      Today is Thursday, September 16th,
7  2021.  The time is approximately 1:24
8  p.m.
9      This is the remote audio/video
10 conference of George E. Platt, MD, in the
11 matter of Mark Flora versus Transocean
12 Drilling, U.S.A., Inc.
13     This is the Zoom host, Bob
14 Laroussini.  The Court Reporter is Debbie
15 Chaney appearing for Lori Heaphy and
16 Associates at Lafayette.
17     Will counsel please state your name,
18 whom your represent, and your agreement
19 to the following condition that the Court
20 Reporter shall swear in the witness
21 remotely via audio/video conference.
22 MR. SHEPPARD:
23     Daniel Sheppard for the Plaintiff,
24 agree to the stipulation.
25 MR. MECHE:

Page 6

1      Alan Meche representing LOGG
2  Exploration and Gulf Logistics, and we
3  agree to the stipulation.
4  MS. SANDOVAL:
5      Elizabeth Sandoval for Grand Isle
6  Shipyard, LLC, and we agree to the
7  stipulations.
8  VIDEOGRAPHER:
9      Thank you.
10 MR. SHEPPARD:
11     I just want to put on the record,
12 the parties have agreed that objection to
13 form will count for all form objections.
14 VIDEOGRAPHER:
15     Thank you.  Madam Court Reporter,
16 would you swear in the witness?
17     GEORGE E. PLATT, M.D.,
18 after being first duly sworn, was examined and
19 testified as follows:
20     THE WITNESS:
21     I do.
22         EXAMINATION
23 BY MR. MECHE:
24 Q  All right.  Dr. Platt, would you please state
25    your full name for the record, sir?

Page 7

1  A  George Edward Platt.
2  Q  And how are you employed, sir?
3  A  I'm self-employed at the particular business
4     that involves doing the pre-employment exams
5     and Coast Guard exams.  Well, it's actually a
6     private corporation.  Actually, I own -- I'm
7     half owner in a corporation called Clay
8     Medical of North Florida.
9  Q  Okay.  And what is the address of that
10    company, sir?
11 A  705 Ferris Street, Green Cove Springs,
12    Florida 32043.
13 Q  All right.  Can you tell the court and jury
14    what type of medical doctor you are?
15 A  I'm a family physician.
16 Q  Okay.  Can you give us kind of a summary of
17    your training, schooling, and experience in
18    that area?
19 A  Yes.  I went to medical school at the Medical
20    University of South Carolina in Charleston.  I
21    did my residency at St. Vincent's Hospital in
22    Jacksonville, Florida.  And, you know, I've
23    done a number of CMEs, including occupation
24    medical -- medicine CMEs.
25 Q  Okay.  How long have you been a medical

Page 8

1     doctor?
2  A  Since 1987.
3  Q  Okay.  Do you have any particular, or other
4     specializations or board specializations?
5  A  I do not.
6  Q  Okay.  Doctor, do you have a curriculum vitae,
7     if we would like to take a look at it?
8  A  I do.
9  Q  Okay.  When we're done with this deposition,
10    can you provide a copy of that to my office so
11    that we can attach it to the deposition?
12 A  I do.  My office manager will take care of
13    that.
14 Q  Okay.
15    MR. MECHE:
16       We'll go ahead and mark that as the
17    Exhibit Number 1, the curriculum vitae of
18    Dr. Platt.
19    (Exhibit 1 marked for identification.)
20 MR. MECHE:
21 Q  Dr. Platt, you understand that we're here to
22    take your deposition regarding the U.S. Coast
23    Guard physical that you performed on Captain
24    Mark Flora, on December 11th, 2017?
25 A  Correct.

Page 9

1  Q   Okay. Do you have any particular memory of
2      Captain Flora?
3  A   I truly don't. I've got the exam that I
4      completed, and that's about all I know at this
5      point.
6  Q   Okay. Dr. Platt, I'll represent to you that
7      the document that my office has that's been
8      circulated in this litigation is a five-page
9      document. It's called the Application for
10     Merchant Marine Medical Certificate.
11 A   Yes, that is this document right here.
12 Q   Okay. Other than that document, and we're
13     going to take a look at it here in a minute,
14     do you have any other medical records on --
15 A   I do not.
16 Q   -- Captain Mark Flora?
17         You do not?
18 A   I do not.
19 Q   Okay. So is it -- is it accurate to say that
20     the only time that you ever saw Captain Flora
21     was on December 11th of 2017?
22 A   To the best of my knowledge. I don't think
23     I've ever seen him as a true patient.
24 Q   Okay. And in addition to that medical record
25     that you just held up, have you received any

Page 10

1      medical records or other documents regarding
2      Captain Flora from any source?
3  A   I have not.
4  Q   Okay. And Doctor, we used to do these
5      depositions in-person, but because of the
6      pandemic, we're working on Zoom. One of the
7      shortcomings of the video process is there's
8      some sort of a delay at times, so I'll just
9      ask you to give a little bit of a pause before
10     your start your answer so that you and I are
11     not talking over each other. Okay?
12 A   Sure.
13 Q   Thank you.
14     All right. And so, as I understand your
15     testimony, you don't have any other medical
16     records --
17 A   I do not.
18 Q   -- on Captain Flora. Okay.
19 A   I think I did this, this exam, I think he was
20     working for Smith Maritime at the time, and I
21     think they were responsible for getting this
22     exam done.
23 Q   That is correct, sir. I'll represent to you
24     that we got a copy of your medical record in
25     the Smith Maritime documents that were

Page 11

1      subpoenaed and produced in this litigation.
2         You understand that?
3  A   Okay.
4  Q   Okay. So December 11th of 2017 is the only
5      time that you have ever seen or evaluated
6      Captain Flora?
7  A   To the best of my knowledge.
8  Q   All right. If anybody were to ask you about
9      healthcare that Captain Flora received before
10     that date or after that date, would it be fair
11     to tell the jury that you have no personal
12     knowledge of that?
13 A   That is correct.
14 Q   And you no have opinions on that?
15 A   That is correct.
16 Q   All right.
17 A   When I do these exams, you have to pretty much
18     depend on what the person tells you as far as
19     their medical history goes.
20 Q   And I understand that, Doctor. We're going to
21     get into that --
22 A   Okay.
23 Q   -- because that's some of the questions that
24     all of the lawyers here want to know about.
25 A   Sure.

Page 12

1  Q   Have you had an opportunity to review the
2      record before today?
3  A   I did.
4  Q   All right.
5         MR. MECHE:
6         Doctor, I'm going to go ahead and
7      pull up what we're going to call as
8      Exhibit 2.
9      (Exhibit 2 marked for identification.)
10 MR. MECHE:
11 Q   All right. Dr. Platt, are you able to see on
12     your screen --
13 A   Yes.
14 Q   Okay. All right. And just before we
15     continue, I'm going to scroll through it and
16     make sure that we have all the pages. These
17     documents have been Bates-numbered in this
18     case as number 208 all the way down to 212.
19     212 --
20 A   Okay.
21 Q   -- is the last page that includes your
22     signature and your stamp; is that correct?
23 A   That is correct.
24 Q   All right. This document, Exhibit Number 2,
25     is this your -- is this a true and correct

Page 13

1  copy of your medical record in this case on
2  Captain Mark Flora?
3  A  Yes, it is.
4  Q  Okay.  And this is a document that you would
5     have kept in your medical practice at the time
6     that you saw Captain Flora for the purpose of
7     recordkeeping.  True?
8  A  That is the only document I would have kept.
9  Q  Okay.  All right.  I want go through the
10    specifics in this document, Dr. Platt.  But
11    before doing so, can you give us a general
12    description of how a U.S. Coast Guard physical
13    is conducted?
14 A  Yes.  The -- the applicant, basically, you
15    know, comes to the office.  In this situation,
16    he was working for Smith Maritime.  So the
17    secretary at Smith Maritime would call my
18    office and say they have so and so that needs
19    to be, you know, cleared for Coast Guard, or
20    for a Coast Guard physical.  And they'd --
21    we'd make an appointment.
22        They show up.  We'd do their vital signs,
23    and they'd put him in a room and give me this
24    form.  And I would go in there and question
25    the person on the various things in the form;

Page 14

1  are they taking medications, do they have
2  medical problems?  And then, I would conduct a
3  physical general exam.
4  Q  All right.  Now, in terms of this -- the type
5     of physical that you might conduct on a
6     civilian versus someone who is seeking a
7     merchant marine certificate, those are
8     different, correct?
9  A  There's a little more detail in the merchant
10    marines, because we do, like -- you know, we
11    do some coordination tests, and also do, you
12    know, color -- color vision screening using,
13    you know, various charts.
14 Q  Okay.  But in -- but in terms of
15    documentation, there's a specific Department
16    of Homeland Security document that the
17    physician must use when documenting this
18    physical?
19 A  Oh, yeah, that's what this is.  The form
20    you're showing in front of me, that's this
21    document.
22 Q  Okay.  And that -- and that's what I'm driving
23    at.  It's called the CG-719B.  Where do you
24    get copies of those documents?  Do you
25    download them from the internet whenever you

Page 15

1  have a Coast Guard physical?
2  A  We can do that, or typically, Smith Maritime
3     sends it a -- sends a copy with the person.
4  Q  Okay.  And how long have you been doing
5     U.S. Coast Guard physicals, Dr. Platt?
6  A  Probably 20, 25 years.
7  Q  Okay.  And you're still doing them now?
8  A  Absolutely.
9  Q  Okay.  And along with the actual document that
10    has to be filled out and sent to Smith
11    Maritime, you have, in your office or access
12    in your office, the instructions that the
13    Department of Homeland Security uses in order
14    to conduct these examinations?
15 A  Sure.
16 Q  All right.  So let's take a look at Exhibit
17    Number 2, section Roman Numeral I is something
18    that's filled out by Captain Flora and
19    reviewed by you, correct?
20 A  That is correct.
21 Q  Okay.  This is just identifying information on
22    Captain Flora --
23 A  Yes.
24 Q  -- a reference number and that sort of thing,
25    correct?

Page 16

1  A  Correct.
2  Q  Okay.  And in section II, entitled -- strike
3     that.
4        Section IIA, entitled Medical Conditions,
5     where my cursor is located, it says that this
6     is to be completed by the applicant and then
7     reviewed by the medical practitioner; is that
8     correct?
9        VIDEOGRAPHER:
10           Excuse me, Dr.  Platt.  Your
11       microphone has been muted.
12       THE WITNESS:
13           Okay.  That was weird.  I didn't
14       touch anything, but I can hear y'all now.
15       VIDEOGRAPHER:
16           We can hear you.  You're back.
17 MR. MECHE:
18 Q  All right.  Let me ask the question over,
19    Dr. Platt.  Section Roman Numeral IIA,
20    entitled Medical Conditions, where my cursor
21    is located, it says that's to be completed by
22    the applicant, here Captain Flora, and then
23    reviewed by you, the medical practitioner; is
24    that correct?
25 A  That is correct.

4 (Pages 13 to 16)

Page 17

1    Q   All right.  Is this the portion of the
2        interview and evaluation where the patient
3        discloses to you what medical conditions they
4        have that are important --
5    A   Yes.
6    Q   -- to the Department of Homeland Security?
7    A   Absolutely.  That's -- well, that's part of
8        it.  You know, they disclose their conditions,
9        and then, later, they disclose what
10       medications they might be treating, which kind
11       of would lead me to what conditions they have
12       as well.
13   Q   All right.  Why is -- why is the information
14       in section IIA important, Doctor?
15   A   Well, that's the only thing that can really
16       guide me into my decision of, you know,
17       whether they need additional testing, or
18       whether we need a consultation with any
19       specialist, or are they able to work or not.
20   Q   Would it be fair to say that all of the
21       decisions you have to make with respect to
22       whether or not to issue this certificate,
23       those are all impacted by the information that
24       Captain Flora discloses in section IIA?
25   A   Very strongly.

Page 18

1    Q   Right.
2        And I think you said earlier that, you
3        know, you are -- you're, quite frankly, at the
4        mercy of -- of a patient, such as Captain
5        Flora, to either remember or truthfully
6        disclose the information that's being sought
7        in this section.
8    A   Right.  Right.  Indeed.  That's -- there's no
9        other way of getting a history.
10   Q   All right.  What does section IIA tell the
11       patient, the applicant to do?  What do -- what
12       do they have to disclose here?
13   A   They have to disclose any -- any of their --
14       any of their medical information --
15   Q   Okay.
16   A   -- and they have to sign that they -- that
17       this is accurate.
18   Q   All right.  Let's take a look at this
19       statement, the very first statement in that
20       section, Dr. Platt.  It says, to the best of
21       your knowledge, have you ever had, required
22       treatment for, or do you presently have any of
23       the following conditions?
24       Did I read that correctly?
25   A   Correct.

Page 19

1    Q   All right.  This document, Dr. Platt, is
2        asking for a couple of pieces of information,
3        right?  They want to know whether Captain
4        Flora has ever had, or gotten treatment for
5        these conditions, or if he presently has those
6        conditions when he saw you.  True?
7    A   Absolutely.  Yes.
8    Q   What is the only category that Captain Flora
9        disclosed that he had --
10   A   14.
11   Q   -- that he answered yes to?
12   A   The 14, allergies.
13   Q   Okay.  And that's allergies or allergic
14       reactions to any substance, medication, or
15       food; is that correct?
16   A   That is correct.
17   Q   All right.  I want to ask you some questions
18       about some specific information that Captain
19       Flora checked off.  Take a look at item number
20       29.  What is item number 29?
21   A   Back pain, joint problems, orthopedic surgery.
22   Q   All right.  And in terms of whether Captain
23       Flora has ever had that, if he's ever required
24       treatment for that, or if he had that at the
25       time that he saw you, what did he disclose to

Page 20

1        you?
2    A   He said he did not have that.
3    Q   He denied having any of those things in the
4        past --
5    A   Right.
6    Q   -- or present when he saw you?
7    A   Correct.
8        MR. SHEPPARD:
9           Object to form.
10   MR. MECHE:
11   Q   Okay.  Did you have any information to
12       contradict what Captain Flora was telling you?
13   A   I did not.
14   Q   I mean, you're at the mercy of what he's
15       telling you?
16       MR. SHEPPARD:
17          Object to form.
18   MR. MECHE:
19   Q   Is that correct?
20   A   Yes, sir.
21   Q   Did Captain Flora disclose to you a low back
22       injury that he had received as a result of an
23       automobile accident many years earlier?  Did
24       he disclose that to you?
25   A   He did not.

5 (Pages 17 to 20)

Page 21

1    Q    All right. Let's take a look at item
2         number 31. What does that one read, Doctor?
3    A    Fractures, recurring dislocations, or
4         limitation of motion of any joint.
5    Q    Okay. At the time that you saw him on
6         December 11th, 2017, did he disclose any past
7         or present problems with that category?
8    A    He did not.
9    Q    Let's take a look at item number 33. When
10        asked to disclose any diseases, surgeries,
11        cancers, illnesses, or disabilities that were
12        not otherwise listed on the form, what did he
13        disclose to you, Dr. Platt?
14   A    He said there were none.
15   Q    Okay. So Captain Flora didn't disclose to you
16        that he had had hernia surgery at some point
17        in his life?
18   A    No. No, he did not.
19   Q    Okay. And these are things that are important
20        to you, right?
21   A    Yes. Typically, I would say that, you know,
22        any kind of surgeries are important because
23        that would cue me to look more closely in that
24        area.
25   Q    It certainly -- it may or may not have

Page 22

1         anything to do with ultimately whether you
2         clear Captain Flora, but the only way that you
3         know how to focus your questions and your
4         investigations is if you were provided with
5         accurate information, correct?
6    A    Absolutely.
7    Q    Now, at the time -- strike that.
8             We started off this deposition,
9         Dr. Platt -- you understand that Captain Flora
10        is in litigation right now. Do you know that?
11   A    I would assume that since he has an attorney
12        and y'all have an attorney, but I don't know
13        anything more about it than that.
14   Q    Okay. You don't know what his lawsuit injury
15        is all about?
16   A    I do not.
17   Q    Do you know what date Captain Flora alleged
18        that he was injured, that this lawsuit is
19        based on?
20   A    I do not.
21   Q    Okay. Well, Dr. Platt, I'll represent to you
22        that Captain Flora alleges a left shoulder and
23        other injuries arising out of an offshore
24        accident. And in particular, he alleges that
25        he has left shoulder and other problems.

Page 23

1         You were not aware of that before today?
2    A    I was not.
3    Q    Okay. I'll also represent to you that,
4         according to his lawsuit, this incident that
5         caused the injury occurred on May 24th, 2017.
6             Were you aware of that?
7    A    I was not.
8    Q    Okay. That's about -- that's just a little
9         over six months before Captain Flora saw you;
10        is that correct?
11   A    Sounds like it.
12   Q    Okay. I'll also represent to you that, you
13        know, because we're here today, this lawsuit
14        is still going on. And so, when Captain Flora
15        saw you in December of 2017, he didn't say
16        anything to you about the incident that this
17        lawsuit is based on?
18   A    No, sir.
19        MR. SHEPPARD:
20            Object to form.
21   MR. MECHE:
22   Q    Did he make any complaints of shoulder pain?
23   A    He did not.
24   Q    Did he make any complaints of physical
25        limitations to his shoulder?

Page 24

1    A    He did not.
2    Q    Did he make any complaints to you about any
3         injury to any other part of his body?
4    A    He did not.
5    Q    All right. Let's take a look at the next page
6         of Exhibit 2, which is the section IIB,
7         Medical Conditions.
8             Doctor, I need to pause you just for one
9         second. Just one second, sir.
10            All right, Dr. Platt. You testified that
11        the only thing that Captain Flora disclosed
12        was an allergy. And that's identified in
13        section IIB; is that correct?
14   A    Right. And it's penicillin.
15   Q    All right.
16   A    Spelled wrong.
17   Q    Now, in terms -- in terms of medication, that
18        would be documented in section Roman Numeral
19        III of Exhibit 2; is that correct?
20   A    Section III?
21   Q    Yes --
22   A    Yes.
23   Q    -- I believe it's section Roman Numeral III.
24   A    Correct. And he checked none, right.
25            Can you hear me?

6 (Pages 21 to 24)

```
                                                    Page 25
 1   Q   Yes, sir.
 2   A   Okay.
 3   Q   Let me pull this up so that we can look at it
 4       together.
 5   A   Yes, I got it here, too.
 6   Q   Okay.  So can you read what the first sentence
 7       of section Roman Numeral III says with regard
 8       to medication?
 9   A   Yes.  Applicants are required to complete a
10       general medical exam -- are required to report
11       all prescription medications prescribed,
12       filled, or refilled, and/or taken within 30
13       days prior to the date that the applicant
14       signs this form.
15           In addition, all prescription medications
16       and all non-prescriptions, over-the-counter
17       medications, including dietary supplements and
18       vitamins, that were used for a period of 30
19       days or more within the last 90 days prior to
20       the date that the applicant signs the form, or
21       approved equivalent form, must also be
22       reported.
23           The information reported by the applicant
24       must be verified by the verifying medical
25       practitioner, or other qualifying medical
```

```
                                                    Page 26
 1       practitioner, to the satisfaction of the
 2       verified medical practitioner to include the
 3       two following items:  Report all medications,
 4       prescription or non-prescription, dietary
 5       supplements and vitamins, and to include doses
 6       of each -- doses of every substance reported
 7       on this form, as well as the condition for
 8       which the substance is taken.
 9   Q   Okay.  And so, with respect to prescription
10       medication, did Captain Flora disclose to you
11       that he had taken -- that he was taking any
12       prescription medication?
13   A   He did not.  And he signed that -- to indicate
14       the signature that he agreed.
15   Q   Did he disclose to you that he was taking any
16       over-the-counter medication?
17   A   He did not.
18       MR. SHEPPARD:
19           Object to form.
20   A   He checked none.
21   MR. MECHE:
22   Q   Okay.  Did Captain Flora disclose to you that
23       he was in need of prescription medication that
24       he had not yet obtained?
25   A   No.
```

```
                                                    Page 27
 1   Q   All right.  And so, as a result of the
 2       disclosures that Captain Flora represented to
 3       you, you checked off none in section III; is
 4       that correct?
 5   A   That is correct.
 6   Q   And both you and Captain Flora signed that?
 7   A   He actually checked it off and I verified it.
 8   Q   Okay.  All right.
 9       MR. MECHE:
10           Doctor, I want to -- I want to show
11       you what we're going to mark as Exhibit
12       Number 3.
13       (Exhibit 3 marked for identification.)
14   MR. MECHE:
15   Q   And I'll just ask for your patience while I
16       try to pull this up.
17           All right.  Doctor, what we've marked as
18       Exhibit Number 3, do you see on your screen, a
19       copy?
20   A   I do.
21   Q   It's the Plaintiff's First Amended Complaint?
22   A   Correct.
23   Q   Okay.
24       MR. MECHE:
25           Bob, is there a way to take the
```

```
                                                    Page 28
 1       video -- well, let me see.  This might do
 2       it.  Okay.
 3   MR. MECHE:
 4   Q   Can you still see the document, Doctor?
 5   A   Yes, sir.
 6   Q   Okay.  All right.  I'll represent to you this
 7       is -- this is actually an amended lawsuit that
 8       Captain Flora filed in October 25th of 2019.
 9       Do you see that at the top of Exhibit 3?
10   A   I do.
11   Q   Okay.  And Doctor, I'm going to go to page 6
12       of this document.  I've got some questions
13       regarding the representations made by Captain
14       Flora.
15           All right.  You see here at the bottom of
16       page 6, I'll read to you the last sentence.
17       It says, Plaintiff has incurred and will
18       continue to incur pharmaceutical and medical
19       expenses in connection with his injuries.
20           My question to you is:  When you saw
21       Captain Flora just a few months after his
22       alleged incident, did he disclose to you any
23       issue with respect to pharmaceuticals that he
24       needed or that he would need in the future?
25   A   He did not.
```

Electronically signed by Debbie Chaney (201-173-885-4286)        5c97eaa5-1ad9-4f32-b342-1e516996f80d

Page 29

1  MR. SHEPPARD:
2      Object to form and also misleading.
3  MR. MECHE:
4  Q  Did he disclose those, Doctor?
5  A  He did not.
6      MR. SHEPPARD:
7          Same objection.
8  MR. MECHE:
9  Q  In fact, wouldn't it be fair to tell the jury
10     that with respect to whatever injuries are
11     described in this lawsuit, Captain Flora
12     didn't tell you anything about it?
13     MR. SHEPPARD:
14         Object to form.
15 A  Yeah, he did -- he did not tell me anything
16    about previous injuries.
17 MR. MECHE:
18 Q  All right.  I want you to take a look at
19    paragraph 12 of the Plaintiff's amended
20    lawsuit.  It says here that the Plaintiff
21    suffered serious and debilitating injuries to
22    his head, neck, shoulder, back, knee, and
23    other parts -- body parts when struck by a
24    heavy headache ball.
25         When you saw Captain Flora in December of

Page 30

1     2017, did he describe to you any incident
2     wherein he was hit by a headache ball and
3     suffered serious and debilitating injuries to
4     these body parts?
5     MR. SHEPPARD:
6         Object to form.
7  A  He did not.
8  MR. MECHE:
9  Q  If, in fact, Captain Flora was suffering
10    injuries to some or all of these particular
11    body parts that he is representing to the
12    jury, based on your examination of him in
13    connection with this medical certificate,
14    wouldn't he have been required to disclose
15    that to you?
16 A  According to the Coast Guard rules, he should
17    have.
18 Q  Let's take a look, Doctor, going back to
19    Exhibit Number 2.  You talked earlier about
20    the fact that you had to do certain vision and
21    maybe hearing type examinations in conjunction
22    with the medical certificate as well; is that
23    correct?
24 A  That's correct.
25 Q  And those are reflected on section IV and V

Page 31

1     that we have up on the screen right now.
2     True?
3  A  That is -- that is correct.
4  Q  And Captain Flora was cleared for duty based
5     on those as well?
6  A  As you can see, he's got exceptional
7     vision, 20/13, which is better than average.
8     And no -- no -- no errors on the Ishihiara
9     color plates.
10 Q  Okay.  Now, let's take a look at page 4 of
11    Exhibit Number 2, section Roman Numeral VI.
12        All right.  This is the physical
13    examination part of your exam; is that
14    correct?
15 A  That is correct.
16 Q  Okay.  Doctor, can you describe for the jury
17    how you go about examining upper and lower
18    extremities and the spine and musculoskeletal
19    sections of this exam?
20 A  I typically watch how they walk into the exam
21    room, how they sit, what their appearance is
22    sitting.  I tend to -- tend to get them to do
23    the Romberg test, which involves outstretching
24    their arms, tilt, leaning backwards, and then
25    touching their index finger to their nose with

Page 32

1     their eyes closed on each side independently.
2         I typically have them lean over and touch
3     their toes, allowing them to bend their knees
4     if they need to.  And that's pretty much --
5     and I do check reflexes.
6  Q  Now, in terms of your physical exam, sections
7     VIII and IX -- well, actually all of them are
8     normal, correct?
9  A  That is correct.
10 Q  You didn't find a single abnormality with
11    Captain Flora on this exam.  True?
12 A  No gross abnormality, that is correct.
13 Q  Okay.  And if he would have disclosed to you a
14    left shoulder injury, left shoulder pain, or
15    left shoulder limitations, those would be
16    described in this section, correct?
17 A  Well --
18    MR. SHEPPARD:
19        Object to form.
20 A  -- if I had noted -- if I had noted
21    anything -- had he disclosed that at the
22    beginning in his history, I probably would
23    have done a much more detailed exam of the
24    shoulder, for example.  You know, I could have
25    gone through a whole shoulder exam --

Page 33

1  MR. MECHE:
2  Q  Okay.
3  A  -- as opposed to just the general exam.
4  Q  Unless the patient tells you about an issue
5     with the left shoulder --
6  A  Right.
7  Q  -- you only -- you only have to go so far with
8     the exam, correct?
9  A  Exactly.
10 Q  Let's take a look at the last page of
11    Exhibit 2, Doctor.  This is Roman Numeral VII,
12    and it's a demonstration of physical ability.
13    Can you describe for the court and jury what
14    happens in this part of the exam?
15 A  Again, that's where I -- where I -- you know,
16    I'm taking note of how they -- what their gait
17    is, do I see any gross abnormalities, their
18    arms, missing limbs, fingers, toes, that type
19    of thing.  And, you know, I don't require them
20    to lift anything, but, you know, I typically
21    ask them, could you do -- can you do these
22    type of things.
23 Q  Okay.  And what was your -- what was your
24    findings as a result of this portion of the
25    exam?

Page 34

1  A  He appeared grossly normal.
2  Q  Okay.  It says here, where my cursor is, that
3     the applicant has the physical strength,
4     agility, and flexibility to perform all of the
5     items listed in the instruction table that
6     comes with this form; is that correct?
7  A  That is correct.
8  Q  All right.  And ultimately, based on your
9     physical examination and the representations
10    that were made to you by Captain Flora, you
11    found that he was healthy and fit for duty?
12 A  That is correct.
13 Q  All right.  Now, ultimately, both you and
14    Captain Flora have to sign certain
15    declarations for the Department of Homeland
16    Security when this document is executed; is
17    that correct?
18 A  That is correct.
19 Q  All right.  Let's go down and focus on section
20    number X.  This is where Captain Flora has to
21    make those declarations; is that correct?
22 A  That's correct.
23 Q  Can you read for the jury what Captain Flora
24    signed?
25 A  My signature below attests, subject to

Page 35

1     prosecution under 18 USC 1001, that all
2     information provided by me on this form is
3     complete and true to the best of my knowledge,
4     and I agree that it is to be considered part
5     of the basis for issuance of any measurable
6     certificate to me.  I have not knowingly
7     omitted any material information relevant to
8     this form.  I have also read and understand
9     the Privacy Act statement that accompanies
10    this form.
11 Q  Okay.  And what date did he sign that, Doctor?
12 A  On 12/11/17.
13 Q  Based on this examination, you clear Captain
14    Flora for the medical certificate that is a
15    requirement for his job at Smith Maritime; is
16    that correct?
17 A  Yes.
18 Q  And, Doctor, if Captain Flora had told you
19    about any active and ongoing problems that he
20    was having that could have affected his
21    ability to do his job consistent with the
22    medical certificate, you would have identified
23    that on those forms?
24 A  I would have.
25    MR. SHEPPARD:

Page 36

1     Object to form.
2  MR. MECHE:
3  Q  Is that correct, Doctor?
4  A  Yes, that is correct.
5  Q  And that -- that could have determined one way
6     or another whether the medical certificate was
7     actually issued, correct?
8  A  That would -- that --
9     MR. SHEPPARD:
10       Object to form.
11 A  -- would impact it.
12 MR. MECHE:
13 Q  Now, we've -- we've talked a lot about what
14    Captain Flora did or didn't disclose to you.
15    But my next question is a little different.
16       In terms of your own physical examination
17    of Captain Flora, did you find any physical
18    limitations or impairments of any kind?
19 A  I did not.
20 Q  All right.
21    MR. MECHE:
22       Doctor, I may have a few more
23    questions for you after the other lawyers
24    ask theirs.  But as for as now, I'll just
25    go ahead and pass the witness.  Thank you

Page 37

```
 1       for your time, sir.
 2             MR. SHEPPARD:
 3                Do you have anything right now?
 4             MS. SANDOVAL:
 5                No, we'll reserve our questions.
 6             MR. SHEPPARD:
 7                Okay.  I'll jump in.
 8                   EXAMINATION
 9   BY MR. SHEPPARD:
10   Q   Dr. Platt, I would like to go back to this
11       little form that we've been talking about for
12       a little while here.
13            I'm sorry, I'm scrolling through the
14       pages now.  Okay.
15            All right.  I know you have this in front
16       of you, sir -- actually, if you want to look
17       at the one in front of you, that's fine.  I'm
18       on section IIA.
19            Mr. Meche had talked about a few of these
20       numbers here, specifically 29.  I kind of want
21       to start there.  It says, back pain, joint
22       problems, and orthopedic surgery, right?
23   A   Correct.
24   Q   Does it say -- it doesn't say shoulder in
25       there, does it?
```

Page 38

```
 1   A   It does not say shoulder.  It says joint, in
 2       general.
 3   Q   Right.
 4            Could a person not consider their
 5       shoulder a joint if they're just not as well
 6       versed in the medical vernacular?  Is that --
 7   A   I mean, I guess that they could -- they could
 8       potentially consider that not a joint.  But I
 9       mean, I don't know what they consider joints
10       then.
11   Q   Right.
12            I sometimes think of joints as like
13       fingers and toes.  Does that make sense?
14       Maybe an elbow.
15   A   I don't know.  You know, I'm a physician, so I
16       think of a joint as a joint, you know.
17   Q   Right.
18            Do you think lay -- lay people aren't
19       going to necessarily think of things the same
20       way as you are, as a Doctor, right?
21   A   They -- they may not.
22   Q   Okay.
23   A   But, I mean, people -- people are used to
24       talking about, you know, knee surgery, hip
25       surgery, and shoulder surgery, those are
```

Page 39

```
 1       probably the most common surgeries.
 2   Q   Right.
 3   A   And they're all joint surgeries, of course.
 4   Q   And looking at back pain, joint problems, and
 5       orthopedic surgery, that's -- that's pretty
 6       general and vague, right?
 7   A   It's very general.
 8             MR. MECHE:
 9                Object to the form.
10   MR. SHEPPARD:
11   Q   Okay.  The form could be more specific if they
12       wanted to, they could say things like neck
13       pain, shoulder pain, you know, cervical pain,
14       things like that, right?
15             MS. SANDOVAL:
16                Form.
17   A   I mean, they could clearly do that, you know,
18       you can -- you can -- yeah -- yes.
19   MR. SHEPPARD:
20   Q   I'm just saying that the categories could be
21       worded a little better; is that fair?
22   A   Yes, they could make the form a lot longer.
23   Q   True.
24            You completed section VI of this form,
25       correct?
```

Page 40

```
 1   A   I did.
 2   Q   Okay.  And section VI has you looking at
 3       certain things.  I want to look at number 10,
 4       skin, normal.  What do you do to determine --
 5       to test that particular category?
 6   A   That's strictly observation there.
 7   Q   Okay.  Do you ask a person to remove their
 8       shirt, or pants, or anything like that to
 9       see if there's anything wrong?
10   A   We don't -- I don't make them take the pants
11       off, no.
12   Q   Okay.  Because I'll represent to you that
13       Mr. Flora has a -- got a scar on his shoulder
14       from when this incident occurred.  If he had
15       taken his shirt off, you would have noticed
16       that as well, right?
17   A   I probably would have --
18             MR. MECHE:
19                Objection.  Form.  Mischaracterizes
20       the evidence.
21             MS. SANDOVAL:
22                Same objection.
23   MR. SHEPPARD:
24   Q   If Mr. Flora had removed his shirt and you'd
25       seen a scar on his shoulder, would you have
```

10 (Pages 37 to 40)

Page 41

1    taken note of that?
2  A  I would have probably documented that.
3  Q  Okay.  Would you have asked, where did that
4    come from?
5  A  I would have.
6  Q  Okay.  Do you consider yourself Mr. Flora's
7    treating physician?
8  A  No.
9  Q  Okay.  Prior to today, were you aware that
10   Mr. Flora was struck by a headache ball on his
11   shoulder around May of 2017?
12 A  I was not.
13 Q  Okay.  Were you aware that Mr. Flora was
14   diagnosed with a micro trabecular fracture?
15 A  I was not.
16 Q  Okay.  Well, do you know what a micro
17   trabecular fracture is?
18 A  I'm not all that familiar.  It sounds like,
19   you know, a small fracture of a portion of
20   the -- where the tendons attach to the
21   shoulder.
22 Q  Okay.  Were you aware that Mr. Flora had a
23   scar over the superior aspect of his left
24   shoulder where the headache ball impacted his
25   shoulder?

Page 42

1  A  I was not.
2  Q  As part of your examination, did you perform
3    any tests to see if Mr. Flora had a micro
4    trabecular fracture near his AC joint?
5  A  No.
6  Q  Okay.  Did you order an MRI?
7  A  No.
8  Q  Did you know that Mr. Flora received a
9    cortisone injection in his shoulder area on
10   June 27, 2018?
11 A  No, I was not aware of that.
12 Q  Okay.  On this, where you've kind of checked
13   the boxes of -- sort of the tests that you had
14   done, we talked about upper, lower
15   extremities, and spine, musculoskeletal.  The
16   kind of two tests that I remember you saying
17   was you had the person bend over and try to
18   touch their toes, and then to put their arms
19   out, and then also --
20 A  Right --
21 Q  -- and put their hands to their nose.
22 A  -- while leaning backwards, yes.
23 Q  Okay.  Did you perform an O'Brien's test?
24 A  I did not.
25    MR. MECHE:

Page 43

1    Objection, form.
2  MR. SHEPPARD:
3  Q  Did you perform a Hawkins test?
4  A  No, I did not.
5    MR. MECHE:
6      Objection.
7    MS. SANDOVAL:
8      Form.
9  MR. SHEPPARD:
10     Okay.  What's the basis of the
11   objection?
12   MR. MECHE:
13     Lack of foundation.
14 MR. SHEPPARD:
15 Q  Okay.  Do you know what a Hawkins -- do you
16   know what a Hawkins test is?
17   MR. MECHE:
18     Personal foundation.
19 A  I believe that -- we also call it an empty can
20   test where you put your fingers down, tilt
21   your -- tilt your thumbs down, and put
22   pressure on your shoulder, I believe.
23 MR. SHEPPARD:
24 Q  Okay.  And do you know what the purpose of
25   performing that test is?

Page 44

1  A  It's a rotator cuff test.
2  Q  Okay.  And that was the O'Brien's test, right?
3  A  Yes.  I'm not sure which is which, I call it
4    the empty can test.
5  Q  Okay.  Then there's the Hawkins test, right?
6  A  But I'm not an orthopedic surgeon, so I don't
7    really get into that.
8  Q  Okay.  That's fair.
9      You didn't perform either of those tests,
10   right?
11 A  I did not, no.
12 Q  Okay.  I know you haven't seen them, but do
13   you have any criticisms of the opinions that
14   Mr. Flora's treating physicians have offered
15   in this case?
16   MR. MECHE:
17     Objection.  Form.  Lack of personal
18   knowledge.
19   MS. SANDOVAL:
20     Form.
21 MR. SHEPPARD:
22 Q  Okay.  Do you know Dr. Harvey?
23 A  I do not.
24 Q  Do you know Dr. Andrew Lee?
25 A  I do not.

11 (Pages 41 to 44)

Page 45

1  Q  Do you know Dr. Michael Roberts?
2  A  I do not.
3  Q  Okay. So would it be fair to say that you
4     don't have any basis to criticize the opinions
5     that they've made in this case?
6  A  Yes, I have no basis to criticize or support.
7  Q  Okay. You're not making an opinion as to the
8     causation of the injuries Mr. Flora alleges he
9     sustained when a headache ball hit his
10    shoulder, are you?
11 A  Absolutely not.
12 Q  Okay. When you -- when we were going towards
13    this last page of the -- of this form, it
14    talks about demonstration of physical ability.
15    Did you -- you didn't actually require
16    Mr. Flora to perform any physical tasks, aside
17    from those --
18 A  Right. No.
19 Q  -- those exams we talked about earlier, right?
20 A  I didn't require him to lift any weights or
21    anything like that.
22 Q  Okay. If Mr. Flora's treating physicians have
23    opined that Mr. Flora suffered an injury to
24    his shoulder as a result of the incident
25    involving the headache ball, do you have any

Page 46

1     reason to dispute that?
2  A  I have no reason.
3  Q  Okay. I'll represent to you that Mr. Flora's
4     treating physician, Gregory Harvey, testified
5     that he found an impingement sign when
6     examining Mr. Flora's shoulder.
7        If Mr. Flora's treating physicians
8     testified that they performed tests that
9     indicate Mr. Flora had tenderness in his
10    shoulder and impingement signs, do you have
11    any reason to dispute that?
12 A  I do not.
13    MR. MECHE:
14       Object to form. Lack of personal
15    knowledge. Lack of foundation.
16 MR. SHEPPARD:
17 Q  You can -- could you answer the question
18    again, sir?
19 A  No, I don't have any reason to because I
20    really don't know, you know, what they've
21    done.
22 Q  Okay. If Mr. Flora testifies that he's been
23    pain since the incident, do you have any
24    reason to dispute that?
25 A  Well, he didn't tell me he was having pain.

Page 47

1  Q  Right.
2  A  He denied anything that -- that anything was
3     wrong.
4  Q  Okay. If he's saying -- if he's saying he's
5     in pain now, do you have any reason to dispute
6     that?
7  A  No.
8  Q  Okay. Would you agree that sometimes people
9     that are desperate to get back to work kind of
10    minimize their issues?
11    MS. SANDOVAL:
12       Form.
13    MR. MECHE:
14       Form.
15 A  Do you want me to answer that still?
16 MR. SHEPPARD:
17 Q  Yes, sir.
18 A  I mean, I think, you know, the people give me
19    fraudulent advice, advice that is not true, I
20    think I get that -- told that frequently, in
21    workmen's comp -- compensation situations I
22    do. Return-to-work situations, if somebody
23    wants to return to work, sometimes they'll
24    minimize their findings as well.
25 Q  Okay. So --

Page 48

1  A  You see it in both directions.
2  Q  Right.
3        If a person -- if a person is hurt and
4     they want to get back to work, in your
5     experience in what you've done, do sometimes
6     they minimize their issues so that they can
7     get back to work?
8  A  Yes.
9     MR. SHEPPARD:
10       All right. I can pass the witness.
11    MR. MECHE:
12       I have a few more, if nobody else
13    does.
14       Do you -- do you have any questions?
15    MS. SANDOVAL:
16       No, go ahead.
17       RE-EXAMINATION
18 BY MR. MECHE:
19 Q  Okay. Just a few follow-up questions,
20    Dr. Platt.
21       You were asked a bunch of questions about
22    orthopedic tests and whether you had done
23    those tests or accomplished those tests. Do
24    you remember that question -- those lines of
25    questioning?

12 (Pages 45 to 48)

Page 49

1  A   I do.
2  Q   Did anybody ask you to perform orthopedic
3      tests on Captain Flora?
4  A   No.  Again, I stated at the beginning that if
5      somebody says they have an issue with their
6      shoulder or an issue -- I would do more -- a
7      little more thorough exam of that area.
8  Q   So if Captain Flora didn't tell you about any
9      pain, limitation problem, or injury to his
10     shoulder, why would you order those tests?
11 A   Again, I wouldn't order the tests, and I
12     wouldn't perform those tests necessarily,
13     unless there was a reason.
14 Q   And he didn't give you a reason, did he?
15 A   No.
16         MR. SHEPPARD:
17             Object to form.
18 MR. MECHE:
19 Q   If Captain Flora had an injury so severe as
20     what has been described in his lawsuit or that
21     provided some sort of scar that's been
22     described for you today, do you think he could
23     have disclosed that to you when you saw him?
24         MR. SHEPPARD:
25             Object to form.

Page 50

1  A   I mean, the form asks you to do that.
2  MR. MECHE:
3  Q   Okay.  Did he tell you he had a scar?
4  A   He did not.
5  Q   Okay.  Did he tell you he had any problems
6      lifting anything?
7  A   He did not.
8          MR. SHEPPARD:
9              Object to form.
10 MR. MECHE:
11 Q   You were asked some questions about whether
12     Captain Flora might have minimized his
13     condition so that he could go to work.  Do you
14     remember those questions?
15 A   I do.
16 Q   If he is able to misrepresent his condition to
17     you, could he do that to the jury?
18         MR. SHEPPARD:
19             Object to form.
20 A   I think -- like I said previously -- and I
21     don't know Captain Flora, so I can't comment
22     on Captain Flora himself.  I can say, in
23     general, people can either overexaggerate or
24     underexaggerate depending on what -- what
25     they're looking to do.

Page 51

1  MR. MECHE:
2  Q   All right.  And you haven't seen any of the
3      medical opinions from any other doctor in this
4      case?
5  A   I have not.
6          MR. SHEPPARD:
7              Object.
8  MR. MECHE:
9  Q   And you haven't seen the testimony of any of
10     those doctors either?
11 A   I have not.
12 Q   All right.
13         MR. MECHE:
14             Those are all the questions that I
15     have for you, Dr. Platt.  Thank you very
16     much, sir.
17         VIDEOGRAPHER:
18             Are we done?
19         MS. SANDOVAL:
20             Actually, Dr. Platt, I have two
21     questions for you.
22             EXAMINATION
23 BY MS. SANDOVAL:
24 Q   Dr. Platt, my name is Liz Sandoval.  I
25     represent one of the other defendants in this

Page 52

1      lawsuit, and I just have a few quick questions
2      for you, if you don't mind.
3          Earlier you testified as to a type of
4      test that you do where you have the patient
5      kind of lean back and touch their nose.
6  A   Romberg.
7  Q   I'm sorry?
8  A   Romberg test is what we typically call it.
9  Q   That was the -- that was my next question.  I
10     missed it the first time.  Okay.
11         All right.  And so when -- when a patient
12     comes in and does that, so they -- you kind of
13     showed us; they lean back, and do they stretch
14     their arms out all the way to the side?
15 A   Yes.
16 Q   And they bring them back and touch their nose,
17     correct?
18 A   Correct.
19 Q   Okay.  Based on your recollection, or on any
20     of the notes on your document here, did
21     Captain Flora appear to have any sort of
22     problems with his shoulder or -- one second,
23     let me finish so we have a clear record.
24         Any problems with that -- that test when
25     it came to stretching his arms out, and then

13 (Pages 49 to 52)

Page 53

1  bringing his fingers back to his nose?
2  A   He did not appear to have any problems.
3  Q   Okay.
4       MS. SANDOVAL:
5           Okay.  Thank you, Doctor.  That's
6       all I have.  I pass the witness.
7              RE-EXAMINATION
8  BY MR. SHEPPARD?
9  Q   Question on the Romberg test, Doctor.  Would
10     that show impingement in the shoulder?
11 A   I don't -- it's not designed specifically
12     because you're not rotating the shoulder
13     inwards.
14 Q   Okay.  What's the purpose of the Romberg test?
15 A   It's, Again, to look at -- look at the rotator
16     cuff there, where it's getting caught.
17 Q   Okay.
18      MR. MECHE:
19          Doctor, before -- before we go
20      off -- I'm sorry, Daniel, are you done?
21      MR. SHEPPARD:
22          I might have another one or two.
23      I'm just -- I'm just looking at my notes
24      really quickly.
25          I think I'm got.

Page 54

1       MR. MECHE:
2           Okay.  Dr. Platt, you've probably
3       done this hundreds of times, but you have
4       the right to read and sign your
5       deposition testimony, or you can waive
6       that right.  What would you like to do,
7       sir?
8       THE WITNESS:
9           I'll be glad to waive that.
10      MR. MECHE:
11          Okay.  I'm going to contact your
12      office manager to get a copy of your CV.
13      Who do I call?
14      THE WITNESS:
15          Jeremy Love.
16      MR. MECHE:
17          And what's the number?
18      THE WITNESS:
19          (904) 284-4510.
20      MR. MECHE:
21          That's all, Doctor.  Thank you very
22      much, sir.
23      THE WITNESS:
24          Thank you all very much.
25      VIDEOGRAPHER:

Page 55

1       That marks the end of the deposition
2   in video file 1.  Off the record at
3   approximately 2:15 p.m.
4       (DEPOSITION CONCLUDED AT 2:15 P.M.)

Page 56

1              REPORTER'S PAGE
2
3       I, Debbie G. Chaney, Certified Court Reporter
4   in and for the State of Louisiana, (CCR #90023), as
5   defined in Rule 28 of the Federal Rules of Civil
6   Procedure and/or Article 1434 (B) of the Louisiana
7   Code of Civil Procedure, do hereby state on the
8   Record:
9       That due to the interaction in the spontaneous
10  discourse of this proceeding, dashes (--) have been
11  used to indicate pauses, changes in thought, and/or
12  talkovers; that same is the proper method for a
13  Court Reporter's transcription of proceeding, and
14  that the dashes (--) do not indicate that words or
15  phrases have been left out of this transcript;
16      That any spelling of words and/or names which
17  could not be verified through reference material
18  have been denoted with the phrase "(phonetic)";
19      That "[sic]" denotes when a witness stated a
20  word or phrase that appears odd or erroneous to
21  show that it was quoted exactly as it stands.
22
23          DEBBIE G. CHANEY, CCR
24
25

14 (Pages 53 to 56)

```
                                                              Page 57

 1                       CERTIFICATE
 2
            This certification is valid only for a
 3     transcript accompanied by my original signature and
       original required seal on this page.
 4
 5         I, Debbie G. Chaney, Certified Court Reporter,
       in and for the State of Louisiana, as the officer
 6     before whom this testimony was taken, do hereby
       certify that GEORGE E. PLATT, M.D., after having
 7     been duly sworn by me upon authority of R.S.
       37:2554, did testify as hereinbefore set forth in
 8     the foregoing fifty-five (55) pages; that this
       testimony was reported by me in the stenotype
 9     reporting method, was prepared and transcribed by
       me or under my personal direction and supervision,
10     and is a true and correct transcript to the best of
       my ability and understanding; that the transcript
11     has been prepared in compliance with transcript
       format guidelines required by statute or by rules
12     of the board;
           That I am informed about the complete
13     arrangement, financial or otherwise, with the
       person or entity making arrangements for deposition
14     services; that I have acted in compliance with the
       prohibition on contractual relationships, as
15     defined by Louisiana Code of Civil Procedure
       Article 1434 and in rules and advisory opinions of
16     the board; that I have no actual knowledge of any
       prohibited employment or contractual relationship,
17     direct or indirect, between a court reporting firm
       and any party litigant in this matter, nor is there
18     any such relationship between myself and a party
       litigant in this matter.
19         That I am not related to counsel or to the
       parties herein, nor am I otherwise interested in
20     the outcome of this matter.
           This the 30th day of September, 2021 at
21     LAFAYETTE, LOUISIANA.
22
             _____
23              DEBBIE GIDDINGS CHANEY, CCR
              LOUISIANA CERTIFICATION NO. 90023
24
25
```

Electronically signed by Debbie Chaney (201-173-885-4286)    5c97eaa5-1ad9-4f32-b342-1e516996f80d